# Exhibit A

EFiled:  May 10 2024 03:41PM EDT
Transaction ID 73026023
Case No. N24C-05-105 VLM

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GENERAL CABLE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No._____ (CCLD) |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTTSDALE INDEMNITY COMPANY, | ) | **TRIAL BY JURY OF TWELVE** |
| | ) | **DEMANDED** |
| Defendant. | ) | |
| | ) | |

## SUMMONS

**THE STATE OF DELAWARE,**

**TO THE KENT COUNTY SHERIFF'S DEPARTMENT**

**YOU ARE COMMANDED:**

1.    To summon the above-named defendant, SCOTTSDALE INDEMNITY COMPANY ("Defendant"), so that within twenty (20) days after service hereof upon Defendant, exclusive of the day of service, Defendant shall serve upon Adam V. Orlacchio, Esquire, Plaintiff's attorney, whose address is Blank Rome LLP, 1201 N. Market St., Suite 800, Wilmington, Delaware 19801, an answer to the Complaint (and, if an affidavit of demand has been filed, an affidavit of defense).

2.    To serve upon Defendant two (2) copies of this Summons an two (2) copies of this Complaint pursuant to 18 *Del. C.* § 525 (and of the affidavit of demand if any has been filed by Plaintiff).

Dated: 5 29 24

COLLEEN REDMOND
*Prothonotary*

*Per Deputy*

1

**SCOTTSDALE INDEMNITY COMPANY, DEFENDANT**

**TO THE ABOVE-NAMED DEFENDANT:**

In case of your failure, within twenty (20) days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an answer to the Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

COLLEEN REDMOND
*Prothonotary*

*Per Deputy*

2

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| GENERAL CABLE CORPORATION,<br><br>       Plaintiff,<br><br>       v.<br><br>SCOTTSDALE INDEMNITY COMPANY,<br><br>       Defendant. | )<br>)<br>)  C.A. No._____ (CCLD)<br>)<br>)<br>)<br>)  **TRIAL BY JURY OF TWELVE**<br>)  **DEMANDED**<br>)<br>) |

## COMPLAINT

NOW COMES Plaintiff General Cable Corporation ("General Cable"), on behalf of itself, its predecessors, subsidiaries and successors, by and through its undersigned attorneys, and for its Complaint against Scottsdale Indemnity Company ("Nationwide"), states as follows:

## NATURE OF THE CASE

1.      This is an action for declaratory judgment and anticipatory breach of contract arising out of Nationwide's unwarranted refusal to acknowledge coverage to General Cable under Excess Insurance Policies (the "Nationwide Policies"), for which General Cable paid substantial premiums, for the costs General Cable has paid and/or incurred, and will continue to pay and incur in defending against and responding to private investigations commenced by the Securities and Exchange Commission (the "SEC") against General Cable for the policy period November 1, 2011 to November 30, 2012 General Cable was insured by a primary Directors,

Officers, and Organizational Liability Policy, issued by Travelers Casualty and Surety Company of America ("Travelers") bearing policy number 105518156 (the "2011 Travelers Policy").

## THE PARTIES

2.     Plaintiff General Cable Corporation ("General Cable"), a manufacturer and distributor of wires and cables used in industrial applications, is a Delaware Corporation with corporate headquarters in Highland Heights, Kentucky.

3.     Upon information and belief, Defendant Scottsdale Indemnity Company ("Nationwide"), an insurance company, is an Ohio Corporation licensed to do business in Delaware.

## <u>JURISDICTION</u>

4.     This Court has personal jurisdiction over Nationwide pursuant to 10 *Del. C.* § 3104(c) because, upon information and belief, Nationwide is licensed to do business and does transact business in the State of Delaware. Moreover, Nationwide issued one or more D&O insurance policies to General Cable, a Delaware corporation, at the time of issuance of the insurance policy, and thereby insured the covered risks of Delaware citizens, including those risks arising under Delaware law, including, for example, alleged breaches of fiduciary duties.

5.     This Court has subject matter jurisdiction over this dispute pursuant to 10 *Del. C.* § 541.

6.    Pursuant to the Superior Court's Complex Commercial Litigation Division ("CCLD") guidance, and given that this matter has "in controversy $1,000,000 or more," this matter is being filed in the CCLD.

## FACTUAL BACKGROUND

7.    The 2011 Travelers Policy provided a $15 million limit of liability excess to a $750,000 self-insured retention, including defense costs. A true and correct copy of the 2011 Travelers Policy is attached as **Exhibit A**.

8.    For the same November 1, 2011 to November 30, 2012 policy period as the 2011 Travelers Policy, General Cable was insured by a first layer excess policy issued by Old Republic Insurance Company ("Old Republic") providing a $10 million limit of liability immediately excess of the 2011 Travelers Policy (the "2011 Old Republic Policy"). A true and correct copy of the 2011 Old Republic Policy is attached as **Exhibit B**.

9.    For the same November 1, 2011 to November 30, 2012 policy period as the 2011 Travelers Policy and the 2011 Old Republic Policy, Nationwide sold General Cable an Excess Insurance Policy (No. XMI1200611) ("2011 Nationwide Policy"). The 2011 Nationwide Policy provides a $10 million limit of liability immediately excess of the 2011 Old Republic Policy. A true and correct copy of the 2011 Nationwide Policy is attached as **Exhibit C**.

3

10.    The 2011 Nationwide Policy's insuring agreement states that Nationwide "shall provide [General Cable] with insurance coverage excess of the Underlying Policies" and that the "Policy shall apply in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the Followed Policy." Exhibit C, Section 1. Insuring Agreement.

11.    The 2011 Nationwide Policy defines the "Followed Policy" as the 2011 Travelers Policy. *See* Exhibit C, Section II. Definitions, F and Declarations, Item 4.

12.    The 2011 Travelers Policy's insuring agreements obligate Travelers (and, therefore, Nationwide) to reimburse General Cable for Loss (as that term is defined in the Policy) as follows:

**A.    ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** of any **Insured Person** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**B.    ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay for any **Securities Claim** first made against the **Insured Organization** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

Exhibit A, Section I.A, I.B. (Emphases in the original).

4

13.   "Wrongful Act" is defined by the 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) in relevant part as "any actual or alleged . . . error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted . . . by any Insured Person in their capacity as such . . . ; or with respect to Insuring Agreement C, by the Insured Organization." *See* Exhibit A, Section III. Definitions, EE.

14.   The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Securities Claim," in pertinent part, as "any **Claim**, in whole or in part, that is . . . based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization . . .** including any such **Claim** brought by the SEC or any other claimant." *See* Exhibit A, Section III. Definitions, Z.

15.   By an endorsement entitled "Claim Definition Endorsement – Add Mediation Coverage and Co-Defendant Entity Coverage for Administrative and Regulatory Proceedings," (the "Revised Claim Definition Endorsement") the 2011 Travelers Policy's (and, therefore, the 2011 Nationwide Policy's) definition of Claim includes:

> a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any Insured Person, *or against any Insured Organization, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an Insured Person and the Insured Organization,* and commenced by

the receipt of a: . . . notice of filed charges, investigative order, or similar document.

*See* Exhibit A at 45 of 47 (Emphasis added).

16.     The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Insured Person" to include General Cable's past or present officers as follows: "any natural person who was, is, or becomes a duly elected or appointed director, officer, Manager, or in-house general counsel of the Insured Organization, or any functional equivalent position . . . ." Exhibit A, Section III. Definitions, N.

17.     The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Loss" in pertinent part to include "damages, judgments, settlements, pre-judgment and post-judgment interest, . . . and Defense Expenses." Exhibit A, Section III. Definitions, Q. "Defense Expenses" are in turn defined in relevant part as "the reasonable costs, charges, fees (including attorneys', experts', mediators', or arbitrators' fees), and expenses . . . incurred in defending a Claim covered by Insuring Agreements A, B, C, or E, and the premium for appeal, attachment, or similar bonds." Exhibit A, Section III. Definitions, D.

18.     The 2011 Nationwide Policy provides that in the event the limits of 2011 Travelers Policy and 2011 Old Republic Policy are reduced by reason of actual payment by Travelers and Old Republic, the 2011 Nationwide Policy "shall continue to apply as excess over the reduced Underlying Limits." Exhibit C, Section IV. Reduction or Exhaustion of Underlying Limits, A.

C.      **General Cable's 2012-2016 Insurance Tower**

19.     Upon expiration, the 2011-2012 policies were renewed for a new policy year, from 2012 to 2013, on substantially the same terms as the 2011-12 policies (the "2012 Tower" and, with respect to the individual policies, the "2012 Travelers Policy," the "2012 Old Republic Policy" and the "2012 Nationwide Policy"). True and correct copies of the 2012 policies are attached as **Exhibits D, E, and F**, respectively.

20.     In 2013, rather than being renewed at expiration, the policy period of the 2012 policies was extended for an additional year. After that, the period was extended for the next two years, such that the policies that incepted in 2012 did not expire until 2016.

21.     For purposes here, the only material difference between policies in the 2011 Tower and the 2012 Tower are that, effective in November 1, 2014, (1) the definition of Claim with respect to a "formal civil administrative or formal civil regulatory proceeding" or "formal civil investigation" was modified; and (2) the applicable retention for non-M&A Claims increased from $750,000 to $1,500,000.

D.      **The Accounting Matters**

22.     In or about October 2012, General Cable provided its insurers in its directors and officers insurance program, including Travelers, Old Republic, and Nationwide, with a Notice of Circumstances that could give rise to a "Claim(s)," as

7

that term is defined under the relevant policies (the "2012 Notice of Circumstances").

23.     As set forth in that correspondence, the circumstances concerned General Cable's subsidiary, Phelps Dodge International Brasil Ltda. Corporation ("PDIB"), and a possible discrepancy between PDIB's actual inventory book value and the inventory valuation reflected in its inventory management systems and financial accounting records.

24.     Travelers responded to General Cable's notice on October 18, 2012. Travelers agreed to "accept the information" "as a written Notice of a Potential Claim by either the Insured's shareholders and/or governmental regulatory agencies alleging breaches of fiduciary duties or violations of statutes, regulations or other laws against Insured(s) in connection with a restatement of the financials of PDIB and/or General Cable caused by material inventory valuation misstatements at PDIB[.]" *See* **Exhibit G**, Travelers Oct. 18, 2012 Letter.

25.     After Travelers' acceptance of the 2012 Notice of Circumstances, General Cable became the target of a Securities and Exchange Commission ("SEC") investigation and certain lawsuits alleging wrongdoing in connection with the circumstances described in General Cable's 2012 Notice of Circumstances (the "Accounting Matters").

8

26.     First, on July 15, 2013, the SEC issued a formal Order Directing Private Investigation and Designating Officers to Take Testimony, captioned as *In the Matter of General Cable Corp.*, HO-11998 (the "Formal Order"; the investigation initially authorized by the Formal Order is herein referred to as the "Accounting Investigation"). The Formal Order authorized investigation into earnings management, inventory classification, and bill and hold sales in General Cable's Rest of the World segment and related to the circumstances described in General Cable's 2012 Notice of Circumstances.

27.     General Cable notified its D&O insurers, including Nationwide, of the Formal Order shortly after its issuance, and on September 19, 2013, General Cable provided Travelers with a further Notice of Circumstances. By that correspondence, General Cable advised that its management recently had become aware of possible inaccuracies in past accounting for certain transactions at General Cable's subsidiary, Phelps Dodge International Corporation, and certain affiliates of Phelps Dodge International Corporation in Latin America, and in particular, PDIB. *See* **Exhibit H**, General Cable Sept. 19, 2013 Letter. As a result of the accounting discrepancies, in October 2013, General Cable publicly announced its intention to restate its financial statements and provided Travelers with notice of the same. *See* **Exhibit I**.

28.     Following General Cable's public statement, on October 17, 2013, the SEC served General Cable with a subpoena ordering General Cable to produce documents and related information in connection with its investigation into the accounting issues (the "Accounting Subpoena").

29.     General Cable was also named as a defendant in four civil lawsuits, including two securities class actions and two derivative actions, filed in 2013 and 2014 in New York and Kentucky in connection with the inventory accounting issues (the "Accounting Lawsuits").

30.     The two securities class actions were styled as (i) *Satish Doshi v. General Cable Corporation, et al.*, (the "*Doshi I*" action), filed in the United States District Court for the Southern District of New York on October 21, 2013; and (ii) *City of Livonia Employees' Retirement System v. General Cable Corporation, Gregory B. Kenny, and Brian J. Robinson*, filed in the Southern District of New York (the "*City of Livonia*" action). The *Doshi I* and *City of Livonia* actions alleged substantially similar facts and circumstances, and on January 17, 2013, the Southern District of New York consolidated those actions. On February 5, 2014, the consolidated action was transferred to the Eastern District of Kentucky.

31.     The two derivative lawsuits were styled as (i) *Kenneth McPherson v. Gregory B. Kenny et al.*, Case No. 14-CI-011, filed in the Circuit Court of Kentucky, Division I (the "McPherson Complaint"); and (ii) *David G. Kelly v. Gregory B.*

10

*Kenny et al.*, Case No. 14-CI-060, also filed in the Circuit Court of Kentucky, Division No. I (the "Kelly Complaint"). The Kelly Complaint was nearly identical to the McPherson Complaint, and, at or around the same time it was filed, the McPherson Complaint was dismissed.

32.     General Cable provided its insurers, including Nationwide, with timely notice and copies of the Accounting Subpoena and Accounting Lawsuits, and sought coverage for those matters.

33.     General Cable incurred substantial covered defense costs in responding to and defending against the Formal Order, the Accounting Subpoena and Accounting Lawsuits.  .

34.     In addition to the Accounting Lawsuits, pursuant to the authority of the Formal Order, the SEC issued subpoenas to several individuals, including Mathias Francisco Sandoval Herrera ("Sandoval") and Maria D. Cidre ("Cidre"), who were the then Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, of the Latin American operations of General Cable (including in Brazil). Both were afforded coverage from Travelers, and later Old Republic, in connection with the Accounting Matters.

35.     In addition to Sandoval and Cidre, in 2014, the SEC also subpoenaed several other individual Insureds, for whom General Cable advanced defense costs, and for which Travelers provided coverage to General Cable.

11

E.     **Travelers Coverage Position and the 2014 Settlement of the Accounting Matters**

36.     Travelers responded to General Cable's request for coverage for the Formal Order and the Accounting Lawsuits in February 2014.

37.     By that correspondence, Travelers acknowledged that the 2011 Travelers Policy governed because the Accounting Matters related back to the 2012 Notice of Circumstances.  In so doing, Travelers noted that the matters emanated "from the same facts and circumstances" as those set out in the 2012 Notice of Circumstances because they each concerned "alleged misstatements and misrepresentations regarding accounting errors in Brazil[.]" *See* **Exhibit J**, Travelers Feb. 18, 2014 Letter at 7.

38.     Travelers agreed, subject to a reservation of rights, to reimburse General Cable's Defense Expenses incurred in defending against the Accounting Lawsuits.

39.     Although Travelers initially denied coverage for the Formal Order, the parties ultimately reached an agreement that resolved coverage for General Cable's Losses in responding to the Formal Order (the "2014 Settlement").  Further to the 2014 Settlement, Travelers agreed to pay a portion of General Cable's past and ongoing Defense Expenses in responding to the Accounting Investigation, as well as Defense Expenses General Cable had incurred in defending against the Litigations.

40.     The 2014 Settlement only related to the Accounting Investigation, not the FCPA Investigation, and coverage for General Cable's Loss resulting from the FCPA Investigation was neither sought nor afforded under the 2014 Settlement.

**F.     The FCPA Matters**

41.     As noted above, during the relevant time period, General Cable engaged in operations around the world.  As part of these worldwide operations, General Cable maintained separate geographic divisions which oversaw operations of its subsidiaries in the carrying out of General Cable's business, and maintained operations in three segments—North America, Europe & Mediterranean ("E&M,"), and Rest of World ("ROW").

42.     In September 2012, in the ordinary course of business, General Cable's Internal Audit Department performed an on-site audit of financial and operational processes and controls at General Cable Condel, Cabos de Energia e Telecomunicações, S.A. ("Condel"), an indirect subsidiary of General Cable located in Angola (the "Internal Audit").  Condel manufactured and sold General Cable's products primarily to entities owned by the Angolan government.  Condel's direct parent was General Cable Celcat, Energia e Telecomunicações, S.A. ("Celcat"), an indirect subsidiary of General Cable located in Portugal.  During the relevant time period, Celcat manufactured and sold General Cable's wire and cable products primarily in the E&M segment.

13

43.    Based on the Internal Audit and subsequent investigation efforts, General Cable determined that, despite its policies and procedures designed to ensure compliance with federal regulations, certain of its foreign subsidiaries, including those in Angola, Thailand, India, China, and Egypt, might have engaged in conduct that exposed General Cable to liability under the FCPA.

44.    General Cable promptly self-reported those potential FCPA violations to the SEC and the Department of Justice ("DOJ") in January 2014, after it had retained outside counsel to conduct an internal investigation.  As its investigation progressed, General Cable self-reported other potentially improper payments and regularly updated the SEC staff on its internal investigation.  In addition, General Cable likewise cooperated with the DOJ, which was working with the SEC in the investigation of the FCPA Matters.

45.    General Cable notified the Underlying Insurers and Nationwide of the investigation into the potential FCPA violations on June 13, 2014. *See* **Exhibit K**, General Cable June 13, 2014 Letter.

46.    In connection with the FCPA Investigation, the SEC issued two subpoenas to General Cable, dated August 8, 2014, and September 23, 2015, respectively, demanding the production of voluminous documents and other information relating the FCPA inquiry.

14

47.     In January 2016 the SEC also issued a subpoena to another insured individual executive , who in 2013 was a Senior Vice President of General Cable. That executive was not involved in the matters giving rise to the Accounting Investigation, but the SEC determined the executive had direct involvement in the FCPA Matters. General Cable provided timely notice to the Underlying Insurers and Nationwide of each of these subpoenas.

48.     In addition, two lawsuits emanated from the FCPA Investigation.

49.     One lawsuit was a securities class action styled as *Doshi v. General Cable Corp. et al.* (the "*Doshi II*" action) filed on January 5, 2017, in the Southern District of New York and later transferred to the Eastern District of Kentucky, the same venue for the prior *Doshi I* action. The *Doshi II* action was brought on behalf of a putative class of General Cable shareholders, and generally alleged that due to the "wrongful acts" that gave rise to the FCPA investigation and resulting settlement, the value of General Cable's shares declined precipitously, causing the plaintiffs losses for which they sought damages.

50.     The other lawsuit was filed in Delaware Chancery Court in March 2017 and styled as *Quackenbush v. General Cable Corporation* (the "*Quackenbush*" action). The *Quackenbush* action stemmed from an October 27, 2015 demand for inspection of books and records related to FCPA issues pursuant to 8 Del. C. §220

brought by Michael Quackenbush, a shareholder of General Cable (the "Quackenbush Section 220 Demand").

**G.      The 2016 SEC Settlement**

51.     On December 29, 2016, General Cable reached a settlement with the SEC with respect to the Accounting Investigation, and separately, the FCPA Investigation ("2016 SEC Settlement"). *See* **Exhibit L**, Dec. 29, 2016 SEC Press Release ("SEC Press Release") (announcing that General Cable "agreed to pay more than $75 million to resolve parallel SEC and U.S. Department of Justice investigations related to its violations of the FCPA. The company agreed to pay an additional $6.5 million to the SEC to settle *separate* accounting-related violations.") (emphasis added).

52.     First, with respect to the SEC's Accounting Investigation, General Cable agreed, pursuant to an order memorializing that settlement, to pay $6.5 million to the SEC to settle its accounting-related violations, while neither admitting nor denying the SEC's findings. *See id.*; *see also* **Exhibit M**, Dec. 29, 2016 Order (the "SEC Accounting Order").

53.     Second, with respect to the FCPA Investigation, General Cable agreed to pay the SEC nearly $55,000,000 pursuant to a separate order addressing the alleged FCPA violations. *See id.*; *see also* **Exhibit N**, Dec. 29, 2016 Order (the "SEC FCPA Order"), at § IV.B.

54.     Additionally, as also set forth in the SEC FCPA Order, General Cable entered into a non-prosecution agreement ("NPA") to settle the DOJ's parallel FCPA investigation.  As further noted in the SEC FCPA Order, the SEC refrained from imposing a civil penalty on General Cable, based in part on General Cable's agreement to pay nearly $20,500,000 pursuant to the NPA.

55.     Finally, the SEC entered a separate order against the insured individual executive directly involved in the FCPA (but not Accounting) Matters.  *See* **Exhibit O**, Dec. 29, 2016 Order.

## H.     The SEC's Action Against Sandoval and Cidre

56.     On January 24, 2017, in furtherance of the Accounting Investigation, the SEC brought an action against Sandoval, Cidre and another executive, and was originally captioned as *Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera and Maria D. Cidre et al.*, Civil Action No. 1:17-cv-20301-JAL (S.D. Fla.) (the "Sandoval Action").[1]

57.     The Sandoval Action alleged, among other things, that Sandoval and Cidre had concealed the inventory accounting errors in Brazil from General Cable's executive management.   The Sandoval Action complaint charged Sandoval and Cidre with violations of, among others, Section 17(a) of the Securities Act of 1933

---

[1]  A third executive, Jose Antonio Miranda Gonzalez, was also originally named in the Sandoval Action but pursuant to a consent judgment entered shortly after commencement of the Sandoval Action, the proceedings against Mr. Miranda were effectively discontinued.

and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as books and records and reporting violations.

58.    As part of the Sandoval Action, General Cable's outside counsel was subpoenaed, and the SEC sought and obtained General Cable's cooperation in responding to numerous document and other information requests.

59.    General Cable incurred substantial defense costs in such efforts and defending against the Sandoval Action subpoena.

60.    General Cable timely provided notice of the Sandoval Action Subpoena to the Underlying Insurers and Nationwide no later than October 5, 2017, when General Cable submitted initial invoices for its costs incurred in responding to the subpoena.

61.    The Sandoval Action was concluded on February 20, 2019, by way of the entry of final judgments on consent against both Sandoval and Cidre.  *See* **Exhibit P**, Feb. 21 SEC Press Release ("Sandoval Press Release").

I.    **The Accounting Losses Exhausted the Travelers 2011-12 Policy and Substantially Eroded the 2011-2012 Old Republic Policy**

62.    Net of the $750,000 retention under the 2011 Travelers Policy, General Cable paid more than $10,500,000 in Defense Expenses for the Accounting Matters. Such Defense Expenses included those incurred in connection with (i) the Accounting Investigation pursuant to the Formal Order, (including Defense Expenses for SEC subpoenas to Individual Insureds); and (ii) the Accounting

18

Lawsuits. Of this amount, Travelers reimbursed General Cable approximately $5,000,000.[2]

63.    In addition to reimbursing General Cable for a portion of its Loss for the Accounting Matters, as noted above, Travelers also agreed to provide coverage to Sandoval and Cidre in connection with the Accounting Matters, and on December 18, 2017, Travelers wrote to General Cable to advise that the $15,000,000 limit of Travelers' 2011-2012 Policy was "approaching exhaustion." **Exhibit Q**. According to Travelers, as of the date of its December, 2017 letter, it had paid $14,809,395.88 of its $15 million limit of liability.

64.    Travelers subsequently advised General Cable that its $15 million limit was fully exhausted, including in correspondence to General Cable dated March 26, 2018. *See* **Exhibit R**.

65.    In addition, as set forth in correspondence dated March 23, 2018 from counsel for Old Republic, Old Republic advised that on March 1, 2018, counsel for Travelers "advised Old Republic's counsel that 'Travelers ha[d] … processed its final payments under the [2011 Travelers Policy]'" and that with those payments the 2011 Travelers Policy was then exhausted.

---

[2] The $10,500,000 paid by General Cable includes $1,020,000 that General Cable paid for the Accounting Matters that remain outstanding.

66.    Old Republic acknowledged in that same March 23, 2018 letter that an additional approximately $2 million in Defense Expenses were then outstanding in connection with the Accounting Matters. *See* **Exhibit S**, March 23, 2018 Letter at 11 ("The currently outstanding costs of the ... Accounting Matters are invoices of Sandoval and Cidre's respective counsel that contain approximately $2 million in charges.") Old Republic's letter further stated that Old Republic would pay those outstanding invoices and future costs for the Accounting Matters, albeit subject to "a full reservation of all of its rights." *Id.*

67.    With respect to its "reservation of rights," Old Republic contended that the Losses for the FCPA Matters were unrelated to the Losses for the Accounting Matters and given the timing of the FCPA Matters, the coverage tower that was potentially responsive to the FCPA Matters was not the 2011-2012 Policy, but instead the subsequent 2012-2016 tower. Old Republic thus in turn contended that the amounts of any payments made by Travelers for the FCPA Matters under the 2011 Travelers policy did not erode the $15 million limit of the 2011-2012 Travelers Policy. *Id.* at 10-11.

68.    Though Old Republic contended that the amounts Travelers paid under the 2011 Travelers Policy for the FCPA Matters may have been higher than Travelers estimated, it is indisputable that more than $13,000,000 of the costs paid under the 2011 Travelers Policy were for the Accounting Matters.

69.     As of September 2019, Old Republic advised that it had paid more than $8.4 million in coverage in connection with the Sandoval and Cidre Accounting Matters.   Accordingly, regardless of Old Republic's contention that some of the amounts paid by Travelers under the 2011 Travelers policy were for the FCPA Matters rather than Accounting Matters, it is indisputable that the Underlying Policies have been eroded by at least $21 million in losses paid for the Accounting Matters.

**J.     General Cable Losses for the FCPA Matters**

70.     With respect to the FCPA Matters, General Cable has paid more than $31,000,000 in losses related to the FCPA Investigation, and more than $800,000 in defending against the FCPA Lawsuits.

71.     Nonetheless, the 2014 Settlement did not address General Cable's losses for the FCPA Matters.   As such, with limited exception within the 2011 Travelers Policy layer as discussed herein, General Cable's losses for the FCPA Matters have not been reimbursed by any of its insurers.

**K.     The Insurance Coverage Dispute**

72.     As indicated above, General Cable timely tendered its claim for coverage as to the FCPA Matters to the Underlying Insurers and Nationwide through a series of notices and/or documentation.

21

73.     In response, the Underlying Insurers and Nationwide issued to General Cable a series of letters purporting to reserve rights and provide their respective coverage positions.

74.     As is relevant here, Travelers and Old Republic dispute whether the 2011-2012 Tower or the 2012-2016 Tower of coverage applies to the FCPA Matters. The dispute over which tower applies, in turn, gave rise to a dispute over the amount of FCPA-related costs Travelers paid under the 2011 Travelers Policy to create a "gap" between the "proper" exhaustion of the 2011 Travelers Policy and the Old Republic Policy.

75.     General Cable's substantial losses for the FCPA Matters are in excess of the policy limits provided by the Underlying Insurers' policies in both the 2011-12 and 2012-2016 Towers.  Therefore, regardless of whether the proper tower of coverage attributable to the FCPA Matters is the 2011-2012 Tower or the 2012-2016 Tower, Nationwide's coverage is implicated.

76.     General Cable, Travelers and Old Republic engaged in negotiations regarding the dispute over which tower of coverage applies to the FCPA Matters and provide coverage for General Cable's FCPA-related loss beginning in 2019.  To that end, General Cable, Travelers and Old Republic entered into a tolling agreement and agreed to engage in meditation.  That mediation was scheduled to take place on March 20, 2020, at the outset of the COVID-19 pandemic, and was therefore

22

cancelled due to the implementation of governmental "stay at home" orders and travel restrictions.

77.     Once the March 2020 mediation was cancelled due to COVID-19 restrictions, General Cable made efforts to reschedule.  As part of those efforts, General Cable communicated with Nationwide on several occasions to secure Nationwide's acknowledgment of coverage for the FCPA Matters, and its agreement to participate in the rescheduled mediation along with Travelers and Old Republic, including written exchanges in late 2021 providing Nationwide with the parties' mediation statements so that Nationwide could evaluate and consider its participation.

78.     However, as of January 2022, Nationwide had neither acknowledged its coverage obligation, nor agreed to participate in the mediation.  Accordingly, on January 18, 2022 General Cable again wrote to Nationwide demanding that Nationwide acknowledge its obligation to cover the FCPA Matters.  A copy of General Cable's January 18, 2022 e-mail to Nationwide is attached as **Exhibit T.**

79.     To date, Nationwide has failed to accept coverage or otherwise participate in negotiations or potential mediation with respect to its obligations.

80.     Accordingly, as set forth more fully above, there is a genuine dispute between General Cable and Nationwide with respect to Nationwide's obligation to

accept coverage for General Cable's losses attributable to the Accounting Matters and the FCPA Matters. This matter is therefore ripe for adjudication.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

81.     General Cable incorporates and restates the allegations of paragraphs 1 through 80 of the Complaint by reference as if fully set forth herein.

82.     At all relevant times, General Cable was covered by the Nationwide Policies, which entitle it to the reimbursement of Loss, including defense costs advanced for itself and/or its officers and/or other insured persons, excess the underlying limits of the Underlying Insurers' policies, in the event a Claim arose.

83.     General Cable has materially complied with all obligations under the Nationwide Policies, and therefore is entitled to the benefits of the Nationwide Policies.

84.     The Accounting Matters and the FCPA Matters are Claims pursuant to each of the Nationwide Policies, which follow form to the terms and conditions in the Travelers Policies.

85.     Accordingly, the attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the FCPA Matters constitutes covered Losses on account of Claims for which General Cable is entitled to full

24

reimbursement from Nationwide per the Insuring Agreement of each of the Nationwide Policies, which follow form to the Insuring Agreements in the Travelers Policies.

86.     General Cable's substantial Losses in connection with the Accounting Matters and the FCPA Matters exceed the policy limits provided by the Underlying Insurers' policies.

87.     Nationwide has nonetheless wrongfully refused to accept coverage for General Cable's costs in defending against and responding to the Accounting Matters and the FCPA Matters.  General Cable and Nationwide thus have an actual controversy concerning Nationwide's obligation to provide coverage for the FCPA Matters.  The parties have a real and adverse interest in the controversy, and it is ripe for judicial determination.   Any further demand or administrative remedy is unavailing.

88.     Nationwide has also wrongly refused to participate in mediation with the Underlying Insurers and General Cable to resolve General Cable's rights to receive and the insurers' obligation to provide coverage for the Accounting Matters and FCPA Matters, despite having been invited to participate.

89.     As a result of Nationwide's refusals, General Cable has suffered—and continues to suffer—significant harm.   Thus, General Cable seeks a judgment declaring that it is entitled to reimbursement of all Losses, as that term is defined

under the Nationwide Policies, in responding and defending against the FCPA Matters, excess of the Underlying Insurers' limits of liability.

90.     The full extent of General Cable's damages will be determined according to proof at trial.

### SECOND CLAIM FOR RELIEF
**(Anticipatory Repudiation or Breach of Contract)**

91.     General Cable incorporates and restates the allegations of paragraphs 1 through 90 of the Complaint by reference as if fully set forth herein.

92.     The attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the FCPA Matters constitute covered Losses on account of Claims for which General Cable is entitled to full reimbursement from Nationwide per the Insuring Agreement of each of the Nationwide Policies, which follow form to the Insuring Agreements in the Travelers Policies.

93.     Nationwide has anticipatorily repudiated its obligations to pay such amounts covered under the Nationwide Policies by failing and refusing to acknowledge any obligation to pay costs, including, among other things, attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the

26

FCPA Matters, now that such amounts exceed the limits of liability of the Underlying Insurers' policies.

94.     Nationwide has therefore wrongfully refused to accept coverage for General Cable's covered Losses in connection with the Accounting Matters and the FCPA Matters pursuant to either of the two Nationwide Policies.

95.     Thus, Nationwide's conduct has rendered General Cable insecure and has caused General Cable to reasonably believe that Nationwide will not perform its contractual obligations to General Cable as and when due.

96.     As a direct and proximate result of Nationwide's anticipated breach, General Cable has, with respect to the Accounting Matters and FCPA Matters, been deprived of the benefit of insurance coverage for which substantial sums were paid.

97.     As a direct and proximate result of the aforesaid anticipatory breach by Nationwide, General Cable has been damaged, and will continue to be damaged, according to proof at trial.

WHEREFORE, General Cable respectfully requests that this Court enter judgment as follows:

a.     Declaring that (i) the FCPA Matters are covered by the Nationwide Policies; and (ii) upon exhaustion or settlement of the Travelers and Old Republic Policies for the FCPA Matters, whether under the 2011-12 or 2012-16 Tower, Nationwide owes coverage for the Losses General Cable has paid and/or will continue to pay and/or incur in connection with the FCPA Matters, up to the Nationwide Policies' limits of liability.

27

b.  Awarding General Cable compensatory and consequential damages, pre- and post-judgment interest and costs of suit, and such other relief permitted by law.

c.  Awarding General Cable its costs herein and any and all other and further relief this Court may deem just and proper.

Dated: May 10, 2024          **BLANK ROME LLP**

*/s/ Adam V. Orlacchio*
Adam V. Orlacchio (#5520)
Anna Currier (#6271)
1201 N. Market St., Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6431
Facsimile: (302) 397-2156
adam.orlacchio@blankrome.com
anna.currier@blankrome.com

*Counsel for Plaintiff General Cable Corporation*

OF COUNSEL:

Lisa M. Campisi (*pro hac vice* forthcoming)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885.5378
Facsimile: (212) 658.9926
lisa.campisi@blankrome.com

Alexander H. Berman (*pro hac vice* forthcoming)
Dominique Khani (#6440)
1825 Eye St NW
Washington, D.C. 20006
Telephone: (202) 772 5946
Facsimile: (202) 572 1429
alex.berman@blankrome.com
dominique.khani@blankrome.com

28

EFiled:  May 10 2024 02:05PM
Transaction ID 73022255
Case No. N24C-05-105 VLM

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| GENERAL CABLE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No._____ (CCLD) |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTTSDALE INDEMNITY COMPANY, | ) | **TRIAL BY JURY OF TWELVE** |
| | ) | **DEMANDED** |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff General Cable Corporation ("General Cable"), on behalf of itself, its predecessors, subsidiaries and successors, by and through its undersigned attorneys, and for its Complaint against Scottsdale Indemnity Company ("Nationwide"), states as follows:

## NATURE OF THE CASE

1.      This is an action for declaratory judgment and anticipatory breach of contract arising out of Nationwide's unwarranted refusal to acknowledge coverage to General Cable under Excess Insurance Policies (the "Nationwide Policies"), for which General Cable paid substantial premiums, for the costs General Cable has paid and/or incurred, and will continue to pay and incur in defending against and responding to private investigations commenced by the Securities and Exchange Commission (the "SEC") against General Cable for the policy period November 1, 2011 to November 30, 2012 General Cable was insured by a primary Directors,

Officers, and Organizational Liability Policy, issued by Travelers Casualty and Surety Company of America ("Travelers") bearing policy number 105518156 (the "2011 Travelers Policy").

## THE PARTIES

2.      Plaintiff General Cable Corporation ("General Cable"), a manufacturer and distributor of wires and cables used in industrial applications, is a Delaware Corporation with corporate headquarters in Highland Heights, Kentucky.

3.      Upon information and belief, Defendant Scottsdale Indemnity Company ("Nationwide"), an insurance company, is an Ohio Corporation licensed to do business in Delaware.

## <u>JURISDICTION</u>

4.      This Court has personal jurisdiction over Nationwide pursuant to 10 *Del. C.* § 3104(c) because, upon information and belief, Nationwide is licensed to do business and does transact business in the State of Delaware. Moreover, Nationwide issued one or more D&O insurance policies to General Cable, a Delaware corporation, at the time of issuance of the insurance policy, and thereby insured the covered risks of Delaware citizens, including those risks arising under Delaware law, including, for example, alleged breaches of fiduciary duties.

5.      This Court has subject matter jurisdiction over this dispute pursuant to 10 *Del. C.* § 541.

2

6.     Pursuant to the Superior Court's Complex Commercial Litigation Division ("CCLD") guidance, and given that this matter has "in controversy $1,000,000 or more," this matter is being filed in the CCLD.

## FACTUAL BACKGROUND

7.     The 2011 Travelers Policy provided a $15 million limit of liability excess to a $750,000 self-insured retention, including defense costs.  A true and correct copy of the 2011 Travelers Policy is attached as **Exhibit A**.

8.     For the same November 1, 2011 to November 30, 2012 policy period as the 2011 Travelers Policy, General Cable was insured by a first layer excess policy issued by Old Republic Insurance Company ("Old Republic") providing a $10 million limit of liability immediately excess of the 2011 Travelers Policy (the "2011 Old Republic Policy").  A true and correct copy of the 2011 Old Republic Policy is attached as **Exhibit B**.

9.     For the same November 1, 2011 to November 30, 2012 policy period as the 2011 Travelers Policy and the 2011 Old Republic Policy, Nationwide sold General Cable an Excess Insurance Policy (No. XMI1200611) ("2011 Nationwide Policy").  The 2011 Nationwide Policy provides a $10 million limit of liability immediately excess of the 2011 Old Republic Policy.  A true and correct copy of the 2011 Nationwide Policy is attached as **Exhibit C**.

3

10.   The 2011 Nationwide Policy's insuring agreement states that Nationwide "shall provide [General Cable] with insurance coverage excess of the Underlying Policies" and that the "Policy shall apply in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the Followed Policy." Exhibit C, Section 1. Insuring Agreement.

11.   The 2011 Nationwide Policy defines the "Followed Policy" as the 2011 Travelers Policy. *See* Exhibit C, Section II. Definitions, F and Declarations, Item 4.

12.   The 2011 Travelers Policy's insuring agreements obligate Travelers (and, therefore, Nationwide) to reimburse General Cable for Loss (as that term is defined in the Policy) as follows:

**A.     ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** of any **Insured Person** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**B.     ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay for any **Securities Claim** first made against the **Insured Organization** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

Exhibit A, Section I.A, I.B.  (Emphases in the original).

4

13. "Wrongful Act" is defined by the 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) in relevant part as "any actual or alleged . . . error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted . . . by any Insured Person in their capacity as such . . . ; or with respect to Insuring Agreement C, by the Insured Organization." *See* Exhibit A, Section III. Definitions, EE.

14. The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Securities Claim," in pertinent part, as "any **Claim**, in whole or in part, that is . . . based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization . . .** including any such **Claim** brought by the SEC or any other claimant." *See* Exhibit A, Section III. Definitions, Z.

15. By an endorsement entitled "Claim Definition Endorsement – Add Mediation Coverage and Co-Defendant Entity Coverage for Administrative and Regulatory Proceedings," (the "Revised Claim Definition Endorsement") the 2011 Travelers Policy's (and, therefore, the 2011 Nationwide Policy's) definition of Claim includes:

> a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any Insured Person, *or against any Insured Organization, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an Insured Person and the Insured Organization,* and commenced by

5

the receipt of a: . . . notice of filed charges, investigative order, or similar document.

*See* Exhibit A at 45 of 47 (Emphasis added).

16.    The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Insured Person" to include General Cable's past or present officers as follows: "any natural person who was, is, or becomes a duly elected or appointed director, officer, Manager, or in-house general counsel of the Insured Organization, or any functional equivalent position . . . ." Exhibit A, Section III. Definitions, N.

17.    The 2011 Travelers Policy (and, therefore, the 2011 Nationwide Policy) defines "Loss" in pertinent part to include "damages, judgments, settlements, pre-judgment and post-judgment interest, . . . and Defense Expenses." Exhibit A, Section III. Definitions, Q. "Defense Expenses" are in turn defined in relevant part as "the reasonable costs, charges, fees (including attorneys', experts', mediators', or arbitrators' fees), and expenses . . . incurred in defending a Claim covered by Insuring Agreements A, B, C, or E, and the premium for appeal, attachment, or similar bonds." Exhibit A, Section III. Definitions, D.

18.    The 2011 Nationwide Policy provides that in the event the limits of 2011 Travelers Policy and 2011 Old Republic Policy are reduced by reason of actual payment by Travelers and Old Republic, the 2011 Nationwide Policy "shall continue to apply as excess over the reduced Underlying Limits." Exhibit C, Section IV. Reduction or Exhaustion of Underlying Limits, A.

C.    **General Cable's 2012-2016 Insurance Tower**

19.    Upon expiration, the 2011-2012 policies were renewed for a new policy year, from 2012 to 2013, on substantially the same terms as the 2011-12 policies (the "2012 Tower" and, with respect to the individual policies, the "2012 Travelers Policy," the "2012 Old Republic Policy" and the "2012 Nationwide Policy"). True and correct copies of the 2012 policies are attached as **Exhibits D, E, and F**, respectively.

20.    In 2013, rather than being renewed at expiration, the policy period of the 2012 policies was extended for an additional year. After that, the period was extended for the next two years, such that the policies that incepted in 2012 did not expire until 2016.

21.    For purposes here, the only material difference between policies in the 2011 Tower and the 2012 Tower are that, effective in November 1, 2014, (1) the definition of Claim with respect to a "formal civil administrative or formal civil regulatory proceeding" or "formal civil investigation" was modified; and (2) the applicable retention for non-M&A Claims increased from $750,000 to $1,500,000.

D.    **The Accounting Matters**

22.    In or about October 2012, General Cable provided its insurers in its directors and officers insurance program, including Travelers, Old Republic, and Nationwide, with a Notice of Circumstances that could give rise to a "Claim(s)," as

7

that term is defined under the relevant policies (the "2012 Notice of Circumstances").

23.    As set forth in that correspondence, the circumstances concerned General Cable's subsidiary, Phelps Dodge International Brasil Ltda. Corporation ("PDIB"), and a possible discrepancy between PDIB's actual inventory book value and the inventory valuation reflected in its inventory management systems and financial accounting records.

24.    Travelers responded to General Cable's notice on October 18, 2012. Travelers agreed to "accept the information" "as a written Notice of a Potential Claim by either the Insured's shareholders and/or governmental regulatory agencies alleging breaches of fiduciary duties or violations of statutes, regulations or other laws against Insured(s) in connection with a restatement of the financials of PDIB and/or General Cable caused by material inventory valuation misstatements at PDIB[.]" *See* **Exhibit G**, Travelers Oct. 18, 2012 Letter.

25.    After Travelers' acceptance of the 2012 Notice of Circumstances, General Cable became the target of a Securities and Exchange Commission ("SEC") investigation and certain lawsuits alleging wrongdoing in connection with the circumstances described in General Cable's 2012 Notice of Circumstances (the "Accounting Matters").

26.     First, on July 15, 2013, the SEC issued a formal Order Directing Private Investigation and Designating Officers to Take Testimony, captioned as *In the Matter of General Cable Corp.*, HO-11998 (the "Formal Order"; the investigation initially authorized by the Formal Order is herein referred to as the "Accounting Investigation"). The Formal Order authorized investigation into earnings management, inventory classification, and bill and hold sales in General Cable's Rest of the World segment and related to the circumstances described in General Cable's 2012 Notice of Circumstances.

27.     General Cable notified its D&O insurers, including Nationwide, of the Formal Order shortly after its issuance, and on September 19, 2013, General Cable provided Travelers with a further Notice of Circumstances. By that correspondence, General Cable advised that its management recently had become aware of possible inaccuracies in past accounting for certain transactions at General Cable's subsidiary, Phelps Dodge International Corporation, and certain affiliates of Phelps Dodge International Corporation in Latin America, and in particular, PDIB. *See* **Exhibit H**, General Cable Sept. 19, 2013 Letter. As a result of the accounting discrepancies, in October 2013, General Cable publicly announced its intention to restate its financial statements and provided Travelers with notice of the same. *See* **Exhibit I**.

28.     Following General Cable's public statement, on October 17, 2013, the SEC served General Cable with a subpoena ordering General Cable to produce documents and related information in connection with its investigation into the accounting issues (the "Accounting Subpoena").

29.     General Cable was also named as a defendant in four civil lawsuits, including two securities class actions and two derivative actions, filed in 2013 and 2014 in New York and Kentucky in connection with the inventory accounting issues (the "Accounting Lawsuits").

30.     The two securities class actions were styled as (i) *Satish Doshi v. General Cable Corporation, et al.*, (the "*Doshi I*" action), filed in the United States District Court for the Southern District of New York on October 21, 2013; and (ii) *City of Livonia Employees' Retirement System v. General Cable Corporation, Gregory B. Kenny, and Brian J. Robinson*, filed in the Southern District of New York (the "*City of Livonia*" action). The *Doshi I* and *City of Livonia* actions alleged substantially similar facts and circumstances, and on January 17, 2013, the Southern District of New York consolidated those actions. On February 5, 2014, the consolidated action was transferred to the Eastern District of Kentucky.

31.     The two derivative lawsuits were styled as (i) *Kenneth McPherson v. Gregory B. Kenny et al.*, Case No. 14-CI-011, filed in the Circuit Court of Kentucky, Division I (the "McPherson Complaint"); and (ii) *David G. Kelly v. Gregory B.*

10

*Kenny et al.*, Case No. 14-CI-060, also filed in the Circuit Court of Kentucky, Division No. I (the "Kelly Complaint"). The Kelly Complaint was nearly identical to the McPherson Complaint, and, at or around the same time it was filed, the McPherson Complaint was dismissed.

32.     General Cable provided its insurers, including Nationwide, with timely notice and copies of the Accounting Subpoena and Accounting Lawsuits, and sought coverage for those matters.

33.     General Cable incurred substantial covered defense costs in responding to and defending against the Formal Order, the Accounting Subpoena and Accounting Lawsuits. .

34.     In addition to the Accounting Lawsuits, pursuant to the authority of the Formal Order, the SEC issued subpoenas to several individuals, including Mathias Francisco Sandoval Herrera ("Sandoval") and Maria D. Cidre ("Cidre"), who were the then Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, of the Latin American operations of General Cable (including in Brazil). Both were afforded coverage from Travelers, and later Old Republic, in connection with the Accounting Matters.

35.     In addition to Sandoval and Cidre, in 2014, the SEC also subpoenaed several other individual Insureds, for whom General Cable advanced defense costs, and for which Travelers provided coverage to General Cable.

11

E.    **Travelers Coverage Position and the 2014 Settlement of the Accounting Matters**

36.    Travelers responded to General Cable's request for coverage for the Formal Order and the Accounting Lawsuits in February 2014.

37.    By that correspondence, Travelers acknowledged that the 2011 Travelers Policy governed because the Accounting Matters related back to the 2012 Notice of Circumstances. In so doing, Travelers noted that the matters emanated "from the same facts and circumstances" as those set out in the 2012 Notice of Circumstances because they each concerned "alleged misstatements and misrepresentations regarding accounting errors in Brazil[.]" *See* **Exhibit J**, Travelers Feb. 18, 2014 Letter at 7.

38.    Travelers agreed, subject to a reservation of rights, to reimburse General Cable's Defense Expenses incurred in defending against the Accounting Lawsuits.

39.    Although Travelers initially denied coverage for the Formal Order, the parties ultimately reached an agreement that resolved coverage for General Cable's Losses in responding to the Formal Order (the "2014 Settlement"). Further to the 2014 Settlement, Travelers agreed to pay a portion of General Cable's past and ongoing Defense Expenses in responding to the Accounting Investigation, as well as Defense Expenses General Cable had incurred in defending against the Litigations.

12

40.    The 2014 Settlement only related to the Accounting Investigation, not the FCPA Investigation, and coverage for General Cable's Loss resulting from the FCPA Investigation was neither sought nor afforded under the 2014 Settlement.

**F.    The FCPA Matters**

41.    As noted above, during the relevant time period, General Cable engaged in operations around the world.  As part of these worldwide operations, General Cable maintained separate geographic divisions which oversaw operations of its subsidiaries in the carrying out of General Cable's business, and maintained operations in three segments—North America, Europe & Mediterranean ("E&M,"), and Rest of World ("ROW").

42.    In September 2012, in the ordinary course of business, General Cable's Internal Audit Department performed an on-site audit of financial and operational processes and controls at General Cable Condel, Cabos de Energia e Telecomunicações, S.A. ("Condel"), an indirect subsidiary of General Cable located in Angola (the "Internal Audit").  Condel manufactured and sold General Cable's products primarily to entities owned by the Angolan government.  Condel's direct parent was General Cable Celcat, Energia e Telecomunicações, S.A. ("Celcat"), an indirect subsidiary of General Cable located in Portugal.  During the relevant time period, Celcat manufactured and sold General Cable's wire and cable products primarily in the E&M segment.

13

43.    Based on the Internal Audit and subsequent investigation efforts, General Cable determined that, despite its policies and procedures designed to ensure compliance with federal regulations, certain of its foreign subsidiaries, including those in Angola, Thailand, India, China, and Egypt, might have engaged in conduct that exposed General Cable to liability under the FCPA.

44.    General Cable promptly self-reported those potential FCPA violations to the SEC and the Department of Justice ("DOJ") in January 2014, after it had retained outside counsel to conduct an internal investigation. As its investigation progressed, General Cable self-reported other potentially improper payments and regularly updated the SEC staff on its internal investigation. In addition, General Cable likewise cooperated with the DOJ, which was working with the SEC in the investigation of the FCPA Matters.

45.    General Cable notified the Underlying Insurers and Nationwide of the investigation into the potential FCPA violations on June 13, 2014. *See* **Exhibit K**, General Cable June 13, 2014 Letter.

46.    In connection with the FCPA Investigation, the SEC issued two subpoenas to General Cable, dated August 8, 2014, and September 23, 2015, respectively, demanding the production of voluminous documents and other information relating the FCPA inquiry.

14

47.   In January 2016 the SEC also issued a subpoena to another insured individual executive , who in 2013 was a Senior Vice President of General Cable. That executive was not involved in the matters giving rise to the Accounting Investigation, but the SEC determined the executive had direct involvement in the FCPA Matters.   General Cable provided timely notice to the Underlying Insurers and Nationwide of each of these subpoenas.

48.   In addition, two lawsuits emanated from the FCPA Investigation.

49.   One lawsuit was a securities class action styled as *Doshi v. General Cable Corp. et al.* (the "*Doshi II*" action) filed on January 5, 2017, in the Southern District of New York and later transferred to the Eastern District of Kentucky, the same venue for the prior *Doshi I* action.   The *Doshi II* action was brought on behalf of a putative class of General Cable shareholders, and generally alleged that due to the "wrongful acts" that gave rise to the FCPA investigation and resulting settlement, the value of General Cable's shares declined precipitously, causing the plaintiffs losses for which they sought damages.

50.   The other lawsuit was filed in Delaware Chancery Court in March 2017 and styled as *Quackenbush v. General Cable Corporation* (the "*Quackenbush*" action). The *Quackenbush* action stemmed from an October 27, 2015 demand for inspection of books and records related to FCPA issues pursuant to 8 Del. C. §220

brought by Michael Quackenbush, a shareholder of General Cable (the "Quackenbush Section 220 Demand").

## G.     The 2016 SEC Settlement

51.     On December 29, 2016, General Cable reached a settlement with the SEC with respect to the Accounting Investigation, and separately, the FCPA Investigation ("2016 SEC Settlement").  *See* **Exhibit L**, Dec. 29, 2016 SEC Press Release ("SEC Press Release") (announcing that General Cable "agreed to pay more than $75 million to resolve parallel SEC and U.S. Department of Justice investigations related to its violations of the FCPA. The company agreed to pay an additional $6.5 million to the SEC to settle *separate* accounting-related violations.") (emphasis added).

52.     First, with respect to the SEC's Accounting Investigation, General Cable agreed, pursuant to an order memorializing that settlement, to pay $6.5 million to the SEC to settle its accounting-related violations, while neither admitting nor denying the SEC's findings. *See id.*; *see also* **Exhibit M**, Dec. 29, 2016 Order (the "SEC Accounting Order").

53.     Second, with respect to the FCPA Investigation, General Cable agreed to pay the SEC nearly $55,000,000 pursuant to a separate order addressing the alleged FCPA violations. *See id.*; *see also* **Exhibit N**, Dec. 29, 2016 Order (the "SEC FCPA Order"), at § IV.B.

54.     Additionally, as also set forth in the SEC FCPA Order, General Cable entered into a non-prosecution agreement ("NPA") to settle the DOJ's parallel FCPA investigation.  As further noted in the SEC FCPA Order, the SEC refrained from imposing a civil penalty on General Cable, based in part on General Cable's agreement to pay nearly $20,500,000 pursuant to the NPA.

55.     Finally, the SEC entered a separate order against the insured individual executive directly involved in the FCPA (but not Accounting) Matters.   *See* **Exhibit O**, Dec. 29, 2016 Order.

## H.     The SEC's Action Against Sandoval and Cidre

56.     On January 24, 2017, in furtherance of the Accounting Investigation, the SEC brought an action against Sandoval, Cidre and another executive, and was originally captioned as *Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera and Maria D. Cidre et al.*, Civil Action No. 1:17-cv-20301-JAL (S.D. Fla.) (the "Sandoval Action").[1]

57.     The Sandoval Action alleged, among other things, that Sandoval and Cidre had concealed the inventory accounting errors in Brazil from General Cable's executive management.   The Sandoval Action complaint charged Sandoval and Cidre with violations of, among others, Section 17(a) of the Securities Act of 1933

---

[1]  A third executive, Jose Antonio Miranda Gonzalez, was also originally named in the Sandoval Action but pursuant to a consent judgment entered shortly after commencement of the Sandoval Action, the proceedings against Mr. Miranda were effectively discontinued.

17

and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as books and records and reporting violations.

58.     As part of the Sandoval Action, General Cable's outside counsel was subpoenaed, and the SEC sought and obtained General Cable's cooperation in responding to numerous document and other information requests.

59.     General Cable incurred substantial defense costs in such efforts and defending against the Sandoval Action subpoena.

60.     General Cable timely provided notice of the Sandoval Action Subpoena to the Underlying Insurers and Nationwide no later than October 5, 2017, when General Cable submitted initial invoices for its costs incurred in responding to the subpoena.

61.     The Sandoval Action was concluded on February 20, 2019, by way of the entry of final judgments on consent against both Sandoval and Cidre.  *See* **Exhibit P**, Feb. 21 SEC Press Release ("Sandoval Press Release").

**I.      The Accounting Losses Exhausted the Travelers 2011-12 Policy and Substantially Eroded the 2011-2012 Old Republic Policy**

62.     Net of the $750,000 retention under the 2011 Travelers Policy, General Cable paid more than $10,500,000 in Defense Expenses for the Accounting Matters. Such Defense Expenses included those incurred in connection with (i) the Accounting Investigation pursuant to the Formal Order, (including Defense Expenses for SEC subpoenas to Individual Insureds); and (ii) the Accounting

18

Lawsuits. Of this amount, Travelers reimbursed General Cable approximately $5,000,000.[2]

63. In addition to reimbursing General Cable for a portion of its Loss for the Accounting Matters, as noted above, Travelers also agreed to provide coverage to Sandoval and Cidre in connection with the Accounting Matters, and on December 18, 2017, Travelers wrote to General Cable to advise that the $15,000,000 limit of Travelers' 2011-2012 Policy was "approaching exhaustion." **Exhibit Q**. According to Travelers, as of the date of its December, 2017 letter, it had paid $14,809,395.88 of its $15 million limit of liability.

64. Travelers subsequently advised General Cable that its $15 million limit was fully exhausted, including in correspondence to General Cable dated March 26, 2018. *See* **Exhibit R**.

65. In addition, as set forth in correspondence dated March 23, 2018 from counsel for Old Republic, Old Republic advised that on March 1, 2018, counsel for Travelers "advised Old Republic's counsel that 'Travelers ha[d] … processed its final payments under the [2011 Travelers Policy]'" and that with those payments the 2011 Travelers Policy was then exhausted.

---

[2] The $10,500,000 paid by General Cable includes $1,020,000 that General Cable paid for the Accounting Matters that remain outstanding.

66.     Old Republic acknowledged in that same March 23, 2018 letter that an additional approximately $2 million in Defense Expenses were then outstanding in connection with the Accounting Matters. *See* **Exhibit S**, March 23, 2018 Letter at 11 ("The currently outstanding costs of the … Accounting Matters are invoices of Sandoval and Cidre's respective counsel that contain approximately $2 million in charges.")  Old Republic's letter further stated that Old Republic would pay those outstanding invoices and future costs for the Accounting Matters, albeit subject to "a full reservation of all of its rights." *Id.*

67.     With respect to its "reservation of rights," Old Republic contended that the Losses for the FCPA Matters were unrelated to the Losses for the Accounting Matters and given the timing of the FCPA Matters, the coverage tower that was potentially responsive to the FCPA Matters was not the 2011-2012 Policy, but instead the subsequent 2012-2016 tower.  Old Republic thus in turn contended that the amounts of any payments made by Travelers for the FCPA Matters under the 2011 Travelers policy did not erode the $15 million limit of the 2011-2012 Travelers Policy. *Id.* at 10-11.

68.     Though Old Republic contended that the amounts Travelers paid under the 2011 Travelers Policy for the FCPA Matters may have been higher than Travelers estimated, it is indisputable that more than $13,000,000 of the costs paid under the 2011 Travelers Policy were for the Accounting Matters.

20

69.     As of September 2019, Old Republic advised that it had paid more than
$8.4 million in coverage in connection with the Sandoval and Cidre Accounting
Matters.  Accordingly, regardless of Old Republic's contention that some of the
amounts paid by Travelers under the 2011 Travelers policy were for the FCPA
Matters rather than Accounting Matters, it is indisputable that the Underlying
Policies have been eroded by at least $21 million in losses paid for the Accounting
Matters.

**J.      General Cable Losses for the FCPA Matters**

70.     With respect to the FCPA Matters, General Cable has paid more than
$31,000,000 in losses related to the FCPA Investigation, and more than $800,000 in
defending against the FCPA Lawsuits.

71.     Nonetheless, the 2014 Settlement did not address General Cable's
losses for the FCPA Matters.  As such, with limited exception within the 2011
Travelers Policy layer as discussed herein, General Cable's losses for the FCPA
Matters have not been reimbursed by any of its insurers.

**K.      The Insurance Coverage Dispute**

72.     As indicated above, General Cable timely tendered its claim for
coverage as to the FCPA Matters to the Underlying Insurers and Nationwide through
a series of notices and/or documentation.

21

73.   In response, the Underlying Insurers and Nationwide issued to General Cable a series of letters purporting to reserve rights and provide their respective coverage positions.

74.   As is relevant here, Travelers and Old Republic dispute whether the 2011-2012 Tower or the 2012-2016 Tower of coverage applies to the FCPA Matters. The dispute over which tower applies, in turn, gave rise to a dispute over the amount of FCPA-related costs Travelers paid under the 2011 Travelers Policy to create a "gap" between the "proper" exhaustion of the 2011 Travelers Policy and the Old Republic Policy.

75.   General Cable's substantial losses for the FCPA Matters are in excess of the policy limits provided by the Underlying Insurers' policies in both the 2011-12 and 2012-2016 Towers.  Therefore, regardless of whether the proper tower of coverage attributable to the FCPA Matters is the 2011-2012 Tower or the 2012-2016 Tower, Nationwide's coverage is implicated.

76.   General Cable, Travelers and Old Republic engaged in negotiations regarding the dispute over which tower of coverage applies to the FCPA Matters and provide coverage for General Cable's FCPA-related loss beginning in 2019.  To that end, General Cable, Travelers and Old Republic entered into a tolling agreement and agreed to engage in meditation.  That mediation was scheduled to take place on March 20, 2020, at the outset of the COVID-19 pandemic, and was therefore

cancelled due to the implementation of governmental "stay at home" orders and travel restrictions.

77.  Once the March 2020 mediation was cancelled due to COVID-19 restrictions, General Cable made efforts to reschedule. As part of those efforts, General Cable communicated with Nationwide on several occasions to secure Nationwide's acknowledgment of coverage for the FCPA Matters, and its agreement to participate in the rescheduled mediation along with Travelers and Old Republic, including written exchanges in late 2021 providing Nationwide with the parties' mediation statements so that Nationwide could evaluate and consider its participation.

78.  However, as of January 2022, Nationwide had neither acknowledged its coverage obligation, nor agreed to participate in the mediation. Accordingly, on January 18, 2022 General Cable again wrote to Nationwide demanding that Nationwide acknowledge its obligation to cover the FCPA Matters. A copy of General Cable's January 18, 2022 e-mail to Nationwide is attached as **Exhibit T.**

79.  To date, Nationwide has failed to accept coverage or otherwise participate in negotiations or potential mediation with respect to its obligations.

80.  Accordingly, as set forth more fully above, there is a genuine dispute between General Cable and Nationwide with respect to Nationwide's obligation to

accept coverage for General Cable's losses attributable to the Accounting Matters and the FCPA Matters. This matter is therefore ripe for adjudication.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

81.     General Cable incorporates and restates the allegations of paragraphs 1 through 80 of the Complaint by reference as if fully set forth herein.

82.     At all relevant times, General Cable was covered by the Nationwide Policies, which entitle it to the reimbursement of Loss, including defense costs advanced for itself and/or its officers and/or other insured persons, excess the underlying limits of the Underlying Insurers' policies, in the event a Claim arose.

83.     General Cable has materially complied with all obligations under the Nationwide Policies, and therefore is entitled to the benefits of the Nationwide Policies.

84.     The Accounting Matters and the FCPA Matters are Claims pursuant to each of the Nationwide Policies, which follow form to the terms and conditions in the Travelers Policies.

85.     Accordingly, the attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the FCPA Matters constitutes covered Losses on account of Claims for which General Cable is entitled to full

24

reimbursement from Nationwide per the Insuring Agreement of each of the Nationwide Policies, which follow form to the Insuring Agreements in the Travelers Policies.

86.     General Cable's substantial Losses in connection with the Accounting Matters and the FCPA Matters exceed the policy limits provided by the Underlying Insurers' policies.

87.     Nationwide has nonetheless wrongfully refused to accept coverage for General Cable's costs in defending against and responding to the Accounting Matters and the FCPA Matters. General Cable and Nationwide thus have an actual controversy concerning Nationwide's obligation to provide coverage for the FCPA Matters. The parties have a real and adverse interest in the controversy, and it is ripe for judicial determination. Any further demand or administrative remedy is unavailing.

88.     Nationwide has also wrongly refused to participate in mediation with the Underlying Insurers and General Cable to resolve General Cable's rights to receive and the insurers' obligation to provide coverage for the Accounting Matters and FCPA Matters, despite having been invited to participate.

89.     As a result of Nationwide's refusals, General Cable has suffered—and continues to suffer—significant harm. Thus, General Cable seeks a judgment declaring that it is entitled to reimbursement of all Losses, as that term is defined

under the Nationwide Policies, in responding and defending against the FCPA Matters, excess of the Underlying Insurers' limits of liability.

90.     The full extent of General Cable's damages will be determined according to proof at trial.

### SECOND CLAIM FOR RELIEF
### (Anticipatory Repudiation or Breach of Contract)

91.     General Cable incorporates and restates the allegations of paragraphs 1 through 90 of the Complaint by reference as if fully set forth herein.

92.     The attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the FCPA Matters constitute covered Losses on account of Claims for which General Cable is entitled to full reimbursement from Nationwide per the Insuring Agreement of each of the Nationwide Policies, which follow form to the Insuring Agreements in the Travelers Policies.

93.     Nationwide has anticipatorily repudiated its obligations to pay such amounts covered under the Nationwide Policies by failing and refusing to acknowledge any obligation to pay costs, including, among other things, attorneys' fees and defense costs and expenses advanced or otherwise paid by General Cable on behalf of itself, its directors, officers and/or employees and/or other insured persons in responding to and defending against the Accounting Matters and the

FCPA Matters, now that such amounts exceed the limits of liability of the Underlying Insurers' policies.

94.     Nationwide has therefore wrongfully refused to accept coverage for General Cable's covered Losses in connection with the Accounting Matters and the FCPA Matters pursuant to either of the two Nationwide Policies.

95.     Thus, Nationwide's conduct has rendered General Cable insecure and has caused General Cable to reasonably believe that Nationwide will not perform its contractual obligations to General Cable as and when due.

96.     As a direct and proximate result of Nationwide's anticipated breach, General Cable has, with respect to the Accounting Matters and FCPA Matters, been deprived of the benefit of insurance coverage for which substantial sums were paid.

97.     As a direct and proximate result of the aforesaid anticipatory breach by Nationwide, General Cable has been damaged, and will continue to be damaged, according to proof at trial.

WHEREFORE, General Cable respectfully requests that this Court enter judgment as follows:

> a.      Declaring that (i) the FCPA Matters are covered by the Nationwide Policies; and (ii) upon exhaustion or settlement of the Travelers and Old Republic Policies for the FCPA Matters, whether under the 2011-12 or 2012-16 Tower, Nationwide owes coverage for the Losses General Cable has paid and/or will continue to pay and/or incur in connection with the FCPA Matters, up to the Nationwide Policies' limits of liability.

b.   Awarding General Cable compensatory and consequential damages, pre- and post-judgment interest and costs of suit, and such other relief permitted by law.

c.   Awarding General Cable its costs herein and any and all other and further relief this Court may deem just and proper.

Dated: May 10, 2024                **BLANK ROME LLP**

*/s/ Adam V. Orlacchio*
Adam V. Orlacchio (#5520)
Anna Currier (#6271)
1201 N. Market St., Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6431
Facsimile: (302) 397-2156
adam.orlacchio@blankrome.com
anna.currier@blankrome.com

*Counsel for Plaintiff General Cable Corporation*

OF COUNSEL:

Lisa M. Campisi (*pro hac vice* forthcoming)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 885.5378
Facsimile: (212) 658.9926
lisa.campisi@blankrome.com

Alexander H. Berman (*pro hac vice* forthcoming)
Dominique Khani (#6440)
1825 Eye St NW
Washington, D.C. 20006
Telephone: (202) 772 5946
Facsimile: (202) 572 1429
alex.berman@blankrome.com
dominique.khani@blankrome.com

28

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: May 30 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

COUNTY: ☒N   ☐K   ☐S     CIVIL ACTION NUMBER: _____

| | |
|---|---|
| Caption:<br><br>General Cable Corporation (Plaintiff)<br><br>_____<br><br>v.<br><br>_____<br>Scottsdale Indemnity Company (Defendant)<br><br>_____<br><br>_____<br><br>_____ | Civil Case Code:  CCLD_____<br><br>Civil Case Type:  Complex Commercial Litigation Division<br>                          (SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) _____<br><br>Name and Status of Party filing document:<br><br>General Cable Corporation (Plaintiff)_____<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br><br>Complaint_____<br><br>JURY DEMAND:  YES_X_ NO_____ |
| ATTORNEY NAME(S):<br> Adam V. Orlacchio, Esq., Anna E. Currier, Esq.<br>ATTORNEY ID(S):<br><br>#5520, #6271_____<br>FIRM NAME:<br>Blank Rome LLP_____<br>ADDRESS:<br><br>1201 N. Market Street, Suite 800 Wilmington,<br>DE 19801<br><br>TELEPHONE NUMBER:<br>302-425-6400_____<br>FAX NUMBER:<br>302-428-5113_____<br>E-MAIL ADDRESS:<br>Adam.Orlacchio@blankrome.com<br><br>Anna.Currier@blankrome.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>_____<br><br>_____<br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br><br>_____<br><br>_____<br><br>_____<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_____<br><br>_____<br><br>_____<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 10/2022

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS) INSTRUCTIONS

## CIVIL CASE TYPE
Please select the appropriate civil case code and case type (e.g., **CODE - AADM** and **TYPE - Administrative Agency**) from the list below. Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ACER - Certiorari
ACCP - Court of Common Pleas
AIAB - Industrial Accident Board
APSC - Public Service Commission
AUIB - Unemployment Insurance Appeal Board

**COMPLAINTS**
CABT – Abatement
CASB – Asbestos
CAAA – Auto Arb Appeal
CMIS – Civil Miscellaneous
CACT - Class Action
CCON – Condemnation
CCLD – Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt/Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM – Ejectment
CATT – Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT – Interpleader
CLEM - Lemon Law
CLIB - Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPIN -  Personal Injury
CPIA - Personal Injury Auto
CPRL – Products Liability
CPRD – Property Damage
CRPV – Replevin
CSPD – Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery

**MASS TORT**
CABI - Abilify Cases
CBEN - Benzene Cases
CFAR - Farxiga Cases
CFIB – FiberCel Cases
CHON - Honeywell Cases
CMON - Monsanto Cases
CPEL - Pelvic Mesh Cases
CPLX - Plavix Cases
CPPI -  PPI Cases
CTAL - Talc Cases
CTAX - Taxotere Cases
CXAR - Xarelto Cases
CZAN – Zantac Cases

**INVOLUNTARY COMMITMENTS**
INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF - Application for Forfeiture
MAAT - Appointment of Attorney
MGAR - Appointment of Guardianship
MCED - Cease and Desist Order
MCON - Civil Contempt/Capias
MCVP - Civil Penalty
MSOJ - Compel Satisfaction of Judgment
MSAM - Compel Satisfaction of Mortgage
MCTO - Consent Order
MIND - Destruction of Indicia of Arrest *
MESP - Excess Sheriff Proceeds
MHAC - Habeas Corpus
MTOX - Hazardous Substance Cleanup
MFOR - Intercept of Forfeited Money
MISS - Issuance of Subpoena
MLEX - Lien Extension
MMAN - Mandamus
MWIT - Material Witness *
MWOT - Material Witness - Out of State
MRAT - Motion for Risk Assessment
MROP - Petition for Return of Property
MCRO - Petition Requesting Order
MROD - Road Resolution
MSEL - Sell Real Estate for Property Tax
MSEM - Set Aside Satisfaction of Mortgage
MSSS - Set Aside Sheriff's Sale
MSET - Structured Settlement
MTAX - Tax Ditches
MREF -  Tax Intercept
MLAG -  Tax  Lagoons
MVAC - Vacate Public Road
MPOS - Writ of Possession
MPRO - Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

## * Not eFiled

## DUTY OF THE PLAINTIFF
Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the complaint.

## DUTY OF THE DEFENDANT
Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the answer and/or first responsive pleading.

Revised 10/2022



90000 SERIES
30% P.C.W.

Exhibit A

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT A**

## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Enterprise Development, One Tower Square, Hartford, CT 06183.

## TERRORISM POLICY DISCLOSURE NOTICE -
## TERRORISM RISK INSURANCE ACT OF 2002

On December 26, 2007, the President of the United States signed into law amendments to the Terrorism Risk Insurance Act of 2002 (the "Act"), which, among other things, extend the Act and expand its scope.  The Act establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in the Act) caused by "acts of terrorism".  An "act of terrorism" is defined in Section 102(l) of the Act to mean any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for Insured Losses is 85% of the amount of Insured Losses in excess of each Insurer's statutorily established deductible, subject to the "Program Trigger", (as defined in the Act).  In no event, however, will the Federal Government or any Insurer be required to pay any portion of the amount of aggregate Insured Losses occurring in any one year that exceeds $100,000,000,000, provided that such Insurer has met its deductible.  If aggregate Insured Losses exceed $100,000,000,000 in any one year, your coverage may therefore be reduced.

Please note that no separate additional premium charge has been made for the terrorism coverage required by the Act.  The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and does not include any charge for the portion of losses covered by the Federal Government under the Act.  The charge is no more than one percent of your premium.

# KENTUCKY - IMPORTANT NOTICE - DISCLOSURE OF LOCAL GOVERNMENT TAXES

In compliance with Kentucky Administrative Regulation 806 KAR 2:092 the company is providing the amount of Kentucky local government tax being charged to the policyholder and the taxing jurisdiction to which the tax is due. Any applicable collection fee is included in the tax.

| Taxing Jurisdiction | Amount of Local Government Tax |
|---|---|
| **HIGHLAND HEIGHTS** | $19,875.80 |
| **Total** | $19,875.80 |

©2010 The Travelers Companies, Inc. All Rights Reserved



**One Tower Square**
**Hartford, CT 06183**

**12/07/2011**

**GENERAL CABLE CORPORATION**
**4 TESSENEER DRIVE**
**HIGHLAND HEIGHTS, KY 41076**

RE: Risk Management PLUS+ Online® from Travelers Bond & Financial Products (www.rmplusonline.com)

Thank you for choosing Travelers Bond & Financial Products for your insurance needs. Travelers is a market leader in providing management liability coverage that is in-synch with your company.  As your risks evolve, so do we through our ability to provide you with responsive risk management services.

Travelers Bond & Financial Products is pleased to provide you with Risk Management PLUS+ Online, the industry's most comprehensive program for mitigating your management liability exposures. The site includes risk management tools for the following coverage related exposures:

- Employment Practices Liability
- Fiduciary Liability
- Directors & Officers Liability
- Crime
- Kidnap and Ransom
- CyberRisk
- Identity Fraud Expense Reimbursement

Risk Management PLUS+ Online is a flexible, comprehensive loss prevention program specifically designed for Travelers Bond & Financial Products customers and is available to you at no additional cost. Included in the site is a library of articles, checklists and training on relevant risk mitigation topics for the management liability areas mentioned above.

Highlights of Risk Management PLUS+ Online services include:
- Web-based risk management training
- Weekly articles on current issues
- Model policies and forms for downloading or printing that cover major risks associated with the workplace

The attached Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS + Online representative. It's that simple.

We strongly encourage you to take full advantage of this program. Once again, thank you for choosing Travelers Bond & Financial Products.

Instructions for Registration & Orientation to Risk Management PLUS+ Online®

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to www.rmplusonline.com.
2. In the Sign-In box, click **Register**.
3. Enter the password/passcode: TRVP200000 (Please note there are 4 letters followed by 6 numbers in the code)
4. Fill in the Registration Information and click **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.



**TRAVELERS**

*Executive Choice* SM

### DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY POLICY DECLARATIONS

POLICY NO. **105518156**

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

**THIS LIABILITY COVERAGE IS WRITTEN ON A CLAIMS-MADE BASIS. THIS LIABILITY COVERAGE COVERS ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM.**

| | |
|---|---|
| **ITEM 1** | **NAMED INSURED:**<br><br>**GENERAL CABLE CORPORATION**<br><br>Principal Address:<br>**4 TESSENEER DRIVE**<br>**HIGHLAND HEIGHTS, KY 41076** |
| **ITEM 2** | **POLICY PERIOD:**<br><br>Inception Date: **November 1, 2011**   Expiration Date: **November 1, 2012**<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| **ITEM 3** | **ALL NOTICES OF CLAIMS OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE OR MAIL AS SET FORTH BELOW:**<br><br>**Email:bfpclaims@travelers.com**<br>**FAX:(888) 460-6622**<br><br>**Mail:Travelers Bond & Financial Products Claim**<br>      **385 Washington St. – Mail Code 9275-NB03F**<br>      **St Paul, MN  55102** |
| **ITEM 4** | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>Directors, Officers, and Organization Liability Coverage |
| **ITEM 5** | **DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE**<br><br>**Directors, Officers,<br>and Organization<br>Limit of Liability:**      $15,000,000      for all **Claims** |

| | | |
|---|---|---|
| **Investigation Expense Limit of Liability:** | $250,000 | for all **Investigation Expense**, which amount is part of, and not in addition to, the Directors,Officers, and Organization Limit of Liability |
| **Supplemental Independent Director Limit of Liability:** | **Not Covered** | for all **Independent Director Claims**, which amount is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability |
| **Retention:** | Not applicable to non-indemnifiable **Loss** or Insuring Agreement D | |
| | $750,000 | for all **Securities Claims** |
| | $500,000 | for all other **Claims** |
| **Prior and Pending Proceeding Date:** | May 16, 1997 | |

| ITEM 6 | PREMIUM FOR THE POLICY PERIOD: | |
|---|---|---|
| | $198,758.00 | Policy Premium |
| | N/A | Annual Installment Premium |

| ITEM 7 | EXTENDED REPORTING PERIOD: | |
|---|---|---|
| | Additional Premium Percentage: | Additional Months: |
| | 75 % | 12 |
| | N/A | 24 |
| | 100 % | 36 |
| | 150 % | 72 |

| ITEM 8 | FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE: |
|---|---|
| | ACF-7004-0110; PCDO-3001-0109; PCDO-4014-0809; PCDO-7018-0109; PCDO-10002-0910; PCDO-10042-1210; PCDO-10043-1210; PCDO-10044-1210; PCDO-10063-0111; PCDO-10066-0910; PCDO-10107-0311; ACF-7006-0511; PCDO-10130-0911; PCDO-10200-1111; PCDO-10201-1011 |

**THE DECLARATIONS, THE APPLICATION, THE DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY POLICY, AND ANY ENDORSEMENTS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE INSURED.**

Countersigned By
IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

Executive Vice President                    Corporate Secretary

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies the following:

**Directors, Officers, and Organization Liability**

---

**It is agreed that:**

1. The following is added to the **CONDITIONS** section:

   **CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

   If aggregate insured losses attributable to **Certified Acts of Terrorism** exceed $100 billion in a program year (January 1 through December 31) and the Company has met the deductible under the Terrorism Risk Insurance Act:

   a. the Company will not be responsible for the payment of any portion of the amount of such losses that exceeds $100 billion; and

   b. insured losses up to $100 billion will be subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

   The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded.

2. The following is added to the **DEFINITIONS** section:

   **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

   a. the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**


**TRAVELERS**

*Executive Choice* ⁺ᴹ

### DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE

**THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.**
**PLEASE READ ALL TERMS CAREFULLY.**

### CONSIDERATION CLAUSE

**IN CONSIDERATION** of the payment of the premium, in reliance on the statements in the **Application**, subject to the Declarations, and pursuant to all terms, conditions, exclusions, and limitations of this **Policy**, the **Company** and the **Insureds** agree as follows:

### I.   INSURING AGREEMENTS

#### A.   DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE

The **Company** will pay, on behalf of any **Insured Person**, **Loss** that is not indemnified by the **Insured Organization** and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

#### B.   ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** of any **Insured Person** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

#### C.   ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay for any **Securities Claim** first made against the **Insured Organization** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

#### D.   INVESTIGATION EXPENSE COVERAGE

The **Company** will pay, on behalf of the **Insured Organization**, **Investigation Expense** for any **Shareholder Derivative Demand** first made during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

#### E.   OUTSIDE POSITION LIABILITY COVERAGE

The **Company** will pay, on behalf of any **Insured Person** serving in an **Outside Position**, **Loss** that such **Insured Person** becomes legally obligated to pay for any **Claim** first made against any **Insured Person** in such **Outside Position** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

### II.   ADDITIONAL BENEFITS

#### SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE

The **Company** will pay, on behalf of any **Independent Director**, **Loss** covered under Insuring Agreement A that the **Independent Director** is not indemnified by the **Insured Organization** and that the **Independent Director** becomes legally obligated to pay for any **Claim** first made against the **Independent Director** during the **Policy**

**Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

However, the Directors, Officers, and Organization Limit of Liability must be completely exhausted by payment of **Loss** before the **Company** will have any obligation to pay for **Loss** under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section. Coverage under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section will also be specifically excess of any other insurance or indemnification available to the **Independent Director**, including any other insurance that is specifically excess of this **Policy**. All such other insurance and indemnification must be completely exhausted by payment of loss, damages, defense expenses, claim expenses or other amounts covered under such other insurance or indemnification before the **Company** will have any obligation to pay for **Loss** under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section. This **Policy** will not be subject to the terms, conditions, exclusions, or limitations of any other insurance.

If the amount of covered **Loss** which is otherwise due and owing by the **Company** under this **Policy** is subject to both the then-remaining Directors, Officers, and Organization Limit of Liability in ITEM 5 of the Declarations and the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations, and if such **Loss** is incurred by both **Independent Directors** and other **Insured Persons**, then such **Loss** will be allocated to and paid by the **Company** under such respective Limits of Liability in whatever portions will maximize the total amount of such **Loss** being paid under this **Policy**.

## III.    DEFINITIONS

Wherever appearing in this **Policy**, either in the singular or plural, the following words and phrases appearing in bold type will have the meanings set forth in this section *III. DEFINITIONS*:

**A.    *Application*** means:

1. all signed applications for this **Policy**, or for any policy that this **Policy** renews, replaces, or succeeds in time, including any material submitted with or requested in such applications; and

2. all public documents filed by any **Insured** with the Securities and Exchange Commission (SEC), Federal Deposit Insurance Corporation (FDIC), or any similar federal, state, local, or foreign regulatory body during the 24 months preceding the **Policy Period**.

All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

**B.    *Claim*** means:

1. a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;

2. a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;

3. a criminal proceeding against any **Insured Person**, commenced by:

    a. a filing of charges;

    b. the return of an indictment, information, or similar document; or

    c. a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;

4. a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any **Insured Person**, commenced by the receipt of a:

    a. notice of filed charges, investigative order, or similar document;

    b. written notice identifying such **Insured Person** as a target of an investigatory authority; or

    c. Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**;

5. service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to an SEC formal investigative order;

6. a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

7.      a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**; or

8.      a written request to toll or waive a statute of limitations relating to any of the above,

for a **Wrongful Act**, including any appeal therefrom.

**C.**      *Company* means the insurer that issued this **Policy**, as set forth in the Declarations.

**D.**      *Defense Expense* means the reasonable costs, charges, fees (including attorneys', experts', mediators', or arbitrators' fees), and expenses, including **Extradition Expense**, incurred in defending a **Claim** covered under Insuring Agreements A, B, C, or E, and the premium for appeal, attachment, or similar bonds.

     **Defense Expense** does not include any: (1) regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**; or (2) **Investigation Expense**.

**E.**      *Domestic Partner* means any natural person who qualifies as a domestic partner, or party to a civil union, under the provisions of any applicable federal, state, local, or foreign law or regulation, or under the provisions of any formal program established by the **Insured Organization**.

**F.**      *Executive Officer* means any natural person who was, is, or becomes the chief executive officer or chief financial officer of the **Insured Organization**, or any functional equivalent position.

**G.**      *Extended Reporting Period* means the period of time set forth in ITEM 7 of the Declarations following the effective date of any nonrenewal or termination of the **Policy**.

**H.**      *Extradition* means a formal process by which an **Insured Person** located in any country is surrendered to any other country to answer any criminal accusation.

**I.**      *Extradition Expense* means the reasonable costs, charges, fees (including attorneys' and experts' fees), and expenses incurred by an **Insured Person** in lawfully opposing, challenging, resisting, or defending against any request for, or any effort to obtain, the **Extradition** of such **Insured Person**.

     **Extradition Expense** does not include regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**.

**J.**      *Financial Insolvency* means the: (1) court appointment of an examiner, receiver, conservator, liquidator, trustee, or rehabilitator, or any functional equivalent position, to take control of, supervise, manage, or liquidate the **Insured Organization** or **Outside Entity**; or (2) **Insured Organization** or **Outside Entity** becoming a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law or regulation.

**K.**      *Independent Director* means an **Insured Person** who is a "Non-Employee Director" of the **Insured Organization** as such term is defined in rule 16b-3 promulgated under the Securities Exchange Act of 1934, as amended; provided, that the term "issuer" as referenced in such rule is deemed to refer to the **Insured Organization**.

**L.**      *Insured* means the **Insured Persons** and the **Insured Organizations**.

**M.**      *Insured Organization* means any: (1) entity named in ITEM 1 of the Declarations; (2) **Subsidiary**; and (3) such entity or **Subsidiary** as a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law or regulation.

**N.**      *Insured Person* means any:

1.      natural person who was, is, or becomes a duly elected or appointed director, officer, **Manager**, or in-house general counsel of the **Insured Organization**, or any functional equivalent position;

2.      natural person described in **N.**1. above while serving in an **Outside Position**; and

3.    other natural person not described in **N.**1. above who:

    a.    with respect to a **Securities Claim** or a **Claim** for an employment-related **Wrongful Act**, was, is, or becomes a full or part-time employee of any **Insured Organization**, but only if the **Securities Claim** or **Claim** for an employment-related **Wrongful Act** is made against such natural person; and

    b.    with respect to any other **Claim**, was, is, or becomes a full or part-time employee of any **Insured Organization**, but only if the **Claim** is initially made against both such natural person and any natural person described in **N.**1. above.

**O.**    *Investigation Expense* means the reasonable costs, charges, fees (including attorneys' and experts' fees), and expenses, in connection with the investigation or evaluation of any **Shareholder Derivative Demand** covered under Insuring Agreement D incurred by: (1) the **Insured Organization**; (2) the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board; or (3) any committee of such board.

**Investigation Expense** does not include regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**.

**P.**    *Joint Venture* means any incorporated joint venture, other than a **Subsidiary**, if the **Insured Organization**:

1.    owns or controls at least 33% of the outstanding voting securities representing the present right to vote for the election or appointment of the directors or officers of such joint venture, or any functional equivalent position; or

2.    has the present right to elect or appoint at least 33% of the directors or officers of such joint venture, or any functional equivalent position.

**Q.**    *Loss* means the amount of any:

1.    damages, judgments, settlements, pre-judgment and post-judgment interest, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the **Insured**, the **Claim**, the **Company**, or this **Policy**; and

2.    **Investigation Expense**, with respect to Insuring Agreement D only.

**Loss**, other than **Defense Expenses**, does not mean any of the following:

1.    any amount that an **Insured** is absolved from payment;

2.    any amount that constitutes taxes, fines, or penalties; provided, **Loss** includes civil penalties assessed against any **Insured Person** pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended;

3.    any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

4.    any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.    any amount that constitutes disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the **Company** will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of section 11 or section 12 of the Securities Act of 1933, as amended, including **Defense Expenses** attributable to such **Claim**, constitutes disgorgement or other uninsurable loss.

**R.**    *Manager* means, with respect to an **Insured Organization** that is a limited liability company, political action committee, or non-profit entity, any natural person who was, is, or becomes a:

1.    member of the board of managers, the board of governors, management committee, or advisory committee of such **Insured Organization**, or any functional equivalent position; or

2.    trustee, other than a bankruptcy trustee, of any non-profit entity, or any functional equivalent position.

S.    *Named Insured* means the entity first named in ITEM 1 of the Declarations.

T.    *Outside Entity* means any:

1.    non-profit entity, corporation, community chest, fund, or foundation, other than a **Subsidiary**, and is exempt from federal income tax as an entity described in section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended;

2.    **Joint Venture**; or

3.    other entity, if coverage for such entity is specifically granted by endorsement to this **Policy**.

U.    *Outside Position* means the position of director, officer, manager, or trustee in an **Outside Entity**, or any functional equivalent position, held by a natural person, but only if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to such natural person by the **Insured Organization**.

V.    *Policy* means, collectively, the Declarations, the **Application**, this policy form, and any endorsement to any of the above.

W.    *Policy Period* means the period of time set forth in ITEM 2 of the Declarations, subject to prior termination in accordance with section *V. CONDITIONS*, **P. TERMINATION OF POLICY**.

X.    *Pollutant* means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste.  Waste includes material to be recycled, reconditioned, or reclaimed.

Y.    *Related Wrongful Acts* means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

Z.    *Securities Claim* means any **Claim**, in whole or in part, that is:

1.    brought and maintained by one or more security holders of the **Insured Organization**, in their capacity as such; or

2.    based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization**, whether such purchase, sale, or offer involves a transaction with the **Insured Organization** or occurs in the open market, including any such **Claim** brought by the SEC or any other claimant.

AA.   *Shareholder Derivative Action* means a civil proceeding brought and maintained on behalf of, or in the name or right of, the **Insured Organization** by one or more shareholders of the **Insured Organization** in their capacity as such.

BB.   *Shareholder Derivative Demand* means any written demand on behalf of the **Insured Organization** brought and maintained by any shareholder of the **Insured Organization** and made upon the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board, to bring a civil proceeding in a court of law against any **Insured Person** for a **Wrongful Act** committed by an **Insured Person**, but only if such demand is brought and maintained without the active solicitation, assistance, or participation of any **Insured**.

CC.   *Subsidiary* means any:

1.    entity, other than a limited liability company, joint venture, non-profit entity, or political action committee, if more than 50% of the outstanding voting securities representing the present right to vote for the election or appointment of directors or officers, or any functional equivalent position, is owned, directly or indirectly, by any entity named in ITEM 1 of the Declarations;

2.    limited liability company, if the present right to elect or appoint more than 50% of such limited liability company's **Managers** is owned or controlled, directly or indirectly, by any entity named in ITEM 1 of the Declarations;

3.    joint venture, if: (1) 50% of the outstanding voting securities representing the present right to vote for the election or appointment of directors or officers, or any functional equivalent position, is owned, directly or indirectly, by any entity named in ITEM 1 of the Declarations, and (2) the entity named in ITEM 1 of the Declarations solely controls the management and operation of such joint

venture, pursuant to a written agreement with the owner of the remaining issued and outstanding voting securities of such joint venture; or

4.    non-profit entity or political action committee, if the present right to elect or appoint more than 50% of such entity's **Managers** is owned or controlled, directly or indirectly, by any entity named in ITEM 1 of the Declarations;

on or before the Inception Date set forth in ITEM 2 of the Declarations or subject to section **V. CONDITIONS**, **K. ACQUISITIONS**, during the **Policy Period**.

**DD.**    ***Whistleblower Activity*** means activity protected under:

1.    18 U.S.C. 1514A(a) (whistleblower protection pursuant to section 806 of the Sarbanes-Oxley Act of 2002, as amended), other than the activity of "filing or the causing to be filed" any proceeding as specified under section 1514A(a)(2) and any other activity specified in section 1514A(a)(2) that is engaged in on a voluntary basis; or

2.    any similar whistleblower protection provision of any applicable federal, state, local, or foreign securities law or regulation that affords protection to a natural person, other than the filing, causing to be filed, or any other activity similar to the type specified in section 18 U.S.C. 1514A(a)(2) that is engaged in on a voluntary basis.

**EE.**    ***Wrongful Act*** means any actual or alleged:

1.    error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted:

    a.    by any **Insured Person** in their capacity as such, or in an **Outside Position**; or

    b.    with respect to Insuring Agreement C, by the **Insured Organization**; or

2.    matter claimed against the **Insured Person** solely because of their serving in such capacity or in an **Outside Position**.

Except as provided in Insuring Agreement E, **Wrongful Act** does not include any conduct committed or attempted by any **Insured Person** in their capacity as a director, officer, manager, trustee or employee of any entity other than the **Insured Organization**, or any functional equivalent position, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to such **Insured Person** by the **Insured Organization**.

## IV.    EXCLUSIONS

**A.**    **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS**

1.    **PRIOR NOTICE**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any **Insured** under any policy of insurance that: (1) this **Policy** renews, replaces, or succeeds in time, or (2) afforded coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

2.    **PRIOR OR PENDING PROCEEDING**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any: (1) prior or pending demand, suit, or other proceeding against any **Insured** or **Outside Entity** as of, or prior to, the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** underlying or alleged in such demand, suit, or other proceeding.

3.    **INSURED VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** against any **Insured** that is brought or maintained by or on behalf of any **Insured** in any capacity; provided, this exclusion will not apply to:

    a.    a **Claim** that is a **Shareholder Derivative Demand** or **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any

Insured; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

b.    a **Claim** brought and maintained by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this **Policy**;

c.    a **Claim** brought and maintained by a natural person who was a director, officer, or **Manager** of the **Insured Organization**, or any functional equivalent position, but who has not served in such capacity for at least four years preceding the date the **Claim** is first made, and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any natural person who: (1) is serving as a director, officer, or **Manager** of the **Insured Organization**, or any functional equivalent position; or (2) was serving in such capacity within such four-year period; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

d.    a **Claim** brought and maintained by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee, or rehabilitator of the **Insured Organization**, in any bankruptcy proceeding by or against the **Insured Organization**;

e.    a **Claim** that is brought and maintained outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, and any other jurisdiction governed by a common law legal system, but only if coverage for such **Claim** is specifically granted by endorsement to this **Policy**; or

f.    a **Claim** brought and maintained by any employee of the **Insured Organization**.

**4.    OUTSIDE ENTITY VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Position**, if such **Claim** is brought or maintained: (1) by or on behalf of the **Outside Entity** in which the **Insured Person** serves; (2) by or on behalf of any director, officer, manager, or trustee of such **Outside Entity**, or any functional equivalent position; or (3) by any entity that has an ownership interest in a **Joint Venture**; provided, this exclusion will not apply with respect to:

a.    a **Claim** that is a shareholder derivative action brought and maintained on behalf of such entity by any natural person who is not a director, officer, manager, or trustee of such entity, or any functional equivalent position, and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of such entity or any such director, officer, manager, or trustee, or the functional equivalent position; or

b.    a **Claim** brought and maintained by an officer of such entity, or any functional equivalent position, for an employment-related **Wrongful Act**.

**5.    ERISA**

The **Company** will not be liable for **Loss** for any **Claim** for a violation of the responsibilities, obligations, or duties imposed by the Employee Retirement Income Security Act of 1974, as amended, or similar provisions of any federal, state, local, or foreign law or regulation upon fiduciaries of any pension, profit sharing, health and welfare, or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Insured Organization** or **Outside Entity**.

**6.    BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY**

The **Company** will not be liable for **Loss** for any **Claim** for: (1) bodily injury, mental anguish, emotional distress, sickness, disease, or death of any person; (2) damage to, or destruction of, any tangible or intangible property, including loss of use of such property; or (3) libel, slander, defamation of character, disparagement, or violation of a person's right of privacy; provided, this exclusion will not apply with respect to: (1) any mental anguish, emotional distress, libel, slander, defamation of character, disparagement, or violation of a natural person's right of privacy in any **Claim** brought and maintained by a past, present, or prospective employee of the **Insured Organization** for an employment-related **Wrongful Act**; (2) **Loss** covered under Insuring Agreement A for a **Securities Claim**; or (3) **Loss** covered under Insuring Agreement A for a **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains such action without the active solicitation, assistance, or

©2009 The Travelers Companies, Inc. All Rights Reserved

participation of any **Insured**; provided, any  **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**.

7.   **POLLUTION, ASBESTOS, AND OTHER HAZARDS**

The **Company** will not be liable for **Loss**  for any  **Claim**:

a.   based upon or arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of;

b.   based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of; or

c.   brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of,

any **Pollutant**, any oil or oil products, any electric, magnetic, or electromagnetic field, any odor or noise, or the actual or alleged presence or actual, alleged, or threatened dispersal of any asbestos, asbestos fibers, or products containing asbestos, including any **Securities Claim** or any other  **Claim** brought or maintained by or on behalf of the **Insured Organization** or **Outside Entity**, its securities holders, or creditors based upon or arising out of the matters described in this exclusion; provided, this exclusion will not apply to **Loss** covered under Insuring Agreement A for a: (1)  **Securities Claim**; or (2) **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains such action without the active solicitation, assistance, or participation of any **Insured**.  For purposes of this exception, if any  **Insured Person**  engages in any **Whistleblower Activity**, such activity alone will not be considered the active solicitation, assistance, or participation of any **Insured**.

8.   **NON-SUBSIDIARY WRONGFUL ACTS**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by an entity that is, or was, a **Subsidiary**, or any **Insured Person** of such entity, if such **Wrongful Act** occurs during the time when such entity is not a **Subsidiary**.

B.   **EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C, AND E AND TO ADDITIONAL BENEFITS ONLY**

1.   **FRAUD**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that:

a.   such **Insured Person**, with respect to Insuring Agreements A or E, and section *II. ADDITIONAL BENEFITS*; or

b.   any **Executive Officer** or the **Insured Organization**, with respect to Insuring Agreement C,

committed such an act, omission, or willful violation.

2.   **PERSONAL PROFIT**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, if a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that such **Insured** was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any **Securities Claim** for a violation of section 11 or section 12 of the Securities Act of 1933, as amended.

C.   **SEVERABILITY OF EXCLUSIONS**

No fact pertaining to, or knowledge possessed by, any **Insured Person** will be imputed to any other **Insured Person** for purposes of applying the exclusions set forth in section *IV. EXCLUSIONS*.  Only facts pertaining to, or knowledge possessed by, an **Executive Officer** will be imputed to the **Insured Organization** for purposes of applying the exclusions set forth in section *IV. EXCLUSIONS*.

*V.*   *CONDITIONS*

A.   **LIMITS OF LIABILITY**

The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the **Company** will pay under this **Policy**, regardless of the number of **Claims** or **Insureds**, and regardless of when payment is made by the **Company** or when an **Insured's** legal obligation with regard to any **Claim** arises or is established.

The **Company's** maximum liability for all **Loss** for all **Claims** first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the **Policy Period** set forth in ITEM 5 of the Declarations.

The **Company's** maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Shareholder Derivative Demands** first made during the same **Policy Period** is the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

The **Company's** maximum liability under the SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE section for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations. Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

**Defense Expenses** are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the **Company** for all **Loss** for all **Claims** first made during the **Policy Period** and **Extended Reporting Period**, combined.

B.   **RETENTION**

The **Company's** liability with respect to **Loss** for each **Claim** applies only to that portion of **Loss** that is excess of the applicable Retention set forth in ITEM 5 of the Declarations. Such Retention will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of **Loss**.

However, no Retention applies to **Loss** covered under Insuring Agreements A or D or the **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section, except as otherwise provided in section *V. CONDITIONS, D. PRESUMPTIVE INDEMNIFICATION*. If **Loss** for a single **Claim** is covered in part under Insuring Agreements A or D, and in part under Insuring Agreements B, C, or E, then the applicable Retention set forth in ITEM 5 of the Declarations applies to that portion of the **Loss** covered under Insuring Agreements B, C, or E. The largest applicable Retention set forth in ITEM 5 of the Declarations is the maximum Retention applicable to all **Loss** for such **Claim**.

C.   **EXTENDED REPORTING PERIOD COVERAGE**

If the **Company** or the **Named Insured** does not renew this **Policy**, or if the **Named Insured** terminates this **Policy**, the **Named Insured** has the right, upon payment of the additional premium described below in this **EXTENDED REPORTING PERIOD COVERAGE** section, to elect an extension of coverage granted by this **Policy** for the **Extended Reporting Period**, but only with respect to a **Wrongful Act** otherwise covered under this **Policy** occurring before or during the **Policy Period**. This right of extension will lapse unless the **Named Insured** provides written notice of such election, together with payment of the additional premium due, to the **Company** within 60 days following the effective date of such nonrenewal or termination. Any **Claim** made during the **Extended Reporting Period** will be deemed made during the **Policy Period**.

The premium due for the **Extended Reporting Period** will equal that percent set forth in ITEM 7 of the Declarations of the original annualized premium, and the fully annualized amount of any additional premium, charged by the **Company** for or during the **Policy Period**.  The entire premium for the **Extended Reporting Period** will be deemed fully earned and non-refundable upon payment.

The **Named Insured** will not be entitled to elect the **Extended Reporting Period** under this **EXTENDED REPORTING PERIOD COVERAGE** section if an extension of coverage is elected pursuant to section *V. CONDITIONS*, **M. CHANGE OF CONTROL**.

D.      **PRESUMPTIVE INDEMNIFICATION**

Regardless of whether **Loss** for any **Claim** against an **Insured Person** is actually indemnified, Insuring Agreement B and E and the associated Retention set forth in ITEM 5 of the Declarations will apply to any **Loss**  that the **Insured Organization**, or any **Outside Entity**, is legally permitted to indemnify, whether or not actual indemnification is made, unless such **Insured Organization** or such **Outside Entity** fails to provide such indemnification solely because of its **Financial Insolvency**.

The security holder and board of director resolutions, articles of incorporation, bylaws, certificate of incorporation, charter, and other similar organizational documents of the **Insured Organization** and any **Outside Entity** are deemed to provide indemnification for **Loss** to the fullest extent permitted by law.

If the **Insured Organization**, or any **Outside Entity**, is legally permitted, but fails or refuses to advance **Defense Expenses** or indemnify an **Insured Person** for **Loss**:

1.      the **Company** will advance such **Defense Expenses** and pay such other **Loss** on behalf of the **Insured Person** and such **Insured Person** will not be liable for amounts within the applicable Retention; and

2.      if the **Insured Organization**, or **Outside Entity**, fails or refuses to advance **Defense Expenses** or indemnify  an **Insured Person** for **Loss** for reasons other than **Financial Insolvency**, the **Insured Organization** or **Outside Entity** will reimburse the **Company** for **Loss**, including **Defense Expenses**, that would not be have been paid by the **Company** if the **Insured Organization** or **Outside Entity** would have indemnified the **Insured Person** to the fullest extent permitted by law.  Any such failure or refusal will be subject to section *V. CONDITIONS*, **Q. SUBROGATION**.

E.      **NOTICE**

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Claim** made against any  **Insured**  as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, or risk manager of the **Insured Organization**, or any functional equivalent position, first becomes aware of such **Claim**.

If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

1.      becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

2.      gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.

As a condition precedent to exercising rights under this **Policy**, the **Insured** must:

1.      include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and

2.      give to the **Company** such other information and cooperation as the **Company** may reasonably request.

All notices under this **NOTICE** section must be sent or delivered to the **Company**, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

**F.    DEFENSE AND SETTLEMENT**

The **Company** will have no duty under this **Policy** to defend any **Claim**. The **Insureds** will have the duty to defend any **Claim** made against them.

The **Insureds** agree not to settle or offer to settle any **Claim**, or incur any **Defense Expenses** in connection with any **Claim**, without the **Company's** written consent; provided, that if the **Insureds** are able to fully and finally settle or otherwise dispose of any **Claim**, including **Defense Expenses**, for an amount not to exceed the applicable Retention set forth in ITEM 5 of the Declarations, the **Company's** consent will not be required. The **Company** is not liable for any settlement or **Defense Expenses** to which it has not consented when such consent is required.

The **Insureds** also agree not to assume any contractual obligation, stipulate to any judgment, or admit any liability with respect to any **Claim** without the **Company's** written consent, and the **Company** will not be liable for any such assumed obligation, stipulated judgment, or admission without such written consent.

With respect to any **Claim** submitted for coverage under this **Policy**, the **Company** has the right, and will be given the opportunity, to effectively associate with, and be consulted in advance by, the **Insureds** regarding:

1.    the selection of appropriate defense counsel;
2.    substantive defense strategies, including decisions regarding the filing and content of substantive motions; and
3.    settlement negotiations.

The **Insureds** agree: (1) to provide the **Company** with all information, assistance, and cooperation that the **Company** reasonably requests; and (2) that in the event of a **Claim**, the **Insureds** will do nothing to prejudice the **Company's** position or its potential or actual rights of subrogation or recovery. The **Company** may make any investigation it deems necessary.

The **Company**, on a current basis and prior to disposition of the **Claim**, will advance, on behalf of the **Insureds**, **Defense Expenses** or **Investigation Expenses** that the **Company** believes to be covered under this **Policy** and that are incurred in connection with any **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**; provided, that to the extent it is finally established that any such **Defense Expenses** or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally according to their interests, agree to repay the **Company** such **Defense Expenses** and **Investigation Expenses**.

The **Company** may, with the written consent of the **Insured**, settle any **Claim** for a monetary amount that the **Company** deems reasonable.

The **Company** and the **Insureds** will not unreasonably withhold any consent referenced in this **DEFENSE AND SETTLEMENT** section.

**G.    ALLOCATION**

If, in any **Claim**, any **Insured** incurs **Loss** jointly with others (including an **Insured Person** incurring **Loss** jointly with the **Insured Organization** for any **Claim** not covered under Insuring Agreement C) or incurs an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because the **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Company** will allocate such amount between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.

For that part of **Loss** consisting of **Defense Expenses**, if there can be an agreement on an allocation of **Defense Expenses**, then the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** allocated to covered **Loss**. If there can be no agreement on an allocation

of **Defense Expenses**, the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** that the **Company** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated, or judicially determined.  As a condition of any advancement of **Defense Expenses**, the **Company** may require a written undertaking on terms and conditions satisfactory to the **Company** guaranteeing the repayment of any **Defense Expenses** paid to, or on behalf of, any **Insured**  if it is finally determined that any such **Claim**, or portion of **Claim**, is not covered under this **Policy**.

Any negotiated, arbitrated, or judicially determined allocation of **Defenses Expenses** in connection with a **Claim** will apply retroactively to all **Defense Expenses** in connection with such **Claim**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of **Defense Expenses** in connection with a **Claim** will not apply to, or create any presumption with respect to, the allocation of other **Loss** for such **Claim** or any other **Claim**.

**H.**     **OTHER INSURANCE**

If **Loss** arising from any **Claim** made against any **Insured** is insured under any valid and collectible other insurance, prior or current, then this **Policy** covers such **Loss** only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written as specific excess insurance over the Limits of Liability set forth in ITEM 5 of the Declarations.  Any payment by an **Insured** of a retention or deductible under any such other insurance issued by the **Company** or any of its affiliated companies will reduce, by the amount of such payment that would otherwise have been covered under this **Policy**, any applicable Retention under this **Policy**.  This **Policy** will not be subject to the terms, conditions, exclusions, or limitations of any other insurance.

In addition, this **Policy** covers **Loss** for any  **Claim** made against any  **Insured Person** serving in an **Outside Position** only to the extent that the amount of such **Loss** exceeds any indemnity and other insurance available from, or provided by, the applicable **Outside Entity**.  Also, payment by the **Company** or any of its affiliated companies under another policy as a result of a  **Claim**  made against an **Insured Person** in an **Outside Position** reduces the **Company's** Limits of Liability under this **Policy**, with respect to such **Claim**, by the amount of such payment.

**I.**     **ORDER OF PAYMENTS**

If **Loss** for any **Claim** exceeds, or may exceed, the remaining applicable Limits of Liability set forth in ITEM 5 of the Declarations:
1.      the **Company** will first pay **Loss** covered under Insuring Agreement A; then
2.      with respect to any remaining amount of the Limits of Liability available after such payment, at the written request of a majority of the members of the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board, who are not named defendants in such  **Claim**, the **Company** will either pay or withhold payment of such other **Loss** covered under any other Insuring Agreement of this **Policy**.

Except as provided in this **ORDER OF PAYMENTS** section, the **Company** may pay **Loss** as it becomes due without regard to the potential for other future payment obligations under this **ORDER OF PAYMENTS**  section.

**J.**     **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSAL LIABILITY COVERAGE**

Subject to the applicable Insuring Agreement, this **Policy** will afford coverage for **Claims** for **Wrongful Acts** of any **Insured Person** made against:
1.      any estate, heir, legal representative, or assignee of the **Insured Person** in the event of death, incapacity, insolvency, or bankruptcy of such **Insured Person**; or
2.      the **Insured Person's** lawful spouse or **Domestic Partner** solely because of such spouse's or such  **Domestic Partner's** legal status as a spouse or **Domestic Partner**, or because of such spouse's or such **Domestic Partner's** ownership interest in property that the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**.

All loss such estate, heir, legal representative, assignee, spouse, or **Domestic Partner** of such **Insured Person** becomes legally obligated to pay for such **Claim** will be treated as **Loss** that the **Insured Person** becomes legally obligated to pay for the **Claim** made against the **Insured Person**. The coverage afforded by this **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSAL LIABILITY COVERAGE** section will not apply to the extent the **Claim** alleges any wrongful act or omission by the estate, heir, legal representative, assignee, spouse, or **Domestic Partner** of the **Insured Person**.

**K.     ACQUISITIONS**

If, during the **Policy Period**, the **Insured Organization**:

1.      acquires securities in, or creates, another entity, that as a result of such acquisition or creation becomes a **Subsidiary**; or

2.      acquires any entity by merger into, or consolidation with, the **Insured Organization**,

then such entity and its **Insured Persons** will be covered under this **Policy** as follows:

a.      If the total assets of any such acquired or created entity are less than 30% of the total assets of all **Insured Organizations**, as reflected in the **Insured Organizations'** most recent financial statements as of the inception of the **Policy Period**, such entity and its **Insured Persons** will be covered automatically under this **Policy**, but only with respect to **Wrongful Acts** occurring after such acquisition or creation, unless the **Company** agrees after presentation of a complete **Application** and all appropriate information to provide coverage by endorsement for **Wrongful** Acts occurring prior to such acquisition or creation.

b.      With respect to all acquisitions or creations other than as described in a. above, such entity and its **Insured Persons** will be covered automatically under this **Policy**, but only for the lesser of the remainder of the **Policy Period** or 90 days, following the effective date of such acquisition or creation (Automatic Coverage Period), and only with respect to **Wrongful Acts** occurring after such acquisition or creation. As a condition precedent to further coverage with respect to such entity and its **Insured Persons** after such Automatic Coverage Period, the **Named Insured** must give written notice of such acquisition or creation to the **Company** as soon as practicable, but in no event later than 60 days following the effective date of such acquisition or creation, and must promptly provide the **Company** such information as the **Company** may request. Upon receipt of such notice and other information, the **Company** will provide the **Named Insured** a quotation for coverage under this **Policy** for such entity and its **Insured Persons** for the remainder of the **Policy Period**. If the **Named Insured** fails to comply with such condition precedent, or if within 60 days following receipt of such quotation the **Named Insured** fails to pay any additional premium or fails to agree to any additional coverage terms, conditions, exclusions, or limitations set forth in such quotation, coverage otherwise afforded by this **ACQUISITIONS** section for such entity and its **Insured Persons** will terminate upon expiration of such Automatic Coverage Period.

**L.     CESSATION OF SUBSIDIARIES**

If, before or during the **Policy Period,** an entity ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insured Persons** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** occurring during the time that such entity was a **Subsidiary**.

**M.     CHANGE OF CONTROL**

If, during the **Policy Period**:

1.      the **Named Insured** merges into, or consolidates with, another entity such that the **Named Insured** is not the surviving entity; or

2.      another entity, person, group of entities, or group of persons acting in concert, acquires securities or voting rights that result in ownership or voting control by the other entity, persons, or group of more than 50% of the outstanding securities representing the present right to vote for the election or appointment of directors, officers, or **Managers** of the **Named Insured**, or any functional equivalent position,

then coverage under this **Policy** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** occurring prior to such merger, consolidation, or acquisition. As of the

effective date of such merger, consolidation, or acquisition, all premiums paid or due at any time under this **Policy** are deemed fully earned and non-refundable.

The **Named Insured** must give written notice of such merger, consolidation, or acquisition to the **Company** as soon as practicable together with such information as the **Company** may request. Upon receipt of such notice and information and at the request of the **Named Insured**, the **Company** will provide to the **Named Insured** a quotation for a six-year (or such lesser period as may be negotiated with the **Company**) extension of coverage from such merger, consolidation, or acquisition date with respect to **Claims** for **Wrongful Acts** occurring prior to such merger, consolidation, or acquisition. Any coverage extension pursuant to such quotation will be conditioned upon the **Named Insured** completing the following within 60 days after receipt of such quotation:

1.      provide written notice to the **Company** of the **Named Insured's** desire to elect such coverage extension;

2.      pay any additional premium required by the **Company**, which is deemed fully earned upon inception of such coverage extension; and

3.      accept any additional terms, conditions, exclusions, and limitations required by the **Company**.

Such coverage extension will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations and the Limits of Liability for such coverage extension will be part of, and not in addition to, the Limits of Liability for the **Policy Period**. Any additional premium required under this **CHANGE OF CONTROL** section will be deemed fully earned upon inception of such coverage extension.

The **Insureds** are not entitled to elect an extension of coverage under this **CHANGE OF CONTROL** section if an **Extended Reporting Period** is elected pursuant to section **V. CONDITIONS**, **C. EXTENDED REPORTING PERIOD COVERAGE**.

N.      **REPRESENTATIONS AND SEVERABILITY**

In consideration of issuing this **Policy**, the **Company** has relied upon the statements and representations in the **Application**. The **Insureds** represent and agree that all such statements and representations are true and accurate and are the basis of the **Policy**. This **Policy** is issued in reliance upon the truth of all such statements and representations.

With respect to all statements and representations contained in the **Application**, no knowledge possessed by any one **Insured Person** will be imputed to any other **Insured Person**.

The **Company** will not, under any circumstance, rescind this **Policy** with respect to any **Insured**. However, the **Insureds** agree that in the event any such statements or representations in the **Application** are untrue or inaccurate and materially affect either the acceptance of the risk or the hazard assumed by the **Company**, then no coverage will be afforded under this **Policy** with respect to the following **Insureds** for any **Claim** based upon or arising out of the information that was not truthfully or accurately disclosed in the **Application** (whether or not the **Insured** or **Executive Officer** knew of such untruthful or inaccurate disclosure in the **Application**) with respect to any of the following **Insureds**:

1.      any **Insured Person**, under Insuring Agreements A or E, who knew the information that was not truthfully or accurately disclosed in the **Application**;

2.      the **Insured Organization**, under Insuring Agreement B, to the extent it indemnifies any **Insured Person** referenced in **N.1.** above; and

3.      the **Insured Organization**, under Insuring Agreements C or D, if any **Executive Officer** knew the information that was not truthfully or accurately disclosed in the **Application**.

O.      **TERRITORY AND VALUATION**

Where legally permissible, coverage under this **Policy** extends to **Wrongful Acts** occurring, or **Claims** made, anywhere in the world.

If the laws or regulations of any country or jurisdiction outside of the United States (including any U.S. territory, possession, or protectorate) prohibit the **Company** from paying on behalf of an **Insured** any **Loss** covered under this **Policy**, such **Insured** may pay such **Loss**, with the **Company's** written consent. If the **Insured** provides the **Company** with proof of payment for such **Loss**, the **Company** will reimburse

either such **Insured** or the **Named Insured** for such **Loss**, where legally permissible, subject to all applicable terms, conditions, exclusions, and limitations of this **Policy**.

All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Policy** is stated in a currency other than United States dollars, payment under this **Policy** will be made in United States dollars at the rate of exchange published in _The Wall Street Journal_ on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

**P.   TERMINATION OF POLICY**

This **Policy** terminates at the earliest of the following times:

1.   the effective date of termination specified in a prior written notice by the **Named Insured** to the **Company**; provided, this **Policy** may not be terminated after the effective date of any merger, consolidation, or acquisition of the **Named Insured** as described in section *V. CONDITIONS*, **M. CHANGE OF CONTROL**;

2.   upon expiration of the **Policy Period** set forth in ITEM 2 of the Declarations;

3.   20 days after receipt by the **Named Insured** of a written notice of termination from the **Company** for failure to pay a premium when due, unless the premium is paid within such 20 day period; or

4.   at such other time as may be agreed upon by the **Company** and the **Named Insured**.

The **Company** may not terminate this **Policy** prior to expiration of the **Policy Period**, except as provided above for non-payment of premium.  The **Company** will refund any unearned premium computed at customary short rates if this **Policy** is terminated by the **Named Insured**. Under any other circumstance, the refund will be computed pro rata.  Payment or tender of any unearned premium by the **Company** is not a condition precedent to the effectiveness of such termination, but such payment must be made as soon as practicable.

**Q.   SUBROGATION**

In the event of payment under this **Policy**, the **Company** will be subrogated to all of the **Insureds'** rights of recovery against any person or entity, including the **Insured Persons'** rights to indemnification or advancement from any entity, to the extent of such payment, and the **Insured** must execute and deliver instruments and papers and do all that is necessary to secure such rights.  The **Insured** must do nothing to prejudice such rights.

**R.   RECOVERY**

The **Company** will not exercise its rights of recovery against any **Insured**, unless there is a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishing that:

1.   such **Insured Person**, or with respect to Insuring Agreement C, such **Executive Officer**, committed a deliberately fraudulent act or omission, or a willful violation of any law or regulation; or

2.   such **Insured**  gained any profit, remuneration, or financial advantage to which that **Insured** was not legally entitled.

**S.   BANKRUPTCY**

Bankruptcy or insolvency of any **Insured**, or of an **Insured's** estate, will not relieve the **Company** of its obligations, nor deprive the **Company** of its rights or defenses, under this **Policy**.

In the event a liquidation or reorganization proceeding is commenced by or against an **Insured Organization** pursuant to the U.S. Bankruptcy Code, as amended, or any similar state, local, or foreign law, and if there is **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Policy**, the **Insureds** must:

1.   make a request to waive and release any automatic stay or injunction that may apply to this **Policy**  or its proceeds in such proceeding, to the extent permitted under the applicable law; and

2.  agree not to oppose, or object to, any efforts by the **Company** or any **Insured** to obtain relief from any such stay or injunction.

**T.   ACTION AGAINST THE COMPANY**

No action will lie against the **Company** unless, as a condition precedent, there has been full compliance with all the provisions of this **Policy**. No person or entity will have any right under this **Policy** to join the **Company** as a party to any action against any **Insured** to determine such **Insured's** liability nor may the **Company** be impleaded by any **Insured** or their legal representative.

**U.   AUTHORIZATION**

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claim** or termination, nonrenewal, change of coverage, or the payment of premiums and the receiving of any return premiums that may become due under this **Policy**, and each **Insured** agrees that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing in this **AUTHORIZATION** section relieves any **Insured** from giving any notice to the **Company** required under this **Policy**.

**V.   ALTERATION AND ASSIGNMENT**

No change in, modification of, or assignment of interest under this **Policy** will be effective except when made by the **Company** by written endorsement to this **Policy**.

| THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY. |
|---|

## KENTUCKY CHANGES ENDORSEMENT

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1.  Section **V. CONDITIONS, P. TERMINATION OF POLICY**, item 3.is replaced with the following:

    3.  14 days after receipt by the **Named Insured** of a written notice of termination from the **Company** for failure to pay a premium when due, unless the premium is paid within such 14 day period; or

2.  The following is added to Section **V. CONDITIONS,  P. TERMINATION OF POLICY**:

    Nonrenewal

    This **Policy** may be nonrenewed by or on behalf of the **Company** by delivering to the **Named Insured**, at its last known address, written notice of the nonrenewal stating when, not more than 75 days thereafter, the nonrenewal shall be effective.  Such notice will contain the specific reason(s) for the nonrenewal and  such reason(s) will be in a statement reasonably calculated to inform the **Insured**. Underwriting reasons is not sufficiently specific.

    Failure of the **Company** to provide the **Named Insured** with the required notice of nonrenewal shall entitle the **Insured** to continue on the expiring **Policy** for another **Policy Period** at the same terms and premium upon payment of such premium. This additional **Policy Period** will cease only when the **Insured** accepts replacement coverage with another insurer or agrees to the nonrenewal.

    The **Company** may offer to renew or continue the **Policy**  by delivering to the **Named Insured**, at its last known address, a notice of renewal at least 30 days prior to the expiration date. Such notice shall contain the renewal premium amount and the due date of the renewal premium. A duplicate copy of this notice shall be sent to the agent.  In the event that such notice is provided and the **Insured** does not pay the required premium by the expiration date, the **Policy** will terminate on the expiration date. The **Company** will deliver written notice to the **Named Insured** within 15 after the expiration date confirming the expiration of the **Policy**.

    Renewal with Altered Terms

    The **Company** will give written notice to the **Named Insured** if the renewal premium is increased by more than 25% for a reason other than change in the actual exposure or risk at least 75 days prior to the expiration of the **Policy Period**. Such notice will be sent to the **Insured** at its last known address and shall include the renewal premium amount and the due date of the renewal premium. A duplicate copy of this notice will also be sent to the agent.  If the **Company** fails to provide such notice at least 75 days prior to expiration of the **Policy Period**, the existing **Policy** will continue until the **Company** provides 75 days notice of the premium increase to the **Named Insured**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## AMEND DEFINITION OF INSURED PERSON ENDORSEMENT  - SCHEDULED PERSON OR POSITION

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following is added to section **III. DEFINITIONS, N. Insured Person**:

**N. Insured Person** also means any person, or any natural person serving in a position, set forth below as a scheduled Person or Position:

<u>Person or Position:</u>

**Vice President of Finance & Investor Relations**

**Risk Manager**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## EMPLOYED LAWYER ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

1.  The following is added to ITEM 5 of the Declarations:

    **Employed Lawyer Limit of Liability: $2,000,000.00** for all **Employed Lawyer Claims**, which amount is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability

2.  The following is added to section **III. DEFINITIONS, N. Insured Person:**

    **Insured Persons** also means any **Employed Lawyer**, but only for a **Claim** initially made, and continuously maintained, against both such **Employed Lawyer** and any natural person described in **N. 1.** above.

3.  The following is added to section **III. DEFINITIONS:**

    *Employed Lawyer* means any employee of the **Insured Organization** who is admitted to practice law and who was, now is or shall be, at the time of the **Wrongful Act**, employed as a lawyer full time for, and salaried by, the **Insured Organization**.

4.  The following is added to section **III. DEFINITIONS, EE. Wrongful Act:**

    **Wrongful Act** also means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by any **Employed Lawyer** in his or her capacity as such; provided, **Wrongful Act** does not include any error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with any conduct by such **Employed Lawyer**: (i) which is not related to such **Employed Lawyer's** employment with the **Insured Organization**; (ii) which is not rendered on behalf of the **Insured Organization** at the **Insured Organization's** written request; or (iii) which is performed by such **Employed Lawyer** for others for a fee.

5.  The following is added to section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS:**

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by an **Employed Lawyer**, if such **Wrongful Act** occurs during the time when such **Employed Lawyer** was not employed as a lawyer by the **Insured Organization**.

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a claim about which any **Employed Lawyer** had knowledge prior to the effective date of this endorsement; provided no knowledge by any **Employed Lawyer** will be imputed to any other **Employed Lawyer** to determine the application of this exclusion.

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any activities by an **Employed Lawyer** as an employee, officer or director of any entity other than the **Insured Organization**.

7.  The following is added to section **V. CONDITIONS, A. LIMITS OF LIABILITY:**

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

Page 28 of 46

The **Company's** maximum liability under Insuring Agreements A and B for all **Loss** for all **Claims** first made during the same **Policy Period** based upon or arising out of any **Wrongful Act** by any **Employed Lawyer** is the Employed Lawyer Limit of Liability set forth in ITEM 5 of the Declarations. Such Employed Lawyer Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

8.   The following is added to section **V. <u>CONDITIONS</u>, H. OTHER INSURANCE**:

If **Loss** arising from any **Claim** based upon or arising out of any **Wrongful Act** by any **Employed Lawyer** is insured under any valid or collectible other insurance, prior or current, providing lawyers professional, legal malpractice, or errors and omissions liability coverage, then this **Policy** shall cover such **Loss** only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## PROVIDE NON-SCHEDULED FOR-PROFIT OUTSIDE POSITION COVERAGE ON A "TRIPLE EXCESS" BASIS ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Coverage**

**It is agreed that:**

1.  The following replaces section **III. DEFINITIONS, T., Outside Entity:**

    **T.  *Outside Entity*** means any:

    1.  non-profit entity, corporation, community chest, fund or foundation, other than a **Subsidiary**, and is exempt from federal income tax as an entity described in section 501(c) (3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended;

    2.  **Joint Venture**, or

    3.  for-profit entity.

2.  The following replaces the second paragraph of **V. CONDITIONS, H., OTHER INSURANCE:**

    In addition, this **Policy** covers **Loss** for any **Claim** made against any **Insured Person** serving in an **Outside Position** as follows:

    1.  In regard to any **Insured Person** serving in an **Outside Position** in an **Outside Entity** as specified in subparts 1. and 2. of the definition of **Outside Entity**, only to the extent that the amount of such **Loss** exceeds any indemnity and other insurance from, or provided by, the applicable **Outside Entity**;

    2.  In regard to any **Insured Person** serving in an **Outside Position** in an **Outside Entity** as specified in subpart 3. of the definition of **Outside Entity**, only to the extent that the amount of such **Loss** exceeds (a) any indemnity and other insurance available from, or provided by, the applicable **Outside Entity**; and (b) any indemnification granted to such **Insured Person** by the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## CLAIM DEFINITION ENDORSEMENT – ADD MEDIATION COVERAGE AND CO-DEFENDANT ENTITY COVERAGE FOR ADMINISTRATIVE AND REGULATORY PROCEEDINGS

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

The replaces *III. DEFINITIONS*, B. Claim:

B.    *Claim* also means:

1.    a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;

2.    a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;

3.    a criminal proceeding against any **Insured Person**, commenced by:

    a.    a filing of charges;

    b.    the return of an indictment, information, or similar document; or

    c.    a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;

4.    a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any **Insured Person**, or against any **Insured Organization**, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an **Insured Person** and the **Insured Organization**, and commenced by the receipt of a:

    a.    notice of filed charges, investigative order, or similar document;

    b.    written notice identifying such **Insured Person** as a target of an investigatory authority; or

    c.    Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**;

5.    service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to an SEC formal investigative order;

6.    a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

7.    a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**; or

8.    a written request to toll or waive a statute of limitations relating to any of the above; or

9.    a formal mediation proceeding against any **Insured** if the **Insured** is obligated to participate in such proceeding, and if the mediator for such proceeding has the authority to bind the parties.

    for a **Wrongful Act**, including any appeal therefrom.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2010 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## AMEND "INSURED PERSON" DEFINITION TO INCLUDE SHADOW AND DE FACTO DIRECTORS ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

The following is added to **III. DEFINITIONS, N., INSURED PERSON**:

**Insured Person** also means any natural person acting in his or capacity as (1) a Shadow Director of any **Insured Organization** that is incorporated or domiciled in the United Kingdom, as defined in Section 251 of Chpt 8, Part 10 of the Companies Act of 2006, as amended; or (2) a de facto director of such **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2010 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## ADD ADDITIONAL CARVEBACKS TO OUTSIDE ENTITY VERSUS INSURED ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, 4. OUTSIDE ENTITY VERSUS INSURED:

**4.     OUTSIDE ENTITY VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Position**, if such **Claim** is brought or maintained: (1) by or on behalf of the **Outside Entity** in which the **Insured Person** serves; (2) by or on behalf of any director, officer, manager, or trustee of such **Outside Entity**, or any functional equivalent position; or (3) by any entity that has an ownership interest in a **Joint Venture**; provided, this exclusion will not apply with respect to:

a.    a **Claim** that is a shareholder derivative action brought and maintained on behalf of such entity by any natural person who is not a director, officer, manager, or trustee of such entity, or any functional equivalent position, and who brings and maintains the **Claim** without the solicitation, assistance, or active participation of such entity or any such director, officer, manager, or trustee, or the functional equivalent position;

b.    a **Claim** brought and maintained by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this **Policy**;

c.    a **Claim** brought and maintained by a natural person who was a director, officer, or manager of the **Outside Entity**, or any functional equivalent position, but who has not served in such capacity for at least three years preceding the date the **Claim** is first made, and who brings and maintains the **Claim** without the solicitation, assistance, or active participation of any natural person who: (1) is serving as a director, officer, or manager of the **Outside Entity**, or any functional equivalent position; or (2) was serving in such capacity within such three-year period; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the solicitation, assistance, or active participation of an **Insured**;

d.    a **Claim** brought and maintained by the **Outside Entity** as a debtor in possession, or by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee, or rehabilitator of the **Outside Entity**, in any bankruptcy proceeding by or against the **Outside Entity**;

e.    a **Claim** that is brought and maintained outside of the United States of America by any natural person who is a director, officer, manager, or trustee of any **Outside Entity** incorporated or chartered outside of the United States of America; or

f.    a **Claim** brought and maintained by an officer of such entity, or any functional equivalent position, for an employment-related **Wrongful Act**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## DELETE PRIOR OR PENDING PROCEEDING EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1.  The **Prior or Pending Proceeding Date** is deleted from ITEM 5 of the Declarations.

2.  Section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMETNS AND TO ALL ADDITIONAL BENEFITS, 2. PRIOR OR PENDING PROCEEDING is deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2010 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## AMEND EXECUTIVE OFFICER DEFINITION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Policy**

**It is agreed that:**

The following replaces section *III. DEFINITIONS*, **F. Executive Officer**:

F.   *Executive Officer* means any natural person who was, is, or becomes the chief executive officer or chief financial officer of **Named Insured**, or any functional equivalent position.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Directors, Officers, and Organization Liability**

---

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## DELETE POLLUTION EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Policy**

**It is agreed that:**

1. The following is added to section *III. DEFINITIONS*:

    *Clean-Up Costs* means any payment made, or any cost or expense incurred, as a result of any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, test or assess the effects of, any **Pollutant**, any oil or oil products, any electric, magnetic, or electromagnetic field, any odor or noise, or the actual, alleged or threatened dispersal of any asbestos, asbestos fibers, or products containing asbestos.

2. The following is added to section *III. DEFINITIONS*, **Q. Loss**:

    **Loss** , other than **Defense Expenses**, also does not mean any amount that constitutes **Clean-Up Costs**.

3. *IV. EXCLUSIONS*, **A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 7. POLLUTION, ASBESTOS AND OTHER HAZARDS,** is deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## PRIOR NOTICE EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 1. PRIOR NOTICE:

1.    **PRIOR NOTICE**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** about which written notice has been given by or on behalf of any **Insured**, provided that such written notice has been accepted under any directors and officers liability insurance policy that: (1) this **Policy** renews or replaces, or (2) afforded directors and officers liability coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-10200 Ed. 11-11                                                                                              Page 1 of 1
© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## GENERAL CABLE ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1.  The following is added to *I. INSURING AGREEMENTS*, **A. DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE**:

    The **Company** will pay, on behalf of any **Insured Person**, **Interview Costs** that are not indemnified by the Insured **Organization** and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**.

2.  The following is added to *I. INSURING AGREEMENTS*, **B. ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**:

    The **Company** will pay, on behalf of the **Insured Organization**, **Interview Costs** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**.

3.  The following replaces section *III. DEFINITIONS*, **A. Application**:

    A.  *Application* means:

        1.  all signed applications for this **Policy**, or for any policy that this **Policy** renews or replaces, including any materials submitted with or requested in such applications; and

        2.  all public documents filed by the **Insured Organization** with the Securities and Exchange Commission (SEC), or any similar federal, state, local, or foreign regulatory body, during the 12 months preceding the **Policy Period**.

    All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

4.  The following is added to *III. DEFINITIONS*, **C. Claim**:

    Provided, with respect to any paragraph 1. through 8. above that invokes coverage for **Dodd-Frank Costs**, a **Wrongful Act** is not required, but only with respect to **Dodd-Frank Costs**.

5.  The following is added to *III. DEFINITIONS*, **D. Defense Expense**:

    **Defense Expense** also includes (1) **Corporate Manslaughter Proceeding Costs**, (2) **SOX 304 Defense Expenses**, and (3) **Dodd-Frank 954 Defense Expenses**. Defense Expense does not include **Interview Costs**.

6.  The following replaces *III. DEFINITIONS*, **Q. Loss**:

    Q.  *Loss* means:

        1.  **Interview Costs**;

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

2.      damages, judgments, settlements, pre-judgment and post-judgment interest, **SOXSOX 304 Costs, Corporate Manslaughter Proceeding Costs, Dodd-Frank 954 Costs**, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the Insured, the **Claim**, the **Company**, or this **Policy**; and

3.      **Investigation Expense**, with respect to Insuring Agreement D only.

**Loss**, other than **Defense Expenses**, does not mean any of the following:

1.      any amount that an **Insured** is absolved from payment;

2.      any amount that constitutes taxes, fines, or penalties; provided, **Loss** includes:

    (i)      civil penalties assessed against any **Insured Person** pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended; or

    (ii)     civil penalties assessed against any **Insured Person** pursuant to section 308 of the Sarbanes-Oxley Act of 2002, as amended;

3.      any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

4.      any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.      any amount that constitutes disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the **Company** will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended, including **Defense Expenses** attributable to such **Claim**, constitutes disgorgement or other uninsurable loss.

7.    The following are added to section *III. DEFINITIONS*:

*Corporate Manslaughter Proceeding* means a formal criminal proceeding for corporate manslaughter or corporate homicide, as those terms are defined in the United Kingdom's Corporate Manslaughter and Corporate Homicide Act of 2007, as amended, or similar provisions of any federal, state, local or foreign law or regulation.

*Corporate Manslaughter Proceeding Costs* means the reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by an **Insured Person** in defending against a **Claim** related to or arising out of a **Corporate Manslaughter Proceeding**.

*Dodd-Frank 954 Costs* means:

1.      **Dodd-Frank 954 Defense Expenses**; and

2.      the reasonable amount of a premium or origination fee incurred by such **Insured Person** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to 954(b)(2);

provided that **Dodd-Frank Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to section 954 (b)(2) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, (ii) the principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to section 954 (b)(2) of the Dodd-Frank Act, (iii) the amount incurred to comply with section 954 (b)(1) of the Dodd-Frank Act, and (iv) the expense incurred to determine what amount, if any is owed pursuant to section 954(b)(2) of the Dodd-Frank.

© 2011 The Travelers Indemnity Company. All rights reserved.

*Dodd Frank 954 Defense Expenses* means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to section 954 of the Dodd-Frank Act.

*Enforcement Body* means any federal, state, local or foreign governmental regulatory authority, including the United States Department of Justice, the Securities and Exchange Commission, any states' attorney general, or the enforcement unit of any securities exchange.

*Interview Costs* means the reasonable costs, charges and fees (including attorneys' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred by an **Insured Person** in responding to an **Interview Request**; provided that **Interview Costs** do not include:

1.    any compensation of any **Insured Person** associated with an **Interview Request**; or

2.    any costs incurred in responding to any formal or informal discovery or e-discovery request for the production of documents, records or electronic information of any kind, regardless of whether such documents, records or electronic information are in the possession of any **Insured**, any **Enforcement Body** or any other third party.

*Interview Request* means a written request by an **Enforcement Body** for an **Insured Person** to appear for an interview or meeting in connection with an investigation against any **Insured Person** or the **Insured Organization**; provided that **Interview Request** does not include any routine or regularly scheduled interview or audit conducted pursuant to the **Enforcement Body's** or **Insured Organization's** ordinary review and compliance procedures.

*Related Interview Requests* means all **Interview Requests** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

*SOX 304 Costs* means:

1.    **SOX 304 Defense Expenses**; and

2.    the reasonable amount of a premium or origination fee incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to section 304(a) of the Sarbanes Oxley Act of 2002, as amended (SOX 304(a));

provided that **SOX 304 Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to SOX 304(a), or (ii) the principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to SOX 304(a).

*SOX 304 Defense Expenses* means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to SOX 304(a).

8.    The following replaces section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 3. ORGANIZATION VERSUS INSURED:

3.    **ORGANIZATION VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** against any **Insured** that is brought or maintained by or on behalf of any **Insured Organization** in any capacity, provided that this exclusion will not apply to:

a.    a **Claim** that is a **Shareholder Derivative Demand** or **Shareholder Derivative Action**, brought or maintained by any natural person who is not an **Insured Person** and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any **Insured**; provided any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

© 2011 The Travelers Indemnity Company. All rights reserved.

b.  a **Claim** brought and maintained by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee or rehabilitator of the **Insured Organization**, in any bankruptcy proceeding by or against the **Insured Organization**; or

c.  a **Claim** that is brought and maintained outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, and other jurisdiction governed by a common law legal system, but only if the laws or regulations of such jurisdiction require that such **Claim** be brought by or on behalf of the **Insured Organization**.

9.  The following is added to section **IV. EXCLUSIONS**, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 6. BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY:

This exclusion will also not apply to any **Loss** amounting to **Corporate Manslaughter Proceeding Costs**.

10.  The replaces section **IV. EXCLUSIONS**, B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C AND E AND TO ADDITIONAL BENEFITS ONLY:

**1.  FRAUD**

The **Company** will not be liable for **Loss** for any **Claim** for any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that:

a.  such **Insured Person**, with respect to Insuring Agreements A or E, and section **II. ADDITIONAL BENEFITS**; or

b.  any **Executive Officer** or the **Insured Organization**, with respect to Insuring Agreement C,

committed such an act, omission, or willful violation.

**2.  PERSONAL PROFIT**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that such **Insured** was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended.

11.  The following is added to section **IV. EXCLUSIONS**:

**C.  EXCLUSIONS APPLICABLE TO INTERVIEW REQUEST COVERAGE ONLY**

**1.  PRIOR NOTICE OF CIRCUMSTANCES RELATED TO INTERVIEW REQUESTS**

The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any **Insured** under any policy of insurance that: (1) this **Policy** renews, replaces or succeeds in time, or (2) afforded coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

**2.  PRIOR OR PENDING INTERVIEW REQUEST**

The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any: (1) prior or pending **Interview Request** as of, or prior to, the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, **Related Wrongful Act** or **Related Interview Request** underlying such **Interview Request**.

12.  The following replaces section **V. CONDITIONS, A. LIMITS OF LIABILITY**:

A.  **LIMITS OF LIABILITY**

The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the **Company** will pay under this **Policy**, regardless of the number of **Claims**, **Interview Requests** or **Insureds**, and regardless of when payment is made by the **Company** or when an Insured's legal obligation with regard to any **Claim** or **Interview Request** arises or is established.

The **Company's** maximum liability for all **Loss** for all **Claims**, and for all **Interview Costs** for all **Interview Requests**, first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the **Policy Period** set forth in ITEM 5 of the Declarations.

The **Company's** maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Shareholder Derivative Demands** first made during the same **Policy Period** is the **Investigation Expense** Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

The Company's maximum liability under the **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations. Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

All **Interview Requests** arising out of the same or substantially similar facts or circumstances and all **Related Interview Requests** are deemed one **Interview Request**, and such **Interview Request** is deemed to be first made on the date the earliest of such **Interview Requests** is first made to any **Insured**, regardless of whether such date is before or during the **Policy Period**.

**Defense Expenses** and **Interview Costs** are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the **Company** for all **Loss** combined for: (i) all **Claims** first made during the **Policy Period** and **Extended Reporting Period**; and (ii) all **Interview Costs** for all **Interview Requests** first made to the **Insured** and reported to the **Company** during the **Policy Period** or, if purchased, the **Extended Reporting Period**.

13.  The following replaces the first paragraph of section **V. CONDITIONS, B. RETENTION**:

The **Company's** liability with respect to **Loss** for each **Claim**, or **Interview Costs** for each **Interview Request**, applies only to that portion of **Loss** or **Interview Costs**, respectively, that is excess of the applicable Retention set forth in ITEM 5 of the Declarations. Such Retention will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of such **Loss** or **Interview Costs**.

14.  The following is added to section **V. CONDITIONS, C. EXTENDED REPORTING PERIOD**:

Any **Interview Request** made to any **Insured** and reported to the **Company** during the **Extended Reporting Period** will be deemed made and reported during the **Policy Period**. However, this **Policy** will not cover any **Interview Costs** incurred during or after the **Extended Reporting Period** unless, prior to the Expiration Date of the **Extended Reporting Period**, the **Insureds** provide written notice to the **Company** of the **Interview Request** for which the **Insureds** have incurred, or will incur, such **Interview Costs**.

© 2011 The Travelers Indemnity Company. All rights reserved.

15.     The following replaces section *V. CONDITIONS*, E. NOTICE:

E.      **NOTICE**

1.      **Notice of Claim**

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Claim** made against any Insured as soon as practicable after the risk manager or in-house general counsel of the **Named Insured** first becomes aware of such **Claim** , but in no event later than 60 days after expiration of the **Policy Period**, or any applicable **Extended Reporting Period**.

2.      **Notice of Interview Request**

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Interview Request** made to any **Insured** as soon as practicable after such **Insured** first becomes aware of such **Interview Request**, but in no event later than: (i) the Expiration Date of the **Policy Period**, as set forth in ITEM 2 of the Declarations; or (ii) the Expiration Date of the applicable **Extended Reporting Period**, as set forth in ITEM 7 of the Declarations, if the Named Insured elects such **Extended Reporting Period**, pursuant to section **V. C.** of this **Policy**.

3.      **Notice of Circumstances**

If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

1.      becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

2.      gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.

4.      **Notice Requirements**

a.      Notice of **Claims** or Circumstances

As a condition precedent to exercising rights under this **Policy** with respect to any **Claim** or circumstance, the **Insured** must:

(i)     include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and

(ii)    give to the **Company** such other information and cooperation as the **Company** may reasonably request.

b.      Notice of **Interview Requests**

As a condition precedent to exercising rights under this **Policy** with respect to any **Interview Request**, the **Insured** must:

(i)     include with any notice of an **Interview Request** the name of the **Enforcement Body** making the request and, to the best of the **Insured's** knowledge, a description of the nature and subject matter identified by the **Enforcement Body** in its **Interview Request**; and

© 2011 The Travelers Indemnity Company. All rights reserved.

(ii)      give to the Company such other information and cooperation as the Company may reasonably request, including additional information about the subject matter and nature of the Interview Request as it is learned.

All notices under this **NOTICE** section must be sent or delivered to the **Company**, at the address set forth in **ITEM 3** of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

16.    The following replaces the sixth of **V. CONDITIONS, F. DEFENSE AND SETTLEMENT**:

The **Company** will advance on behalf of the **Insureds**, **Defense Expenses** or **Investigation Expenses** that the **Company** believes to be covered under this **Policy** and that are incurred in connection with any **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**. The **Company** will advance such **Defense Expenses** or **Investigation Expenses** on a current basis, but no later than 90 days of the date when the **Company's** Claims department receives: (i) the invoices documenting that such **Defense Expenses** or **Investigation Expenses** have been incurred; and (ii) any additional information or documentation reasonably requested by the **Company** which are directly related to such **Defense Expenses** or **Investigation Expenses**; provided that to the extent it is finally established that any such **Defense Expenses** or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally according to their interests, agree to repay the **Company** such **Defense Expenses** or **Investigation Expenses**.

17.    The following replaces section **V. CONDITIONS, I. ORDER OF PAYMENTS**:

In the event of **Loss** for which payment is due under this **Policy**:

1.      the **Company** will first pay **Loss** covered under Insuring Agreement A; then

2.      with respect to any remaining amount of the Limits of Liability available after such payment, at the written request of the chief executive officer of the **Insured Organization**, or any functional equivalent position, provided he or she is not a named defendant in such **Claim**, the **Company** will either pay or withhold payment of such other **Loss** covered under any other Insuring Agreement of this **Policy**.

18.    The following is added to section **V. CONDITIONS, L. CESSATION OF SUBSIDIARIES**:

However, coverage for **Interview Requests** for any **Subsidiary** and its **Insured Persons** will terminate when such entity ceases to be a **Subsidiary**; provided that such coverage will continue only with respect to any **Interview Request** about which the **Insureds** have provided written notice to the **Company** before such entity ceased to be a **Subsidiary** and that is otherwise covered under this **Policy**.

19.    The following is added to section **V. CONDITIONS, M. CHANGE OF CONTROL**:

If, during the **Policy Period**, any of the events set forth in this section occur, then coverage for **Interview Requests** under this **Policy** will continue, but only for any **Interview Request** about which the I nsureds have provided written notice to the **Company** prior to the occurrence of such events.

20.    The following replaces section **V. CONDITIONS, R. RECOVERY**:

R.      RECOVERY

The **Company** will not exercise its rights of recovery against any **Insured**, unless there is a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishing that:

1.      such **Insured Person**, or with respect to Insuring Agreement C, such **Executive Officer**, committed a deliberately fraudulent act or omission, or a willful violation of any law or regulation; or

2.      such **Insured** gained any profit, remuneration, or financial advantage to which that **Insured** was not legally entitled.

21.    The following is added to section **V. CONDITIONS**:

**FIRST-DOLLAR ADVANCEMENT OF LOSS TO INSURED PERSONS WHEN INDEMNIFICATION NOT AVAILABLE**

Notwithstanding any provision to the contrary, if the **Insured Organization** refuses or fails to indemnify any **Insured Person** for covered **Loss** under Insuring Agreements B or E within the applicable **Retention**, as required by section **V. D.** of this **Policy**, then the **Company** will advance such amounts on behalf of the **Insured Person** until either: (i) the **Insured Organization** agrees to pay such amounts; or (ii) the **Retention** has been satisfied. However, the advancement by the **Company** of such amounts will not relieve the **Insured Organization** of its obligation to provide indemnification to such **Insured Person**, nor of its obligation to satisfy the applicable **Retention** on behalf of such **Insured Person**. The **Insured Organization's** failure to indemnify such **Insured Person** will be deemed to have occurred if the **Insured Organization** has neither paid such amounts on behalf of the **Insured Person**, nor acknowledged its obligation to do so, within 60 days of the **Insured Person's** written demand to the **Insured Organization** for such indemnification or payment.

Any advancement of covered **Loss** amounts by the **Company** within the applicable **Retention** on behalf of any **Insured Person** pursuant to the preceding paragraph is further subject to the following conditions: (i) such payments by the **Company** will reduce, and may exhaust, the Limits of Liability set forth in Item 5 of the Declarations; (ii) the **Company's** advancement of **Loss** on behalf of an **Insured Person** does not waive or modify the provisions set forth in section **V. D.** of the **Policy**; and (iii) the **Company** will be subrogated to the **Insured Person's** rights of recovery against the **Insured Organization** for any amounts owed to the **Insured Person** by the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

90000 SERIES
30% P.C.W.

Exhibit B

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT B**



**OLD REPUBLIC** INSURANCE COMPANY

## Directors and Officers Liability Insurance Policy

Issuing and Policyholder Servicing Office:

**Chicago Underwriting Group, Inc.**
191 North Wacker Drive, Suite 1000
Chicago, IL 60606
Tel: (312) 750-8800
Fax: (312) 750-8965
**www.cug.com**

**J-00 (02/08)**

# ★★★★ OLD REPUBLIC INSURANCE COMPANY

**GREENSBURG, PENNSYLVANIA**

**Declarations**
**Excess Directors and Officers**
**Liability Insurance**

---

**Important Notice**

This is a claims made policy that applies only to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if exercised.  Defense costs shall be applied against the retention, if applicable.  Defense costs paid by the Insurer shall reduce and may completely exhaust the **Limit of Liability** of the policy.

**Please read the entire policy carefully.**

---

Policy Number: CUG 34739                                             Previous Number: CUG 34056

Item 1.   **Parent Company and Address:**
                General Cable Corporation
                4 Tesseneer Drive
                Highland Heights, KY  41076-9753

Item 2.   **Policy Period:**        From:  November 1, 2011  To:  November 1, 2012
                                        12:01 a.m. local time at the address shown in Item 1.

Item 3.   **Limit of Liability:**   $10,000,000 Maximum aggregate **Limit of Liability** for the **Policy Period.**

Item 4.   **Underlying Policies:**

   (A)   **Primary Policies:**
            Insurer:                              Travelers Casualty and Surety Company of America
            Coverage:                           Directors & Officers Liability Insurance, as more fully defined in
                                                      the policy form.
            Policy Number:                    105518156
            Policy Period:                      November 1, 2011 to November 1, 2012
            Limit of Liability:                 $15,000,000
            Securities Claim Retention:   $750,000  (See policy for details)

Item 5.   **Extended Reporting Period:**

   (A)   Additional Premium:        75% of Annualized Policy Premium
   (B)   Additional Period:            12 months

Item 6.   **Prior or Pending Date:**         May 16, 1997   (If "None" is shown, no Prior or Pending Date
                                                      applies.)

Item 7.   **Premium:**                                    $85,000
            Kentucky State Surcharge:              $1,530
            Kentucky Municipal Surcharge:    _____$8,500
            Total Premium:                            **$95,030**

# ★★★★
# ★ OLD REPUBLIC INSURANCE COMPANY
### ★ ★ ★
GREENSBURG, PENNSYLVANIA

Insured:      General Cable Corporation
Policy No:    CUG 34739

Item 8.   **Forms/Endorsements Effective at Inception:**
Policy Jacket; ORUG-87 (2/2007); Endorsements #1 – D7040KY (03/2009); #2 – D0035 (1/2008); #3 – D7030-E (02/2011); #4 – D7042 (10/2009); #5 – D7043 (03/2010); #6 – MANUSCRIPT; #7 – MANUSCRIPT; #8 – MANUSCRIPT.

In witness whereof, the Insurer issuing this policy has caused this policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

All notices required to be given to the Insurer under this policy shall be addressed to the Insurer c/o Chicago Underwriting Group, Inc., 191 North Wacker Drive, Suite 1000, Chicago, Illinois  60606.

DATE:   March 7, 2012

ORUG-87D (2/2007)                              Page 2                                     _____
                                                                                          Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

## EXCESS DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

In consideration of payment of the premium and in reliance upon any application, materials or information made available by or on behalf of the **Insured Persons** and/or the **Company** to the Insurer during the application or underwriting process for this policy or included within the application for or as defined in any **Underlying Policies**, all of which are made a part hereof as if physically attached, and subject to the Declarations and the limitations, conditions, provisions and other terms of this policy (including any endorsements hereto), Old Republic Insurance Company (herein called the Insurer), the **Company** and the **Insured Persons** agree as follows:

I.  **INSURING CLAUSE**

The Insurer agrees to provide to the **Insured Persons** and, if applicable, the **Company**, insurance coverage for **Claims** first made during the **Policy Period**, including the Extended Reporting Period if exercised, against the **Insureds** for **Wrongful Acts**.  Such coverage shall be in accordance with and subject to the same warranties, terms, conditions, exclusions and limitations (except as regards the premium, the amount and limits of liability, the policy period, the Extended Reporting Period, and except as otherwise provided herein) as are contained in or as may be added to the **Primary Policy** and, to the extent coverage is further limited or restricted thereby, to any other **Underlying Policy**.  In no event shall this policy grant broader coverage than would be provided by any of the **Underlying Policies**.

Notwithstanding any terms of the **Underlying Policies** to the contrary, the Insurer shall not be liable for **Loss** resulting from any **Claim** based upon, arising out of, or attributable to any written demand, litigation or other proceeding pending, or order, decree or judgment entered, against the **Company** or any **Insured Person** on or prior to the Pending or Prior Date set forth in Item 6. of the Declarations, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

II.  **ATTACHMENT AND LIMIT OF LIABILITY**

A.  Liability for any covered **Loss** on account of **Claims** first made in the **Policy Period** shall attach to the Insurer only after (i) the insurers of the **Underlying Policies**, or in the event any such insurer is financially insolvent then the **Company** and/or the **Insured Persons**, shall have paid in legal currency the full amount of the **Underlying Limit** for such policy period, and (ii) the **Company** and/or the **Insured Persons** shall have paid the uninsured retention, if any, applicable under the **Primary Policy**.  The Insurer shall then be liable to pay only covered **Loss** in excess of such **Underlying Limit** up to its **Limit of Liability** as set forth in Item 3. of the Declarations, which shall be the maximum aggregate liability of the Insurer under this policy with respect to all **Claims** first made in the **Policy Period** against all **Insured Persons** and, if applicable, the **Company** irrespective of the time of payment by the Insurer.

B.  In the event and only in the event of the reduction or exhaustion of the **Underlying Limit** by reason of the insurers of the **Underlying Policies**, or in the event any such insurer is financially insolvent then the **Company** and/or the **Insured Persons**, paying in legal currency **Loss** covered under the respective **Underlying Policy**, this policy shall:  (i) in the event of reduction, pay excess of the reduced **Underlying Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this policy shall only pay excess of the uninsured retention, if any, applicable under the **Primary Policy**, which retention shall be applied to any subsequent **Loss** in the same manner as specified in the **Primary Policy**.

C.  Notwithstanding any of the terms of this policy which might be construed otherwise, this policy shall drop down only in the event of reduction or exhaustion of the **Underlying Limit** as described above, and shall not drop down for any other reason including, but not limited to, uncollectability (in whole or

in part) of any **Underlying Policy**.  The risk of uncollectability of the **Underlying Policies** (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the **Insured Persons** and the **Company** and is not in any way or under any circumstances insured or assumed by the Insurer.

D.    If the **Primary Policy** contains a specific grant of coverage that is subject to a sublimit of liability, then coverage under this policy shall not apply to any **Claim** which is otherwise subject to such grant of coverage.  However, any **Loss** paid under the **Underlying Policies** on account of such **Claim** shall reduce or exhaust the **Underlying Limit**, as provided in Section II. B. above, for purposes of this policy.

## III.    UNDERLYING INSURANCE

A.    It is a condition of this policy that the **Underlying Policies** shall not be canceled and shall not otherwise terminate during the **Policy Period**, including the Extended Reporting Period if exercised. If the **Underlying Policies** are canceled or terminate during the **Policy Period** including the Extended Reporting Period if exercised, the Insurer shall not be liable under this policy to a greater extent than it would have been had such **Underlying Policies** been so maintained.

B.    To the extent the terms, conditions, exclusions or limitations of any of the **Underlying Policies** are changed to limit, restrict or exclude coverage, this policy shall become subject to such changes upon the effective date of such changes in the **Underlying Policies**.  To the extent the terms, conditions, exclusions or limitations of any of the **Underlying Policies** are changed to expand or broaden coverage, this policy shall become subject to such changes only if and to the extent the Insurer agrees to such changes by written endorsement to this policy and the **Company** pays any additional premium reasonably required by the Insurer for such changes.

C.    As a condition precedent to their rights under this policy, the **Company** or the **Insured Persons** shall give to the Insurer as soon as practicable written notice and the full particulars of (i) the reduction or exhaustion of the aggregate limit of liability of any **Underlying Policy**, (ii) any **Underlying Policy** being canceled or terminating as described in Section III. A. above, (iii) an insurer of any **Underlying Policy** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority, or (iv) any change in the terms, conditions, exclusions or limitations of any of the **Underlying Policies**.

## IV.    CLAIMS

A.    **Notice of Claim or Circumstances**

The **Company** or the **Insured Persons** shall, as a condition precedent to their rights under this policy, give to the Insurer written notice of (i) any **Claim** at the same time and in the same manner required by the terms and conditions of the **Primary Policy**, regardless of the amount of the **Claim** or the **Underlying Limit** applicable to the **Claim**, and (ii) any circumstances which could give rise to a **Claim** at the same time as notice of such circumstances is given under any **Underlying Policy**.  To be effective under this policy, such notice of circumstances shall contain the information required by and shall otherwise comply with the terms and conditions of the **Primary Policy**.

B.    **Cooperation and Claim Participation**

As a condition precedent to their rights under this policy, the **Company** and the **Insured Persons** shall give the Insurer as soon as practicable (i) written notice of any information, and (ii) such cooperation, as the Insurer may reasonably require with respect to any **Claim** or circumstance reported to the Insurer under this policy.  The Insurer may, at its sole discretion, participate in the investigation, defense or settlement of any **Claim** or circumstance reported to the Insurer under this policy even if the **Underlying Limit** has not been exhausted.

C.      **Allocation**

If a **Claim** is made against both the **Insureds** and others, including the **Company** if this policy does not cover the **Company** for such **Claim**, or if a **Claim** against the **Insureds** includes both covered and uncovered matters, the allocation of any loss on account of such **Claim** shall be subject to any allocation provision in the **Primary Policy**.

## V.      GENERAL CONDITIONS

A.      **Extended Reporting Period**

If the **Insured Persons** and/or the **Company** elect and are granted a discovery period or extended reporting period under all of the **Underlying Policies**, then the **Insured Persons** and/or the **Company** shall have the right to elect an Extended Reporting Period under this policy by:  (i) satisfying the conditions for such an election as set forth in the **Primary Policy**; and (ii) paying to the Insurer the additional premium described in Item 5. (A) of the Declarations within the time period described in the **Primary Policy**.  If exercised, the Extended Reporting Period shall be for the period of time set forth in Item 5. (B) of the Declarations and shall afford the same coverage as afforded by the discovery period or extended reporting period in the **Underlying Policies**, except as otherwise provided in this policy.

The additional premium for the Extended Reporting Period shall be deemed fully earned and nonrefundable once the Extended Reporting Period becomes effective.

The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

B.      **Notices**

All notices under this policy shall be in writing and given by prepaid express courier or certified mail properly addressed to the appropriate party.  Notice to the **Company** or the **Insured Persons** may be given to the **Parent Company** at the address as shown in Item 1. of the Declarations.  Notice to the Insurer of any **Claim** or circumstance shall be given to Old Republic Insurance Company, c/o Chicago Underwriting Group, Inc., 191 North Wacker Drive, Suite 1000, Chicago, Illinois  60606, Attention: Claims Department.  All other notices to the Insurer under this policy shall be given to the same addressee but to the attention of the Underwriting Department.  Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.  Any notice to an insurer of any **Underlying Policy** shall not constitute notice to the Insurer unless also given to the Insurer as provided in this Section V. B.

C.      **Application of Recoveries**

Any amount recovered by or on behalf of the **Company** or the **Insured Persons** relating to any **Loss** paid under this policy shall be applied in the following order:

1.      First, to any other insurer or the **Company** or the **Insured Persons** to the extent they paid such **Loss** excess of this policy;

2.      Second, to this policy to the extent the Insurer paid such **Loss**;

3.      Third, to the insurers of the **Underlying Policies** or the **Company** or the **Insured Persons** to the extent they paid such **Loss** underlying this policy.

The expenses incurred to obtain such recovery shall be apportioned in the same ratio as the recovery.

D. **Termination of Policy**

This policy shall terminate at the earliest of the following times:

1.   At such time and in such manner as provided in the **Primary Policy**;

2.   Upon expiration of the **Policy Period** as set forth in Item 2. of the Declarations; or

3.   At such other time as may be agreed upon by the Insurer and the **Parent Company**.

The Insurer shall refund the unearned premium as provided in the **Primary Policy**.

E. **Authorization**

By acceptance of this policy, the **Parent Company** agrees to act on behalf of the **Company** and the **Insured Persons** with respect to the giving and receiving of notice of claim or termination, the payment of premiums and the receiving of any return premiums that may become due under this policy, and the negotiation, agreement to and acceptance of endorsements, and the **Company** and the **Insured Persons** agree that the **Parent Company** shall act on their behalf.

## VI.   DEFINITIONS

When used in this policy:

A.   "**Limit of Liability**", "**Primary Policy**" and "**Underlying Policies**" have the meanings attributed to them in the Declarations.

B.   "**Claim**", "**Loss**" and "**Wrongful Act**" have the same meanings as the definitions thereof in the **Primary Policy**.

C.   "**Company**" means the **Parent Company** and any subsidiaries or affiliates thereof insured by the **Primary Policy**.

D.   "**Insured Persons**" means those directors, officers and other individuals insured by the **Primary Policy**.

E.   "**Insureds**" means the **Insured Persons** and/or the **Company**.

F.   "**Parent Company**" means the entity named in Item 1. of the Declarations.

G.   "**Policy Period**" means the period of time specified in Item 2. of the Declarations, subject to prior termination in accordance with Section V. D. of this policy.

H.   "**Underlying Limit**" means an amount equal to the aggregate of all limits of liability, as set forth in Item 4. of the Declarations, for all **Underlying Policies**.



**OLD REPUBLIC** INSURANCE COMPANY

### TERMINATION OF POLICY AMENDED
### (Credit Rating Trigger)
### KENTUCKY ONLY

It is understood and agreed that Section V. D. is amended to read in its entirety as follows:

**D.  Termination and Nonrenewal of Policy**

1.  This policy shall terminate at the earliest of the following times:

    a.  At such time and in such manner as provided in the **Primary Policy;**

    b.  Upon expiration of the **Policy Period** as set forth in Item 2. of the Declarations; or

    c.  At such other time as may be agreed upon by the Insurer and the **Parent Company.**

    The Insurer shall refund the unearned premium as provided in the **Primary Policy.**

2.  Notwithstanding anything contained in D. 1. above:

    a.  In the event that a financial strength rating for the Insurer is issued (i) below A- by A.M. Best Co., or (ii) below BBB by Standard & Poor's Rating Services (hereinafter "Credit Rating Downgrade"), this policy may be canceled by the **Parent Company** by mailing written prior notice to the Insurer of such cancellation or by surrender of this policy to the Insurer or its authorized agent. If this policy is canceled by the **Parent Company** within thirty (30) days after such Credit Rating Downgrade, the Insurer shall refund the unearned premium on a pro rata basis.

    b.  After this policy has been in effect for sixty (60) days any cancellation notice from the Insurer other than for non-payment of premium shall be sent to the **Parent Company** no less than seventy-five (75) days prior to the proposed cancellation date.

    c.  The Insurer may cancel this policy for non-payment of premium by giving to the **Parent Company** at least fourteen (14) days prior written notice of such cancellation.

3.  If the Insurer decides to nonrenew this policy, the Insurer will mail to the **Parent Company**

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy |
|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO                            EFFECTIVE DATE OF THIS ENDORSEMENT |
| **1** | **CUG 34739** | |

**D7040KY (03/2009)**
**Page 1 of 2**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

written notice stating such intent at least seventy-five (75) days before the expiration date set forth in Item 2. of the Declarations.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|---|
| ENDT NO. | POLICY NO. | | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **1** | **CUG 34739** | | | |

**D7040KY (03/2009)**
**Page 2 of 2**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

## DECLARATIONS AMENDMENT

It is understood and agreed that the following item (s):

( ) Parent Company Name and Address    (X) Extended Reporting Period
( ) Policy Period                      ( ) Premium
( ) Limit of Liability                 ( ) Underlying Policies
( ) Retentions                         ( ) Prior and/or Pending/Litigation Date

is (are) amended to read:

Item 5.   **Extended Reporting Period:**

1.      (A) Additional Premium:    75% of Annualized Policy Premium
        (B) Additional Period:     12 months

2.      (A) Additional Premium:    100% of Annualized Policy Premium
        (B) Additional Period:     36 months

3.      (A) Additional Premium:    150% of Annualized Policy Premium
        (B) Additional Period:     72 months

The above amendment(s) result in a change in the premium as follows:

(X) No changes
( ) Additional Premium: $ _____
( ) Return Premium: $ _____

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| *Must be Completed* | | *Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy* | |
| --- | --- | --- | --- |
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **2** | **CUG 34739** | | |

**D0035 (1/2008)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

### AMEND SECTION II. A. AND B. VERSION E

It is understood and agreed that:

1.  Sections II. A. and B. are amended to read in their entirety as follows:

    A.  Liability for any covered **Loss** on account of **Claims** first made in the **Policy Period** shall attach to the Insurer only after:

        1.  the insurers of the **Underlying Policies**,

        2.  the **Company**, the **Insured Persons**, and/or any other source either (i) pursuant to a compromise of good faith coverage issues under the **Underlying Policies**, or (ii) by reason of the financial insolvency of the insurer(s) of the **Underlying Policies**, and/or

        3.  any Side A Excess DIC Policy,

        shall have paid in legal currency covered **Loss** equal to the full amount of the **Underlying Limit** for such **Policy Period**, and the **Company**, the **Insured Persons** and/or the insurer of any Side A Excess DIC policy which is specifically excess of this policy shall have paid the uninsured retention, if any, applicable under the **Primary Policy**. The Insurer shall then be liable to pay only covered **Loss** in excess of such **Underlying Limit** up to its **Limit of Liability** as set forth in Item 3. of the Declarations, which shall be the maximum aggregate liability of the Insurer under this policy with respect to all **Claims** first made in the **Policy Period** against all **Insured Persons** and, if applicable, the **Company**, irrespective of the time of payment by the Insurer.

    B.  In the event and only in the event of the reduction or exhaustion of the **Underlying Limit** by reason of the insurers of the **Underlying Policies**, the **Company**, the **Insured Persons**, any Side A Excess DIC Policy and/or any other source paying in legal currency **Loss** covered under the respective **Underlying Policy** as provided in Section II. A. above, this policy shall:  (i) in the event of reduction, pay excess of the reduced **Underlying Limit**, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this policy shall only pay excess of the retention, if any, applicable under the **Primary Policy**, which retention shall be applied to any subsequent **Loss** in the same manner as specified in the **Primary Policy**.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **3** | **CUG 34739** | | |

Countersigned by _____

Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

2.  Any payment by the **Company**, the **Insured Persons**, any Side A Excess DIC Policy and/or any other source pursuant to Section II. A. 2. or 3. above with respect to any **Claim** shall reduce or exhaust the **Underlying Limit** (i) with respect to such **Claim**, by the amount of such payment, and (ii) with respect to any other **Claim**, only to the extent the underlying insurer is released with respect to such other **Claim** pursuant to a limit reduction agreement.

3.  If with respect to any covered **Claim** the **Underlying Limit** is reduced or exhausted by payments by the **Company**, the **Insured Persons**, any Side A Excess DIC Policy and/or any other source as provided in Section II. A. 2. or 3. above, then as a condition to coverage under this policy for such **Claim** the **Company** and **Insured Persons** shall give to the Insurer any information reasonably requested by the Insurer relating to such payment or the reasons for such payment.

4.  For purposes of this Endorsement, "**Underlying Policies**" shall include any Side A Excess DIC policy which is excess of this policy if and to the extent that such Side A Excess DIC policy drops down pursuant to its difference-in-conditions provision and pays **Loss** within the **Underlying Limit**.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy<br>Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO.<br>**3** | POLICY NO.<br>**CUG 34739** | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |

**D7030-E (02/2011)**
**Page 2 of 2**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

### GENERAL EXCESS AMENDMENT

It is understood and agreed that:

1. Sections III. A. and C. are deleted in their entirety and replaced with the following:

   A. If the **Underlying Policies** are canceled or terminate during the **Policy Period** including the Extended Reporting Period if exercised, the Insurer shall not be liable under this policy to a greater extent than it would have been had such **Underlying Policies** been so maintained.

   C. As a condition precedent to their rights under this policy, the **Company** or the **Insured Persons** shall give to the Insurer as soon as practicable written notice and the full particulars of (i) the reduction or exhaustion of the aggregate limit of liability of any **Underlying Policy**, (ii) any **Underlying Policy** being canceled or terminating as described in Section III. A. above, or (iii) any change in the terms conditions, exclusions or limitations of any of the **Underlying Policies**.

2. Section IV. C. **Allocation** is deleted in its entirety.

3. Section V. B. is deleted in its entirety and replaced with the following:

   B. **Notices**

   All notices under this policy shall be in writing and given by prepaid express courier, e-mail, facsimile or certified mail properly addressed to the appropriate party. Notice to the **Company** or the **Insured Persons** may be given to the **Parent Company** at the address as shown in Item 1. of the Declarations. Notice to the Insurer of any **Claim** or circumstance which could give rise to a **Claim** shall be given to Old Republic Insurance Company, c/o Chicago Underwriting Group, Inc., 191 North Wacker Drive, Suite 1000, Chicago, Illinois 60606, Attention: Claims Department (fax number is: 312-750-8965 and e-mail address is: ClaimNotice@cug.com). All other notices to the Insurer under this policy shall be given to the same address but to the attention of the Underwriting Department. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier, subject to the proof of transmittal. Any notice to an insurer of any **Underlying Policy** shall not constitute notice to the Insurer unless also given to the Insurer as provided in this Section V. B.

4. Section V. C. **Application of Recoveries** is deleted in its entirety.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
| --- | --- | --- | --- |
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **4** | **CUG 34739** | | |

**D7042 (10/2009)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



**★ OLD REPUBLIC INSURANCE COMPANY**

## AMEND SECTION III. B.

It is understood and agreed that Section III. B. is deleted and replaced by the following:

## III. UNDERLYING INSURANCE

B. To the extent the terms, conditions, exclusions or limitations of any of the **Underlying Policies** are changed to limit, restrict or exclude coverage, this policy shall become subject to such changes upon the effective date of such changes in the **Underlying Policies**. To the extent the terms, conditions, exclusions or limitations of any of the **Underlying Policies** are changed to expand or broaden coverage, this policy shall become subject to such changes only if and to the extent the Insurer agrees to such changes in writing and the **Company** pays any additional premium reasonably required by the Insurer for such changes.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | |
| --- | --- |
| ENDT NO. | POLICY NO. |
| **5** | **CUG 34739** |

| *Complete Only When This Endorsement is Not Prepared with the Policy* | |
| --- | --- |
| *Or Is Not to be Effective with the Policy* | |
| ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| | |

**D7043 (03/2010)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



## OLD REPUBLIC INSURANCE COMPANY

### STATE AMENDATORY INCONSISTENCY

In consideration of the premium charged, it is understood and agreed that in the even that there is an inconsistency between a state amendatory attached to this policy, then it is understood and agreed that, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory or the policy which are more favorable to the Insured.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 6 | CUG 34739 | | |

**MANUSCRIPT**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

## EXCESS RECOGNITION OF NON-STACKING FORM

In consideration of the premium charged it is understood and agreed the coverage provided under this Policy will specifically apply in conformance with Endorsement Form PCDO-10042 Ed. 12-10 of the **Primary Policy** as well as all other terms and conditions, endorsements and warranties of the **Primary Policy** together with the terms, conditions, endorsements and warranties of any other Underlying Insurance.

It is further agreed for the purposes of determining when coverage under this Policy shall attach, it is understood and agreed that the limit of liability of the Underlying Insurance shall be deemed to have been reduced, depleted or exhausted, as the case may be, by any payment of losses as to which paragraph 1. of Endorsement Form PCDO-10042 Ed. 12-10 of the **Primary Policy** shall afford coverage, regardless of whether, under the terms, conditions, limitations, and endorsements of this Policy, the Insurer would have any obligation or liability to pay such losses after coverage under this Policy shall have attached.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **7** | **CUG 34739** | | |

**MANUSCRIPT**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



**OLD REPUBLIC** INSURANCE COMPANY

### EXCESS SUBLIMIT OVER UNDERLYING INSURANCE SUBLIMIT ENDORSEMENT

It is understood and agreed that:

1.    Notwithstanding Section II. D. of this policy, any liability under this policy for Derivative Demand Investigation Costs which are covered pursuant to, and subject to a sublimit under, the **Primary Policy** shall attach to the Insurer only after:

   (i)    the Underlying Limit has been exhausted pursuant to Section II. A. of this policy; or

   (ii)    the sublimits applicable to such Derivative Demand Investigation Costs under all **Underlying Policies** have been exhausted,

   whichever first occurs.  Such coverage under this policy shall then apply in conformance with the terms and conditions in the **Primary Policy** applicable to such Derivative Demand Investigation Costs coverage, except as otherwise provided in this policy.

2.    The Insurer's maximum liability for all Derivative Demand Investigation Costs under this policy shall be $250,000, which amount shall be part of, and not in addition to, the **Limit of Liability** set forth in Item 3. of the Declarations.

3.    This endorsement does not apply to or amend the Insurer's liability attachment with respect to any **Loss** other than Derivative Demand Investigation Costs.

4.    For purposes of this endorsement, Derivative Demand Investigation Costs has the same meaning as that term or a similar term is defined in the **Primary Policy**.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | |
| --- | --- |
| ENDT NO. | POLICY NO. |
| **8** | **CUG 34739** |

| Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
| --- | --- |
| ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| | |

**MANUSCRIPT**
**Page 1 of 1**

Countersigned by _____
Authorized Representative

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE DECLARATIONS PAGE

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**OLD REPUBLIC INSURANCE COMPANY**
133 Oakland Avenue
Greensburg, Pennsylvania 15601
A Stock Company

Secretary

President

**J-00 (02/08)**

**OLD REPUBLIC**
Corporate Offices
307 North Michigan Avenue
Chicago, Illinois 60601
(312) 346-8100

90000 SERIES
30% P.C.W.

Exhibit C

EFiled:  May 10 2024 02:05PM
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT C**

# Scottsdale Indemnity Company

Home Office:
One Nationwide Plaza ▪ Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive ▪ Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary                                          President

The information contained herein replaces any similar information contained elsewhere in the policy.

UTI-COVPG (12-09)

# Scottsdale Indemnity Company

### A STOCK COMPANY

Home Office: One Nationwide Plaza ▪ Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive ▪ Scottsdale, Arizona 85258
1-800-423-7675

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY SHALL BE REDUCED BY PAYMENT OF DEFENSE COSTS.**

### DECLARATIONS

| Item 1 | **Named Insured & Mailing Address** | GENERAL CABLE CORP.<br>4 TESSENEER DR<br>HIGHLAND HEIGHTS, KY 41076 | Policy No.: XMI1100611<br>Agent No.: 31407<br>Renewal No.: XMI1000611 |
|---|---|---|---|

**Item 2. Aggregate Limit of Liability:** $ 10,000,000    all **Claims** (inclusive of defense costs)

**Item 3. Policy Period:**
  11/01/2011  to  11/01/2012   12:01 a.m. local time at **Named Insured's** Mailing Address.

**Item 4. Followed Policy:**
Issuing Insurer: TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
Limit of Liability: $15,000,000          Policy No.: 105518156
Deductible(s)/Retention(s): $750,000

**Item 5. Schedule of Underlying Policies:**

| | Issuing Insurer | Policy No. | Limits of Liability | Deductible(s)/ Retention(s) |
|---|---|---|---|---|
| Primary Policy | SAME AS ITEM 4. ABOVE | | | |

**Underlying Excess Policies:**

| | Issuing Insurer | Policy No. | Limits of Liability | Attachment |
|---|---|---|---|---|
| 1st Excess: | SEE FORM UTI-358 (12-07) | | | |
| 2nd Excess: | | | | |
| 3rd Excess: | | | | |
| 4th Excess: | | | | |
| 5th Excess: | | | | |
| 6th Excess: | | | | |
| 7th Excess: | | | | |
| 8th Excess: | | | | |

**Item 6. Premium:** $ 67,692   **Terrorism Premium:** $ 684   **Total Premium:** $ 68,376 *

**Item 7. Endorsements Effective at Inception:**
  SEE SCHEDULE OF FORMS AND ENDORSEMENTS

**Item 8. Notices to Company:**

| **Notice of Claims to:** | **Other Notices to:** |
|---|---|
| SCOTTSDALE INDEMNITY COMPANY<br>7 WORLD TRADE CENTER 37TH FL<br>NEW YORK, NY 10007 | SCOTTSDALE INDEMNITY COMPANY<br>7 WORLD TRADE CENTER 37TH FL<br>NEW YORK, NY 10007 |

These Declarations/Policy, together with the **Application** and any written endorsements attached thereto,
shall constitute the contract between the **Insured** and the **Company**.

 *AN ADDITIONAL $1,231 IN KY SURCHARGES APPLY.  TOTAL AMOUNT DUE IS $69,607

# Scottsdale Indemnity Company
## SCHEDULE OF FORMS AND ENDORSEMENTS

Policy No. _XMI1100611_

Effective Date: _11/01/2011_
12:01 A.M., Standard Time

Named Insured _GENERAL CABLE CORP._

Agent No. _31407_

```
EXCESS LIABILITY FORMS
UTI-COVPG  12-09        Cover Page
XMI-D-1   8-07          Excess Insurance Policy Declarations
UTI-SP-2  12-95         Schedule Of Forms and Endorsements
XMI-P-1   8-07          Excess Insurance Policy
UTI-358   12-07         Schedule Of Underlying Policies
XMI-77    4-09          Exhaustion Of Underlying Ins
```

## ADDITIONAL FORMS

```
UTI-3g   3-92          Prior Or Pending Litigation
UTI-3g   3-92          Definition Of Application
UTI-3g   3-92          Amend Section V.A. Condition
UTI-3g   3-92          Amend Conditions Of Coverage
UTI-3g   3-92          Clause V. Amended
UTI-3g   3-92          Non-Follow Form ODL Non
UTI-3g   3-92          Sub-Limit Attachment
```

UTI-SP-2 (12-95)

utisp2mgt.fa

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the Company

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.**

In consideration of the payment of the premium and in reliance upon the statements in the **Application,** which is made a part hereof and subject to the Declarations, terms and conditions of this Policy, the insurance company indicated in the Declarations (herein called the **Company**) and the **Insured** agree as follows:

## I.  INSURING AGREEMENT

The **Company** shall provide the **Insureds** with insurance coverage excess of the **Underlying Policies.** This Policy is subject to the same representations as are contained in the applications for the **Underlying Policies** and, except with respect to the premium, the limit of liability and as otherwise provided herein, the insurance coverage provided by this Policy shall apply in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the **Followed Policy** and, to the extent coverage is further limited or restricted thereby, in any other of the **Underlying Policies.** This Policy shall not grant broader coverage than the most restrictive of the **Underlying Policies.**

## II.  DEFINITIONS

A.  **Application** means all signed applications and any information submitted therewith for this Policy.

B.  **Claim** has the same meaning in this Policy as in the **Followed Policy.**

C.  **Insured** means any persons or entities entitled to coverage under the **Followed Policy.**

D.  **Named Insured** means the entity named in Item 1. of the Declarations.

E.  **Policy Period** means the period from the effective date to the expiration date of this Policy as set forth in Item 3. of the Declarations, or any earlier termination date.

F.  **Followed Policy** means the policy, as constituted at its inception, named in Item 4. of the Declarations.

G.  **Underlying Policies** mean all policies, as constituted at their inception, listed in Item 5. of the Declarations.

H.  **Underlying Limits** means an amount equal to the total of all aggregate limits of liability for all **Underlying Policies,** plus the uninsured retention or deductible applicable to the primary policy named in Item 5. of the Declarations.

## III.  LIMIT OF LIABILITY

The amount stated in Item 2. of the Declarations shall be the maximum amount payable by the **Company** under this Policy with respect to all **Claims** first made during the **Policy Period.**

## IV.  REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A.  In the event the **Underlying Limits** are partially reduced by reason of actual payment by the insurers of the **Underlying Policies,** then subject to the Limit of Liability this Policy shall continue to apply as excess over the reduced **Underlying Limits.**

B.  In the event the **Underlying Limits** are wholly exhausted by reason of actual payment by the insurers of the **Underlying Policies** (and the **Insured** has paid the full amount of any applicable deductible or uninsured retention under the **Followed Policy**), then subject to the Limit of Liability this Policy shall continue to apply as primary insurance;

XMI-P-1 (8-07)                                    Page 1 of 2

provided always that this Policy shall only pay excess of such applicable deductible or retention, which shall be applied to any subsequent **Claim** in the same manner as specified in the **Followed Policy.**

**C.**  This Policy shall only pay in the event of the reduction or exhaustion of the **Underlying Policies** by reason of actual payment by the insurers of the **Underlying Limits** as described above and shall not drop down for any other reason, including but not limited to existence of any sub-limit in any **Underlying Policy** or the uncollectibility (in whole or in part) of any of the **Underlying Limits; provided,** however, this Policy will recognize erosion of any of the **Underlying Policies** due to the existence of a sub-limit.

The **Insureds** expressly retain the risk of any gap in coverage or uncollectibility and the **Company** does not in any way insure or assume such risk.

## V.  CONDITIONS OF COVERAGE

**A.**  As a condition precedent to this Policy's coverage, the **Insureds** agree to maintain the **Underlying Policies** in full effect with solvent insurers during the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** by reason of actual payments thereunder. If the **Underlying Policies** are not so maintained, the **Company** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policies** been maintained.

**B.**  As a condition precedent to this Policy's coverage, the **Insureds** shall notify the **Company** in writing of any of the following events as soon as practicable thereafter, with full particulars:

**(1)**  the reduction or exhaustion of any of the **Underlying Limits;**

**(2)**  the cancellation or termination of, or failure to maintain in full effect, any of the **Underlying Policies;**

**(3)**  any change to any of the **Underlying Policies;** or

**(4)**  the insurer of any of the **Underlying Policies** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

**C.**  If during the **Policy Period** or any discovery or extended reporting period, any terms of any of the **Underlying Policies** are changed in any manner, this Policy shall not be subject to such change unless the **Company** consents to such change by written endorsement to this Policy. Unless the **Company** so consents to such change, the **Company** shall not be liable to a greater extent than it would have been absent such change to any of the **Underlying Policies.**

# Scottsdale Indemnity Company

### SCHEDULE OF UNDERLYING POLICIES

Policy No.: XMI1100611            Effective Date:    11/01/2011

                                                   12:01 A.M. Standard Time

Named Insured: GENERAL CABLE CORP.         Agent No.:        31407

| Issuing Insurer | Policy Number | Limits of Liability | Attachment |
|---|---|---|---|
| 1ST EXCESS:<br>OLD REPUBLIC INSURANCE<br>COMPANY | CUG 34739 | $10,000,000 | $15,000,000 |

UTI-358 (12-07)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** 1

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS POLICY - EXHAUSTION OF UNDERLYING INSURANCE - ALLOW PAYMENT BY INSURED OR DIC INSURER ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that:

I.  Section **II. DEFINITIONS** is amended by the addition of the following:

**DIC Insurer** means any insurer which wrote a difference-in-conditions policy excess of this Policy who drops down to pay any amount due under the **Underlying Policies** pursuant to the difference-in-conditions provisions of such policy. However, the policy issued by the **DIC Insurer** shall not be considered one of the **Underlying Policies.**

II. Section **IV. REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS** is deleted in its entirety and replaced with the following:

A.  It is expressly agreed that liability shall attach to the **Company** only after the full amount of the **Underlying Limits** is paid in accordance with the terms of the **Underlying Policies** by any or all of the following:

(1) the insurers of the **Underlying Policies;** or

(2) the **Insured,** in the event the **Insured** pays any amount which would have been covered under the **Underlying Policies** but for the insolvency of any of the **Underlying Policies;** or

(3) a **DIC Insurer,** in the event the difference-in-conditions policy written by such insurer drops down to pay any amount due under the **Underlying Policies.**

The **Company** shall recognize any such payment by the **Insured** or a **DIC Insurer** as applying to deplete or exhaust the **Underlying Limits;** provided, however, any such payment shall not in any way constitute a waiver of any terms, conditions or exclusions of the **Underlying Policies** or this Policy.

B.  In the event the **Underlying Limits** are partially reduced by reason of actual payments as described in Section **IV.A.** above, then subject to the Limit of Liability this Policy shall continue to apply as excess over the reduced **Underlying Limits.**

C.  In the event the **Underlying Limits** are wholly exhausted by reason of actual payments as described in Section **IV.A.** above (and the **Insured** has paid the full amount of any applicable deductible or uninsured retention under the **Followed Policy**), then subject to the Limit of Liability this Policy shall continue to apply as primary insurance in accordance with the terms and conditions of the **Followed Policy** and to the terms, conditions and exclusions of this Policy; provided always that this Policy shall only pay excess of such applicable deductible or

retention, which shall be applied to any subsequent **Claim** in the same manner as specified in the **Followed Policy.**

**D.** This Policy shall only pay in the event of the reduction or exhaustion of the **Underlying Policies** by reason of actual payment as described Section **IV.A.** above and shall not drop down for any other reason, including but not limited to existence of any sub-limit in any **Underlying Policy;** provided, however, this Policy will recognize erosion of any of the **Underlying Policies** due to the existence of a sub-limit. The **Insureds** expressly retain the risk of any gap in coverage or un-collectibility and the **Company** does not in any way insure or assume such risk.

**All other terms and conditions of this Policy remain unchanged.**

_____          _____
AUTHORIZED REPRESENTATIVE                                    DATE

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** ____2____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS POLICY—PRIOR OR PENDING LITIGATION EXCLUSION

In consideration of the premium paid, it is hereby understood and agreed that the **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any: (1) prior or pending demand, suit, or other proceeding against any **Insured** or **Outside Entity** as of, or prior to, the applicable Prior or Pending Proceeding Date; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** underlying or alleged in such demand, suit, or other proceeding.

Prior or Pending Litigation Date:

      Insuring Agreement A:     N/A

      Insuring Agreement B:     11/1/2010

      Insuring Agreement C:     11/1/2010

**All other terms and conditions of this Policy remain unchanged.**

_____/_____

          AUTHORIZED REPRESENTATIVE       DATE

## SCOTTSDALE INDEMNITY COMPANY

**ENDORSEMENT NO.** _____3_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## DEFINITION OF APPLICATION DELETED

It is hereby understood and agreed that (A) of **Section II. DEFINITIONS** is deleted in its entirety.  The definition of application shall follow the **Followed Policy** language.

All other terms and conditions remain unchanged.

_____      /_____
AUTHORIZED REPRESENTATIVE                                       DATE

UTI-3g (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _____4_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND SECTION V. A. CONDITIONS OF COVERAGE – REMOVE 'SOLVENT'

In consideration of the premium paid, it is hereby understood and agreed that:

Section **V. A. CONDITIONS OF COVERAGE** is deleted in its entirety and replaced with the following:

**A.** As a condition precedent to this Policy's coverage, the Insureds agree to maintain the **Underlying Policies** in full effect with insurers during the **Policy Period** except for any reduction or exhaustion of the Underlying Limits by reason of actual payments thereunder.  If the **Underlying Policies** are not so maintained, the **Company** shall not be liable under this Policy to a greater extend than it would have been had such **Underlying Policies** been maintained.

_____ /_____

AUTHORIZED REPRESENTATIVE                          DATE

UTI-3g (3-92)

## SCOTTSDALE INDEMNITY COMPANY

**ENDORSEMENT NO.** _____5_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND CONDITIONS OF COVERAGE SECTION

This endorsement modifies insurance provided under the following:

Excess Policy XMI1100611

It is agreed that **Section V: Conditions of Coverage, Subsection B** of this Policy is amended to read in its entirety as follows:

**V.   CONDITIONS OF COVERAGE**

**B.** As a condition precedent to this Policy's coverage, the **Insureds** shall notify the **Company** in writing of any of the following events as soon as practicable thereafter, with full particulars:

(1)  the reduction or exhaustion of any of the **Underlying Limits;**

(2)  the cancellation or termination of, or failure to maintain in full effect, any of the **Underlying Policies;**

(3)  any change to any of the **Underlying Policies;** or

All other terms and conditions remain unchanged.

_____/_____
AUTHORIZED REPRESENTATIVE                            DATE

UTI-3g (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** ___6___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CLAUSE V. AMENDED

In consideration of the premium paid, it is hereby understood and agreed that **V. CONDITIONS OF COVERAGE, Subsection C.** is deleted in its entirety and replaced with the following:

**C.** If during the **Policy Period** or any discovery or extended reporting period, any terms of any of the **Underlying Policies** are changed in any manner, this Policy shall not be subject to such change unless the **Company** consents to such change in writing. Unless the **Company** so consents to such change, the **Company** shall not be liable to a greater extent than it would have been absent such change to any of the **Underlying Policies.**

**All other terms and conditions of this Policy remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE                     DATE

UTI-3g (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _____ 7 _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS POLICY - NON-FOLLOW FORM ODL NON STACKING PROVISION

In consideration of the premium paid, it is hereby understood and agreed that:

1.  This Policy shall apply in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the **Followed Policy** (pursuant to the terms, conditions, exclusions and endorsements of this Policy and all Underlying Policies), except that the Policy shall not provide insurance in conformance with the coverage provided in paragraph 10 of Endorsement No. 19 of the **Followed Policy, Outside For-Profit Directorship Liability Endorsement,** or paragraph 10 of Endorsement No. 25 of the **Followed Policy, Outside Not-For- Profit Directorship Liability Endorsement.**

2.  It is further understood and agreed that, notwithstanding the above, the **Company** shall recognize that any **Loss** paid by **Followed Policy** pursuant to Endorsements No. 19 and 25 shall contribute to and shall reduce the total Underlying Limits.

**All other terms and conditions of this Policy remain unchanged.**

**All other terms and conditions of this Policy remain unchanged.**

_____   /   _____
AUTHORIZED REPRESENTATIVE          DATE

UTI-3g (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _____8_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1100611 | 11/01/2011 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS POLICY – SUB-LIMIT ATTACHMENT

In consideration of the premium paid, it is hereby understood and agreed that:

1. The **Declarations** is amended to include the following:

    Item 2a.          Sublimit of Liability (part of, and not in addition to, Aggregate Limit of Liability): $250,000

2. Section II. Definitions is amended to include the following:

    I.          **Underlying Sublimits** means an amount equal to the total of all aggregate sublimits for "Investigation Expense" for "Shareholder Derivative Demand" (as those terms are defined by the **Followed Policy**).

3. The following provision is added to the Policy:

**Section VI.    Derivative Investigation Costs Coverage pursuant to Sub-limit**

A.    The **Company's** maximum limit of liability for all Investigation Expense for Shareholder Derivative Demand under Insuring Clause 4 of the **Followed Policy** shall be the Sublimit of Liability of $250,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations.

B.    The **Company** shall not provide any coverage under this Policy for Investigation Expense for Shareholder Derivative Demand until the full amount of the **Underlying Sublimits** or the **Underlying Limits** has been exhausted (whichever occurs first) through payments of the **Underlying Insurers** of amounts covered under the terms of the **Underlying Policies.**

C.    In the event that there is claim for Investigation Expense for Shareholder Derivative Demand and the **Underlying Sublimits** or **Underlying Limits** are wholly exhausted by reason of payments of the **Underlying Insurers** (and the full amount of any applicable deductible or uninsured retention has been paid under the **Followed Policy** by the **Insured**), then subject to the Sublimit of Liability this Policy shall continue to apply as primary insurance in accordance with the terms, definitions, conditions, exclusions and limitations of the **Followed Policy** and the terms, definitions, conditions, exclusions and limitations of this Policy; provided always that this Policy shall only pay

excess of such deductible or retention, which shall be applied in the same manner as specified in the **Followed Policy.**

D.     Except as expressly set forth above with respect to the Sublimit for Investigation Expense for Shareholder Derivative Demand, nothing in this endorsement is intended, nor shall it be construed, to change the terms or conditions set forth in Section IV. of the Policy.

**All other terms and conditions of this Policy remain unchanged.**

_____          /          _____
                AUTHORIZED REPRESENTATIVE                                          DATE

90000 SERIES
30% P.C.W.
RECYCLED
KLEER-FAX


EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT D**

## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Enterprise Development, One Tower Square, Hartford, CT 06183.

## TERRORISM POLICY DISCLOSURE NOTICE -
## TERRORISM RISK INSURANCE ACT OF 2002

On December 26, 2007, the President of the United States signed into law amendments to the Terrorism Risk Insurance Act of 2002 (the "Act"), which, among other things, extend the Act and expand its scope. The Act establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in the Act) caused by "acts of terrorism". An "act of terrorism" is defined in Section 102(I) of the Act to mean any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for Insured Losses is 85% of the amount of Insured Losses in excess of each Insurer's statutorily established deductible, subject to the "Program Trigger", (as defined in the Act). In no event, however, will the Federal Government or any Insurer be required to pay any portion of the amount of aggregate Insured Losses occurring in any one year that exceeds $100,000,000,000, provided that such Insurer has met its deductible. If aggregate Insured Losses exceed $100,000,000,000 in any one year, your coverage may therefore be reduced.

Please note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and does not include any charge for the portion of losses covered by the Federal Government under the Act. The charge is no more than one percent of your premium.

## KENTUCKY - IMPORTANT NOTICE - DISCLOSURE OF LOCAL GOVERNMENT TAXES

In compliance with Kentucky Administrative Regulation 806 KAR 2:092 the company is providing the amount of Kentucky local government tax being charged to the policyholder and the taxing jurisdiction to which the tax is due. Any applicable collection fee is included in the tax.

| Taxing Jurisdiction | Amount of Local Government Tax |
|---|---|
| **HIGHLAND HEIGHTS** | **$20,712.30** |
| **Total** | **$20,712.30** |

**TRAVELERS**

**One Tower Square**
**Hartford, CT 06183**

11/14/2012

**GENERAL CABLE CORPORATION**
**4 TESSENEER DRIVE**
**HIGHLAND HEIGHTS, KY 41076**

RE: Risk Management PLUS+ Online® from Travelers Bond & Financial Products (www.rmplusonline.com)

Thank you for choosing Travelers Bond & Financial Products for your insurance needs. Travelers is a market leader in providing management liability coverage that is in-synch with your company.  As your risks evolve, so do we through our ability to provide you with responsive risk management services.

Travelers Bond & Financial Products is pleased to provide you with Risk Management PLUS+ Online, the industry's most comprehensive program for mitigating your management liability exposures. The site includes risk management tools for the following coverage related exposures:
- Employment Practices Liability
- Fiduciary Liability
- Directors & Officers Liability
- Crime
- Kidnap and Ransom
- CyberRisk
- Identity Fraud Expense Reimbursement

Risk Management PLUS+ Online is a flexible, comprehensive loss prevention program specifically designed for Travelers Bond & Financial Products customers and is available to you at no additional cost. Included in the site is a library of articles, checklists and training on relevant risk mitigation topics for the management liability areas mentioned above.

Highlights of Risk Management PLUS+ Online services include:
- Web-based risk management training
- Weekly articles on current issues
- Model policies and forms for downloading or printing that cover major risks associated with the workplace

The attached Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS + Online representative. It's that simple.

We strongly encourage you to take full advantage of this program. Once again, thank you for choosing Travelers Bond & Financial Products.

Instructions for Registration & Orientation to Risk Management PLUS+ Online®

*Registration for Site Administrators:*

The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to www.rmplusonline.com.
2. In the Sign-In box, click **Register**.
3. Enter the password/passcode: TRVP200000 (Please note there are 4 letters followed by 6 numbers in the code)
4. Fill in the Registration Information and click **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*

1. Go to www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.


**TRAVELERS**

*Executive Choice* ✦ SM

### DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY POLICY DECLARATIONS

POLICY NO. **105518156**

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

**THIS LIABILITY COVERAGE IS WRITTEN ON A CLAIMS-MADE BASIS. THIS LIABILITY COVERAGE COVERS ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM.**

| ITEM 1 | **NAMED INSURED:**<br><br>**GENERAL CABLE CORPORATION**<br><br>Principal Address:<br>**4 TESSENEER DRIVE**<br>**HIGHLAND HEIGHTS, KY 41076** |
|---|---|
| **ITEM 2** | **POLICY PERIOD:**<br><br>Inception Date: **November 30, 2012**          Expiration Date: **November 1, 2013**<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| **ITEM 3** | **ALL NOTICES OF CLAIMS OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE OR MAIL AS SET FORTH BELOW:**<br>Email:**bfpclaims@travelers.com**<br>FAX:**(888) 460-6622**<br><br>Mail:**Travelers Bond & Financial Products Claim**<br>     **385 Washington St. – Mail Code 9275-NB03F**<br>     **St Paul, MN  55102** |
| **ITEM 4** | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>Directors, Officers, and Organization Liability Coverage |
| **ITEM 5** | |

**DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE**

| Directors, Officers, and Organization Limit of Liability: | $15,000,000 | for all **Claims** |
|---|---|---|

| | | | |
|---|---|---|---|
| **Investigation Expense**<br>**Limit of Liability:** | $350,000 | | for all **Investigation Expense**, which amount is part of, and not in addition to, the Directors,Officers, and Organization Limit of Liability |
| **Supplemental Independent Director**<br>**Limit of Liability:** | $1,000,000 | | for all **Independent Director Claims**, which amount is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability |
| **Retention:** | Not applicable to non-indemnifiable **Loss** or Insuring Agreement D | | |
| | $750,000 | | for all **Securities Claims** |
| | $500,000 | | for all other **Claims** |
| **Prior and Pending**<br>**Proceeding Date:** | N/A | | |

| ITEM 6 | PREMIUM FOR THE POLICY PERIOD: | |
|---|---|---|
| | $207,123.00 | Policy Premium |
| | N/A | Annual Installment Premium |

| ITEM 7 | EXTENDED REPORTING PERIOD: | |
|---|---|---|
| | Additional Premium Percentage: | Additional Months: |
| | 75 % | 12 |
| | N/A | 24 |
| | N/A | 36 |

| ITEM 8 | FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE: |
|---|---|
| | ACF-7004-0110; PCDO-3001-0109; PCDO-4014-0809; PCDO-7018-0109; PCDO-10002-0910; PCDO-10044-1210; PCDO-10055-1210; PCDO-10063-0111; PCDO-10066-0910; ACF-7006-0511; PCDO-10130-0911; PCDO-10200-1111; PCDO-10201-1011; PCDO-19015-0612; PCDO-19016-0612; PCDO-19021-0612 |

**THE DECLARATIONS, THE APPLICATION, THE DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY POLICY, AND ANY ENDORSEMENTS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE INSURED.**

Countersigned By
IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

Executive Vice President

Corporate Secretary

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies the following:

**Directors, Officers, and Organization Liability**

**It is agreed that:**

1.  The following is added to the **CONDITIONS** section:

    **CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

    If aggregate insured losses attributable to **Certified Acts of Terrorism** exceed $100 billion in a program year (January 1 through December 31) and the Company has met the deductible under the Terrorism Risk Insurance Act:

    a.  the Company will not be responsible for the payment of any portion of the amount of such losses that exceeds $100 billion; and

    b.  insured losses up to $100 billion will be subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

    The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded.

2.  The following is added to the **DEFINITIONS** section:

    **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

    a.  the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

    b.  the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

 **TRAVELERS**

*Executive Choice* **+** SM

### DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE

**THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.**

#### CONSIDERATION CLAUSE

**IN CONSIDERATION** of the payment of the premium, in reliance on the statements in the **Application**, subject to the Declarations, and pursuant to all terms, conditions, exclusions, and limitations of this **Policy**, the **Company** and the **Insureds** agree as follows:

**I.   INSURING AGREEMENTS**

**A.   DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE**

The **Company** will pay, on behalf of any **Insured Person**, **Loss** that is not indemnified by the **Insured Organization** and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**B.   ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** of any **Insured Person** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Claim** first made against the **Insured Person** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**C.   ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Loss** that such **Insured Organization** becomes legally obligated to pay for any **Securities Claim** first made against the **Insured Organization** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**D.   INVESTIGATION EXPENSE COVERAGE**

The **Company** will pay, on behalf of the **Insured Organization**, **Investigation Expense** for any **Shareholder Derivative Demand** first made during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**E.   OUTSIDE POSITION LIABILITY COVERAGE**

The **Company** will pay, on behalf of any **Insured Person** serving in an **Outside Position**, **Loss** that such **Insured Person** becomes legally obligated to pay for any **Claim** first made against any **Insured Person** in such **Outside Position** during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

**II.   ADDITIONAL BENEFITS**

**SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE**

The **Company** will pay, on behalf of any **Independent Director**, **Loss** covered under Insuring Agreement A that the **Independent Director** is not indemnified by the **Insured Organization** and that the **Independent Director** becomes legally obligated to pay for any **Claim** first made against the **Independent Director** during the **Policy**

**Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**.

However, the Directors, Officers, and Organization Limit of Liability must be completely exhausted by payment of **Loss** before the **Company** will have any obligation to pay for **Loss** under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section. Coverage under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section will also be specifically excess of any other insurance or indemnification available to the **Independent Director**, including any other insurance that is specifically excess of this **Policy**. All such other insurance and indemnification must be completely exhausted by payment of loss, damages, defense expenses, claim expenses or other amounts covered under such other insurance or indemnification before the **Company** will have any obligation to pay for **Loss** under this **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section. This **Policy** will not be subject to the terms, conditions, exclusions, or limitations of any other insurance.

If the amount of covered **Loss** which is otherwise due and owing by the **Company** under this **Policy** is subject to both the then-remaining Directors, Officers, and Organization Limit of Liability in ITEM 5 of the Declarations and the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations, and if such **Loss** is incurred by both **Independent Directors** and other **Insured Persons**, then such **Loss** will be allocated to and paid by the **Company** under such respective Limits of Liability in whatever portions will maximize the total amount of such **Loss** being paid under this **Policy**.

| III. | *DEFINITIONS* |
|------|---------------|

Wherever appearing in this **Policy**, either in the singular or plural, the following words and phrases appearing in bold type will have the meanings set forth in this section *III. DEFINITIONS*:

A.     *Application* means:

     1.    all signed applications for this **Policy**, or for any policy that this **Policy** renews, replaces, or succeeds in time, including any material submitted with or requested in such applications; and

     2.    all public documents filed by any **Insured** with the Securities and Exchange Commission (SEC), Federal Deposit Insurance Corporation (FDIC), or any similar federal, state, local, or foreign regulatory body during the 24 months preceding the **Policy Period**.

    All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

B.     *Claim* means:

     1.    a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;

     2.    a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;

     3.    a criminal proceeding against any **Insured Person**, commenced by:

          a.    a filing of charges;

          b.    the return of an indictment, information, or similar document; or

          c.    a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;

     4.    a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any **Insured Person**, commenced by the receipt of a:

          a.    notice of filed charges, investigative order, or similar document;

          b.    written notice identifying such **Insured Person** as a target of an investigatory authority; or

          c.    Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**;

     5.    service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to an SEC formal investigative order;

     6.    a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

©2009 The Travelers Companies, Inc. All Rights Reserved

7.  a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**; or

8.  a written request to toll or waive a statute of limitations relating to any of the above,

for a **Wrongful Act**, including any appeal therefrom.

C.  **Company** means the insurer that issued this **Policy**, as set forth in the Declarations.

D.  **Defense Expense** means the reasonable costs, charges, fees (including attorneys', experts', mediators', or arbitrators' fees), and expenses, including **Extradition Expense**, incurred in defending a **Claim** covered under Insuring Agreements A, B, C, or E, and the premium for appeal, attachment, or similar bonds.

**Defense Expense** does not include any: (1) regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**; or (2) **Investigation Expense**.

E.  **Domestic Partner** means any natural person who qualifies as a domestic partner, or party to a civil union, under the provisions of any applicable federal, state, local, or foreign law or regulation, or under the provisions of any formal program established by the **Insured Organization**.

F.  **Executive Officer** means any natural person who was, is, or becomes the chief executive officer or chief financial officer of the **Insured Organization**, or any functional equivalent position.

G.  **Extended Reporting Period** means the period of time set forth in ITEM 7 of the Declarations following the effective date of any nonrenewal or termination of the **Policy**.

H.  **Extradition** means a formal process by which an **Insured Person** located in any country is surrendered to any other country to answer any criminal accusation.

I.  **Extradition Expense** means the reasonable costs, charges, fees (including attorneys' and experts' fees), and expenses incurred by an **Insured Person** in lawfully opposing, challenging, resisting, or defending against any request for, or any effort to obtain, the **Extradition** of such **Insured Person**.

**Extradition Expense** does not include regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**.

J.  **Financial Insolvency** means the: (1) court appointment of an examiner, receiver, conservator, liquidator, trustee, or rehabilitator, or any functional equivalent position, to take control of, supervise, manage, or liquidate the **Insured Organization** or **Outside Entity**; or (2) **Insured Organization** or **Outside Entity** becoming a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law or regulation.

K.  **Independent Director** means an **Insured Person** who is a "Non-Employee Director" of the **Insured Organization** as such term is defined in rule 16b-3 promulgated under the Securities Exchange Act of 1934, as amended; provided, that the term "issuer" as referenced in such rule is deemed to refer to the **Insured Organization**.

L.  **Insured** means the **Insured Persons** and the **Insured Organizations**.

M.  **Insured Organization** means any: (1) entity named in ITEM 1 of the Declarations; (2) **Subsidiary**; and (3) such entity or **Subsidiary** as a debtor in possession under Chapter 11 of the United States Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law or regulation.

N.  **Insured Person** means any:

1.  natural person who was, is, or becomes a duly elected or appointed director, officer, **Manager**, or in-house general counsel of the **Insured Organization**, or any functional equivalent position;

2.  natural person described in **N.1.** above while serving in an **Outside Position**; and

3.    other natural person not described in **N.1.** above who:

    a.    with respect to a **Securities Claim** or a **Claim** for an employment-related **Wrongful Act**, was, is, or becomes a full or part-time employee of any **Insured Organization**, but only if the **Securities Claim** or **Claim** for an employment-related **Wrongful Act** is made against such natural person; and

    b.    with respect to any other **Claim**, was, is, or becomes a full or part-time employee of any **Insured Organization**, but only if the **Claim** is initially made against both such natural person and any natural person described in **N.1.** above.

**O.**    *Investigation Expense* means the reasonable costs, charges, fees (including attorneys' and experts' fees), and expenses, in connection with the investigation or evaluation of any **Shareholder Derivative Demand** covered under Insuring Agreement D incurred by: (1) the **Insured Organization**; (2) the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board; or (3) any committee of such board.

    **Investigation Expense** does not include regular or overtime wages, salaries, or fees of any director, officer, **Manager**, or employee of an **Insured Organization** or **Outside Entity**.

**P.**    *Joint Venture* means any incorporated joint venture, other than a **Subsidiary**, if the **Insured Organization**:

1.    owns or controls at least 33% of the outstanding voting securities representing the present right to vote for the election or appointment of the directors or officers of such joint venture, or any functional equivalent position; or

2.    has the present right to elect or appoint at least 33% of the directors or officers of such joint venture, or any functional equivalent position.

**Q.**    *Loss* means the amount of any:

1.    damages, judgments, settlements, pre-judgment and post-judgment interest, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the **Insured**, the **Claim**, the **Company**, or this **Policy**; and

2.    **Investigation Expense**, with respect to Insuring Agreement D only.

    **Loss**, other than **Defense Expenses**, does not mean any of the following:

1.    any amount that an **Insured** is absolved from payment;

2.    any amount that constitutes taxes, fines, or penalties; provided, **Loss** includes civil penalties assessed against any **Insured Person** pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended;

3.    any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

4.    any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.    any amount that constitutes disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the **Company** will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of section 11 or section 12 of the Securities Act of 1933, as amended, including **Defense Expenses** attributable to such **Claim**, constitutes disgorgement or other uninsurable loss.

**R.**    *Manager* means, with respect to an **Insured Organization** that is a limited liability company, political action committee, or non-profit entity, any natural person who was, is, or becomes a:

1.    member of the board of managers, the board of governors, management committee, or advisory committee of such **Insured Organization**, or any functional equivalent position; or

2.    trustee, other than a bankruptcy trustee, of any non-profit entity, or any functional equivalent position.

S.   *Named Insured* means the entity first named in ITEM 1 of the Declarations.

T.   *Outside Entity* means any:
   1.   non-profit entity, corporation, community chest, fund, or foundation, other than a **Subsidiary**, and is exempt from federal income tax as an entity described in section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended;
   2.   **Joint Venture**; or
   3.   other entity, if coverage for such entity is specifically granted by endorsement to this **Policy**.

U.   *Outside Position* means the position of director, officer, manager, or trustee in an **Outside Entity**, or any functional equivalent position, held by a natural person, but only if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to such natural person by the **Insured Organization**.

V.   *Policy* means, collectively, the Declarations, the **Application**, this policy form, and any endorsement to any of the above.

W.   *Policy Period* means the period of time set forth in ITEM 2 of the Declarations, subject to prior termination in accordance with section *V. CONDITIONS*, **P. TERMINATION OF POLICY**.

X.   *Pollutant* means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste.  Waste includes material to be recycled, reconditioned, or reclaimed.

Y.   *Related Wrongful Acts* means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

Z.   *Securities Claim* means any **Claim**, in whole or in part, that is:
   1.   brought and maintained by one or more security holders of the **Insured Organization**, in their capacity as such; or
   2.   based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization**, whether such purchase, sale, or offer involves a transaction with the **Insured Organization** or occurs in the open market, including any such **Claim** brought by the SEC or any other claimant.

AA.   *Shareholder Derivative Action* means a civil proceeding brought and maintained on behalf of, or in the name or right of, the **Insured Organization** by one or more shareholders of the **Insured Organization** in their capacity as such.

BB.   *Shareholder Derivative Demand* means any written demand on behalf of the **Insured Organization** brought and maintained by any shareholder of the **Insured Organization** and made upon the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board, to bring a civil proceeding in a court of law against any **Insured Person** for a **Wrongful Act** committed by an **Insured Person**, but only if such demand is brought and maintained without the active solicitation, assistance, or participation of any **Insured**.

CC.   *Subsidiary* means any:
   1.   entity, other than a limited liability company, joint venture, non-profit entity, or political action committee, if more than 50% of the outstanding voting securities representing the present right to vote for the election or appointment of directors or officers, or any functional equivalent position, is owned, directly or indirectly, by any entity named in ITEM 1 of the Declarations;
   2.   limited liability company, if the present right to elect or appoint more than 50% of such limited liability company's **Managers** is owned or controlled, directly or indirectly, by any entity named in ITEM 1 of the Declarations;
   3.   joint venture, if: (1) 50% of the outstanding voting securities representing the present right to vote for the election or appointment of directors or officers, or any functional equivalent position, is owned, directly or indirectly, by any entity named in ITEM 1 of the Declarations, and (2) the entity named in ITEM 1 of the Declarations solely controls the management and operation of such joint

venture, pursuant to a written agreement with the owner of the remaining issued and outstanding voting securities of such joint venture; or

4.    non-profit entity or political action committee, if the present right to elect or appoint more than 50% of such entity's **Managers** is owned or controlled, directly or indirectly, by any entity named in ITEM 1 of the Declarations;

on or before the Inception Date set forth in ITEM 2 of the Declarations or subject to section **V. CONDITIONS**, **K. ACQUISITIONS**, during the **Policy Period**.

DD.    **Whistleblower Activity** means activity protected under:

1.    18 U.S.C. 1514A(a) (whistleblower protection pursuant to section 806 of the Sarbanes-Oxley Act of 2002, as amended), other than the activity of "filing or the causing to be filed" any proceeding as specified under section 1514A(a)(2) and any other activity specified in section 1514A(a)(2) that is engaged in on a voluntary basis; or

2.    any similar whistleblower protection provision of any applicable federal, state, local, or foreign securities law or regulation that affords protection to a natural person, other than the filing, causing to be filed, or any other activity similar to the type specified in section 18 U.S.C. 1514A(a)(2) that is engaged in on a voluntary basis.

EE.    **Wrongful Act** means any actual or alleged:

1.    error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted:

    a.    by any **Insured Person** in their capacity as such, or in an **Outside Position**; or

    b.    with respect to Insuring Agreement C, by the **Insured Organization**; or

2.    matter claimed against the **Insured Person** solely because of their serving in such capacity or in an **Outside Position**.

Except as provided in Insuring Agreement E, **Wrongful Act** does not include any conduct committed or attempted by any **Insured Person** in their capacity as a director, officer, manager, trustee or employee of any entity other than the **Insured Organization**, or any functional equivalent position, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to such **Insured Person** by the **Insured Organization**.

## IV.    *EXCLUSIONS*

A.    **EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS**

1.    **PRIOR NOTICE**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any **Insured** under any policy of insurance that: (1) this **Policy** renews, replaces, or succeeds in time, or (2) afforded coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

2.    **PRIOR OR PENDING PROCEEDING**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any: (1) prior or pending demand, suit, or other proceeding against any **Insured** or **Outside Entity** as of, or prior to, the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** underlying or alleged in such demand, suit, or other proceeding.

3.    **INSURED VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** against any **Insured** that is brought or maintained by or on behalf of any **Insured** in any capacity; provided, this exclusion will not apply to:

    a.    a **Claim** that is a **Shareholder Derivative Demand** or **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any

Insured; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

b.    a **Claim** brought and maintained by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this **Policy**;

c.    a **Claim** brought and maintained by a natural person who was a director, officer, or **Manager** of the **Insured Organization**, or any functional equivalent position, but who has not served in such capacity for at least four years preceding the date the **Claim** is first made, and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any natural person who: (1) is serving as a director, officer, or **Manager** of the **Insured Organization**, or any functional equivalent position; or (2) was serving in such capacity within such four-year period; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

d.    a **Claim** brought and maintained by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee, or rehabilitator of the **Insured Organization**, in any bankruptcy proceeding by or against the **Insured Organization**;

e.    a **Claim** that is brought and maintained outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, and any other jurisdiction governed by a common law legal system, but only if coverage for such **Claim** is specifically granted by endorsement to this **Policy**; or

f.    a **Claim** brought and maintained by any employee of the **Insured Organization**.

4.    **OUTSIDE ENTITY VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Position**, if such **Claim** is brought or maintained: (1) by or on behalf of the **Outside Entity** in which the **Insured Person** serves; (2) by or on behalf of any director, officer, manager, or trustee of such **Outside Entity**, or any functional equivalent position; or (3) by any entity that has an ownership interest in a **Joint Venture**; provided, this exclusion will not apply with respect to:

a.    a **Claim** that is a shareholder derivative action brought and maintained on behalf of such entity by any natural person who is not a director, officer, manager, or trustee of such entity, or any functional equivalent position, and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of such entity or any such director, officer, manager, or trustee, or the functional equivalent position; or

b.    a **Claim** brought and maintained by an officer of such entity, or any functional equivalent position, for an employment-related **Wrongful Act**.

5.    **ERISA**

The **Company** will not be liable for **Loss** for any **Claim** for a violation of the responsibilities, obligations, or duties imposed by the Employee Retirement Income Security Act of 1974, as amended, or similar provisions of any federal, state, local, or foreign law or regulation upon fiduciaries of any pension, profit sharing, health and welfare, or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Insured Organization** or **Outside Entity**.

6.    **BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY**

The **Company** will not be liable for **Loss** for any **Claim** for: (1) bodily injury, mental anguish, emotional distress, sickness, disease, or death of any person; (2) damage to, or destruction of, any tangible or intangible property, including loss of use of such property; or (3) libel, slander, defamation of character, disparagement, or violation of a person's right of privacy; provided, this exclusion will not apply with respect to: (1) any mental anguish, emotional distress, libel, slander, defamation of character, disparagement, or violation of a natural person's right of privacy in any **Claim** brought and maintained by a past, present, or prospective employee of the **Insured Organization** for an employment-related **Wrongful Act**; (2) **Loss** covered under Insuring Agreement A for a **Securities Claim**; or (3) **Loss** covered under Insuring Agreement A for a **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains such action without the active solicitation, assistance, or

participation of any **Insured**; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**.

7. **POLLUTION, ASBESTOS, AND OTHER HAZARDS**

The **Company** will not be liable for **Loss** for any **Claim**:

a. based upon or arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of;

b. based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of; or

c. brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of,

any **Pollutant**, any oil or oil products, any electric, magnetic, or electromagnetic field, any odor or noise, or the actual or alleged presence or actual, alleged, or threatened dispersal of any asbestos, asbestos fibers, or products containing asbestos, including any **Securities Claim** or any other **Claim** brought or maintained by or on behalf of the **Insured Organization** or **Outside Entity**, its securities holders, or creditors based upon or arising out of the matters described in this exclusion; provided, this exclusion will not apply to **Loss** covered under Insuring Agreement A for a: (1) **Securities Claim**; or (2) **Shareholder Derivative Action** brought and maintained by any person who is not an **Insured Person** and who brings and maintains such action without the active solicitation, assistance, or participation of any **Insured**. For purposes of this exception, if any **Insured Person** engages in any **Whistleblower Activity**, such activity alone will not be considered the active solicitation, assistance, or participation of any **Insured**.

8. **NON-SUBSIDIARY WRONGFUL ACTS**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by an entity that is, or was, a **Subsidiary**, or any **Insured Person** of such entity, if such **Wrongful Act** occurs during the time when such entity is not a **Subsidiary**.

B. **EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C, AND E AND TO ADDITIONAL BENEFITS ONLY**

1. **FRAUD**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that:

a. such **Insured Person**, with respect to Insuring Agreements A or E, and section *II. ADDITIONAL BENEFITS*; or

b. any **Executive Officer** or the **Insured Organization**, with respect to Insuring Agreement C,

committed such an act, omission, or willful violation.

2. **PERSONAL PROFIT**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, if a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that such **Insured** was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any **Securities Claim** for a violation of section 11 or section 12 of the Securities Act of 1933, as amended.

C. **SEVERABILITY OF EXCLUSIONS**

No fact pertaining to, or knowledge possessed by, any **Insured Person** will be imputed to any other **Insured Person** for purposes of applying the exclusions set forth in section *IV. EXCLUSIONS*. Only facts pertaining to, or knowledge possessed by, an **Executive Officer** will be imputed to the **Insured Organization** for purposes of applying the exclusions set forth in section *IV. EXCLUSIONS*.

## V. CONDITIONS

**A.     LIMITS OF LIABILITY**

The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the **Company** will pay under this **Policy**, regardless of the number of **Claims** or **Insureds**, and regardless of when payment is made by the **Company** or when an **Insured's** legal obligation with regard to any **Claim** arises or is established.

The **Company's** maximum liability for all **Loss** for all **Claims** first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the **Policy Period** set forth in ITEM 5 of the Declarations.

The **Company's** maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Shareholder Derivative Demands** first made during the same **Policy** Period is the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

The **Company's** maximum liability under the **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations. Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

**Defense Expenses** are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the **Company** for all **Loss** for all **Claims** first made during the **Policy Period** and **Extended Reporting Period**, combined.

**B.     RETENTION**

The **Company's** liability with respect to **Loss** for each **Claim** applies only to that portion of **Loss** that is excess of the applicable Retention set forth in ITEM 5 of the Declarations. Such Retention will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of **Loss**.

However, no Retention applies to **Loss** covered under Insuring Agreements A or D or the **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section, except as otherwise provided in section *V. CONDITIONS*, **D. PRESUMPTIVE INDEMNIFICATION**. If **Loss** for a single **Claim** is covered in part under Insuring Agreements A or D, and in part under Insuring Agreements B, C, or E, then the applicable Retention set forth in ITEM 5 of the Declarations applies to that portion of the **Loss** covered under Insuring Agreements B, C, or E. The largest applicable Retention set forth in ITEM 5 of the Declarations is the maximum Retention applicable to all **Loss** for such **Claim**.

**C.     EXTENDED REPORTING PERIOD COVERAGE**

If the **Company** or the **Named Insured** does not renew this **Policy**, or if the **Named Insured** terminates this **Policy**, the **Named Insured** has the right, upon payment of the additional premium described below in this **EXTENDED REPORTING PERIOD COVERAGE** section, to elect an extension of coverage granted by this **Policy** for the **Extended Reporting Period**, but only with respect to a **Wrongful Act** otherwise covered under this **Policy** occurring before or during the **Policy Period**. This right of extension will lapse unless the **Named Insured** provides written notice of such election, together with payment of the additional premium due, to the **Company** within 60 days following the effective date of such nonrenewal or termination. Any **Claim** made during the **Extended Reporting Period** will be deemed made during the **Policy Period**.

The premium due for the **Extended Reporting Period** will equal that percent set forth in ITEM 7 of the Declarations of the original annualized premium, and the fully annualized amount of any additional premium, charged by the **Company** for or during the **Policy Period**. The entire premium for the **Extended Reporting Period** will be deemed fully earned and non-refundable upon payment.

The **Named Insured** will not be entitled to elect the **Extended Reporting Period** under this **EXTENDED REPORTING PERIOD COVERAGE** section if an extension of coverage is elected pursuant to section *V. CONDITIONS*, **M. CHANGE OF CONTROL**.

**D.      PRESUMPTIVE INDEMNIFICATION**

Regardless of whether **Loss** for any **Claim** against an **Insured Person** is actually indemnified, Insuring Agreement B and E and the associated Retention set forth in ITEM 5 of the Declarations will apply to any **Loss** that the **Insured Organization**, or any **Outside Entity**, is legally permitted to indemnify, whether or not actual indemnification is made, unless such **Insured Organization** or such **Outside Entity** fails to provide such indemnification solely because of its **Financial Insolvency**.

The security holder and board of director resolutions, articles of incorporation, bylaws, certificate of incorporation, charter, and other similar organizational documents of the **Insured Organization** and any **Outside Entity** are deemed to provide indemnification for **Loss** to the fullest extent permitted by law.

If the **Insured Organization**, or any **Outside Entity**, is legally permitted, but fails or refuses to advance **Defense Expenses** or indemnify an **Insured Person** for **Loss**:

1.      the **Company** will advance such **Defense Expenses** and pay such other **Loss** on behalf of the **Insured Person** and such **Insured Person** will not be liable for amounts within the applicable Retention; and

2.      if the **Insured Organization**, or **Outside Entity**, fails or refuses to advance **Defense Expenses** or indemnify  an **Insured Person** for **Loss** for reasons other than **Financial Insolvency**, the **Insured Organization** or **Outside Entity** will reimburse the **Company** for **Loss**, including **Defense Expenses**, that would not be have been paid by the **Company** if the **Insured Organization** or **Outside Entity** would have indemnified the **Insured Person** to the fullest extent permitted by law.  Any such failure or refusal will be subject to section *V. CONDITIONS*,  **Q. SUBROGATION**.

**E.      NOTICE**

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Claim** made against any  **Insured**  as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, or risk manager of the **Insured Organization**, or any functional equivalent position, first becomes aware of such **Claim**.

If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

1.      becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

2.      gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.

As a condition precedent to exercising rights under this **Policy**, the **Insured** must:

1.      include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and

2.      give to the **Company** such other information and cooperation as the **Company** may reasonably request.

All notices under this **NOTICE** section must be sent or delivered to the **Company**, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

**F.    DEFENSE AND SETTLEMENT**

The **Company** will have no duty under this **Policy** to defend any **Claim**.  The **Insureds** will have the duty to defend any **Claim** made against them.

The **Insureds** agree not to settle or offer to settle any **Claim**, or incur any **Defense Expenses** in connection with any **Claim**, without the **Company's** written consent; provided, that if the **Insureds** are able to fully and finally settle or otherwise dispose of any **Claim**, including **Defense Expenses**, for an amount not to exceed the applicable Retention set forth in ITEM 5 of the Declarations, the **Company's** consent will not be required.  The **Company** is not liable for any settlement or **Defense Expenses** to which it has not consented when such consent is required.

The **Insureds** also agree not to assume any contractual obligation, stipulate to any judgment, or admit any liability with respect to any **Claim** without the **Company's** written consent, and the **Company** will not be liable for any such assumed obligation, stipulated judgment, or admission without such written consent.

With respect to any **Claim** submitted for coverage under this **Policy**, the **Company** has the right, and will be given the opportunity, to effectively associate with, and be consulted in advance by, the **Insureds** regarding:

1.    the selection of appropriate defense counsel;
2.    substantive defense strategies, including decisions regarding the filing and content of substantive motions; and
3.    settlement  negotiations.

The **Insureds** agree: (1) to provide the **Company** with all information, assistance, and cooperation that the **Company** reasonably requests; and (2) that in the event of a **Claim**, the **Insureds** will do nothing to prejudice the **Company's** position or its potential or actual rights of subrogation or recovery.   The **Company** may make any investigation it deems necessary.

The **Company**, on a current basis and prior to disposition of the **Claim**, will advance, on behalf of the **Insureds**, **Defense Expenses** or **Investigation Expenses** that the **Company** believes to be covered under this  **Policy**  and that are incurred in connection with any **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period** , for a **Wrongful Act** occurring before or during the  **Policy Period**; provided, that to the extent it is finally established that any such **Defense Expenses** or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally according to their interests, agree to repay the **Company** such **Defense Expenses** and **Investigation Expenses**.

The **Company** may, with the written consent of the **Insured**, settle any **Claim** for a monetary amount that the **Company** deems reasonable.

The **Company** and the **Insureds** will not unreasonably withhold any consent referenced in this **DEFENSE AND SETTLEMENT** section.

**G.    ALLOCATION**

If, in any **Claim**, any **Insured** incurs **Loss** jointly with others (including an **Insured Person** incurring **Loss** jointly with the **Insured Organization** for any **Claim** not covered under Insuring Agreement C) or incurs an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because the  **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Company** will allocate such amount between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.

For that part of **Loss** consisting of **Defense Expenses**, if there can be an agreement on an allocation of **Defense Expenses**, then the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** allocated to covered **Loss**.  If there can be no agreement on an allocation

of **Defense Expenses**, the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** that the **Company** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated, or judicially determined. As a condition of any advancement of **Defense Expenses**, the **Company** may require a written undertaking on terms and conditions satisfactory to the **Company** guaranteeing the repayment of any **Defense Expenses** paid to, or on behalf of, any **Insured** if it is finally determined that any such **Claim**, or portion of **Claim**, is not covered under this **Policy**.

Any negotiated, arbitrated, or judicially determined allocation of **Defenses Expenses** in connection with a **Claim** will apply retroactively to all **Defense Expenses** in connection with such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Defense Expenses** in connection with a **Claim** will not apply to, or create any presumption with respect to, the allocation of other **Loss** for such **Claim** or any other **Claim**.

**H.    OTHER INSURANCE**

If **Loss** arising from any **Claim** made against any **Insured** is insured under any valid and collectible other insurance, prior or current, then this **Policy** covers such **Loss** only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written as specific excess insurance over the Limits of Liability set forth in ITEM 5 of the Declarations. Any payment by an **Insured** of a retention or deductible under any such other insurance issued by the **Company** or any of its affiliated companies will reduce, by the amount of such payment that would otherwise have been covered under this **Policy**, any applicable Retention under this **Policy**. This **Policy** will not be subject to the terms, conditions, exclusions, or limitations of any other insurance.

In addition, this **Policy** covers **Loss** for any **Claim** made against any **Insured Person** serving in an **Outside Position** only to the extent that the amount of such **Loss** exceeds any indemnity and other insurance available from, or provided by, the applicable **Outside Entity**. Also, payment by the **Company** or any of its affiliated companies under another policy as a result of a **Claim** made against an **Insured Person** in an **Outside Position** reduces the **Company's** Limits of Liability under this **Policy**, with respect to such **Claim**, by the amount of such payment.

**I.    ORDER OF PAYMENTS**

If **Loss** for any **Claim** exceeds, or may exceed, the remaining applicable Limits of Liability set forth in ITEM 5 of the Declarations:

1. the **Company** will first pay **Loss** covered under Insuring Agreement A; then
2. with respect to any remaining amount of the Limits of Liability available after such payment, at the written request of a majority of the members of the board of directors or board of managers of the **Insured Organization**, or any functional equivalent board, who are not named defendants in such **Claim**, the **Company** will either pay or withhold payment of such other **Loss** covered under any other Insuring Agreement of this **Policy**.

Except as provided in this **ORDER OF PAYMENTS** section, the **Company** may pay **Loss** as it becomes due without regard to the potential for other future payment obligations under this **ORDER OF PAYMENTS** section.

**J.    ESTATES, LEGAL REPRESENTATIVES, AND SPOUSAL LIABILITY COVERAGE**

Subject to the applicable Insuring Agreement, this **Policy** will afford coverage for **Claims** for **Wrongful Acts** of any **Insured Person** made against:

1. any estate, heir, legal representative, or assignee of the **Insured Person** in the event of death, incapacity, insolvency, or bankruptcy of such **Insured Person**; or
2. the **Insured Person's** lawful spouse or **Domestic Partner** solely because of such spouse's or such **Domestic Partner's** legal status as a spouse or **Domestic Partner**, or because of such spouse's or such **Domestic Partner's** ownership interest in property that the claimant seeks as recovery for alleged **Wrongful Acts** of the **Insured Person**.

All loss such estate, heir, legal representative, assignee, spouse, or **Domestic Partner** of such **Insured Person** becomes legally obligated to pay for such **Claim** will be treated as **Loss** that the **Insured Person** becomes legally obligated to pay for the **Claim** made against the **Insured Person**.  The coverage afforded by this **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSAL LIABILITY COVERAGE** section will not apply to the extent the **Claim** alleges any wrongful act or omission by the estate, heir, legal representative, assignee, spouse, or **Domestic Partner** of the **Insured Person**.

**K.**     **ACQUISITIONS**

If, during the **Policy Period**, the **Insured Organization**:

1.     acquires securities in, or creates, another entity, that as a result of such acquisition or creation becomes a **Subsidiary**; or

2.     acquires any entity by merger into, or consolidation with, the **Insured Organization**,

then such entity and its **Insured Persons** will be covered under this **Policy** as follows:

a.     If the total assets of any such acquired or created entity are less than 30% of the total assets of all **Insured Organizations**, as reflected in the **Insured Organizations'** most recent financial statements as of the inception of the **Policy Period**, such entity and its **Insured Persons** will be covered automatically under this **Policy**, but only with respect to **Wrongful Acts** occurring after such acquisition or creation, unless the **Company** agrees after presentation of a complete **Application** and all appropriate information to provide coverage by endorsement for **Wrongful** Acts occurring prior to such acquisition or creation.

b.     With respect to all acquisitions or creations other than as described in a. above, such entity and its **Insured Persons** will be covered automatically under this **Policy**, but only for the lesser of the remainder of the **Policy Period** or 90 days, following the effective date of such acquisition or creation (Automatic Coverage Period), and only with respect to **Wrongful Acts** occurring after such acquisition or creation.  As a condition precedent to further coverage with respect to such entity and its **Insured Persons** after such Automatic Coverage Period, the **Named Insured** must give written notice of such acquisition or creation to the **Company** as soon as practicable, but in no event later than 60 days following the effective date of such acquisition or creation, and must promptly provide the **Company** such information as the **Company** may request.  Upon receipt of such notice and other information, the **Company** will provide the **Named Insured** a quotation for coverage under this **Policy** for such entity and its **Insured Persons** for the remainder of the **Policy Period**.  If the **Named Insured** fails to comply with such condition precedent, or if within 60 days following receipt of such quotation the **Named Insured** fails to pay any additional premium or fails to agree to any additional coverage terms, conditions, exclusions, or limitations set forth in such quotation, coverage otherwise afforded by this **ACQUISITIONS** section for such entity and its **Insured Persons** will terminate upon expiration of such Automatic Coverage Period.

**L.**     **CESSATION OF SUBSIDIARIES**

If, before or during the **Policy Period,** an entity ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insured Persons** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** occurring during the time that such entity was a **Subsidiary**.

**M.**     **CHANGE OF CONTROL**

If, during the **Policy Period**:

1.     the **Named Insured** merges into, or consolidates with, another entity such that the **Named Insured** is not the surviving entity; or

2.     another entity, person, group of entities, or group of persons acting in concert, acquires securities or voting rights that result in ownership or voting control by the other entity, persons, or group of more than 50% of the outstanding securities representing the present right to vote for the election or appointment of directors, officers, or **Managers** of the **Named Insured**, or any functional equivalent position,

then coverage under this **Policy** will continue until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** occurring prior to such merger, consolidation, or acquisition.  As of the

effective date of such merger, consolidation, or acquisition, all premiums paid or due at any time under this **Policy** are deemed fully earned and non-refundable.

The **Named Insured** must give written notice of such merger, consolidation, or acquisition to the **Company** as soon as practicable together with such information as the **Company** may request. Upon receipt of such notice and information and at the request of the **Named Insured**, the **Company** will provide to the **Named Insured** a quotation for a six-year (or such lesser period as may be negotiated with the **Company**) extension of coverage from such merger, consolidation, or acquisition date with respect to **Claims** for **Wrongful Acts** occurring prior to such merger, consolidation, or acquisition. Any coverage extension pursuant to such quotation will be conditioned upon the **Named Insured** completing the following within 60 days after receipt of such quotation:

1.   provide written notice to the **Company** of the Named Insured's desire to elect such coverage extension;

2.   pay any additional premium required by the **Company**, which is deemed fully earned upon inception of such coverage extension; and

3.   accept any additional terms, conditions, exclusions, and limitations required by the **Company**.

Such coverage extension will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations and the Limits of Liability for such coverage extension will be part of, and not in addition to, the Limits of Liability for the **Policy Period**. Any additional premium required under this **CHANGE OF CONTROL** section will be deemed fully earned upon inception of such coverage extension.

The **Insureds** are not entitled to elect an extension of coverage under this **CHANGE OF CONTROL** section if an **Extended Reporting Period** is elected pursuant to section *V. CONDITIONS*, **C. EXTENDED REPORTING PERIOD COVERAGE**.

N.   **REPRESENTATIONS AND SEVERABILITY**

In consideration of issuing this **Policy**, the **Company** has relied upon the statements and representations in the **Application**. The **Insureds** represent and agree that all such statements and representations are true and accurate and are the basis of the **Policy**. This **Policy** is issued in reliance upon the truth of all such statements and representations.

With respect to all statements and representations contained in the **Application**, no knowledge possessed by any one **Insured Person** will be imputed to any other **Insured Person**.

The **Company** will not, under any circumstance, rescind this **Policy** with respect to any **Insured**. However, the **Insureds** agree that in the event any such statements or representations in the **Application** are untrue or inaccurate and materially affect either the acceptance of the risk or the hazard assumed by the **Company**, then no coverage will be afforded under this **Policy** with respect to the following **Insureds** for any **Claim** based upon or arising out of the information that was not truthfully or accurately disclosed in the **Application**(whether or not the **Insured** or **Executive Officer** knew of such untruthful or inaccurate disclosure in the **Application**) with respect to any of the following **Insureds**:

1.   any **Insured Person**, under Insuring Agreements A or E, who knew the information that was not truthfully or accurately disclosed in the **Application**;

2.   the **Insured Organization**, under Insuring Agreement B, to the extent it indemnifies any **Insured Person** referenced in **N.1.** above; and

3.   the **Insured Organization**, under Insuring Agreements C or D, if any **Executive Officer** knew the information that was not truthfully or accurately disclosed in the **Application**.

O.   **TERRITORY AND VALUATION**

Where legally permissible, coverage under this **Policy** extends to **Wrongful Acts** occurring, or **Claims** made, anywhere in the world.

If the laws or regulations of any country or jurisdiction outside of the United States (including any U.S. territory, possession, or protectorate) prohibit the **Company** from paying on behalf of an **Insured** any **Loss** covered under this **Policy**, such **Insured** may pay such **Loss**, with the **Company's** written consent. If the **Insured** provides the **Company** with proof of payment for such **Loss**, the **Company** will reimburse

either such **Insured** or the **Named Insured** for such **Loss**, where legally permissible, subject to all applicable terms, conditions, exclusions, and limitations of this **Policy**.

All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Policy** is stated in a currency other than United States dollars, payment under this **Policy** will be made in United States dollars at the rate of exchange published in  The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

**P.    TERMINATION OF POLICY**

This **Policy** terminates at the earliest of the following times:

1.    the effective date of termination specified in a prior written notice by the **Named Insured** to the **Company**; provided, this **Policy** may not be terminated after the effective date of any merger, consolidation, or acquisition of the **Named Insured** as described in section ***V. CONDITIONS***, **M. CHANGE OF CONTROL;**

2.    upon expiration of the **Policy Period** set forth in ITEM 2 of the Declarations;

3.    20 days after receipt by the **Named Insured** of a written notice of termination from the **Company** for failure to pay a premium when due, unless the premium is paid within such 20 day period; or

4.    at such other time as may be agreed upon by the **Company** and the **Named Insured**.

The **Company** may not terminate this **Policy** prior to expiration of the **Policy Period**, except as provided above for non-payment of premium.   The **Company** will refund any unearned premium computed at customary short rates if this **Policy** is terminated by the **Named Insured**. Under any other circumstance, the refund will be computed pro rata.   Payment or tender of any unearned premium by the **Company** is not a condition precedent to the effectiveness of such termination, but such payment must be made as soon as practicable.

**Q.    SUBROGATION**

In the event of payment under this **Policy**, the **Company** will be subrogated to all of the **Insureds'** rights of recovery against any person or entity, including the **Insured Persons'** rights to indemnification or advancement from any entity, to the extent of such payment, and the **Insured** must execute and deliver instruments and papers and do all that is necessary to secure such rights.   The **Insured** must do nothing to prejudice such rights.

**R.    RECOVERY**

The **Company** will not exercise its rights of recovery against any **Insured**, unless there is a final adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishing that:

1.    such **Insured Person**, or with respect to Insuring Agreement C, such **Executive Officer**, committed a deliberately fraudulent act or omission, or a willful violation of any law or regulation; or

2.    such **Insured**  gained any profit, remuneration, or financial advantage to which that **Insured** was not legally entitled.

**S.    BANKRUPTCY**

Bankruptcy or insolvency of any **Insured**, or of an **Insured's** estate, will not relieve the **Company** of its obligations, nor deprive the **Company** of its rights or defenses, under this **Policy**.

In the event a liquidation or reorganization proceeding is commenced by or against an **Insured Organization** pursuant to the U.S. Bankruptcy Code, as amended, or any similar state, local, or foreign law, and if there is **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Policy**, the **Insureds** must:

1.    make a request to waive and release any automatic stay or injunction that may apply to this **Policy**  or its proceeds in such proceeding, to the extent permitted under the applicable law; and

2.      agree not to oppose, or object to, any efforts by the **Company** or any **Insured** to obtain relief from any such stay or injunction.

**T.      ACTION AGAINST THE COMPANY**

No action will lie against the **Company** unless, as a condition precedent, there has been full compliance with all the provisions of this **Policy**. No person or entity will have any right under this **Policy** to join the **Company** as a party to any action against any **Insured** to determine such **Insured's** liability nor may the **Company** be impleaded by any **Insured** or their legal representative.

**U.      AUTHORIZATION**

By acceptance of this **Policy**, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the giving and receiving of notice of **Claim** or termination, nonrenewal, change of coverage, or the payment of premiums and the receiving of any return premiums that may become due under this **Policy**, and each **Insured** agrees that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing in this **AUTHORIZATION** section relieves any **Insured** from giving any notice to the **Company** required under this **Policy**.

**V.      ALTERATION AND ASSIGNMENT**

No change in, modification of, or assignment of interest under this **Policy** will be effective except when made by the **Company** by written endorsement to this **Policy**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## KENTUCKY CHANGES ENDORSEMENT

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. Section **V. CONDITIONS, P. TERMINATION OF POLICY**, item 3.is replaced with the following:

   3. 14 days after receipt by the **Named Insured** of a written notice of termination from the **Company** for failure to pay a premium when due, unless the premium is paid within such 14 day period; or

2. The following is added to Section **V. CONDITIONS,  P. TERMINATION OF POLICY**:

   Nonrenewal

   This **Policy** may be nonrenewed by or on behalf of the **Company** by delivering to the **Named Insured**, at its last known address, written notice of the nonrenewal stating when, not more than 75 days thereafter, the nonrenewal shall be effective.  Such notice will contain the specific reason(s) for the nonrenewal and  such reason(s) will be in a statement reasonably calculated to inform the **Insured**. Underwriting reasons is not sufficiently specific.

   Failure of the **Company** to provide the **Named Insured** with the required notice of nonrenewal shall entitle the **Insured** to continue on the expiring **Policy** for another **Policy Period** at the same terms and premium upon payment of such premium. This additional **Policy Period** will cease only when the **Insured** accepts replacement coverage with another insurer or agrees to the nonrenewal.

   The **Company** may offer to renew or continue the **Policy**  by delivering to the **Named Insured**, at its last known address, a notice of renewal at least 30 days prior to the expiration date. Such notice shall contain the renewal premium amount and the due date of the renewal premium. A duplicate copy of this notice shall be sent to the agent. In the event that such notice is provided and the **Insured** does not pay the required premium by the expiration date, the **Policy** will terminate on the expiration date. The **Company** will deliver written notice to the **Named Insured** within 15 after the expiration date confirming the expiration of the **Policy**.

   Renewal with Altered Terms

   The **Company** will give written notice to the **Named Insured** if the renewal premium is increased by more than 25% for a reason other than change in the actual exposure or risk at least 75 days prior to the expiration of the **Policy Period**. Such notice will be sent to the **Insured** at its last known address and shall include the renewal premium amount and the due date of the renewal premium. A duplicate copy of this notice will also be sent to the agent.  If the **Company** fails to provide such notice at least 75 days prior to expiration of the **Policy Period**, the existing **Policy** will continue until the **Company** provides 75 days notice of the premium increase to the **Named Insured**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## AMEND DEFINITION OF INSURED PERSON ENDORSEMENT  - SCHEDULED PERSON OR POSITION

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following is added to section **III. DEFINITIONS, N. Insured Person**:

**N. Insured Person** also means any person, or any natural person serving in a position, set forth below as a scheduled Person or Position:

**Person or Position:**

**Vice President of Finance & Investor Relations**

**Risk Manager**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### EMPLOYED LAWYER ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

---

**It is agreed that:**

1.    The following is added to ITEM 5 of the Declarations:

    **Employed Lawyer Limit of Liability: $2,000,000.00** for all **Employed Lawyer Claims**, which amount is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability

2.    The following is added to section **III. DEFINITIONS, N. Insured Person**:

    **Insured Persons** also means any **Employed Lawyer**, but only for a **Claim** initially made, and continuously maintained, against both such **Employed Lawyer** and any natural person described in **N.** 1. above.

3.    The following is added to section **III. DEFINITIONS**:

    *Employed Lawyer* means any employee of the **Insured Organization** who is admitted to practice law and who was, now is or shall be, at the time of the **Wrongful Act**, employed as a lawyer full time for, and salaried by, the **Insured Organization**.

4.    The following is added to section **III. DEFINITIONS, EE. Wrongful Act**:

    **Wrongful Act** also means any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted by any **Employed Lawyer** in his or her capacity as such; provided, **Wrongful Act** does not include any error, misstatement, misleading statement, act, omission, neglect, or breach of duty in connection with any conduct by such **Employed Lawyer**: (i) which is not related to such **Employed Lawyer's** employment with the **Insured Organization**; (ii) which is not rendered on behalf of the **Insured Organization** at the **Insured Organization's** written request; or (iii) which is performed by such **Employed Lawyer** for others for a fee.

5.    The following is added to section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS:**

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by an **Employed Lawyer**, if such **Wrongful Act** occurs during the time when such **Employed Lawyer** was not employed as a lawyer by the **Insured Organization**.

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a claim about which any **Employed Lawyer** had knowledge prior to the effective date of this endorsement; provided no knowledge by any **Employed Lawyer** will be imputed to any other **Employed Lawyer** to determine the application of this exclusion.

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any activities by an **Employed Lawyer** as an employee, officer or director of any entity other than the **Insured Organization**.

7.    The following is added to section **V. CONDITIONS, A. LIMITS OF LIABILITY**:

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-10002 Ed. 09-10
© 2010 The Travelers Indemnity Company. All rights reserved.

The **Company's** maximum liability under Insuring Agreements A and B for all **Loss** for all **Claims** first made during the same **Policy Period** based upon or arising out of any **Wrongful Act** by any **Employed Lawyer** is the Employed Lawyer Limit of Liability set forth in ITEM 5 of the Declarations. Such Employed Lawyer Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

8.   The following is added to section **V. <u>CONDITIONS</u>, H. OTHER INSURANCE**:

If **Loss** arising from any **Claim** based upon or arising out of any **Wrongful Act** by any **Employed Lawyer** is insured under any valid or collectible other insurance, prior or current, providing lawyers professional, legal malpractice, or errors and omissions liability coverage, then this **Policy** shall cover such **Loss** only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

PCDO-10002 Ed. 09-10                                                               Page 2 of 2
© 2010 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

# AMEND "INSURED PERSON" DEFINITION TO INCLUDE SHADOW AND DE FACTO DIRECTORS ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

The following is added to **III. DEFINITIONS, N., INSURED PERSON**:

**Insured Person** also means any natural person acting in his or capacity as (1) a Shadow Director of any **Insured Organization** that is incorporated or domiciled in the United Kingdom, as defined in Section 251 of Chpt 8, Part 10 of the Companies Act of 2006, as amended; or (2) a de facto director of such **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2010 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND ALLOCATION PROVISION ENDORSEMENT

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

---

**It is agreed that:**

The following replaces the second paragraph of section **V. CONDITIONS, G. ALLOCATION**:

For that part of **Loss** consisting of **Defense Expenses**, if there can be an agreement on an allocation of **Defense Expenses**, then the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** allocated to covered **Loss**. If there can be no agreement on an allocation of **Defense Expenses**, the **Company**, on a current basis and prior to disposition of the **Claim**, will advance **Defense Expenses** that the **Company** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated, or judicially determined.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## ADD ADDITIONAL CARVEBACKS TO OUTSIDE ENTITY VERSUS INSURED ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, 4. OUTSIDE ENTITY VERSUS INSURED:

4.      **OUTSIDE ENTITY VERSUS INSURED**

The **Company** will not be liable for **Loss** for any **Claim** for a **Wrongful Act** by an **Insured Person** in an **Outside Position**, if such **Claim** is brought or maintained: (1) by or on behalf of the **Outside Entity** in which the **Insured Person** serves; (2) by or on behalf of any director, officer, manager, or trustee of such **Outside Entity**, or any functional equivalent position; or (3) by any entity that has an ownership interest in a **Joint Venture**; provided, this exclusion will not apply with respect to:

a.      a **Claim** that is a shareholder derivative action brought and maintained on behalf of such entity by any natural person who is not a director, officer, manager, or trustee of such entity, or any functional equivalent position, and who brings and maintains the **Claim** without the solicitation, assistance, or active participation of such entity or any such director, officer, manager, or trustee, or the functional equivalent position;

b.      a **Claim** brought and maintained by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this **Policy**;

c.      a **Claim** brought and maintained by a natural person who was a director, officer, or manager of the **Outside Entity**, or any functional equivalent position, but who has not served in such capacity for at least three years preceding the date the **Claim** is first made, and who brings and maintains the **Claim** without the solicitation, assistance, or active participation of any natural person who: (1) is serving as a director, officer, or manager of the **Outside Entity**, or any functional equivalent position; or (2) was serving in such capacity within such three-year period; provided, any **Insured Person's Whistleblower Activity** alone will not be considered the solicitation, assistance, or active participation of an **Insured**;

d.      a **Claim** brought and maintained by the **Outside Entity** as a debtor in possession, or by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee, or rehabilitator of the **Outside Entity**, in any bankruptcy proceeding by or against the **Outside Entity**;

e.      a **Claim** that is brought and maintained outside of the United States of America by any natural person who is a director, officer, manager, or trustee of any **Outside Entity** incorporated or chartered outside of the United States of America; or

f.      a **Claim** brought and maintained by an officer of such entity, or any functional equivalent position, for an employment-related **Wrongful Act**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## DELETE PRIOR OR PENDING PROCEEDING EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1.  The **Prior or Pending Proceeding Date** is deleted from ITEM 5 of the Declarations.

2.  Section ***IV. EXCLUSIONS***, **A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMETNS AND TO ALL ADDITIONAL BENEFITS, 2. PRIOR OR PENDING PROCEEDING** is deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-10066 Ed. 09-10

Page 1 of 1

© 2010 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Directors, Officers, and Organization Liability**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **105518156**

© 2011 The Travelers Indemnity Company. All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## DELETE POLLUTION EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Policy**

---

**It is agreed that:**

1.   The following is added to section *III. DEFINITIONS*:

*Clean-Up Costs* means any payment made, or any cost or expense incurred, as a result of any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, test or assess the effects of, any **Pollutant**, any oil or oil products, any electric, magnetic, or electromagnetic field, any odor or noise, or the actual, alleged or threatened dispersal of any asbestos, asbestos fibers, or products containing asbestos.

2.   The following is added to section *III. DEFINITIONS*, **Q. Loss**:

**Loss** , other than **Defense Expenses**, also does not mean any amount that constitutes **Clean-Up Costs**.

3.   *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 7. POLLUTION, ASBESTOS AND OTHER HAZARDS, is deleted.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

### PRIOR NOTICE EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 1. PRIOR NOTICE:

1.    **PRIOR NOTICE**

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** about which written notice has been given by or on behalf of any **Insured**, provided that such written notice has been accepted under any directors and officers liability insurance policy that: (1) this **Policy** renews or replaces, or (2) afforded directors and officers liability coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

### GENERAL CABLE ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

1. The following is added to *I. INSURING AGREEMENTS*, A. DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE:

   The **Company** will pay, on behalf of any **Insured Person**, **Interview Costs** that are not indemnified by the Insured **Organization** and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**.

2. The following is added to *I. INSURING AGREEMENTS*, B. ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE:

   The **Company** will pay, on behalf of the **Insured Organization**, **Interview Costs** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**.

3. The following replaces section *III. DEFINITIONS*, A. Application:

   A. *Application* means:

      1. all signed applications for this **Policy**, or for any policy that this **Policy** renews or replaces, including any materials submitted with or requested in such applications; and

      2. all public documents filed by the **Insured Organization** with the Securities and Exchange Commission (SEC), or any similar federal, state, local, or foreign regulatory body, during the 12 months preceding the **Policy Period**.

   All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

4. The following is added to *III. DEFINITIONS*, C. Claim:

   Provided, with respect to any paragraph 1. through 8. above that invokes coverage for **Dodd-Frank Costs**, a **Wrongful Act** is not required, but only with respect to **Dodd-Frank Costs**.

5. The following is added to *III. DEFINITIONS*, D. Defense Expense:

   Defense Expense also includes (1) **Corporate Manslaughter Proceeding Costs**, (2) **SOX 304 Defense Expenses**, and (3) **Dodd-Frank 954 Defense Expenses**. Defense Expense does not include **Interview Costs**.

6. The following replaces *III. DEFINITIONS*, Q. Loss:

   Q. *Loss* means:

      1. **Interview Costs**;

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-10201 Ed. 10-11
© 2011 The Travelers Indemnity Company. All rights reserved.

Page 1 of 8

2.      damages, judgments, settlements, pre-judgment and post-judgment interest, **SOXSOX 304 Costs, Corporate Manslaughter Proceeding Costs, Dodd-Frank 954 Costs**, and **Defense Expenses**; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any **Insured**, **Loss** only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the Insured, the **Claim**, the **Company**, or this **Policy**; and

3.      **Investigation Expense**, with respect to Insuring Agreement D only.

**Loss**, other than **Defense Expenses**, does not mean any of the following:

1.      any amount that an **Insured** is absolved from payment;

2.      any amount that constitutes taxes, fines, or penalties; provided, **Loss** includes:

(i)     civil penalties assessed against any **Insured Person** pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended; or

(ii)    civil penalties assessed against any **Insured Person** pursuant to section 308 of the Sarbanes-Oxley Act of 2002, as amended;

3.      any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

4.      any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.      any amount that constitutes disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the **Company** will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended, including **Defense Expenses** attributable to such **Claim**, constitutes disgorgement or other uninsurable loss.

7.   The following are added to section *III. DEFINITIONS*:

*Corporate Manslaughter Proceeding* means a formal criminal proceeding for corporate manslaughter or corporate homicide, as those terms are defined in the United Kingdom's Corporate Manslaughter and Corporate Homicide Act of 2007, as amended, or similar provisions of any federal, state, local or foreign law or regulation.

*Corporate Manslaughter Proceeding Costs* means the reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by an **Insured Person** in defending against a **Claim** related to or arising out of a **Corporate Manslaughter Proceeding**.

*Dodd-Frank 954 Costs* means:

1.      **Dodd-Frank 954 Defense Expenses**; and

2.      the reasonable amount of a premium or origination fee incurred by such **Insured Person** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to 954(b)(2);

provided that **Dodd-Frank Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to section 954 (b)(2) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, (ii) the principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to section 954 (b)(2) of the Dodd-Frank Act, (iii) the amount incurred to comply with section 954 (b)(1) of the Dodd-Frank Act, and (iv) the expense incurred to determine what amount, if any is owed pursuant to section 954(b)(2) of the Dodd-Frank.

© 2011 The Travelers Indemnity Company. All rights reserved.

*Dodd Frank 954 Defense Expenses* means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to section 954 of the Dodd-Frank Act.

*Enforcement Body* means any federal, state, local or foreign governmental regulatory authority, including the United States Department of Justice, the Securities and Exchange Commission, any states' attorney general, or the enforcement unit of any securities exchange.

*Interview Costs* means the reasonable costs, charges and fees (including attorneys' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred by an **Insured Person** in responding to an **Interview Request**; provided that **Interview Costs** do not include:

1.  any compensation of any **Insured Person** associated with an **Interview Request**; or

2.  any costs incurred in responding to any formal or informal discovery or e-discovery request for the production of documents, records or electronic information of any kind, regardless of whether such documents, records or electronic information are in the possession of any **Insured**, any **Enforcement Body** or any other third party.

*Interview Request* means a written request by an **Enforcement Body** for an **Insured Person** to appear for an interview or meeting in connection with an investigation against any **Insured Person** or the **Insured Organization**; provided that **Interview Request** does not include any routine or regularly scheduled interview or audit conducted pursuant to the **Enforcement Body's** or **Insured Organization's** ordinary review and compliance procedures.

*Related Interview Requests* means all **Interview Requests** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

*SOX 304 Costs* means:

1.  **SOX 304 Defense Expenses**; and

2.  the reasonable amount of a premium or origination fee incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to section 304(a) of the Sarbanes Oxley Act of 2002, as amended (SOX 304(a));

provided that **SOX 304 Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to SOX 304(a), or (ii) the principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to SOX 304(a).

*SOX 304 Defense Expenses* means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to SOX 304(a).

8.  The following replaces section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 3. ORGANIZATION VERSUS INSURED:

    3.  **ORGANIZATION VERSUS INSURED**

        The **Company** will not be liable for **Loss** for any **Claim** against any **Insured** that is brought or maintained by or on behalf of any **Insured Organization** in any capacity, provided that this exclusion will not apply to:

        a.  a **Claim** that is a **Shareholder Derivative Demand** or **Shareholder Derivative Action**, brought or maintained by any natural person who is not an **Insured Person** and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any **Insured**; provided any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

b.    a **Claim** brought and maintained by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee or rehabilitator of the **Insured Organization**, in any bankruptcy proceeding by or against the **Insured Organization**; or

c.    a **Claim** that is brought and maintained outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, and other jurisdiction governed by a common law legal system, but only if the laws or regulations of such jurisdiction require that such **Claim** be brought by or on behalf of the **Insured Organization**.

9.    The following is added to section *IV. EXCLUSIONS*, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 6. BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY:

This exclusion will also not apply to any **Loss** amounting to **Corporate Manslaughter Proceeding Costs**.

10.    The replaces section *IV. EXCLUSIONS*, B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C AND E AND TO ADDITIONAL BENEFITS ONLY:

    **1.**    **FRAUD**

        The **Company** will not be liable for **Loss** for any **Claim** for any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that:

        a.    such **Insured Person**, with respect to Insuring Agreements A or E, and section *II. ADDITIONAL BENEFITS*; or

        b.    any **Executive Officer** or the **Insured Organization**, with respect to Insuring Agreement C,

        committed such an act, omission, or willful violation.

    **2.**    **PERSONAL PROFIT**

        The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that such **Insured** was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended.

11.    The following is added to section *IV. EXCLUSIONS*:

    **C.**    **EXCLUSIONS APPLICABLE TO INTERVIEW REQUEST COVERAGE ONLY**

        **1.**    **PRIOR NOTICE OF CIRCUMSTANCES RELATED TO INTERVIEW REQUESTS**

            The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any **Insured** under any policy of insurance that: (1) this **Policy** renews, replaces or succeeds in time, or (2) afforded coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

        **2.**    **PRIOR OR PENDING INTERVIEW REQUEST**

            The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any: (1) prior or pending **Interview Request** as of, or prior to, the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, **Related Wrongful Act** or **Related Interview Request** underlying such **Interview Request**.

12.   The following replaces section **V. CONDITIONS, A. LIMITS OF LIABILITY:**

A.   **LIMITS OF LIABILITY**

The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the **Company** will pay under this **Policy**, regardless of the number of **Claims**, **Interview Requests** or **Insureds**, and regardless of when payment is made by the **Company** or when an Insured's legal obligation with regard to any **Claim** or **Interview Request** arises or is established.

The **Company's** maximum liability for all **Loss** for all **Claims**, and for all **Interview Costs** for all **Interview Requests**, first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the **Policy Period** set forth in ITEM 5 of the Declarations.

The **Company's** maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Shareholder Derivative Demands** first made during the same **Policy Period** is the **Investigation Expense** Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

The Company's maximum liability under the **SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE** section for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations. Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

All **Interview Requests** arising out of the same or substantially similar facts or circumstances and all **Related Interview Requests** are deemed one **Interview Request**, and such **Interview Request** is deemed to be first made on the date the earliest of such **Interview Requests** is first made to any **Insured**, regardless of whether such date is before or during the **Policy Period**.

**Defense Expenses** and **Interview Costs** are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the **Company** for all **Loss** combined for: (i) all **Claims** first made during the **Policy Period** and **Extended Reporting Period**; and (ii) all **Interview Costs** for all **Interview Requests** first made to the **Insured** and reported to the **Company** during the **Policy Period** or, if purchased, the **Extended Reporting Period**.

13.   The following replaces the first paragraph of section **V. CONDITIONS, B. RETENTION:**

The **Company's** liability with respect to **Loss** for each **Claim**, or **Interview Costs** for each **Interview Request**, applies only to that portion of **Loss** or **Interview Costs**, respectively, that is excess of the applicable Retention set forth in ITEM 5 of the Declarations. Such Retention will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of such **Loss** or **Interview Costs**.

14.   The following is added to section **V. CONDITIONS, C. EXTENDED REPORTING PERIOD:**

Any **Interview Request** made to any **Insured** and reported to the **Company** during the **Extended Reporting Period** will be deemed made and reported during the **Policy Period**. However, this **Policy** will not cover any **Interview Costs** incurred during or after the **Extended Reporting Period** unless, prior to the Expiration Date of the **Extended Reporting Period**, the **Insureds** provide written notice to the **Company** of the **Interview Request** for which the **Insureds** have incurred, or will incur, such **Interview Costs**.

© 2011 The Travelers Indemnity Company. All rights reserved.

15.      The following replaces section **V. CONDITIONS, E. NOTICE**:

    **E.      NOTICE**

        **1.      Notice of Claim**

        As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Claim** made against any Insured as soon as practicable after the risk manager or in-house general counsel of the **Named Insured** first becomes aware of such **Claim** , but in no event later than 60 days after expiration of the **Policy Period**, or any applicable **Extended Reporting Period**.

        **2.      Notice of Interview Request**

        As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Interview Request** made to any **Insured** as soon as practicable after such **Insured** first becomes aware of such **Interview Request**, but in no event later than: (i) the Expiration Date of the **Policy Period**, as set forth in ITEM 2 of the Declarations; or (ii) the Expiration Date of the applicable **Extended Reporting Period**, as set forth in ITEM 7 of the Declarations, if the Named Insured elects such **Extended Reporting Period**, pursuant to section **V. C.** of this **Policy**.

        **3.      Notice of Circumstances**

        If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

           1.      becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

           2.      gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

        then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.

        **4.      Notice Requirements**

          a.      Notice of **Claims** or Circumstances

          As a condition precedent to exercising rights under this **Policy** with respect to any **Claim** or circumstance, the **Insured** must:

             (i)      include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and

             (ii)      give to the **Company** such other information and cooperation as the **Company** may reasonably request.

          b.      Notice of **Interview Requests**

          As a condition precedent to exercising rights under this **Policy** with respect to any **Interview Request**, the **Insured** must:

             (i)      include with any notice of an **Interview Request** the name of the **Enforcement Body** making the request and, to the best of the **Insured's** knowledge, a description of the nature and subject matter identified by the **Enforcement Body** in its **Interview Request**; and

© 2011 The Travelers Indemnity Company. All rights reserved.

Page 42 of 64

      (ii)     give to the Company such other information and cooperation as the Company may reasonably request, including additional information about the subject matter and nature of the Interview Request as it is learned.

All notices under this **NOTICE** section must be sent or delivered to the **Company**, at the address set forth in **ITEM 3** of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

16.    The following replaces the sixth of *V. CONDITIONS*, **F. DEFENSE AND SETTLEMENT**:

The **Company** will advance on behalf of the **Insureds**, **Defense Expenses** or **Investigation Expenses** that the **Company** believes to be covered under this **Policy** and that are incurred in connection with any **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**. The **Company** will advance such **Defense Expenses** or **Investigation Expenses** on a current basis, but no later than 90 days of the date when the **Company's** Claims department receives: (i) the invoices documenting that such **Defense Expenses** or **Investigation Expenses** have been incurred; and (ii) any additional information or documentation reasonably requested by the **Company** which are directly related to such **Defense Expenses** or **Investigation Expenses**; provided that to the extent it is finally established that any such **Defense Expenses** or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally according to their interests, agree to repay the **Company** such **Defense Expenses** or **Investigation Expenses.**

17.    The following replaces section *V. CONDITIONS*, **I. ORDER OF PAYMENTS**:

In the event of **Loss** for which payment is due under this **Policy**:

1.    the **Company** will first pay **Loss** covered under Insuring Agreement A; then

2.    with respect to any remaining amount of the Limits of Liability available after such payment, at the written request of the chief executive officer of the **Insured Organization**, or any functional equivalent position, provided he or she is not a named defendant in such **Claim**, the **Company** will either pay or withhold payment of such other **Loss** covered under any other Insuring Agreement of this **Policy**.

18.    The following is added to section *V. CONDITIONS*, **L. CESSATION OF SUBSIDIARIES**:

However, coverage for **Interview Requests** for any **Subsidiary** and its **Insured Persons** will terminate when such entity ceases to be a **Subsidiary**; provided that such coverage will continue only with respect to any **Interview Request** about which the **Insureds** have provided written notice to the **Company** before such entity ceased to be a **Subsidiary** and that is otherwise covered under this **Policy**.

19.    The following is added to section *V. CONDITIONS*, **M. CHANGE OF CONTROL**:

If, during the **Policy Period**, any of the events set forth in this section occur, then coverage for **Interview Requests** under this **Policy** will continue, but only for any **Interview Request** about which the I nsureds have provided written notice to the **Company** prior to the occurrence of such events.

20.    The following replaces section *V. CONDITIONS*, **R. RECOVERY**:

**R.**    **RECOVERY**

The **Company** will not exercise its rights of recovery against any **Insured**, unless there is a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishing that:

1.    such **Insured Person**, or with respect to Insuring Agreement C, such **Executive Officer**, committed a deliberately fraudulent act or omission, or a willful violation of any law or regulation; or

2.    such **Insured** gained any profit, remuneration, or financial advantage to which that **Insured** was not legally entitled.

21.    The following is added to section *V. CONDITIONS*:

© 2011 The Travelers Indemnity Company. All rights reserved.

**FIRST-DOLLAR ADVANCEMENT OF LOSS TO INSURED PERSONS WHEN INDEMNIFICATION NOT AVAILABLE**

Notwithstanding any provision to the contrary, if the **Insured Organization** refuses or fails to indemnify any **Insured Person** for covered **Loss** under Insuring Agreements B or E within the applicable **Retention**, as required by section *V. D.* of this **Policy**, then the **Company** will advance such amounts on behalf of the **Insured Person** until either: (i) the **Insured Organization** agrees to pay such amounts; or (ii) the **Retention** has been satisfied. However, the advancement by the **Company** of such amounts will not relieve the **Insured Organization** of its obligation to provide indemnification to such **Insured Person**, nor of its obligation to satisfy the applicable **Retention** on behalf of such **Insured Person**. The **Insured Organization's** failure to indemnify such **Insured Person** will be deemed to have occurred if the **Insured Organization** has neither paid such amounts on behalf of the **Insured Person**, nor acknowledged its obligation to do so, within 60 days of the **Insured Person's** written demand to the **Insured Organization** for such indemnification or payment.

Any advancement of covered **Loss** amounts by the **Company** within the applicable **Retention** on behalf of any **Insured Person** pursuant to the preceding paragraph is further subject to the following conditions: (i) such payments by the **Company** will reduce, and may exhaust, the Limits of Liability set forth in Item 5 of the Declarations; (ii) the **Company's** advancement of **Loss** on behalf of an **Insured Person** does not waive or modify the provisions set forth in section **V. D.** of the **Policy**; and (iii) the **Company** will be subrogated to the **Insured Person's** rights of recovery against the **Insured Organization** for any amounts owed to the **Insured Person** by the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PROVIDE NON-SCHEDULED FOR-PROFIT OUTSIDE POSITION COVERAGE ON A "TRIPLE EXCESS" BASIS ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Coverage**

**It is agreed that:**

1.  The following replaces section **III. DEFINITIONS, T., Outside Entity:**

    **T.  *Outside Entity*** means any:

    1.  non-profit entity, corporation, community chest, fund or foundation, other than a **Subsidiary**, and is exempt from federal income tax as an entity described in section 501(c) (3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended;

    2.  **Joint Venture**, or

    3.  for-profit entity.

2.  The following replaces the second paragraph of **V. CONDITIONS, H., OTHER INSURANCE:**

    In addition, this **Policy** covers **Loss** for any **Claim** made against any **Insured Person** serving in an **Outside Position** as follows:

    1.  In regard to any **Insured Person** serving in an **Outside Position** in an **Outside Entity** as specified in subparts 1. and 2. of the definition of **Outside Entity**, only to the extent that the amount of such **Loss** exceeds any indemnity and other insurance from, or provided by, the applicable **Outside Entity**;

    2.  In regard to any **Insured Person** serving in an **Outside Position** in an **Outside Entity** as specified in subpart 3. of the definition of **Outside Entity**, only to the extent that the amount of such **Loss** exceeds (a) any indemnity and other insurance available from, or provided by, the applicable **Outside Entity**; and (b) any indemnification granted to such **Insured Person** by the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2012 The Travelers Indemnity Company.  All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

**CLAIM DEFINITION ENDORSEMENT – ADD MEDIATION COVERAGE AND CO-DEFENDANT ENTITY COVERAGE FOR ADMINISTRATIVE AND REGULATORY PROCEEDINGS**

This endorsement changes the following:

**Directors, Officers, and Organization Liability Policy**

---

**It is agreed that:**

The replaces *III. DEFINITIONS*, **B. Claim**:

**B.**     *Claim* also means:

1.  a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;

2.  a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;

3.  a criminal proceeding against any **Insured Person**, commenced by:

    a.  a filing of charges;

    b.  the return of an indictment, information, or similar document; or

    c.  a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;

4.  a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any **Insured Person**, or against any **Insured Organization**, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an **Insured Person** and the **Insured Organization**, and commenced by the receipt of a:

    a.  notice of filed charges, investigative order, or similar document;

    b.  written notice identifying such **Insured Person** as a target of an investigatory authority; or

    c.  Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**;

5.  service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to an SEC formal investigative order;

6.  a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

7.  a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**; or

8.  a written request to toll or waive a statute of limitations relating to any of the above; or

9.  a formal mediation proceeding against any **Insured** if the **Insured** is obligated to participate in such proceeding, and if the mediator for such proceeding has the authority to bind the parties.

    for a **Wrongful Act**, including any appeal therefrom.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2012 The Travelers Indemnity Company.  All rights reserved.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2012 The Travelers Indemnity Company.  All rights reserved.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## AMEND EXECUTIVE OFFICER DEFINITION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers and Organization Liability Policy**

**It is agreed that:**

The following replaces section *III. DEFINITIONS*, **F. Executive Officer**:

F.    *Executive Officer* means any natural person who was, is, or becomes the chief executive officer or chief financial officer of **Named Insured**, or any functional equivalent position.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-19021 Ed. 06-12                                                                                          Page 1 of 1
© 2012 The Travelers Indemnity Company.  All rights reserved.

Travelers - 2013 Primaqry D&O Extension Endorsement.pdf

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## POLICY EXTENSION ENDORSEMENT

This endorsement modifies the following:
**Directors, Officers, and Organization Liability**

**It is agreed that:**

The following replaces ITEM 2. of the Declarations:

**ITEM 2:**

**POLICY PERIOD:**

Inception Date: **November 30, 2012**     Expiration Date: **November 01, 2014**

12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

Such extension will not provide a new, additional, or renewed limit(s) of liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

©2009 The Travelers Companies, Inc. All Rights Reserved

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**POLICY CHANGES ENDORSEMENT**

This endorsement modifies the following:

**Directors, Officers, and Organization Liability Coverage**

---

**It is agreed that:**

1. As of the Effective Date of this endorsement, the Declarations are amended as indicated below by ☒:

☐ **ITEM 1:**

    ☐   **NAMED INSURED:**

    ☐   Principal Address:

☐ **ITEM 2:**

    **POLICY PERIOD:**

    Inception Date:                Expiration Date:
    12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

☒ **ITEM 5:** (but only for **Claims** first made on or after the Effective Date of this Endorsement)

    **DIRECTORS, OFFICERS, AND ORGANIZATION LIABILITY COVERAGE**

    ☐   **Directors, Officers, and Organization Limit of Liability:**         for all **Claims**

    ☐   **Investigation Expense Limit of Liability:**     for all **Investigation Expense**, which amount is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability

    ☐   **Supplemental Independent Director Limit of Liability:**   for all **Independent Director Claims**, which amount is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability

    ☒   **Retention:**   Not applicable to non-indemnifiable **Loss** or Insuring Agreement D

             **$1,500,000**         for all **Securities Claims**

---

Issuing Company: **Travelers Casualty and Surety Company of America**     Effective Date: **November 01, 2014**
Policy Number: **105518156**

PCDO-7105 Ed. 01-09 Printed in U.S.A.     Page 1 of 2
©2009 The Travelers Companies, Inc. All Rights Reserved

**$1,500,000**          for all other **Claims**

☐  **Prior or Pending
Proceeding Date:**

☐  **ITEM 6:**

**PREMIUM FOR THE POLICY PERIOD:**

Policy Premium

☐  **ITEM 7:**

**EXTENDED REPORTING PERIOD:**

Additional Premium Percentage:     Additional Months:

2. As of the Effective Date of this endorsement, this policy is amended as indicated below by ☒ :

☒   Forms and endorsements added:
**PCDO-10434-0914; PCDO-10443-1014; PCDO-10442-1014.**

☒   Forms and endorsements deleted:
**PCDO-10201-1011; PCDO-19016-0612.**

☐   Forms and endorsements amended:

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

## POLICY EXTENSION ENDORSEMENT

This endorsement modifies the following:
**Directors, Officers, and Organization Liability**

**It is agreed that:**

The following replaces ITEM 2. of the Declarations:

**ITEM 2:**

**POLICY PERIOD:**

Inception Date: **November 30, 2012**     Expiration Date:   **November 01, 2015**

12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

Such extension will not provide a new, additional, or renewed limit(s) of liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

### ACQUISITION, MERGER, OR CONSOLIDATION RETENTION ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

---

**It is agreed that:**

1.    The following replaces the Retention section in ITEM 5 of the Declarations:

| | |
|---|---|
| **Retention:** | Not applicable to non-indemnifiable **Loss** or Insuring Agreement D |

                        **$1,500,000.00**         for all **Securities Claims,** other than **Securities Claims** based upon or arising out of any actual, proposed, or attempted **Merger and Acquisition Event**

                        **$2,500,000.00**         for all **Claims** or **Securities Claims** based upon or arising out of any actual, proposed, or attempted **Merger and Acquisition Event**

                        **$1,500,000.00**         for all other **Claims**

2.    The following is added to **III. DEFINITIONS:**

*Merger and Acquisition Event* means:

1.    an **Insured Organization** merging into, or consolidating with, another entity such that the **Insured Organization** is not the surviving entity;

2.    another entity, person, group of entities, or group of persons acting in concert, acquiring securities or voting rights that result in ownership or voting control by the other entity, persons, or group of more than 50% of the outstanding securities representing the present right to vote for the election or appointment of directors, officers, or **Managers** of an **Insured Organization**, or any functional equivalent position; or

3.    any actual, attempted, or proposed merger, acquisition, or divesture involving the **Insured Organization,** including any actual, attempted, proposed, or alleged negotiations, investigation, evaluation, consideration, recommendation, or decision relating to such merger, acquisition, or divesture.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

PCDO-10434 Ed. 09-14
© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CLAIM DEFINITION ENDORSEMENT – ADD MEDIATION COVERAGE AND CO-DEFENDANT ENTITY COVERAGE FOR ADMINISTRATIVE AND REGULATORY PROCEEDINGS

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

**It is agreed that:**

The following replaces section **III. DEFINITIONS, B. Claim:**

B.     *Claim* means:

    1.     a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;

    2.     a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;

    3.     a criminal proceeding against any **Insured Person**, commenced by:

        a.     a filing of charges;

        b.     the return of an indictment, information, or similar document; or

        c.     a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;

    4.     a formal civil administrative or formal civil regulatory proceeding against, or formal civil investigation of:

        a.     any **Insured Person**, specifically identified by name, commenced by the receipt of a:

            (i)     notice of filed charges, investigative order, or similar document;

            (ii)     written notice identifying such **Insured Person** as a target of an investigatory authority; or

            (iii)     Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**; or

        b.     any **Insured Organization**, commenced by a notice of filed charges, an investigative order or similar document, provided that:

            (i)     the formal civil administrative or formal civil regulatory proceeding is also initially made and continuously maintained against an **Insured Person** specifically identified by name in the manner set forth in subsection 4.a. above; or

            (ii)     the formal civil investigation of an **Insured Organization** is also initially made of, and continuously includes, an **Insured Person** specifically identified by name in the manner set forth in subsection 4.a. above.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**

© 2014 The Travelers Indemnity Company. All rights reserved.

5.    service of a subpoena on an **Insured Person** specifically identified by name if served upon such person pursuant to an SEC formal investigative order;

6.    a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

7.    a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**;

8.    a written request to toll or waive a statute of limitations relating to any of the above; or

9.    a formal mediation proceeding with respect to any **Insured** if the **Insured** is obligated to participate in such proceeding, and if the mediator for such proceeding has the authority to bind the parties.

for a **Wrongful Act**, including any appeal therefrom.

For purposes of the foregoing, "specifically identified by name" shall not mean a reference solely to such **Insured Person's** position in the **Insured Organization** as director, officer, **Manager**, in-house general counsel or functional equivalent.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
| --- |

### GENERAL CABLE ENDORSEMENT

This endorsement changes the following:

**Directors, Officers, and Organization Liability Coverage**

It is agreed that:

1. The following is added to **I. INSURING AGREEMENTS, A. DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE**:

   The **Company** will pay, on behalf of any **Insured Person**, **Interview Costs** that are not indemnified by the Insured **Organization** and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**, for an **Interview Request** that is based upon or arising out of matters or circumstances that occurred before or during the **Policy Period**.

2. The following is added to **I. INSURING AGREEMENTS, B. ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE**:

   The **Company** will pay, on behalf of the **Insured Organization**, **Interview Costs** that the **Insured Organization** indemnifies, as permitted or required by law, and that the **Insured Person** becomes legally obligated to pay for any **Interview Request** first made by an **Enforcement Body** and reported in writing to the **Company** during the **Policy Period** or any applicable **Extended Reporting Period**, for an **Interview Request** that is based upon or arising out of matters or circumstances that occurred before or during the **Policy Period**.

3. The following replaces section **III. DEFINITIONS, A. Application**:

   A.    *Application* means:

        1.    all signed applications for this **Policy**, or for any policy that this **Policy** renews or replaces, including any materials submitted with or requested in such applications; and

        2.    all public documents filed by the **Insured Organization** with the Securities and Exchange Commission (SEC), or any similar federal, state, local, or foreign regulatory body, during the 12 months preceding the **Policy Period**.

      All such applications, materials, and public documents are deemed attached to, and incorporated into, this **Policy**.

4. The following is added to **III. DEFINITIONS, B. Claim**:

   Provided, with respect to any paragraph 1. through 8. above that invokes coverage for **Dodd-Frank 954 Costs**, a **Wrongful Act** is not required, but only with respect to **Dodd-Frank 954 Costs**.

5. The following is added to **III. DEFINITIONS, D. Defense Expense**:

   Defense Expense also includes (1) **Corporate Manslaughter Proceeding Costs**, (2) **SOX 304 Defense Expenses**, and (3) **Dodd-Frank 954 Defense Expenses**. Defense Expense does not include **Interview Costs**.

6. The following replaces **III. DEFINITIONS, Q. Loss**:

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: **105518156**

**Q.**   *Loss* means:

1.   **Interview Costs;**

2.   damages, judgments, settlements, pre-judgment and post-judgment interest, **SOX 304 Costs, Corporate Manslaughter Proceeding Costs, Dodd-Frank 954 Costs,** and **Defense Expenses;** provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by an **Insured,** *Loss* only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the Insured, the **Claim,** the **Company,** or this **Policy;** and

3.   **Investigation Expense,** with respect to Insuring Agreement D only.

*Loss,* other than **Defense Expenses,** does not mean any of the following:

1.   any amount that an **Insured** is absolved from payment;

2.   any amount that constitutes taxes, fines, or penalties; provided, *Loss* includes:

   (i)   civil penalties assessed against any **Insured Person** pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended; or

   (ii)   civil penalties assessed against any **Insured Person** pursuant to section 308 of the Sarbanes-Oxley Act of 2002, as amended;

3.   any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

4.   any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

5.   any amount that constitutes disgorgement or other loss that is uninsurable under the law pursuant to which this **Policy** is construed; provided, the **Company** will not assert that any amount of a judgment or settlement in a **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended, including **Defense Expenses** attributable to such **Claim,** constitutes disgorgement or other uninsurable loss.

7.   The following are added to section **III. DEFINITIONS:**

*Corporate Manslaughter Proceeding* means a formal criminal proceeding for corporate manslaughter or corporate homicide, as those terms are defined in the United Kingdom's Corporate Manslaughter and Corporate Homicide Act of 2007, as amended, or similar provisions of any federal, state, local or foreign law or regulation.

*Corporate Manslaughter Proceeding Costs* means the reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by an **Insured Person** in defending against a **Claim** related to or arising out of a **Corporate Manslaughter Proceeding.**

*Dodd-Frank 954 Costs* means:

1.   **Dodd-Frank 954 Defense Expenses;** and

2.   the reasonable amount of a premium or origination fee incurred by such **Insured Person** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to 954(b)(2);

provided that **Dodd-Frank 954 Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to section 954 (b)(2) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, (ii) the

principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to section 954 (b)(2) of the Dodd-Frank Act, (iii) the amount incurred to comply with section 954 (b)(1) of the Dodd-Frank Act, and (iv) the expense incurred to determine what amount, if any is owed pursuant to section 954(b)(2) of the Dodd-Frank.

***Dodd-Frank 954 Defense Expenses*** means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to section 954 of the Dodd-Frank Act.

***Enforcement Body*** means any federal, state, local or foreign governmental regulatory authority, including the United States Department of Justice, the Securities and Exchange Commission, any states' attorney general, or the enforcement unit of any securities exchange.

***Interview Costs*** means the reasonable costs, charges and fees (including attorneys' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization**) incurred by an **Insured Person** in responding to an **Interview Request**; provided that **Interview Costs** do not include:

1.    any compensation of any **Insured Person** associated with an **Interview Request**; or

2.    any costs incurred in responding to any formal or informal discovery or e-discovery request for the production of documents, records or electronic information of any kind, regardless of whether such documents, records or electronic information are in the possession of any **Insured**, any **Enforcement Body** or any other third party.

***Interview Request*** means a written request by an **Enforcement Body** for an **Insured Person** to appear for an interview or meeting in connection with an investigation against any **Insured Person** or the **Insured Organization**; provided that **Interview Request** does not include any routine or regularly scheduled interview or audit conducted pursuant to the **Enforcement Body's** or **Insured Organization's** ordinary review and compliance procedures.

***Related Interview Requests*** means all **Interview Requests** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

***SOX 304 Costs*** means:

1.    **SOX 304 Defense Expenses**; and

2.    the reasonable amount of a premium or origination fee incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in order to secure a loan or bond for the sole purpose of complying with the requirement that such **Insured Person** repay, return or refund amounts pursuant to section 304(a) of the Sarbanes Oxley Act of 2002, as amended (SOX 304(a));

provided that **SOX 304 Costs** do not include (i) the amount required to be repaid, returned or refunded pursuant to SOX 304(a), or (ii) the principal of, or interest on, a loan or bond secured to comply with a requirement to repay, return or refund amounts pursuant to SOX 304(a).

***SOX 304 Defense Expenses*** means the reasonable costs, charges, fees and expenses incurred by an **Insured Person** who is the chief executive officer or chief financial officer of the **Named Insured** in defending against a demand that such **Insured Person** repay, return or refund amounts pursuant to SOX 304(a).

8.    The following replaces section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 3. INSURED VERSUS INSURED:**

    **3.    ORGANIZATION VERSUS INSURED**

    The **Company** will not be liable for **Loss** for any **Claim** against any **Insured** that is brought or maintained by or on behalf of any **Insured Organization** in any capacity, provided that this exclusion will not apply to:

    a.    a **Claim** that is a **Shareholder Derivative Demand** or **Shareholder Derivative Action**, brought or maintained by any natural person who is not an **Insured Person** and who brings and maintains the **Claim** without the active solicitation, assistance, or participation of any **Insured**; provided any **Insured Person's Whistleblower Activity** alone will not be considered the active solicitation, assistance, or participation of an **Insured**;

    b.    a **Claim** brought and maintained by a court-appointed examiner, receiver, conservator, liquidator, trustee, rehabilitator, or similar official serving in the same legal capacity as a court-appointed examiner, receiver, conservator, liquidator, trustee or rehabilitator of the **Insured Organization**, in any bankruptcy proceeding by or against the **Insured Organization**;

    c.    a **Claim** that is brought and maintained outside of the United States (including any U.S. territory, possession, or protectorate), Canada, the United Kingdom, Australia, and other jurisdiction governed by a common law legal system, but only if the laws or regulations of such jurisdiction require that such **Claim** be brought by or on behalf of the **Insured Organization**; or

    d.    a **Claim** brought pursuant to Section 954 of the Dodd-Frank Act.

9.    The following is added to section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS AND TO ALL ADDITIONAL BENEFITS, 6. BODILY INJURY, PROPERTY DAMAGE, OR PERSONAL INJURY:**

    This exclusion will also not apply to any **Loss** amounting to **Corporate Manslaughter Proceeding Costs.**

10.    The replaces section **IV. EXCLUSIONS, B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C AND E AND TO ADDITIONAL BENEFITS ONLY:**

    **1.**    **FRAUD**

    The **Company** will not be liable for **Loss** for any **Claim** for any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that:

    a.    such **Insured Person**, with respect to Insuring Agreements A or E, and section **II. ADDITIONAL BENEFITS**; or

    b.    any **Executive Officer** or the **Insured Organization**, with respect to Insuring Agreement C,

    committed such an act, omission, or willful violation.

    **2.**    **PERSONAL PROFIT**

    The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of an **Insured** gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled, if a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishes that such **Insured** was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any **Securities Claim** for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended.

11.    The following is added to section **IV. EXCLUSIONS:**

**EXCLUSIONS APPLICABLE TO INTERVIEW REQUEST COVERAGE ONLY**

    **1.**    **PRIOR NOTICE OF CIRCUMSTANCES RELATED TO INTERVIEW REQUESTS**

    The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any fact, circumstance, situation, event, **Wrongful Act**, or **Related Wrongful Act** that has been the subject of any written notice given by or on behalf of any **Insured** under any policy of insurance that:

(1) this **Policy** renews, replaces or succeeds in time, or (2) afforded coverage, prior to the inception of this **Policy**, to any **Insured Person** serving in an **Outside Position**.

2.     **PRIOR OR PENDING INTERVIEW REQUEST**

The **Company** will not be liable for **Interview Costs** for any **Interview Request** based upon or arising out of any: (1) prior or pending **Interview Request** as of, or prior to, the applicable Prior or Pending Proceeding Date set forth in ITEM 5 of the Declarations; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act**, **Related Wrongful Act** or **Related Interview Request** underlying such **Interview Request**.

12.     The following replaces section **V. CONDITIONS, A. LIMITS OF LIABILITY**:

A.     **LIMITS OF LIABILITY**

The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the **Company** will pay under this **Policy**, regardless of the number of **Claims, Interview Requests** or **Insureds**, and regardless of when payment is made by the **Company** or when an Insured's legal obligation with regard to any **Claim** or **Interview Request** arises or is established.

The **Company's** maximum liability for all **Loss** for all **Claims**, and for all **Interview Costs** for all **Interview Requests**, first made during the same **Policy Period**, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for all **Claims** for the **Policy Period** set forth in ITEM 5 of the Declarations.

The **Company's** maximum liability under Insuring Agreement D for all **Investigation Expenses** for all **Shareholder Derivative Demands** first made during the same **Policy Period** is the **Investigation Expense** Limit of Liability set forth in ITEM 5 of the Declarations. Such Investigation Expense Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

The Company's maximum liability under the SUPPLEMENTAL INDEPENDENT DIRECTOR LIABILITY COVERAGE section for all **Loss** for all **Claims** first made during the same **Policy Period** is the Supplemental Independent Director Limit of Liability set forth in ITEM 5 of the Declarations. Such Supplemental Independent Director Limit of Liability is in addition to, and excess of, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

All **Claims** arising out of the same **Wrongful Act** and all **Related Wrongful Acts** are deemed one **Claim**, and such **Claim** is deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

All **Interview Requests** arising out of the same or substantially similar facts or circumstances and all **Related Interview Requests** are deemed one **Interview Request**, and such **Interview Request** is deemed to be first made on the date the earliest of such **Interview Requests** is first made to any **Insured**, regardless of whether such date is before or during the **Policy Period**.

Any **Claim** arising out of the same or substantially similar facts or circumstances as an **Interview Request** for which notice has been provided to the **Company** pursuant to section V. CONDITIONS, E. NOTICE, 2. Notice of Interview Request, is deemed to be first made on the date such **Interview Request** is first made to any **Insured**, regardless of whether such date is before or during the **Policy Period**.

**Defense Expenses** and **Interview Costs** are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

The Limits of Liability for any applicable **Extended Reporting Period** are part of, and not in addition to, the Limits of Liability for the **Policy Period**. The purchase of an **Extended Reporting Period** will not increase or reinstate the Limits of Liability set forth in ITEM 5 of the Declarations, which are the maximum Limits of Liability of the **Company** for all **Loss** combined for: (i) all **Claims** first made during the **Policy Period** and Extended Reporting Period; and (ii) all **Interview Costs** for all **Interview Requests** first

made to the **Insured** and reported to the **Company** during the **Policy Period** or, if purchased, the **Extended Reporting Period.**

13. The following replaces the first paragraph of section **V. CONDITIONS, B. RETENTION:**

The **Company's** liability with respect to **Loss** for each **Claim**, or **Interview Costs** for each **Interview Request**, applies only to that portion of **Loss** or **Interview Costs**, respectively, that is excess of the applicable Retention set forth in ITEM 5 of the Declarations. The applicable Retention set forth in ITEM 5 of the Declarations for all other **Claims** shall apply to **Interview Requests**. Such Retention will be borne by the **Insured Organization** uninsured, at its own risk, and in satisfaction of such **Loss** or **Interview Costs.**

14. The following is replaces the first paragraph of section **V. CONDITIONS, C. EXTENDED REPORTING PERIOD:**

If the **Company** or the **Named Insured** does not renew this **Policy**, or if the **Named Insured** terminates this **Policy**, the **Named Insured** has the right, upon payment of the additional premium described below in this EXTENDED REPORTING PERIOD COVERAGE section, to elect an extension of coverage granted by this **Policy** for the **Extended Reporting Period**, but only with respect to a:

1. **Claim** for a **Wrongful Act** otherwise covered under this **Policy** occurring before or during the **Policy Period**; or

2. **Interview Request** otherwise covered under this **Policy** based upon or arising out of matters or circumstances that occurred before or during the **Policy Period**.

This right of extension will lapse unless the **Named Insured** provides written notice of such election, together with payment of the additional premium due, to the **Company** within 60 days following the effective date of such nonrenewal or termination. Any **Claim** or **Interview Request** made during the **Extended Reporting Period** will be deemed made during the **Policy Period**.

15. The following replaces section **V. CONDITIONS, E. NOTICE:**

E. **NOTICE**

1. **Notice of Claim**

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Claim** made against any Insured as soon as practicable after the risk manager or in-house general counsel of the **Named Insured** first becomes aware of such **Claim**, but in no event later than 60 days after expiration of the **Policy Period**, or any applicable **Extended Reporting Period.**

2. **Notice of Interview Request**

If an **Insured** elects to seek coverage for **Interview Costs**, as a condition precedent to exercising rights under this **Policy**, the **Insured** must give the **Company** written notice of any **Interview Request** made to any **Insured** as soon as practicable after such **Insured** first becomes aware of such **Interview Request**, but in no event later than: (i) the Expiration Date of the **Policy Period**, as set forth in ITEM 2 of the Declarations; or (ii) the Expiration Date of the applicable **Extended Reporting Period**, as set forth in ITEM 7 of the Declarations, if the Named Insured elects such **Extended Reporting Period**, pursuant to section V.C. of this **Policy**.

If an **Insured** elects not to provide notice of an **Interview Request**, then any **Claim** arising out of the same or substantially similar facts or circumstances as such **Interview Request** shall be subject to the requirements of section V. CONDITIONS, E. NOTICE, 1. Notice of Claim, and coverage for such **Claim** will not be denied because the **Insured** elected not to provide notice of the **Interview Request.**

3. **Notice of Circumstances**

If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

1.    becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

2.    gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.

4.    **Notice Requirements**

a.    Notice of **Claims** or Circumstances

As a condition precedent to exercising rights under this **Policy** with respect to any **Claim** or circumstance, the **Insured** must:

(i)    include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and

(ii)    give to the **Company** such other information and cooperation as the **Company** may reasonably request.

b.    Notice of **Interview Requests**

As a condition precedent to exercising rights under this **Policy** with respect to any **Interview Request**, the **Insured** must:

(i)    include with any notice of an **Interview Request** the name of the **Enforcement Body** making the request and, to the best of the **Insured's** knowledge, a description of the nature and subject matter identified by the **Enforcement Body** in its **Interview Request**; and

(ii)    give to the Company such other information and cooperation as the Company may reasonably request, including additional information about the subject matter and nature of the Interview Request as it is learned.

All notices under this NOTICE section must be sent or delivered to the **Company**, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

16.    The following replaces the sixth paragraph of **V. CONDITIONS, F. DEFENSE AND SETTLEMENT**:

The **Company** will advance on behalf of the **Insureds**, **Defense Expenses** or **Investigation Expenses** that the **Company** believes to be covered under this **Policy** and that are incurred in connection with any **Claim** first made against them during the **Policy Period**, or any applicable **Extended Reporting Period**, for a **Wrongful Act** occurring before or during the **Policy Period**. The **Company** will advance such **Defense Expenses** or **Investigation Expenses** on a current basis, but no later than 90 days of the date when the **Company's** Claims department receives: (i) the invoices documenting that such **Defense Expenses** or **Investigation Expenses** have been incurred; and (ii) any additional information or documentation reasonably requested by the **Company** which are directly related to such **Defense Expenses** or **Investigation Expenses**; provided that to the extent it is finally established that any such **Defense Expenses** or **Investigation Expenses** are not covered under this **Policy**, the **Insureds**, severally according to their interests, agree to repay the **Company** such **Defense Expenses** or **Investigation Expenses**.

17. The following replaces section **V. CONDITIONS, I. ORDER OF PAYMENTS**:

In the event of **Loss** for which payment is due under this **Policy**:

1. the **Company** will first pay **Loss** covered under Insuring Agreement A; then

2. with respect to any remaining amount of the Limits of Liability available after such payment, at the written request of the chief executive officer of the **Insured Organization**, or any functional equivalent position, provided he or she is not a named defendant in such **Claim**, the **Company** will either pay or withhold payment of such other **Loss** covered under any other Insuring Agreement of this **Policy**.

18. The following is added to section **V. CONDITIONS, L. CESSATION OF SUBSIDIARIES**:

However, coverage for **Interview Requests** for any **Subsidiary** and its **Insured Persons** will terminate when such entity ceases to be a **Subsidiary**; provided that such coverage will continue only with respect to any **Interview Request** about which the **Insureds** have provided written notice to the **Company** before such entity ceased to be a **Subsidiary** and that is otherwise covered under this **Policy**.

19. The following is added to section **V. CONDITIONS, M. CHANGE OF CONTROL**:

If, during the **Policy Period**, any of the events set forth in this section occur, then coverage for **Interview Requests** under this **Policy** will continue, but only for any **Interview Request** about which the **Insureds** have provided written notice to the **Company** prior to the occurrence of such events.

20. The following replaces section **V. CONDITIONS, R. RECOVERY**:

**R. RECOVERY**

The **Company** will not exercise its rights of recovery against any **Insured**, unless there is a final non-appealable adjudication adverse to the **Insured** in any proceeding other than a proceeding initiated by the **Company** establishing that:

1. such **Insured Person**, or with respect to Insuring Agreement C, such **Executive Officer**, committed a deliberately fraudulent act or omission, or a willful violation of any law or regulation; or

2. such **Insured** gained any profit, remuneration, or financial advantage to which that **Insured** was not legally entitled.

21. The following is added to section **V. CONDITIONS**:

**FIRST-DOLLAR ADVANCEMENT OF LOSS TO INSURED PERSONS WHEN INDEMNIFICATION NOT AVAILABLE**

Notwithstanding any provision to the contrary, if the **Insured Organization** refuses or fails to indemnify any **Insured Person** for covered **Loss** under Insuring Agreements B or E within the applicable **Retention**, as required by section V. D. of this **Policy**, then the **Company** will advance such amounts on behalf of the **Insured Person** until either: (i) the **Insured Organization** agrees to pay such amounts; or (ii) the **Retention** has been satisfied. However, the advancement by the **Company** of such amounts will not relieve the **Insured Organization** of its obligation to provide indemnification to such **Insured Person**, nor of its obligation to satisfy the applicable **Retention** on behalf of such **Insured Person**. The **Insured Organization's** failure to indemnify such **Insured Person** will be deemed to have occurred if the **Insured Organization** has neither paid such amounts on behalf of the **Insured Person**, nor acknowledged its obligation to do so, within 60 days of the **Insured Person's** written demand to the **Insured Organization** for such indemnification or payment.

Any advancement of covered **Loss** amounts by the **Company** within the applicable **Retention** on behalf of any **Insured Person** pursuant to the preceding paragraph is further subject to the following conditions: (i) such payments by the **Company** will reduce, and may exhaust, the Limits of Liability set forth in ITEM 5 of the

Declarations; (ii) the **Company's** advancement of **Loss** on behalf of an **Insured Person** does not waive or modify the provisions set forth in section V.D. of the **Policy**; and (iii) the **Company** will be subrogated to the **Insured Person's** rights of recovery against the **Insured Organization** for any amounts owed to the **Insured Person** by the **Insured Organization**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2014 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## POLICY EXTENSION ENDORSEMENT

This endorsement modifies the following:
**Directors, Officers, and Organization Liability**

---

**It is agreed that:**

The following replaces ITEM 2. of the Declarations:

**ITEM 2**:

**POLICY PERIOD:**

Inception Date:  **November 30, 2012**     Expiration Date:  **November 01, 2016**

12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

Such extension will not provide a new, additional, or renewed limit(s) of liability.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **105518156**



KLEER-FAX
RECYCLED ⊗

90000 SERIES
30% P.C.W.

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT E**



**Directors and Officers Liability Insurance Policy**

Issuing and Policyholder Servicing Office:

**Chicago Underwriting Group, Inc.**
191 North Wacker Drive, Suite 1000
Chicago, IL 60606
Tel: (312) 750-8800
Fax: (312) 750-8965
**www.cug.com**

**J-00 (08/12)**



**OLD REPUBLIC** INSURANCE COMPANY

GREENSBURG, PENNSYLVANIA

**Declarations**
**Excess Policy**

---

**Important Notice**

This is a claims made policy that applies only to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if exercised.  Defense costs shall be applied against the retention, if applicable.  Defense costs paid by the Insurer shall reduce and may completely exhaust the Limit of Liability of the policy.

**Please read the entire policy carefully.**

---

Policy Number: CUG 35536                                  Previous Number: CUG 34739

Item 1.    **Parent Company and Address:**
                            General Cable Corporation
                            4 Tesseneer Drive
                            Highland Heights, KY  41076-9753

Item 2.    **Policy Period:**        From:  November 30, 2012  To:  November 1, 2013
                                      12:01 a.m. local time at the address shown in Item 1.

Item 3.    **Limit of Liability:**   $10,000,000 Maximum aggregate liability for the **Policy Period.**

Item 4.    **Underlying Policy:**

             (A)  **Primary Policy:**
                  Insurer:                      Travelers Casualty and Surety Company of America
                  Coverage:                     Directors & Officers Liability Insurance, as more fully defined in
                                                the policy form.
                  Policy Number:                105518156
                  Policy Period:                November 30, 2012 to November 1, 2013
                  Limit of Liability:           $15,000,000
                  Securities Claim Retention:   $750,000  (See policy for details)

Item 5.    **Extended Reporting Period:**

             (A)  Additional Premium:          75% of Annualized Policy Premium
             (B)  Additional Period:           12 months

Item 6.    **Premium:**                        $82,849.00
           Kentucky State Surcharge:            $1,491.28
           Kentucky Municipal Surcharge:        $8,284.90
           Total Premium:                      **$92,625.18**

# ★ OLD REPUBLIC INSURANCE COMPANY

**GREENSBURG, PENNSYLVANIA**

Insured:       General Cable Corporation
Policy No:    CUG 35536

Item 7.   **Notice to Insurer:**

Notice of **Claims** or Potential **Claims**:

Chicago Underwriting Group, Inc.
191 North Wacker Drive, Suite 1000
Chicago, IL 60606-1905
Fax: 312-750-8965
E-Mail: ClaimNotice@cug.com
Attention: <u>Claims Department</u>

All other Notices:

Chicago Underwriting Group, Inc.
191 North Wacker Drive, Suite 1000
Chicago, IL 60606-1905
Attention: <u>Underwriting Department</u>

Item 8.   **Forms/Endorsements Effective at Inception:**
Policy Jacket; ORUG-91 (11/2011); Endorsements #1 - ORUG-TRIA-8 (1/2008); #2 - D91015-C (03/2012); #3 - D91044 (11/2011).

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

DATE:   February 27, 2013

ORUG-91D (11/2011)                      Page 2                      Authorized Representative



# EXCESS POLICY

In consideration of the payment of premium and in reliance upon any application, materials or information provided to Old Republic Insurance Company ("Insurer") in connection with underwriting this Policy, or included within the application for the **Primary Policy** (as may be defined therein), all of which are hereby incorporated into this Policy, and subject to all of the terms, conditions and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

## I. INSURING AGREEMENT

Except as otherwise stated in this Policy, the Insurer shall provide the **Insureds** with insurance in accordance with the terms, conditions, warranties and exclusions set forth in the **Primary Policy** and, to the extent coverage is further limited or restricted thereby, in any other **Underlying Policy**.  Liability shall attach to the Insurer only after the insurers of the **Underlying Policies**, the **Insureds**, any excess "difference-in-conditions" insurer or any other source pay in legal currency loss covered under the **Underlying Policies** equal to the full amount of the **Underlying Limit**.  The Insurer's maximum aggregate liability for all **Loss** covered under this Policy shall be the aggregate Limit of Liability as stated in Item 3. of the Declarations.

## II. CONDITIONS

A.   If any **Underlying Policy** contains a specific grant of coverage that is subject to a sublimit of liability, then coverage under this Policy shall not apply to any **Loss** which is otherwise subject to such grant of coverage.  However, any such **Loss** paid under the **Underlying Policies** shall reduce or exhaust the **Underlying Limit** for purposes of this Policy.

B.   If during the **Policy Period** or any Extended Reporting Period the **Underlying Policies** are changed to broaden or expand coverage, the Insurer shall not be liable under this Policy to a greater extent than it would have been without such change unless the Insurer agrees in writing to such broader or expanded coverage and the **Insureds** pay any additional premium required by the Insurer therefor.  If any **Underlying Policy** is terminated during the **Policy Period** or any Extended Reporting Period or becomes uncollectable, the Insurer shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policy** been maintained and was collectable.

C.   Any amount recovered by or on behalf of the **Insureds** after payment under this Policy, less the cost of obtaining the recovery, shall be applied first to amounts paid in excess of this Policy, then to amounts paid under this Policy, and then to amounts paid within the **Underlying Limit**.

D.   Any notice to the Insurer under this Policy shall be given at the same time and in the same manner required by the terms and conditions of the **Primary Policy** regardless of the amount of the **Claim** or the **Underlying Limit**, and shall be given at the respective address shown in Item 7. of the Declarations.  Any notice to the insurer of an **Underlying Policy** shall not constitute notice to the Insurer unless also given to the Insurer as provided above.

E.   The Insurer may, at its sole discretion, fully and effectively associate with the **Insureds**, and the **Insureds** shall fully cooperate with the Insurer, in the investigation, defense or settlement of any **Claim** or potential **Claim** reported to the Insurer under this Policy even if the **Underlying Limit** has not been exhausted.  No action by any other insurer shall bind the Insurer under this Policy.

## III. DEFINITIONS

When used in this Policy either in the singular or in the plural:

A.   **Claim** and **Loss** shall have the same meaning as set forth in the **Primary Policy**.

B.   **Primary Policy** and **Underlying Policies** means the policies designated as such in the Declarations.

C.   **Insureds** means the entities and natural persons insured under the **Primary Policy**.

D.   **Policy Period** means the period of time designated in Item 2. of the Declarations, subject to prior termination.

E.   **Underlying Limit** means an amount equal to the total limits of liability of all **Underlying Policies**, as set forth in the Declarations, plus any applicable retention or deductible under the **Underlying Policies**.



## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE

On December 26, 2007, the Terrorism Risk Insurance Act was extended.  Any losses caused by certified acts of terrorism are partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 85% of covered terrorism losses exceeding the statutorily established deductible paid by Old Republic Insurance Company. The premium charged for this coverage is provided below and does not include any charges for the portion of loss that may be covered by the federal government under the Act.

As defined in Section 102(1) of the Terrorism Risk Insurance Act, a certified "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism. To be certified, the act of terrorism must: 1) be a violent act or an act that is dangerous to human life, property, or infrastructure; 2) have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and 3) have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is: $0 and does not include any charges for the portion of losses covered by the United States government under the Act.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| 1 | **CUG 35536** | | |

**ORUG-TRIA-8 (1/2008)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



# OLD REPUBLIC INSURANCE COMPANY

## PENDING OR PRIOR LITIGATION EXCLUSION VERSION C

It is understood and agreed that the Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising out of, or attributable to any **Claim** or other litigation, arbitration or administrative or regulatory proceeding involving any **Insured**, pending on or before May 16, 1997, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.



*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy Or Is Not to be Effective with the Policy | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **2** | **CUG 35536** | | |

**D91015-C (03/2012)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative



## OLD REPUBLIC INSURANCE COMPANY

### EXCESS SUBLIMIT OVER UNDERLYING INSURANCE SUBLIMIT

It is understood and agreed that:

1. Notwithstanding Section II. A. of this Policy, any liability under this Policy for Derivative Demand Investigation Costs which are covered pursuant to, and subject to a sublimit under, the **Primary Policy** shall attach to the Insurer only after:

   (i)  the **Underlying Limit** has been exhausted pursuant to Section I. of this Policy; or

   (ii) the sublimits applicable to such Derivative Demand Investigation Costs under all **Underlying Policies** have been exhausted;

   whichever first occurs.  Such coverage under this Policy shall then apply in conformance with the terms and conditions in the **Primary Policy** applicable to such Derivative Demand Investigation Costs coverage, except as otherwise provided in this Policy.

2. The Insurer's maximum liability for all Derivative Demand Investigation Costs under this Policy shall be $250,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 3. of the Declarations.

3. This endorsement does not apply to or amend the Insurer's liability attachment with respect to any **Loss** other than Derivative Demand Investigation Costs.

4. For purposes of this endorsement, Derivative Demand Investigation Costs has the same meaning as that term or a similar term is defined in the **Primary Policy**.

*All other terms and conditions of this policy remain unchanged.*

*This endorsement is a part of the policy and takes effect on the effective date of the policy, unless another effective date is shown below.*

| Must be Completed | | Complete Only When This Endorsement is Not Prepared with the Policy *Or Is Not to be Effective with the Policy* | |
|---|---|---|---|
| ENDT NO. | POLICY NO. | ISSUED TO | EFFECTIVE DATE OF THIS ENDORSEMENT |
| **3** | **CUG 35536** | | |

**D91044 (11/2011)**
**Page 1 of 1**

Countersigned by _____
Authorized Representative

INSURANCE IS PROVIDED BY
THE COMPANY DESIGNATED ON THE DECLARATIONS PAGE

**IN WITNESS WHEREOF,** we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

**OLD REPUBLIC INSURANCE COMPANY**
133 Oakland Avenue
Greensburg, Pennsylvania 15601
A Stock Company

Secretary

President

J-00 (08/12)



**OLD REPUBLIC** COMPANIES

307 North Michigan Avenue
Chicago, Illinois 60601
(312) 346-8100

KLEER-FAX
RECYCLED ♻

*90000 SERIES*
*30% P.C.W.*

Exhibit F

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT F**

# Scottsdale Indemnity Company

Home Office:
One Nationwide Plaza ▪ Columbus, Ohio 43215
Administrative Office:
8877 North Gainey Center Drive ▪ Scottsdale, Arizona 85258
1-800-423-7675
A STOCK COMPANY

In Witness Whereof, the Company has caused this policy to be executed and attested.

_____          _____
Secretary                                              President

The information contained herein replaces any similar information contained elsewhere in the policy.

UTI-COVPG (12-09)

# Scottsdale Indemnity Company

A STOCK COMPANY

Home Office: One Nationwide Plaza ▪ Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive ▪ Scottsdale, Arizona 85258
1-800-423-7675

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY SHALL BE REDUCED BY PAYMENT OF DEFENSE COSTS.**

### DECLARATIONS

| Item 1 | **Named Insured & Mailing Address** | GENERAL CABLE CORP.<br>4 TESSENEER DR<br>HIGHLAND HEIGHTS, KY 41076 | **Policy No.:** XMI1200611<br>**Agent No.:** 31407<br>**Renewal No.:** XMI1100611 |
|---|---|---|---|

**Item 2. Aggregate Limit of Liability:** $ 10,000,000      all **Claims**(inclusive of defense costs)

**Item 3. Policy Period:**
_11/30/2012_ to _11/01/2013_ 12:01 a.m. local time at **Named Insured's** Mailing Address.

**Item 4. Followed Policy:**
Issuing Insurer: TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA
Limit of Liability: $15,000,000     Policy No.: 105518156
Deductible(s)/Retention(s): 750,000

**Item 5. Schedule of Underlying Policies:**

| | **Issuing Insurer** | **Policy No.** | **Limits of Liability** | **Deductible(s)/ Retention(s)** |
|---|---|---|---|---|
| Primary Policy | SAME AS ITEM 4. ABOVE | | | |

**Underlying Excess Policies:**

| | **Issuing Insurer** | **Policy No.** | **Limits of Liability** | **Attachment** |
|---|---|---|---|---|
| 1st Excess: | SEE FORM UTI-358 12-07 | | | |
| 2nd Excess: | | | | |
| 3rd Excess: | | | | |
| 4th Excess: | | | | |
| 5th Excess: | | | | |
| 6th Excess: | | | | |
| 7th Excess: | | | | |
| 8th Excess: | | | | |

**Item 6. Premium:** $ 62,344    **Terrorism Premium:** $ 630    **Total Premium:** $ 62,974 *

**Item 7. Endorsements Effective at Inception:**
    **SEE SCHEDULE OF FORMS AND ENDORSEMENTS**

**Item 8. Notices to Company:**

| **Notice of Claims to:** | **Other Notices to:** |
|---|---|
| SCOTTSDALE INDEMNITY COMPANY<br>7 WORLD TRADE CENTER 37TH FLOOR<br>NEW YORK, NY 10007 | SCOTTSDALE INDEMNITY COMPANY<br>7 WORLD TRADE CENTER 37TH FLOOR<br>NEW YORK, NY 10007 |

These Declarations/Policy, together with the **Application** and any written endorsements attached thereto, shall constitute the contract between the **Insured** and the **Company.**

*AN ADDITIONAL KENTUCKY SURCHARGE
OF $1,134 APPLIES. TOTAL AMOUNT DUE: $64,108

XMI-D-1 (8-07)                                               xmi1d.fap

# Scottsdale Indemnity Company
## SCHEDULE OF FORMS AND ENDORSEMENTS

Policy No. _____ XMI1200611 _____

Effective Date: _____ 11/30/2012 _____

12:01 A.M., Standard Time

Named Insured _GENERAL CABLE CORP._____

Agent No. _____ 31407 _____

```
EXCESS LIABILITY FORMS
UTI-COVPG  12-09        Cover Page
XMI-D-1  8-07           Excess Insurance Policy Declarations
UTI-SP-2  12-95         Schedule Of Forms and Endorsements
XMI-P-1  8-07           Excess Insurance Policy
UTI-358  12-07          Schedule Of Underlying Policies
XMI-77  4-09            Exhaustion Of Underlying Ins
```

# ADDITIONAL FORMS

```
UTI-3g  3-92            Prior  or Pending Litigation
UTI-3g  3-92            Definition of Application
UTI-3g  3-92            Amend Section V.A. Condition
UTI-3g  3-92            Amend Conditions of Coverage
UTI-3g  3-92            Clause V. Amended
UTI-3g  3-92            NON-FOLLOW FORM ODL
UTI-3g  3-92            SUB-LIMIT ATTACHMENT
```

UTI-SP-2 (12-95)

utisp2mgt.fa

# Scottsdale Indemnity Company

A Stock Insurance Company, herein called the Company

## EXCESS INSURANCE POLICY

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE COSTS.**

In consideration of the payment of the premium and in reliance upon the statements in the **Application,** which is made a part hereof and subject to the Declarations, terms and conditions of this Policy, the insurance company indicated in the Declarations (herein called the **Company**) and the **Insured** agree as follows:

## I.   INSURING AGREEMENT

The **Company** shall provide the **Insureds** with insurance coverage excess of the **Underlying Policies.** This Policy is subject to the same representations as are contained in the applications for the **Underlying Policies** and, except with respect to the premium, the limit of liability and as otherwise provided herein, the insurance coverage provided by this Policy shall apply in accordance with the same terms, definitions, conditions, exclusions and limitations as are contained in the **Followed Policy** and, to the extent coverage is further limited or restricted thereby, in any other of the **Underlying Policies.** This Policy shall not grant broader coverage than the most restrictive of the **Underlying Policies.**

## II.   DEFINITIONS

A.   **Application** means all signed applications and any information submitted therewith for this Policy.

B.   **Claim** has the same meaning in this Policy as in the **Followed Policy.**

C.   **Insured** means any persons or entities entitled to coverage under the **Followed Policy.**

D.   **Named Insured** means the entity named in Item 1. of the Declarations.

E.   **Policy Period** means the period from the effective date to the expiration date of this Policy as set forth in Item 3. of the Declarations, or any earlier termination date.

F.   **Followed Policy** means the policy, as constituted at its inception, named in Item 4. of the Declarations.

G.   **Underlying Policies** mean all policies, as constituted at their inception, listed in Item 5. of the Declarations.

H.   **Underlying Limits** means an amount equal to the total of all aggregate limits of liability for all **Underlying Policies,** plus the uninsured retention or deductible applicable to the primary policy named in Item 5. of the Declarations.

## III.   LIMIT OF LIABILITY

The amount stated in Item 2. of the Declarations shall be the maximum amount payable by the **Company** under this Policy with respect to all **Claims** first made during the **Policy Period.**

## IV.   REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS

A.   In the event the **Underlying Limits** are partially reduced by reason of actual payment by the insurers of the **Underlying Policies,** then subject to the Limit of Liability this Policy shall continue to apply as excess over the reduced **Underlying Limits.**

B.   In the event the **Underlying Limits** are wholly exhausted by reason of actual payment by the insurers of the **Underlying Policies** (and the **Insured** has paid the full amount of any applicable deductible or uninsured retention under the **Followed Policy**), then subject to the Limit of Liability this Policy shall continue to apply as primary insurance;

provided always that this Policy shall only pay excess of such applicable deductible or retention, which shall be applied to any subsequent **Claim** in the same manner as specified in the **Followed Policy.**

**C.** This Policy shall only pay in the event of the reduction or exhaustion of the **Underlying Policies** by reason of actual payment by the insurers of the **Underlying Limits** as described above and shall not drop down for any other reason, including but not limited to existence of any sub-limit in any **Underlying Policy** or the uncollectibility (in whole or in part) of any of the **Underlying Limits;** provided, however, this Policy will recognize erosion of any of the **Underlying Policies** due to the existence of a sub-limit.

The **Insureds** expressly retain the risk of any gap in coverage or uncollectibility and the **Company** does not in any way insure or assume such risk.

**V.   CONDITIONS OF COVERAGE**

**A.** As a condition precedent to this Policy's coverage, the **Insureds** agree to maintain the **Underlying Policies** in full effect with solvent insurers during the **Policy Period** except for any reduction or exhaustion of the **Underlying Limits** by reason of actual payments thereunder. If the **Underlying Policies** are not so maintained, the **Company** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policies** been maintained.

**B.** As a condition precedent to this Policy's coverage, the **Insureds** shall notify the **Company** in writing of any of the following events as soon as practicable thereafter, with full particulars:

**(1)** the reduction or exhaustion of any of the **Underlying Limits;**

**(2)** the cancellation or termination of, or failure to maintain in full effect, any of the **Underlying Policies;**

**(3)** any change to any of the **Underlying Policies;** or

**(4)** the insurer of any of the **Underlying Policies** becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

**C.** If during the **Policy Period** or any discovery or extended reporting period, any terms of any of the **Underlying Policies** are changed in any manner, this Policy shall not be subject to such change unless the **Company** consents to such change by written endorsement to this Policy. Unless the **Company** so consents to such change, the **Company** shall not be liable to a greater extent than it would have been absent such change to any of the **Underlying Policies.**

# Scottsdale Indemnity Company

## SCHEDULE OF UNDERLYING POLICIES

Policy No.: XMI1200611                                    Effective Date:  11/30/2012
                                                                         12:01 A.M. Standard Time

Named Insured: GENERAL CABLE CORP.                       Agent No.: _____ 31407

| Issuing Insurer | Policy Number | Limits of Liability | Attachment |
|---|---|---|---|
| 1ST EXCESS: OLD REPUBLIC INSURANCE COMPANY | CUG35536 | $10,000,000 | $15,000,000 |

UTI-358 (12-07)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** ___1___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCESS POLICY - EXHAUSTION OF UNDERLYING INSURANCE - ALLOW PAYMENT BY INSURED OR DIC INSURER ENDORSEMENT

In consideration of the premium paid, it is hereby understood and agreed that:

I.   Section **II. DEFINITIONS** is amended by the addition of the following:

**DIC Insurer** means any insurer which wrote a difference-in-conditions policy excess of this Policy who drops down to pay any amount due under the **Underlying Policies** pursuant to the difference-in-conditions provisions of such policy. However, the policy issued by the **DIC Insurer** shall not be considered one of the **Underlying Policies**.

II.  Section **IV. REDUCTION OR EXHAUSTION OF UNDERLYING LIMITS** is deleted in its entirety and replaced with the following:

A.   It is expressly agreed that liability shall attach to the **Company** only after the full amount of the **Underlying Limits** is paid in accordance with the terms of the **Underlying Policies** by any or all of the following:

   **(1)**  the insurers of the **Underlying Policies;** or

   **(2)**  the **Insured,** in the event the **Insured** pays any amount which would have been covered under the **Underlying Policies** but for the insolvency of any of the **Underlying Policies;** or

   **(3)**  a **DIC Insurer,** in the event the difference-in-conditions policy written by such insurer drops down to pay any amount due under the **Underlying Policies.**

The **Company** shall recognize any such payment by the **Insured** or a **DIC Insurer** as applying to deplete or exhaust the **Underlying Limits;** provided, however, any such payment shall not in any way constitute a waiver of any terms, conditions or exclusions of the **Underlying Policies** or this Policy.

B.   In the event the **Underlying Limits** are partially reduced by reason of actual payments as described in Section **IV.A.** above, then subject to the Limit of Liability this Policy shall continue to apply as excess over the reduced **Underlying Limits**.

C.   In the event the **Underlying Limits** are wholly exhausted by reason of actual payments as described in Section **IV.A.** above (and the **Insured** has paid the full amount of any applicable deductible or uninsured retention under the **Followed Policy**), then subject to the Limit of Liability this Policy shall continue to apply as primary insurance in accordance with the terms and conditions of the **Followed Policy** and to the terms, conditions and exclusions of this Policy; provided always that this Policy shall only pay excess of such applicable deductible or

XMI-77 (4-09)                                      Page 1 of 2

retention, which shall be applied to any subsequent **Claim** in the same manner as specified in the **Followed Policy.**

**D.** This Policy shall only pay in the event of the reduction or exhaustion of the **Underlying Policies** by reason of actual payment as described Section **IV.A.** above and shall not drop down for any other reason, including but not limited to existence of any sub-limit in any **Underlying Policy;** provided, however, this Policy will recognize erosion of any of the **Underlying Policies** due to the existence of a sub-limit. The **Insureds** expressly retain the risk of any gap in coverage or un-collectibility and the **Company** does not in any way insure or assume such risk.

**All other terms and conditions of this Policy remain unchanged.**

/

_____          _____
AUTHORIZED REPRESENTATIVE                      DATE

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** ___2___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCESS POLICY—PRIOR OR PENDING LITIGATION EXCLUSION

In consideration of the premium paid, it is hereby understood and agreed that the **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any: (1) prior or pending demand, suit, or other proceeding against any **Insured** or **Outside Entity** as of, or prior to, the applicable Prior or Pending Proceeding Date; or (2) same or substantially similar fact, circumstance, situation, event, **Wrongful Act,** or **Related Wrongful Act** underlying or alleged in such demand, suit, or other proceeding.

Prior or Pending Litigation Date:

|  |  |
|---|---|
| Insuring Agreement A: | N/A |
| Insuring Agreement B: | 11/1/2010 |
| Insuring Agreement C: | 11/1/2010 |

_____/_____
AUTHORIZED REPRESENTATIVE                    DATE

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _3_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## DEFINITION OF APPLICATION DELETED

It is hereby understood and agreed that (A) of **Section II. DEFINITIONS** is deleted in its entirety.  The definition of application shall follow the **Followed Policy** language.

_____/_____
AUTHORIZED REPRESENTATIVE                DATE

UTI-3g  (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** ___4___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND SECTION V. A. CONDITIONS OF COVERAGE – REMOVE 'SOLVENT'

In consideration of the premium paid, it is hereby understood and agreed that:

Section **V. A. CONDITIONS OF COVERAGE** is deleted in its entirety and replaced with the following:

A.   As a condition precedent to this Policy's coverage, the Insureds agree to maintain the **Underlying Policies** in full effect with insurers during the **Policy Period** except for any reduction or exhaustion of the Underlying Limits by reason of actual payments thereunder.  If the **Underlying Policies** are not so maintained, the **Company** shall not be liable under this Policy to a greater extend than it would have been had such **Underlying Policies** been maintained.

_____/_____
AUTHORIZED REPRESENTATIVE                        DATE

UTI-3g  (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _5_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## AMEND CONDITIONS OF COVERAGE SECTION

This endorsement modifies insurance provided under the following:

Excess Policy XMI1200611

It is agreed that **Section V: Conditions of Coverage, Subsection B** of this Policy is amended to read in its entirety as follows:

**V.  CONDITIONS OF COVERAGE**

   **B.** As a condition precedent to this Policy's coverage, the **Insureds** shall notify the **Company** in writing of any of the following events as soon as practicable thereafter, with full particulars:

   (1)  the reduction or exhaustion of any of the **Underlying Limits;**

   (2)  the cancellation or termination of, or failure to maintain in full effect, any of the **Underlying Policies;**

   (3)  any change to any of the **Underlying Policies.**

All other terms and conditions remain unchanged.

_____/_____
AUTHORIZED REPRESENTATIVE                DATE

UTI-3g  (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _____6_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CLAUSE V. AMENDED

In consideration of the premium paid, it is hereby understood and agreed that **V. CONDITIONS OF COVERAGE, Subsection C.** is deleted in its entirety and replaced with the following:

**C.** If during the **Policy Period** or any discovery or extended reporting period, any terms of any of the **Underlying Policies** are changed in any manner, this Policy shall not be subject to such change unless the **Company** consents to such change in writing. Unless the **Company** so consents to such change, the **Company** shall not be liable to a greater extent than it would have been absent such change to any of the **Underlying Policies.**

All other terms and conditions of this Policy remain unchanged

_____/_____
AUTHORIZED REPRESENTATIVE                    DATE

UTI-3g  (3-92)

# Scottsdale Indemnity Company

**ENDORSEMENT NO.** _7_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| XMI1200611 | 11/30/2012 | GENERAL CABLE CORP. | 31407 |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCESS POLICY – SUB-LIMIT ATTACHMENT

In consideration of the premium paid, it is hereby understood and agreed that:

1. The **Declarations** is amended to include the following:

   Item 2a.    Sublimit of Liability (part of, and not in addition to, Aggregate Limit of Liability): $250,000

2. Section II. Definitions is amended to include the following:

   I.    **Underlying Sublimits** means an amount equal to the total of all aggregate sublimits for "Investigative Costs" for "Securityholder Derivative Demands" (as those terms are defined by the **Followed Policy**).

3. The following provision is added to the Policy:

**Section VI.    Derivative Investigation Costs Coverage pursuant to Sub-limit**

A.    The **Company's** maximum limit of liability for all Investigative Costs for Securityholder Derivative Demands under Insuring Clause 4 of the **Followed Policy** shall be the Sublimit of Liability of $250,000, which amount shall be part of, and not in addition to, the Limit of Liability set forth in Item 2 of the Declarations.

B.    The **Company** shall not provide any coverage under this Policy for Investigative Costs for Securityholder Derivative Demands until the full amount of the **Underlying Sublimits** or the **Underlying Limits** has been exhausted (whichever occurs first) through payments of the **Underlying Insurers** of amounts covered under the terms of the **Underlying Policies.**

C.    In the event that there is claim for Investigative Costs for Securityholder Derivative Demands and the **Underlying Sublimits** or **Underlying Limits** are wholly exhausted by reason of payments of the **Underlying Insurers** (and the full amount of any applicable deductible or uninsured retention has been paid under the **Followed Policy** by the **Insured**), then subject to the Sublimit of Liability this Policy shall continue to apply as primary insurance in accordance with the terms, definitions, conditions, exclusions and limitations of the **Followed Policy** and the terms, definitions, conditions, exclusions and limitations of this Policy; provided always that this Policy shall only pay excess of such deductible or retention, which shall be applied in the same manner as specified in the **Followed Policy.**

D.    Except as expressly set forth above with respect to the Sublimit for Investigative Costs for Securityholder Derivative Demands, nothing in this endorsement is intended, nor shall it be construed, to change the terms or conditions set forth in Section IV. of the Policy.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____

AUTHORIZED REPRESENTATIVE                    DATE

UTI-3g  (3-92)



*90000 SERIES*
*30% P.C.W.*

Exhibit G

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT G**



161 N. Clark St.
10th Floor
Chicago, IL 60601

George M. Carver
Senior Claim Counsel
Bond & Financial Products Claim
Phone: (312) 458-6684
Fax (888) 256-5409
Email: GCARVER@travelers.com

October 18, 2012

**VIA EMAIL:** rsiverd@generalcable.com

Robert J. Siverd
Executive VP and General Counsel
General Cable Corporation
4 Tesseneer Drive
Highland Heights, KY 41076-9753

RE:    Insured Name:        General Cable Corporation
       Policy Number:       105518156
       Reference:           Phelps Dodge International Brasil Ltda. Corp.
       Reference Number:    X1216977

Dear Mr. Siverd:

On behalf of Travelers Casualty and Surety Company of America ("Travelers" or the
"**Company**"), we have reviewed the information you provided regarding the Potential
Claimants under the Executive Choice+ Directors & Officers and Organization Liability
Policy, No. 105518156 ("Policy"). The **Policy** has a **Policy Period** of November 1, 2011
to November 1, 2012, with a Limit of Liability of $15,000,000. This Limit of Liability is
excess of an underlying Retention of $750,000 for **Securities Claims** and $500,000 for
each **Claim** other than a **Securities Claim**. Based on our review, please be advised that,
although at this time there is no coverage under the **Policy** for this matter, we agree to
accept the information available at this time (as described herein) as Notice of a Potential
Claim. This letter does not modify the terms, conditions and exclusions of the **Policy**.

We have received your letter dated October 9, 2012. In your letter, you state that the
Management of General Cable Corporation ("General Cable") has become aware of a
possible discrepancy between the actual inventory book value at Phelps Dodge
International Brasil Ltda. Corporation ("PDIB") and the inventory valuation reflected in
its inventory management systems and financial accounting records. We understand that
the **Insureds** are investigating the source and duration of the discrepancy. We further
understand that the **Insureds** are investigating whether such discrepancies exist at any
other Phelps Dodge International businesses. Your letter states that if a true material
inventory valuation misstatement is identified, a restatement of the financials of PDIB
and/or General Cable may be necessary. Your letter states that such a restatement could
result in **Claims** against some or all of the **Insureds**, including "without limitation by
shareholders and/or governing regulatory agencies, seeking compensation for loss due to
alleged Wrongful Acts."

Travelers
10/18/2012
Page 2

We further understand from our teleconference with you on October 17, 2012 that a similar problem may exist at the Phoenix facility in the Republic of South Africa.

Under the Insuring Clauses A and B of the **Policy**, we agreed to pay, on behalf of the **Insured Persons**, **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts** taking place before or during the **Policy Period**, subject to the **Policy** terms, conditions and exclusions. Under Insuring Clause C, we agreed to pay on behalf of the **Insured Organization Loss** for which the **Insured Organization** becomes legally obligated on account of any **Securities Claim**.

The **Insured Organization** is defined to mean General Cable and its **Subsidiaries**.

**Securities Claim** (as amended) is defined to mean:

> any **Claim**, in whole or in part, that alleges a violation of any law, rule or regulation, whether statutory or common law, regulating securities, and is:
>
> 1.    brought and maintained by one or more security holders of the **Insured Organization**, in their capacity as such; or
> 2.    based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the **Insured Organization**, whether such purchase, sale, or offer involves a transaction with the **Insured Organization** or occurs in the open market, including any such **Claim** brought by the SEC or any other claimant.
> 3.    based upon or arising out of any violation of any federal, state, local, or foreign securities law or regulation.

A **Claim** (as amended) is defined to mean in relevant part:

> 1. a written demand, other than a **Shareholder Derivative Demand**, against any **Insured** for monetary damages or non-monetary relief, including injunctive relief;
> 2. a civil proceeding against any **Insured**, commenced by service of a complaint, arbitration petition, or similar pleading;
> 3. a criminal proceeding against any **Insured Person**, commenced by:
>    a. a filing of charges;
>    b. the return of an indictment, information, or similar document; or
>    c. a formal written notice identifying such **Insured Person** as the target of a grand jury investigation;
> 4. a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any **Insured Person**, commenced by the receipt of a:
>    a. notice of filed charges, investigative order, or similar document;

Travelers
10/18/2012
Page 3

        b. written notice identifying such **Insured Person** as a target of an investigatory authority; or

        c. Wells Notice from the SEC that it may commence an enforcement action against such **Insured Person**;

5. service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to an SEC formal investigative order;

6. a **Shareholder Derivative Demand**, with respect to Insuring Agreement D only;

7. a request for **Extradition**, including the execution of an arrest warrant where such execution is an element of **Extradition**; or

8. a written request to toll or waive a statute of limitations relating to any of the above,

9. a formal mediation proceeding against any **Insured** if the **Insured** is obligated to participate in such proceeding, and if the mediator for such proceeding ahs the authority to bind the parties.

for a **Wrongful Act,** including any appeal therefrom. Provided that with respect to any paragraph 1. through 8. above that invokes coverage for **Dodd-Frank Costs**, a **Wrongful Act** is not required, but only with respect to **Dodd-Frank Costs**.

Further, a **Wrongful Act,** in relevant part, means:

any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any **Insured Person** in their capacity as such, or in an **Outside Position** or, with respect to Insuring Agreement C, by the **Insured Organization**, or

any matter claimed against the **Insured Person** solely by reason of their serving in such capacity....

This matter does not presently constitute a **Claim** under the **Policy**. Accordingly, there is no coverage for this matter under the **Policy** at this time.

The Notice section of the Conditions (Section V.E.) states in relevant part:

If, during the **Policy Period**, or any applicable **Extended Reporting Period**, an **Insured**:

1. becomes aware of any circumstance that could give rise to a **Claim** for a **Wrongful Act** occurring before or during the **Policy Period**; and

2. gives written notice of such circumstance, and the other information referenced below in this **NOTICE** section, to the **Company** during the **Policy Period** or any **Extended Reporting Period**,

Travelers
10/18/2012
Page 4

> then any **Claim** subsequently arising from such circumstance will be deemed made during the **Policy Period**.
>
> As a condition precedent to exercising rights under this **Policy**, the **Insured** must:
> 1. include within any notice of **Claim** or circumstance a description of the **Claim** or circumstance, the nature of the **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants and **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Claim** or circumstance; and
> 2. give to the **Company** such other information and cooperation as the **Company** may reasonably request.

The information that we have received sets forth a description of the circumstances of the Potential Claim, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, and the manner in which the **Insureds** first became aware of the circumstances. We will accept the information which has been submitted to us as a written Notice of a Potential Claim by either the **Insured's** shareholders and/or governmental regulatory agencies alleging breaches of fiduciary duties or violations of statutes, regulations or other laws against **Insured(s)** in connection with a restatement of the financials of PDIB and/or General Cable caused by material inventory valuation misstatements at PDIB or at the Phoenix facility in the Republic of South Africa. If a **Claim** is subsequently made against an **Insured Person**, please send us that documentation immediately and we will review it for coverage under the **Policy** at that time.

With respect to any other Phelps Dodge International Businesses, we will need to know which specific businesses are being investigated for discrepancies and the basis for any concern that the inventory valuations may be misstated.

With respect to the Confidentiality Provisions contained in your notice letter, please note that while the materials sent to us will be treated as confidential, and marked as such, we will be unable to return the materials sent to us or destroy them as requested. As an insurance company, Travelers is subject to various regulatory obligations with respect to the retention of records. If you require further assurances regarding confidentiality, please contact me so that we may further discuss the issue.

Our continuing investigation and evaluation of coverage for this matter is without prejudice to Travelers' rights, or the rights of the individual **Insureds** in this matter. Further, if you believe that any of the facts or **Policy** provisions which have been cited in this letter are incorrect, please advise us so that we can discuss those statements with you and either clarify or correct them.

Travelers
10/18/2012
Page 5

If there is any matter that you would like to discuss, please do not hesitate to contact me directly at 312.458-6684 or at gcarver@travelers.com.

Very truly yours,
**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**

George M. Carver, Esq.
Senior Claim Counsel


cc:   Andre O'Reggio - Marsh
      Via Email: Andre.OReggio@marsh.com

      David Finz - Marsh
      Via Email: David.Finz@marsh.com

      Katie Kempf - Travelers
      Via Email: KKEMPF@travelers.com



*90000 SERIES*
*30% P.C.W.*

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT H**

 **General Cable**

**ROBERT J. SIVERD**
*Executive Vice President
and General Counsel
Telephone: 859-572-8890
Facsimile:  859-572-8444
E-mail:*  rsiverd@generalcable.com

September 19, 2013

**HIGHLY CONFIDENTIAL**

**VIA E-MAIL AND CERTIFIED MAIL (RETURN RECEIPT REQUESTED)**

Travelers Bond & Financial Products Claim
385 Washington Street – Mail Code 9275-NB03F
St. Paul, Minnesota  55102
bfpclaims@travelers.com

Re:  Your Insured:   General Cable Corporation, et al.
Policy No.:              105518156
<u>NOTICE OF CIRCUMSTANCES</u>

Dear Sir or Madam:

By this correspondence, on behalf of itself and all other Insureds, General Cable Corporation ("General Cable" and collectively with all other Insureds, the "Insureds") provides Travelers Casualty and Surety Company of America ("Travelers" or "You") with Notice of Circumstances that could give rise to a Claim(s) under Directors, Officers, and Organization Liability Policy No. 105518156, and any other applicable policies, whether or not cited (the "Policy").  The Insureds demand that Travelers provide them all coverage afforded by the Policy in connection with any Claims that may result from, arise out of, are based upon, or attributable to the facts and circumstances discussed herein.

The circumstances that may give rise to Claims against the Insureds of which the Insureds are currently aware concern past accounting for certain transactions at General Cable's subsidiary Phelps Dodge International Corporation, and certain affiliates in Latin America (together, "PDIC").  Recently, the Management of General Cable became aware of possible inaccuracies in transactions relating to:  (i) revenue recognition with respect to certain contracts in Brazil; (ii) accounting in Chile and Venezuela for costs incurred resulting from a customer's quality issue with respect to cable it purchased and from the payment by the Chile subsidiary for raw materials shipped by a third party supplier to the Venezuela subsidiary; and (iii) certain intercompany credit notes issued between the company's Ecuador and Chile subsidiaries, and accounting related to the intercompany adjustment.  The Insureds presently are investigating the facts surrounding these transactions in order to discern

4 Tesseneer Drive
Highland Heights, KY 41076-9753
tel 859 572 8000
fax 859 572 8458
www.generalcable.com

whether accounting for them was inaccurate, and if inaccurate, material. Because these circumstances, if validated, could give rise to a Claim(s) under the Policy, out of an abundance of caution, the Insureds hereby provide the instant Notice of Circumstances.

In the event that the above inaccuracies are determined to exist and are material, a further restatement of the PDIC and/or General Cable financial statements may be necessary. Such a restatement could result in Claims against some or all of the Insureds, including without limitation, by shareholders and/or government regulatory agencies, seeking compensation for Loss due to alleged Wrongful Acts.

The Insureds deny that they have engaged in any wrongdoing or violations of law. This Notice of Circumstances is not and shall not be construed as an admission against interest or of wrongdoing by any Insured with respect to any issue that is the subject of the matters detailed herein.

As discussed above, the Insureds presently are conducting a thorough review to assess fully the potential Losses. We will keep you apprised of our findings.

## CONFIDENTIALITY AND NON-WAIVER PROVISIONS

The Insureds demand that the information disclosed in this Notice of Circumstances (the "Confidential Information") be maintained in strict confidence, not be disclosed without the Insureds' consent other than as necessary for insurance claims handling purposes, and be used solely for insurance claims handling purposes.

The Confidential Information has not been publicly disclosed. Because some or all of this Confidential Information may constitute material non-public information, we demand that you treat it with the highest level of confidentiality.

Further, the Insureds and their insurers, including Travelers, share a common interest in minimizing potential liability that may arise from these matters and in providing a joint defense against them with respect to any claims that may arise. Accordingly, the disclosure of this Confidential Information to you in this Notice of Circumstances is not intended to, and should not be construed as, a waiver of any applicable privilege, immunity, confidentiality, or protection from disclosure that may apply to these materials.

If another person or entity requests or demands, by subpoena or otherwise, any of the Confidential Information submitted as part of this Notice of Circumstances, then You shall immediately notify the Insureds of the request, demand, or subpoena and permit the Insureds to intervene and assert any applicable privileges, immunities, or other protections from disclosure. You shall cooperate fully to protect the confidentiality of these materials and take whatever steps are necessary and permissible to prevent or limit their disclosure.

Moreover, upon final resolution of any Claims that may arise under the Policy that relate to the circumstances that are the subject of this notice, or if no Claims result from these circumstances, all materials submitted in connection with this Notice of Circumstances shall either be returned to the Insureds or destroyed as directed by the Insureds.

Nothing contained herein shall constitute a waiver of the Insureds' rights, claims, or causes of action under the Policy or otherwise.

If you have any questions concerning this Notice of Circumstances, please do not hesitate to contact the undersigned.

Sincerely,

Robert J. Siverd
Executive Vice President,
General Counsel and Secretary

RJS/ksr



*KLEER-FAX*
*RECYCLED ⊕*

*90000 SERIES*
*30% P.C.W.*

Exhibit I

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT I**

 **MARSH**

Shamica Aleong
mCAR Advisor
Marsh USA , Inc
1166 Avenue of the Americas
New York, NY 10036-2774
(212) 345-4105  Fax (212) 345-9894
Shamica.Aleong@marsh.com
www.marsh.com

## Additional Correspondence

October 17, 2013

George Carver, Esq.
Bond & Financial Products Claims
Travelers
161 N. Clark Street
10th Floor
Chicago, IL 60601

| | |
|---|---|
| INSURED: | GENERAL CABLE CORPORATION |
| CLAIMANT(S): | NOTICE OF CIRCUMSTANCES |
| TYPE OF COVERAGE: | *Directors & Officers |
| MARSH FILE NUMBER: | 13NYC_105219 |
| INSURER FILE NUMBER: | X1216977 |

Dear Mr. Carver:

Attached please find additional correspondence pertaining to the above captioned.  This claim was previously reported to you on September 19, 2013.

The following policy information is applicable:

| Policy Number | Policy Term | Layer | Participation |
|---|---|---|---|
| 105518156<br>TRAVELERS CAS & SURETY OF AMER | 11/30/2012 -<br>11/01/2013 | $15,000,000 Primary | $15,000,000 |
| CUG 34739<br>OLD REPUBLIC INSURANCE CO | 11/30/2012 -<br>11/01/2013 | $10,000,000 X<br>$15,000,000 | $10,000,000 |
| XMI1200611<br>SCOTTSDALE INDEMNITY COMPANY | 11/30/2012 -<br>11/01/2013 | $10,000,000 X<br>$25,000,000 | $10,000,000 |
| QB092412<br>BEAZLEY SYNDICATES 2623 & 623 AT<br>LLOYD'S | 11/30/2012 -<br>11/01/2013 | $10,000,000 X<br>$35,000,000 | $10,000,000 |
| 6803-6194<br>FEDERAL INSURANCE CO | 11/30/2012 -<br>11/01/2013 | $10,000,000 X<br>$45,000,000 | $10,000,000 |

As further information is received we will forward the same to you.

Please include the **Marsh file number** on all correspondence related to the above claim.

Very truly yours,

*Shamica Aleong*

The information contained in this document is confidential, may be privileged, and is intended for the use of the individual or entity named above. If you are not the intended recipient, please do not read, copy, forward, use, or store this document or any of the information contained herein.

Shamica Aleong
mCAR Advisor
cc:

Stephen Messinger
Vice President, Risk Management
General Cable Corporation
4 Tesseneer Drive
highland heights, KY 41076-9753
Phone: 859-572-8918
Fax: 859-572-6877
eMail: smessinger@generalcable.com

Robert Siverd
Executive Vice President & General Couns
General Cable Corporation
4 Tesseneer Drive
Highland Heights, KY 41076-9753
Phone: 859 572-8890
Fax: 859 572-8444
eMail: rsiverd@generalcable.com

David Finz
Senior Vice President
Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Phone: 212 345 9585
eMail: david.finz@marsh.com

Andre Oreggio
Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
eMail: Andre.OReggio@marsh.com

**Enclosure:**

| File Description | File Name | Document # |
|---|---|---|
| 2013-10-17, supplement letter.pdf | 2013-10-17, supplement letter.pdf | A_189653.pdf |

8-K 1 d611795d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): October 10, 2013**



# GENERAL CABLE CORPORATION
### (Exact name of registrant as specified in its charter)

| Delaware | 001-12983 | 06-1398235 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**4 Tesseneer Drive, Highland Heights, Kentucky**                     **41076-9753**
**(Address of principal executive offices)**                                 **(Zip Code)**

**Registrant's telephone number, including area code: (859) 572-8000**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 4.02    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On October 10, 2013, the Audit Committee of the Company's Board of Directors, upon the recommendation of the Company's executive officers, concluded that due to certain accounting errors, in the aggregate, related to i) value added tax (VAT) and ii) revenue recognition in connection with historical "bill and hold" transactions for aerial transmission projects in Brazil as further described below, the Company's previously issued consolidated financial statements for the fiscal years 2008 through 2012 (and the related reports of its independent registered public accounting firm) and the interim periods during those years, and the financial statements as of, as well as for, the three fiscal months ended March 29, 2013 should no longer be relied upon.

As a result of the theft of inventory and inventory accounting errors in Brazil disclosed in Amendment No. 1 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 and in other previous filings, the Company undertook an extensive evaluation, with the assistance of external accounting consultants and external legal counsel, to determine whether an adjustment related to value added tax (VAT) in Brazil associated with the inventory theft and accounting errors was necessary. The Company previously disclosed its evaluation of a potential adjustment related to VAT in its Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on July 31, 2013 (the "July 31 Form 8-K"). Based on its evaluation, the Company no longer expects to recover approximately $18 million of VAT credits that were previously recognized from 2008 to 2012. As a result, the estimated cost of sales expense to be recorded to correct the overstatement of VAT credits for the years ended December 31, 2012, 2011, 2010, 2009 and 2008 follows:

| Understated / (Overstated) In millions | For the twelve months ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | Total |
| Gross Margin | ($ 3) | ($ 3) | ($ 4) | ($ 6) | ($ 2) | ($18) |

In addition, as part of its efforts to remediate its previously disclosed deficiencies in internal control over financial reporting, the Company reviewed revenue recognition with regard to bill and hold sales in Brazil related to aerial transmission projects. "Bill and hold" sales generally are sales meeting specified criteria under U.S. generally accepted accounting principles ("GAAP") to recognize revenue at the time title to goods is transferred to the customer, even though the seller does not ship the goods until a later time. In typical sales transactions other than those accounted for as bill and hold, title to goods is transferred to the customer at the point of shipment or delivery. As a result of its review, conducted with the assistance of external counsel, the Company identified a number of instances where the requirements for revenue recognition under GAAP with respect to the bill and hold sales were not met. Moreover, the Company determined that the related control environment in Brazil, which as noted above is in the process of being remediated, was inadequate at the time to support revenue recognition for bill and hold sales. As a result, the Company concluded, with the assistance of external accounting consultants and based on the factual findings made with the assistance of external legal counsel, that revenue should have been recognized at the time of shipment. Beginning in the third quarter of 2013 the Company discontinued bill and hold revenue accounting in Brazil and will recognize revenue and the related profit for sales related to aerial transmission projects in Brazil at the time of shipment. The Company estimates that its revenues and gross margin were understated (overstated) for the years ended December 31, 2012, 2011, 2010 and 2009, and three months ended March 29, 2013 as follows:

| Understated/(Overstated) In millions | For the twelve months ended December 31, | | | | For the three months ended March 29, 2013 |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | |
| Revenues | ($ 8) | ($ 10) | ($ 64) | $ 41 | $ 10 |
| Gross Margin | $ — | ($ 5) | ($ 19) | $ 14 | $ 3 |

Note: There is approximately $30 million of revenue and $7 million of gross margin that were previously accounted for as bill and hold transactions, which now will be recognized in future periods at the time of shipment for aerial transmission projects in Brazil.

The Company's foregoing estimated adjustments are based on current data and are subject to change upon completion of its internal review of the Company's prior financial statements. The Company's restated financial statements also will reflect adjustments in response to comments of the Staff of the SEC described in its Form 8-K filed previously on July 31, 2013. During the ongoing process of finalizing restated financial statements, if it is determined that there are other adjustments for the periods subject to restatement, the Company will include such adjustments in its restated financial statements.

The Company intends to reflect the adjustments described above, including adjustments in response to the SEC Staff's comments, by filing amendments to its Quarterly Reports on Forms 10-Q for the fiscal quarters ended March 30, 2012, June 29, 2012, September 28, 2012 and March 29, 2013 and Annual Reports on Form 10-K for the fiscal years ended December 31, 2011 and December 31, 2012. The Company will also concurrently file its Form 10-Q for the fiscal quarter ended June 28, 2013, which has not previously been filed, as the Company was evaluating certain of the items described above. Due to the impact of the above matters on the presentation of the Company's financial statements in its Form 10-Q for the quarter ended September 27, 2013, the Company may not timely file its Quarterly Report on Form 10-Q for the quarterly period ended September 27, 2013 with the SEC.

As part of the consideration of the above-described matters, the Company has and will continue to assess the underlying internal control deficiency or deficiencies that allowed these issues to go undetected and will provide its conclusion regarding control deficiencies and remedial measures in the filings referenced in the preceding paragraph.

The Audit Committee of the Company's Board of Directors has discussed the matters disclosed in this Item 4.02(a) filed on Form 8-K with the Company's independent registered public accounting firm.

### Item 7.01     Regulation FD Disclosure.

In addition to the disclosures under Item 4.02 with regard to non-reliance on previously issued financial statements, the financial data included in the Company's July 31, 2013 press release furnished as Exhibit 99.1 to the July 31 Form 8-K should also no longer be relied upon due to the bill and hold matter described above. The Company estimates that its net sales reported in the press release for the three months ended June 28, 2013 were understated by $15 million and operating income for the three months ended June 28, 2013 was understated by $4 million.

### Forward-Looking Statements

This Current Report on Form 8-K contains forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, including forward-looking statements regarding the Company's continuing analysis and review of the inventory accounting errors, the VAT matter and bill and hold revenue recognition, the restatement of its consolidated financial statements and review of its internal controls as well as its disclosure controls. These statements are based on management's current expectations and estimates. These statements are neither promises nor guarantees and involve risks and uncertainties that could cause actual results to differ materially from those stated or implied by the forward looking statements, including, without limitation, risks relating to additional information arising from the Company's continuing internal review of VAT and bill and hold transactions adjustments in Brazil and its prior financial statements, as well as the review and audit by the Company's independent auditors of the Company's prior financial statements, the Company's ability to maintain an effective system of internal controls and disclosure controls and other risks described in the registrant's filings with the SEC.

Form 8-K                                                                                    Page 4 of 4

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GENERAL CABLE CORPORATION

October 15, 2013                                      /s/ Robert J. Siverd
                                                      Robert J. Siverd
                                                      Executive Vice President, General Counsel and Secretary

90000 SERIES
30% P.C.W.

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT J**



**KAUFMAN BORGEEST & RYAN LLP**

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000    FAX: 914.449.1100    WWW.KBRLAW.COM

February 18, 2014

WAYNE E. BORGEEST
DIRECT: 914.449.1002
WBORGEEST@KBRLAW.COM

MATTHEW COLLIBEE
DIRECT: 914.449.1075
MCOLLIBEE@KBRLAW.COM

<u>BY EMAIL</u>

Robert J. Siverd
Executive Vice President and General Counsel
General Cable Corporation
4 Tesseneer Drive
Highland Heights, KY 41076-9753
rsiverd@generalcable.com

Re:  Insured        :   General Cable Corporation
     Policy No.     :   105518156 (November 1, 2011 – November 1, 2012)
     Matters        :   (1) *Doshi v. General Cable Corp. et al.*, Case No. 13-7409
                         (S.D.N.Y. Oct. 21, 2013)
                         (2) *City of Livonia Employees' Retirement Sys. v. General Cable
                         Corp. et al.*, Case No. 13-8634 (S.D.N.Y. Dec. 4, 2013)
                         (3) *McPherson v. Kenny et al.*, Case No. 14-CI-011 (Ky. Cir. Ct.
                         Div. I, Jan. 7, 2014)
                         (4) *Kelly v. Kenny et al.*, Case No. 14-CI-060 (Ky. Cir. Ct. Div. I,
                         Jan. 23, 2014)
                         (5) *In the Matter of General Cable Corporation*, HO-11998 (the
                         "SEC Investigation")
     Travelers No. :   X1216977
     KBR No.       :   187.326

Dear Mr. Siverd:

As you may be aware, this firm has been retained to advise and assist Travelers Casualty &
Surety Company of America ("Travelers") in connection with the above-captioned matters. We
write further to Travelers' prior correspondence, which are incorporated herein. Please direct all
future correspondence intended for Travelers in these matters to the undersigned.

The purpose of this letter is to convey Travelers' determination regarding coverage for the
above-captioned matters. Travelers has reviewed these matters in light of the captioned
policy's provisions. Please be aware that we do not attribute any merit to the claimants'
allegations, and reference those allegations here only for purposes of discussing the question of
coverage. Should further pertinent information come to light, Travelers may revise its

NEW YORK CITY    LOS ANGELES    NEW JERSEY    STAMFORD    WESTCHESTER    LONG ISLAND

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 2

determination accordingly, and it reserves the right to do so.  Nothing in this letter, including any requests for information, is intended to waive any rights Travelers may have under the policy, at law, or in equity, all of which are expressly reserved.  Travelers' determination is necessarily based upon information that has been made available to it at this point.  If you have any other information that Travelers should consider, please let us know.  Travelers will consider such other or additional information as appropriate.

The Matters Submitted

By letter dated October 9, 2012, General Cable Corporation ("General Cable") submitted Notice of a Potential Claim to Travelers concerning past inventory valuation of General Cable's subsidiary, Phelps Dodge International Brasil Ltda. Corporation ("PDIB").  General Cable had recently become aware of a possible discrepancy between PDIB's actual inventory book value and the inventory valuation reflected in its inventory management systems and financial accounting records.  As of October 9, General Cable was investigating whether there was an actual discrepancy, and if so, if it constituted a material error.  The possible discrepancy was discovered at a PDIB facility in Brazil.  The October 9 letter warned that a material inventory valuation misstatement could require a restatement of General Cable/PDIB's financials.

By letter dated October 18, 2012, Travelers accepted the October 9 letter as Notice of a Potential Claim concerning material inventory valuation misstatements at PDIB.  Travelers also noted that by teleconference with General Cable on October 17, 2012, the Insured advised that a similar financial discrepancy may exist at a facility in the Republic of South Africa.  Travelers' October 18 letter accepted this information as Notice of a Potential Claim as well.

By letter dated September 18, 2013, General Cable advised that it was aware of possible inaccuracies arising from its subsidiary Phelps Dodge International Corporation ("PDIC") and relating to: (1) revenue recognition with respect to certain contracts in Brazil; (2) accounting in Chile and Venezuela for costs incurred from a customer's quality issue with respect to cable it purchased; and (3) certain intercompany credit notes issued between the company's Ecuador and Chile subsidiaries.  General Cable warned that if the inaccuracies exist and are deemed material, they may require further restatements of General Cable/PDIC's financials.

*The Securities Class Actions*

On October 21, 2013, a securities class action captioned *Satish Doshi v. General Cable Corporation, Gregory B. Kenny, and Brian J. Robinson*, Case No. 13-7409, was filed in the Southern District of New York (the "Doshi Action" or "Doshi Complaint").  The Doshi Action is brought on behalf of a putative class that purchased General Cable securities between May 3, 2011 and October 14, 2013. Gregory Kenny is the CEO and President of General Cable, and Brian Robinson is the company's CFO and Treasurer.

The Doshi Complaint alleges that between May 3, 2011 and August 3, 2012, General Cable issued press releases and made SEC filings regarding its financial health.  The SEC forms were signed by Robinson, while SOX certifications were signed by Kenny and Robinson.  According to the Doshi Complaint, the press releases and filings were materially false and misleading because they misrepresented and failed to disclose material financial information.  In particular, on October 29, 2012, General Cable announced for the first time "certain inventory related accounting errors in two facilities located in Brazil and a third facility located in South Africa . . .

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 3

resulting in an understatement of cost of goods sold and overstatement of ending inventory." As a result, the company advised that its financial statements for fiscal years 2009 through 2011, and for the periods ended March 30, 2012 and June 29, 2012, should no longer be relied upon. On February 25, 2013, the company explained that the accounting errors in Brazil were caused, at least in part, by inventory theft. On March 1, 2013, General Cable restated certain financials.

On July 31, 2013, General Cable announced that it may be required to adjust its value added tax ("VAT") in Brazil because of the theft of inventory. On October 15, 2013, the company announced that it would not be recovering approximately $18 million in Brazilian VAT credits that were previously recognized between 2008 and 2012. In addition, General Cable announced that requirements for revenue recognition under GAAP were not met with respect to "bill and hold" sales of aerial transmission projects in Brazil. As a result, the company's revenues were overstated between 2009 and early 2013.

The Doshi Complaint alleges that General Cable's securities were sold at artificially inflated prices during the putative class period as a result of the company's failure to disclose inventory accounting errors in Brazil and South Africa, and revenue recognition errors with respect to "bill and hold" sales in Brazil. Causes of action are brought under Sections 10(b) and 20(a) of the Exchange Act. Plaintiff seeks damages, prejudgment and post-judgment interest, and attorneys' fees.

On December 4, 2013, a securities class action styled *City of Livonia Employees' Retirement System v. General Cable Corporation, Gregory B. Kenny, and Brian J. Robinson*, Case No. 13-8634, was filed in the Southern District of New York (the "City of Livonia Action" or "City of Livonia Complaint"). The Livonia Complaint alleges substantially similar facts and circumstances as those made in the Doshi Complaint, and reflects a similar putative class period.[1]

On January 17, 2013, the Southern District of New York consolidated the Doshi Action and City of Livonia Action (collectively, the "Securities Class Action"). On February 5, 2014, the court transferred the matter to the Eastern District of Kentucky.

### The Derivative Actions

On January 7, 2014, a derivative complaint captioned *Kenneth McPherson v. Gregory B. Kenny et al.*, Case No. 14-CI-011, was filed in the Circuit Court of Kentucky, Division I (the "McPherson Complaint"). The McPherson Complaint alleges breaches of fiduciary duty against ten current/former directors and officers of General Cable or PDIC based on: (1) inventory related accounting errors in Brazil and South Africa; and (2) revenue recognition errors in connection with "bill and hold" transactions for aerial transmission projects in Brazil. The McPherson Complaint alleges that the defendants are responsible for disseminating false and misleading statements concerning General Cable's internal controls and profitability between 2007 and 2013. Plaintiff seeks: (1) damages sustained by General Cable as a result of the alleged breaches of fiduciary duty; (2) unspecified equitable relief; and (3) attorneys' fees.

---

[1] The Livonia Complaint is brought on behalf of individuals that purchased General Cable securities between May 2, 2011 and November 4, 2013. The Doshi Action putative class period is May 3, 2011 through October 14, 2013.

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 4

On January 21, 2013, a derivative complaint captioned *David G. Kelly v. Gregory B. Kenny et al.*, Case No. 14-CI-060, was filed in the Circuit Court of Kentucky, Division No. I (the "Kelly Complaint"). The Kelly Complaint is nearly identical to the McPherson Complaint, and includes the same defendants, allegations, and plaintiff's counsel.

According to the circuit court clerk's office, the McPherson Complaint has been dismissed. The Kelly Action remains active, and may have been filed in place of the McPherson Complaint (hereinafter, the Kelly Action is referred to as the "Derivative Action").

*The SEC Investigation*

By letter dated January 22, 2013, the SEC requested that General Cable voluntarily provide documents as part of the agency's investigation captioned *In the Matter of General Cable Corporation*, File No. HO-11998 (the "SEC Investigation"). The SEC sought documents for the period of 2007 to 2013 related to, among other things: (1) accounting and internal control policies and procedures applicable to the company's Rest of the World ("ROW") segment, particularly as they relate to inventory and costs of goods sold accounts; and (2) inventory and costs of goods sold accounts associated with General Cable's operations in Brazil and South Africa. We understand that General Cable's Brazil and South Africa operations are part of the company's ROW segment.

By letter dated July 22, 2013, the SEC issued General Cable a formal order of investigation. The order indicates that the SEC has information tending to show that General Cable and/or ROW, their officers, directors, or employees may have violated federal securities laws by making false statements or failing to disclose material facts concerning: (1) the allowance for loan and lease losses; (2) failure to keep accurate books and records; and (3) failure to maintain internal controls that provide reasonable assurances that financial statements were prepared in accordance with GAAP.

On October 17, 2013, the SEC demanded documents pertaining to ROW's "bill and hold" sales since 2009. The demands are generally broad, but references are made to General Cable's operations in Brazil.

On January 24, 2014, Maria Cidre received a subpoena for testimony as part of the SEC Investigation. We also understand that Mathias Sandoval may have received a subpoena as well. To our knowledge, no other individuals have received subpoenas.

<u>Coverage Determination</u>

Travelers issued Executive Choice+ Policy No. 105518156 to General Cable for the Policy Period of November 1, 2011 to November 1, 2012 (the "Policy"). The Policy reflects a Limit of Liability of $15 million for all Claims, subject to a $750,000 Retention for Securities Claims under Insuring Agreements I.B. and I.C. The Policy was renewed for the Policy Period of November 30, 2012 to November 1, 2013.

Defense Expenses are part of, and not in addition to, the $15 million Limit of Liability. Travelers has no obligation to pay Loss under the Policy until such time that the applicable Retention has been exhausted by covered Loss.

<u>KAUFMAN BORGEEST & RYAN LLP</u>

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 5

Please note that our discussion of coverage below does not address whether Mathias Sandoval is afforded coverage under the Policy.  By letter dated February 3, 2014, Marsh advised us that General Cable is "of the view that Mr. Sandoval should not obtain any benefit or coverage, including reimbursement or payment of legal expenses under any Director and Officer insurance policy issued to General Cable Corporation."  As General Cable is not seeking a coverage determination from Travelers regarding Mr. Sandoval, we do not discuss the possibility of coverage for him herein.  Any references to Insured Persons or defendants below should not be construed as a determination of coverage for Mr. Sandoval.

We also recognize that General Cable submitted a separate claim for coverage on behalf of Maria Cidre.  However, we understand that General Cable has not made a decision on whether it will indemnify her.  We will address coverage for Ms. Cidre under separate cover.  Any references to Insured Persons or defendants below should not be construed as a determination of coverage for Ms. Cidre.

Based on discussions with defense counsel, Morgan Lewis, we understand that General Cable is indemnifying all other individuals that have been named in the Securities Class Action and/or Derivative Action.  Please advise us immediately if this is inaccurate.

*Provisions of the Policy*

Section I. of the Policy states, in relevant part:

> A.  DIRECTORS AND OFFICERS INDIVIDUAL LIABILITY COVERAGE
>
> The Company will pay, on behalf of any Insured Person, Loss that is not indemnified by the Insured Organization and that the Insured Person becomes legally obligated to pay for any Claim first made against the Insured Person during the Policy Period, or any applicable Extended Reporting Period, for a Wrongful Act occurring before or during the Policy Period.
>
> B.  ORGANIZATION INDEMNIFICATION LIABILITY COVERAGE
>
> The company will pay, on behalf of the Insured Organization, Loss of any Insured Person that the Insured Organization indemnifies, as permitted or required by law, and that the Insured Person becomes legally obligated to pay for any Claim first made against the Insured Person during the Policy Period, or any applicable Extended Reporting Period, for a Wrongful Act occurring before or during the Policy Period.
>
> C.  ORGANIZATION SECURITIES CLAIM LIABILITY COVERAGE
>
> The company will pay, on behalf of the Insured Organization, Loss that such Insured Organization becomes legally obligated to pay for any Securities Claim first made against the Insured Organization during the Policy Period, or any applicable Extended Reporting Period, for a Wrongful Act occurring before or during the Policy Period.

Insured Person, per Section III.N., includes any natural person who was, is, or becomes a duly elected or appointed director, officer, Manager, or in-house general counsel of the Insured

<hr>

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 6

Organization, or any functional equivalent position. Insured Organization, per Section III.M., includes General Cable and any Subsidiary.

Under Endorsement No. PCDO-10043, a Claim means:

1. a written demand, other than a Shareholder Derivative Demand, against any Insured for monetary damages or non-monetary relief, including injunctive relief;

2. a civil proceeding against any Insured, commenced by service of a complaint, arbitration petition, or similar pleading;

3. [ . . . ]

4. a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any Insured Person, or against any Insured Organization, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an Insured Person and the Insured Organization, and commenced by the receipt of a:

   a. notice of filed charges, investigative order, or similar document;

   b. written notice identifying such Insured Person as a target of an investigatory authority; or

   c. Wells Notice from the SEC that it may commence an enforcement action against such Insured Person;

5. service of a subpoena on an Insured Person identified by name if served upon such person pursuant to an SEC formal investigative order;

6. [ . . . ]

7. [ . . . ]

8. [ . . . ]

9. [ . . . ]

for a Wrongful Act, including any appeal therefrom.

Under Section III.EE., a Wrongful Act means, in relevant part, any actual or alleged:

1. error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted:

   a. by any Insured Person in their capacity as such, or in an Outside Position; or

   b. with respect to Insuring Agreement C, by the Insured Organization; or

2. matter claimed against the Insured Person solely because of their serving in such capacity or in an Outside Position.

Under Section II.Z., a Securities Claim means any Claim, in whole or in part, that is:

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 7

1. brought and maintained by one or more security holders of the Insured Organization, in their capacity as such; or

2. based upon or arising out of the purchase or sale of, or offer to purchase or sell, any equity or debt securities of, and issued by, the Insured Organization, whether such purchase, sale, or offer involves a transaction with the Insured Organization or occurs in the open market, including any such Claim brought by the SEC or any other claimant.

*The Submitted Matters Relate Back to the October 9, 2012 Notice of a Potential Claim*

The Securities Class Action, Derivative Action, and SEC Investigation were all filed or initiated after the 2011-2012 Policy Period. However, each of these matters arise from the same facts and circumstances explained in the October 9, 2012 Notice of a Potential Claim. Specifically, the matters concern alleged misstatements and misrepresentations regarding accounting errors in Brazil and South Africa. Under Section V.E.3. of the Policy, as amended by Endorsement PCDO-10201:

If, during the Policy Period, or any applicable Extended Reporting Period, an Insured:

1. becomes aware of any circumstances that could give rise to a Claim for a Wrongful Act occurring before or during the Policy Period; and

2. gives written notice of such circumstance, and the other information referenced below in this NOTICE section, to the Company during the Policy Period or any Extended Reporting Period,

then any Claim subsequently arising from such circumstance will be deemed made during the Policy Period.

Travelers accepted the October 9 letter as a Notice of a Potential Claim on October 18, 2012. Accordingly, it is reviewing coverage for these matters under the Policy.[2]

*The Securities Class Action*

The Securities Class Action[3] is a civil proceeding brought by General Cable security holders alleging that General Cable, the CEO, and the CFO violated the Exchange Act. As a result, it is a Securities Claim against Insureds. As a Securities Claim, the Securities Class Action appears to trigger coverage for General Cable under Insuring Agreement I.C., subject to a reservation of rights. The CEO (Kenny) and CFO (Robinson) also appear to be covered under the Policy, subject to a reservation of rights.

---

[2] If General Cable is seeking coverage under any other policy issued by Travelers, please advise us immediately. Travelers reserves its rights accordingly.

[3] An amended consolidated complaint has not yet been filed in the Securities Class Action, so the case still involves two separate complaints. Nonetheless, the allegations are substantively similar, so coverage for these complaints is addressed together.

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 8

*The Derivative Action*

The Derivative Action is brought against former and current officers/directors of General Cable and/or Subsidiary PDIC.  The defendants appear to be Insured Persons under the Policy because they are/were duly elected or appointed officers and directors of General Cable and/or PDIC.  Please advise us immediately if this is inaccurate.  The Derivative Complaint appears to trigger the Policy, subject to a reservation of rights, because it constitutes a Claim against Insured Persons.

*The SEC Investigation*

General Cable has received a formal order of investigation, but no Insured Persons have been identified in writing as a target in the SEC Investigation (although some have received subpoenas).  A Claim is defined at Section III.B. (as amended by Endorsement PCDO-10043) to mean, in relevant part:

> 4. a formal civil administrative or formal civil regulatory proceeding or formal civil investigation against any Insured Person, or against any Insured Organization, provided the formal civil administrative or formal civil regulatory proceeding or formal civil investigation is initially made against both an Insured Person and the Insured Organization, and commenced by the receipt of a:
>
>    a. notice of filed charges, investigative order, or similar document;
>
>    b. written notice identifying such Insured Person as a target of an investigatory authority; or
>
>    c. Wells Notice from the SEC that it may commence an enforcement action against such Insured Person;

It does not appear that the SEC Investigation is a Claim against General Cable.  In particular, the SEC Investigation is not a civil formal investigation "initially made against *both* an Insured Person and the Insured Organization" (emphasis added).   Rather, the formal order of investigation was issued to General Cable, the SEC Investigation is captioned *In the Matter of General Cable Corporation*, HO-11998, and we are unaware of any formal civil investigation that has been initiated against an Insured Person.  Accordingly, the SEC Investigation does not meet the criteria of Section III.B.4.

A Claim also means "a written demand . . . against an Insured for . . . non-monetary relief . . . ."  However, the formal order of investigation does not demand anything from General Cable, and subpoenas issued as part of the SEC Investigation do not seek "relief."  In short, the SEC Investigation is not a Claim made against an Insured Organization.

*Reservation of Rights*

Travelers expressly reserves its rights with respect to certain provisions, conditions, or exclusions that may apply to these matters.

Under Endorsement PCDO-10201:

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 9

The [sic] replaces section *IV. EXCLUSIONS*, B. EXCLUSIONS APPLICABLE TO INSURING AGREEMENTS A, C AND E AND TO ADDITIONAL BENEFITS ONLY:

1.  FRAUD

    The Company will not be liable for Loss for any Claim for any deliberately fraudulent act or omission, or any willful violation of any law or regulation, if a final non-appealable adjudication adverse to the Insured in any proceeding other than a proceeding initiated by the Company establishes that:

    a.  such Insured Person, with respect to Insuring Agreements A or E, and section *II. ADDITIONAL BENEFITS*; or

    b.  any Executive Officer or the Insured Organization, with respect to Insuring Agreement C,

committed such an act, omission, or willful violation.

2.  PERSONAL PROFIT

    The Company will not be liable for Loss for any Claim based upon or arising out of an Insured gaining any profit, remuneration, or financial advantage to which such Insured was not legally entitled, if a final non-appealable adjudication adverse to the Insured in any proceeding other than a proceeding initiated by the Company establishes that such Insured was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any Securities Claim for a violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended.

Travelers reserves its rights to the extent a final non-appealable adjudication arising from the submitted matters establishes a deliberately fraudulent act or omission, willful violation of any law or regulation, or profit, remuneration, or final advantage not legally entitled.

Section V.N. of the Policy states that Travelers relied upon statements and representations made in the Application, and the Insureds represent and agree to their accuracy. Application is defined to include SEC filings in the twelve months leading up to the Policy Period. Section V.N. states:

[T]he Insureds agree that in the event any such statements or representations in the Application are untrue or inaccurate and materially affect either the acceptance of the risk or the hazard assumed by the Company, then no coverage will be afforded under this Policy with respect to the following Insureds for any Claim based upon or arising out of the information that was not truthfully or accurately disclosed in the Application (whether or not the Insured or Executive Officer knew of such untruthful or inaccurate disclosure in the Application) with respect to any of the following Insureds:

1. any Insured Person, under Insuring Agreements A or E, who knew the information that was not truthfully or accurately disclosed in the Application;

2. the Insured Organization, under Insuring Agreement B, to the extent it indemnifies any Insured Person referenced in N.1. above; and

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 10

     3. the Insured Organization, under Insuring Agreements C or D, if any Executive Officer knew the information that was not truthfully or accurately disclosed in the Application.

There were errors in certain General Cable SEC filings, requiring restatements.   Travelers reserves its rights under Section V.N. and the definition of Application accordingly.

Travelers reserves all of its rights under the definition of Loss, defined in relevant part to mean the amount of any:

     damages, judgments, settlements, pre-judgment and post-judgment interest, and Defense Expenses; provided, with respect to the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by any Insured, Loss only includes such damages to the extent they are insurable under the law of any jurisdiction that is most favorable to the insurability of such damages and has a substantial relationship to the Insured, the Claim, the Company, or this Policy[.]

Loss, other than Defense Expenses, explicitly does not mean any of the following:

    1.  any amount that an Insured is absolved from payment;

    2.  any amount that constitutes tax, fines, or penalties; provided, Loss includes civil penalties assessed against any Insured Person pursuant to section (2)(g)(2)(B) of the Foreign Corrupt Practices Act of 1977, as amended;

    3.  any amount that constitutes the cost of complying with any order for, grant of, or agreement to provide injunctive or non-monetary relief;

    4.  any increased amount in the price or consideration paid, or proposed to be paid, for any actual or attempted acquisition of all or substantially all of the ownership interest in, or assets of, an entity, or merger with any entity;

    5.  any amount that constitutes disgorgement or loss that is uninsurable under the law pursuant to which this Policy is construed; provided, the Company will not assert that any amount of a judgment or settlement in the Securities Claim for a violation of section 11 or section 12 of the Securities Act of 1933, as amended, including Defense Expenses attributable to such Claim, constitutes disgorgement or other uninsurable loss.

Please note that the Derivative Action seeks injunctive relief, which is not covered under the definition of Loss.

*General Cable's Indemnification Obligations*

As noted above, Travelers does not make any coverage determinations for Maria Cidre and Mathias Sandoval herein.   However, they are named in the Derivative Action and received subpoenas from the SEC.   We understand that General Cable does not believe it has an obligation to indemnify Sandoval, and has yet to determine whether it will indemnify Cidre.

Please know that Section V.D. of the Policy states:

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 11

> Regardless of whether Loss for any Claim against an Insured Person is actually indemnified, Insuring Agreement B and E and the associated Retention set forth in ITEM 5 of the Declarations will apply to any Loss that the Insured Organization, or any Outside Entity, is legally permitted to indemnify, whether or not actual indemnification is made, unless such Insured Organization or such Outside Entity fails to provide such indemnification solely because of its Financial Insolvency.
>
> The security holder and board of director resolutions, articles of incorporation, bylaws, certificate of incorporation, charter, and other similar organizational documents of the Insured Organization and any Outside Entity are deemed to provide indemnification for Loss to the fullest extent permitted by law.

Further, Endorsement PCDO-10201 states in part:

> Any advancement of covered Loss amounts by the Company within the applicable Retention on behalf of any Insured Person pursuant to the preceding paragraph is further subject to the following conditions: (i) such payments by the Company will reduce, and may exhaust, the Limits of Liability set forth in Item 5 of the Declarations; (ii) the Company's advancement of Loss on behalf of an Insured Person does not waive or modify the provisions set forth in section V.D. of the Policy; and (iii) the Company will be subrogated to the Insured Person's rights of recovery against the Insured Organization for any amounts owed to the Insured Person by the Insured Organization.

If Travelers determines that coverage is afforded to any individuals that General Cable is not indemnifying, understand that Insuring Agreement B of the Policy, which has a $750,000 Retention for Securities Claims, would apply because it appears that General Cable and/or its Subsidiaries are legally permitted to advance costs and indemnify their officers and directors under the law, and their bylaws are deemed to provide indemnification. In particular, Section 145 of the Delaware General Corporation Law states in relevant part:

> [a] corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation . . . against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding . . . .

As a result, Travelers requests confirmation on which individuals named in the submitted matters are not being indemnified by General Cable and/or its Subsidiaries, and General Cable's basis for not advancing their defense costs under the terms of the Policy and state law. Travelers reserves all of its rights under the Policy to the extent that General Cable is not indemnifying or advancing defense costs to individuals in these matters.

<u>Defense Arrangements</u>

Travelers has no duty under the Policy to defend any Claim. The Insureds have the duty to defend any Claim made against them. The Insureds agree not to settle or offer to settle any Claim, or incur any Defense Expenses in connection with any Claim, without Travelers' written consent; provided, that if the Insureds are able to fully and finally settle or otherwise dispose of any Claim, including Defense Expenses, for an amount not to exceed the applicable Retention

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 12

set forth in ITEM 5 of the Declarations, the Company's consent will not be required.  Travelers is not liable for any settlement or Defense Expenses to which it has not consented when such consent is required.

The Insureds also agree not to assume any contractual obligation, stipulate to any judgment, or admit any liability with respect to any Claim without Travelers' written consent, and Travelers will not be liable for any such assumed obligation, stipulated judgment, or admission without such written consent.  Please know that Travelers has the right to effectively associate with, and be consulted with in advance by, the Insureds regarding substantive defense strategies and settlement negotiations.

Travelers appreciates the copies of defense invoices that have been provided to date.  Please continue to forward copies of all invoices as they are issued by defense counsel.  Travelers also requests a litigation report summarizing the merits of plaintiffs' claims, viability of defenses, damages, expectations for discovery, and likely motion practice.  Following receipt of the initial litigation report, please ensure that defense counsel provides us with regular reports concerning the status of the cases, and notice of any material developments.

Conclusion

In sum, the Securities Class Action and Derivative Action appear to be Claims made against Insureds, subject to a reservation of rights.  However, the SEC Investigation is not a Claim against the Insured Organization, and Travelers is not liable to pay General Cable's costs associated with the SEC Investigation under the Policy.

We understand that you would like to meet with Travelers to discuss coverage for the submitted matters.  Travelers is willing to meet, and asks that you provide us with possible dates in the near future.

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, exclusions, or Endorsements of the Policy.  Nothing in this letter is intended to, or does, waive any of Travelers' rights, privileges, or defenses under the Policy, at law, or in equity, all of which are expressly reserved.  Travelers continues to expressly reserve the right to alter, supplement, and modify its coverage determination as other or additional information may become available.

Should you have any questions or concerns, please do not hesitate to contact us.

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Matthew Collibee

KAUFMAN BORGEEST & RYAN LLP

2497756

General Cable Corp.
Travelers Ref. No. X1216977; KBR File No. 187.326
Page 13

cc:     via e-mail only

        George Carver
        gcarver@travelers.com

        David Finz
        david.finz@marsh.com

        Shamica Aleong
        Shamica.aleong@marsh.com

KAUFMAN BORGEEST & RYAN LLP

90000 SERIES
30% P.C.W.

Exhibit K

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT K**

 **MARSH**

Colleen Erwin
mCAR Advisor
Marsh USA , Inc
1166 Avenue of the Americas
New York, NY 10036-2774
(212) 345-6626  Fax (212) 345-6810
Colleen.Erwin@marsh.com
www.marsh.com

June 13, 2014

Claims Department
Travelers
385 Washington Street
Mail Code NB03F
St. Paul, MN 55102

INSURED:          GENERAL CABLE CORPORATION
MATTER:           DISCLOSRE OF ANGOLA INVESTIGATION
MARSH FILE NUMBER:    14NYC_130391

Dear Sir/Madam:

On behalf of the insured, and in accordance with the reporting provisions of the referenced Policy, we give notice that the referenced matter has been presented to the insured.

Please refer to the following for your policy information:

| Policy Number | Policy Term | Layer | Participation |
|---|---|---|---|
| 105518156<br>TRAVELERS CAS & SURETY OF AMER | 11/30/2012 -<br>11/01/2014 | $15,000,000 Primary | $15,000,000 |
| CUG 35536<br>OLD REPUBLIC INSURANCE CO | 11/30/2012 -<br>11/01/2014 | $10,000,000 X<br>$15,000,000 | $10,000,000 |
| XMI1200611<br>SCOTTSDALE INDEMNITY COMPANY | 11/30/2012 -<br>11/01/2014 | $10,000,000 X<br>$25,000,000 | $10,000,000 |
| QB092412<br>BEAZLEY SYNDICATES 2623 & 623 AT<br>LLOYD'S | 11/30/2012 -<br>11/01/2014 | $10,000,000 X<br>$35,000,000 | $10,000,000 |
| 6803-6194<br>FEDERAL INSURANCE CO | 11/30/2012 -<br>11/01/2014 | $10,000,000 X<br>$45,000,000 | $10,000,000 |

This matter is reported under any and all applicable policies whether or not cited.

The Insured advises that on January 21, 2014, it disclosed that the company is in the process of reviewing certain commission payments made by its subsidiary in Angola. The review is being conducted under the oversight of the Audit Committee of the Board of Directors with the assistance of external counsel. Due to the ongoing nature of the review, the Insured has not yet been able to determine whether such commission payments were inconsistent with applicable U.S. or international laws and regulations. Based on the information gathered to date,  the Insured cannot predict the duration or the outcome of this review. If there is a finding that one or more payments were inconsistent with applicable laws and regulations, the Insured may be subject to monetary or other sanctions which could be substantial.

The information contained in this document is confidential, may be privileged, and is intended for the use of the individual or entity named above. If you are not the intended recipient, please do not read, copy, forward, use, or store this document or any of the information contained herein.

Insured point of contact is Steve Messinger and he can be reached at smessinger@generalcable.com. Kindly **acknowledge** receipt of this correspondence to the **undersigned and the insured, noting your file number and the name and e-mail address of the claim handler** assigned to this matter.

Please address all **further** inquiries and correspondence to the insured contact, who is copied below, and to the Marsh Claim Advocate, David Finz, at david.finz@marsh.com, 212 345 9585.

Please include the **Marsh file number** on all correspondence related to the above claim.

Very truly yours,

**Colleen Erwin**

Colleen Erwin
mCAR Advisor

cc:

Stephen Messinger
Vice President, Risk Management
General Cable Corporation
4 Tesseneer Drive
highland heights, KY 41076-9753
Phone: 859-572-8918
Fax: 859-572-6877
eMail: smessinger@generalcable.com

Robert Siverd
Executive Vice President & General Couns
General Cable Corporation
4 Tesseneer Drive
Highland Heights, KY 41076-9753
Phone: 859 572-8890
Fax: 859 572-8444
eMail: rsiverd@generalcable.com

David Finz
Senior Vice President
Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Phone: 212 345 9585
eMail: david.finz@marsh.com

Andre Oreggio
Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
eMail: Andre.OReggio@marsh.com



KLEER-FAX
RECYCLED ♻

*90000 SERIES*
*30% P.C.W.*

Exhibit L

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT L**

## Press Release

# Wire and Cable Manufacturer Settles FCPA and Accounting Charges

**FOR IMMEDIATE RELEASE**
**2016-283**

*Washington D.C., Dec. 29, 2016* — The Securities and Exchange Commission today announced that Kentucky-based General Cable Corporation agreed to pay more than $75 million to resolve parallel SEC and U.S. Department of Justice investigations related to its violations of the Foreign Corrupt Practices Act (FCPA). The company agreed to pay an additional $6.5 million penalty to the SEC to settle separate accounting-related violations.

According to the SEC's orders instituting settled administrative proceedings, General Cable's overseas subsidiaries made improper payments to foreign government officials for a dozen years to obtain or retain business in Angola, Bangladesh, China, Egypt, Indonesia, and Thailand. General Cable's weak internal controls also failed to detect improper inventory accounting at its Brazilian subsidiary, causing the company to materially misstate its financial statements from 2008 to the second quarter of 2012.

"General Cable operated globally without the effective compliance programs and internal controls necessary to proactively address corruption risks and accounting errors," said Stephanie Avakian, Acting Director of the SEC Enforcement Division.

In the FCPA case, General Cable agreed to pay more than $55 million in disgorgement and interest to the SEC as well as a penalty of nearly $20.5 million in a non-prosecution agreement announced today by the Justice Department. General Cable must self-report its FCPA compliance efforts for the next three years. General Cable neither admitted nor denied the SEC's findings while agreeing to pay the $6.5 million penalty to settle the accounting violations. The SEC considered General Cable's self-reporting, cooperation, and remedial acts when determining the settlements.

The SEC also charged Karl J. Zimmer, General Cable's then-senior vice president responsible for sales in Angola. Zimmer agreed to pay a $20,000 penalty without admitting or denying the SEC's findings that he knowingly circumvented internal accounting controls and caused FCPA violations when he approved certain improper payments.

The SEC's investigation found no personal misconduct by General Cable's former CEO Gregory B. Kenny and former CFO Brian J. Robinson, who returned $3.7 million and $2.1 million in compensation received from the company during the period when the accounting violations occurred. Therefore, it wasn't necessary for the SEC to pursue a clawback action under Section 304(a) of the Sarbanes-Oxley Act.

The SEC's investigation, which is continuing, is being conducted by Rachel Nonaka, Mark Oh, Colin Rand, Eric Hubbs, David Johnson, and Olivia Choe. The case is being supervised by Anita Bandy, Kristen Dieter, and Bridget Fitzpatrick. The SEC appreciates the assistance of the U.S. Department of Justice, Federal Bureau of Investigation, and Portuguese Securities Market Commission.

*###*

## Related Materials

- SEC order against General Cable - Accounting

- SEC order against General Cable - FCPA

- SEC order against Karl J. Zimmer

30% P.C.W.
90000 SERIES
RECYCLED
KLEER-FAX


EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT M**

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 79702 / December 29, 2016**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 3840 / December 29, 2016**

**ADMINISTRATIVE PROCEEDING**
**File No.  3-17754**

| | |
|---|---|
| In the Matter of<br><br>**GENERAL CABLE CORPORATION,**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against General Cable Corporation ("GCC" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, Respondent admits the jurisdiction over it and the subject matter of these proceedings, and consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that

### Summary

1.      This matter concerns improper inventory accounting and disclosure violations by GCC, a global manufacturer of copper, aluminum, and fiber optic wire and cable products based in Highland Heights, Kentucky.

2.      From 2008 to the second quarter of 2012, GCC materially misstated its financial statements due to improper inventory accounting at its Brazil subsidiary that went undetected due to the company's internal accounting controls failures.  During this period, certain Brazilian accounting employees manipulated the company's accounting systems, which GCC executives knew were highly manual and presented financial reporting risks, by entering false entries for inventory values to cover up missing copper inventory from the subsidiary's manufacturing plants. When the improper accounting was reported to GCC's then-Rest of World ("ROW") segment Chief Executive Officer and Chief Financial Officer in January 2012, they actively concealed the inventory overstatement from GCC's executive management.  Instead, the ROW CEO and ROW CFO overrode internal accounting controls and issued or passed on directives to employees to destroy documents about the missing inventory, signed false sub-certifications of financial statements, and failed to take corrective action to ensure that the accounting errors did not continue.

3.      In October 2012, GCC announced that it had identified these inventory accounting issues, and in March 2013, GCC restated its financial statements from 2008 to the second quarter of 2012.  During this period, the missing inventory in Brazil caused GCC to materially overstate its inventory by $46.7 million and overstate its net income available to common shareholders by 21.6%, 11.3%, and 29.8% for the annual periods ended December 31, 2011, 2010, and 2009, and 8.8% and 13.8% for the quarterly periods ended June 30 and March 31, 2012, respectively.

### Respondent

4.      **GCC** is a publicly traded company headquartered in Highland Heights, Kentucky. GCC is a global manufacturer of copper, aluminum, and fiber optic wire and cable products. During the relevant period, GCC maintained operations in three segments, North America, Europe & Mediterranean ("E&M," now known as the Europe segment), and ROW (split into the Latin America and Asia Pacific segments in 2014).  GCC's common stock is registered with the Commission under Section 12(b) of the Exchange Act, and GCC files annual and quarterly reports under Section 13(a) of the Exchange Act and related rules.  GCC's common stock trades on the New York Stock Exchange under the ticker symbol "BGC."

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in these or any other proceedings.

<u>Relevant Entities</u>

5.        **General Cable Brasil Indústria e Comércio de Condutores Elétricos Ltda.** (current name of Phelps Dodge Brasil Ltda., acquired in 2007), and **General Cable do Brasil Ltda. ("GC Brasil")** are indirect subsidiaries of GCC in its ROW (from 2007 to 2014) and Latin America (from 2014 to present) segments, and manufacture and sell GCC's products for its domestic market.  In this Order GCC's Brazil operations through these two subsidiaries are referred to collectively as **"GCC Brazil."**

<u>Facts</u>

**GCC Brazil's Improper Inventory Accounting**

6.        In October 2007, following the acquisition of Phelps Dodge International Corp. ("PDIC"), GCC created the ROW reporting segment, with ROW's management based in Doral, Florida.  GCC Brazil, as part of ROW's Latin America operations, was one of the largest and most significant operations that were reported in ROW's financial statements.  During the relevant period, GCC Brazil maintained two manufacturing facilities, Serra and Poços de Caldas ("Poços").

7.        From at least 2008 to mid-2012, GCC Brazil materially understated cost of sales and overstated copper inventory balances on its books and records, which were consolidated into GCC's financial statements.  The inventory overstatement, leading to material financial reporting errors, was due to both missing inventory and accounting errors within GCC Brazil's enterprise resource planning ("ERP") system and its implementation.  In covering up the missing inventory, certain cost accounting personnel, who controlled entries into GCC Brazil's general ledger as well as controlled the accounting for inventory, manipulated the ERP system to reflect inventory that did not exist.

8.        After conducting an internal investigation, GCC determined that the inventory accounting errors at GCC Brazil were material and would require a restatement of certain of its previously issued financial statements. For the years ended December 31, 2011, 2010, 2009, and 2008, and for the three months ended March 30, 2012 and six months ended June 29, 2012, cost of sales was understated by $17.9 million, $8.3 million, $5.6 million, $7.1 million, $2.7 million and $6.2 million, respectively.  As of December 31, 2011, 2010, 2009 and 2008, March 30, 2012 and June 29, 2012 inventory balances were overstated by $40.0 million, $27.0 million, $17.4 million, $8.7 million, $43.7 million, and $43.5 million, respectively.  In addition, due to accounting errors at one of the Brazilian facilities that occurred before GCC's acquisition of PDIC in 2007, GCC also overstated inventory in its allocation of the purchase price among assets acquired, resulting in an understatement of goodwill.  The understated goodwill and overstated inventory associated with the acquisition of PDIC in the fourth quarter of 2007 was $3.4 million.

9.        The inventory accounting errors at GCC Brazil caused GCC to overstate its net income available to common shareholders by 21.6%, 11.3%, and 29.8% for the annual periods ended December 31, 2011, 2010, and 2009, and 8.8% and 13.8% for the quarterly periods ended June 30 and March 31, 2012, respectively.

3

10.     GCC Brazil's improper inventory accounting went undetected by GCC for several years because its inventory accounting systems were highly manual and decentralized, and lacked adequate controls. As a result, the lapses in the systems were exploited by certain GCC Brazil cost accounting personnel. Although GCC Brazil's inventory accounting systems were centralized in its ERP system, its cost accounting personnel were able to falsify GCC Brazil's general ledger by manually calculating inventory values in a spreadsheet module and then feeding those values into the general ledger. The general ledger, therefore, contained falsely overstated inventory values. Those values were not reconciled with GCC Brazil's actual inventory (*e.g.,* reels of raw copper metal and finished goods). These actions enabled the cost accounting personnel to make improper entries in the general ledger without appropriate review by GCC Brazil's management. The false entries were designed to conceal accounting errors and missing inventory, resulting in overstated inventory balances on the general ledger.

11.     The lack of segregation of responsibilities for making and approving manual journal entries further enabled the manipulation to occur and go undetected. Although GCC executive management was unaware that inventory accounting for Brazil was overstated during the relevant period, it was aware that the ERP system, which was widely used by several countries within ROW, was highly manual, unevenly implemented throughout ROW, and was not subject to centralized oversight, creating financial reporting risks.

12.     In late 2011, while completing newly required tax documentation for local regulators, GCC Brazil's Controller ("Brazil Controller") discovered significant inconsistencies between GCC Brazil's general ledger and supporting documentation for intercompany sales. The Brazil Controller, in consultation with GCC Brazil's CFO ("Brazil CFO"), reviewed intercompany sales in 2011 and concluded in December 2011 that GCC Brazil's inventory was overstated and suspected it was due to accounting errors and an inventory theft involving the primary Brazil cost accountant.

13.     A number of deficient internal accounting and risk management controls prevented GCC Brazil from detecting this scheme for years: (a) physical controls at Serra to account for or protect inventory were inadequate; (b) access to IT systems in GCC Brazil was not effectively controlled; (c) GCC Brazil failed to properly reconcile inventory values to the general ledger balance; and (d) GCC Brazil lacked proper segregation of duties as cost accounting personnel manually made entries to the inventory sub-ledger without further review or verification by other personnel.

**ROW Executives Overrode Controls and Concealed the Inventory Errors**

14.     From at least January 26, 2012 to September 28, 2012, ROW's CEO and CFO overrode controls and concealed these issues from GCC's executive management, and internal and external auditors, and instructed others at GCC Brazil to do the same, despite evidence that the magnitude of the potential accounting errors was increasing. As a result of their concealment, GCC filed its Form 10-K for the fiscal year ended December 31, 2011, and Forms 10-Q the fiscal quarters ended March 31, 2012, and June 29, 2012, that included materially false financial information.

15.     On a video conference call in late January 2012, the Brazil CFO and Brazil Controller (collectively "Brazil Finance Managers") reported to ROW's CEO and CFO that they had conducted an investigation and had found evidence that GCC Brazil's inventory, valued at $103.78 million as of December 31, 2011, was overstated by at least $12 million, a material shortfall for Brazil's financial reporting. The Brazil Finance Managers further reported that they believed the overstatement was due to accounting errors and/or the theft of inventory by GCC Brazil cost accounting personnel, which had occurred throughout 2011 and possibly in prior periods.

16.     On the video call, following the disclosure by the Brazil Finance Managers, ROW's CEO informed the participants that he would not disclose the accounting errors or potential theft to GCC's executive management and instructed them to keep the matter confidential. ROW's CEO and CFO failed to take any significant remedial or corrective action to ensure that GCC Brazil's financial statements were accurate or to address the concern that cost accounting personnel had circumvented GCC's internal accounting controls.

17.     From February to September 2012, ROW's CEO and CFO took affirmative steps to mislead or conceal GCC Brazil's inventory accounting errors from GCC's executive management, and internal and external auditors, including, for example, the following: (a) issuing or supporting a directive to destroy all relevant company records concerning the missing inventory; (b) submitting to GCC false sub-certifications of ROW's financial statements for the quarters ended December 31, 2011, March 31, 2012, and June 29, 2012, and instructing the Brazil CFO to do the same; (c) instructing the Brazil Finance Managers not to disclose the inventory accounting errors to members of GCC's Internal Audit, who were onsite in early 2012; (d) with respect to ROW's CEO, failing to include the accounting errors in monthly reports submitted to GCC executive management; and (e) failing, until May 2012, to provide necessary support to investigate the inventory overstatement reported by Brazil Finance Managers.

18.     In mid-May 2012, ROW's CFO eventually authorized a ROW cost accountant (located outside Brazil) to assist the Brazil Finance Managers' ongoing investigation of the inventory accounting issues. In less than two weeks of analysis, the accountant not only corroborated the Brazil Finance Managers' findings, but reported to ROW's CFO that inventory was improperly overstated by a significant magnitude. The accountant, in this regard, notified ROW's CFO, in both an e-mail and on a videoconference call including the Brazil Finance Managers, that the magnitude of the inventory accounting errors was approximately $30 million.

19.     Despite this increasing magnitude of the overstatement and its material impact on GCC's financial statements, ROW's CFO continued to disregard the mounting evidence and merely instructed the cost accountant to reassess and report back in six weeks.

20.     On July 10, 2012, the cost accountant submitted a written report to ROW's CFO confirming that GCC Brazil's inventory was overstated by $29 million due to significant accounting errors and internal control deficiencies. ROW's CEO and CFO, however, continued to conceal the inventory errors from GCC's executive management and, on August 3, 2012, GCC filed its Form 10-Q for the quarter ended June 30, 2012, which again materially understated costs of sales and overstated inventory.

5

21.     Given the decentralized reporting structure of GCC's ROW segment, over which GCC's executive management had little actual oversight, the Brazil Finance Managers regarded ROW's CEO and CFO as the highest level to whom they could report their concerns, and believed that they did not have direct access to GCC executive management.  ROW's CEO and CFO further reinforced this belief by discouraging the country-level financial managers, including the Brazil Finance Managers, from reporting issues outside of their direct reporting chain.

22.     In late September 2012, the Brazil CFO informed the ROW CEO and CFO that, despite the ROW CEO and CFO's continued protests, she intended to disclose the accounting overstatement to GCC's executive management and external auditors, who were preparing for the upcoming fiscal year audit.  Faced with no other choice, the ROW CEO reported the matter to GCC's executive management, who immediately directed an internal investigation of the inventory issues.

### Restatement No. 1

23.     On October 29, 2012, GCC announced that it had identified inventory related accounting errors within the ROW segment, and that its previously issued financial statements for fiscal years 2009 through 2011, and for the interim periods ended March 31 and June 30, 2012, should not be relied upon.  On March 1, 2013, GCC, after completing the internal investigation, restated its financial statements as follows:  For the annual periods ended December 31, 2011, 2010, 2009, and 2008, and for the quarterly periods ended March 30 and June 29, 2012, cost of sales was understated by $17.9 million, $8.3 million, $5.6 million, $7.1 million, $2.7 million and $6.2 million, respectively.  For the same periods above, inventory balances were overstated by $40.0 million, $27.0 million, $17.4 million, $8.7 million, $43.7 million, and $43.5 million, respectively.

### Restatement No. 2

24.     GCC Brazil also failed to implement and maintain sufficient internal accounting controls relating to revenue recognition, which ultimately caused GCC to restate its financial statements a second time in January 2014.  Following the detection and internal investigation of GCC Brazil's inventory accounting errors, GCC identified inappropriate revenue recognition practices with regard to bill and hold sales at GCC Brazil.  Specifically, GCC found evidence that revenue recognition criteria under U.S. Generally Accepted Accounting Principles with respect to bill and hold sales were not met in a number of instances.

25.     On October 15, 2013, GCC concluded that due to the accounting errors related to (i) revenue recognition in connection with historical bill and hold transactions for aerial transmission projects in Brazil and (ii) value added tax ("VAT") assets, GCC's previously issued consolidated financial statements for the fiscal years 2008 through 2012 and the interim periods during those years, and the interim financial statements as of and for the three months ended March 29, 2013 should no longer be relied upon.  On January 21, 2014, GCC restated its results for the relevant quarters and fiscal year-ends.

## Legal Standards and Violations

26.     Under Section 21C(a) of the Exchange Act, 15 U.S.C. § 78u-3(a), if the Commission finds that any person is violating, has violated, or is about to violate any provision of the Exchange Act, or any rule or regulation thereunder, the Commission may publish its findings and enter an order requiring such person, and any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to such violation, to cease and desist from committing or causing such violation and any future violation of the same provision, rule, or regulation.

27.     As a result of the conduct described above, GCC violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require an issuer to file with the Commission accurate annual, current, and quarterly reports.  15 U.S.C. § 78m; 17 C.F.R. §§ 240.13a-1, 13a-11 & 13a-13.  GCC also violated Exchange Act Rule 12b-20, 17 C.F.R. § 240.12b-20, which requires an issuer in its periodic reports to add such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

28.     GCC further violated Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), under which every issuer which has a class of securities registered pursuant to Section 12 of the Exchange Act is required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

29.     GCC further violated Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), under which every issuer which has a class of securities registered pursuant to Section 12 of the Exchange Act is required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

## GCC's Self-Reporting, Cooperation, and Remedial Efforts

30.     In determining to accept GCC's Offer, the Commission considered GCC's self-reporting, substantial cooperation, and remedial efforts.  GCC promptly self-reported the potential inventory accounting errors in October 2012 after it retained outside counsel to conduct an internal investigation.  GCC also self-reported other accounting issues as its investigation progressed, and regularly updated the staff on the investigation.

31.     GCC further provided complete and timely cooperation with the staff by providing detailed presentations on the key findings of the investigation, and promptly producing all relevant documents and information (including thousands of documents translated into English), chronologies, key document binders, interview downloads, and forensic accounting

7

analyses.  GCC also made its current or former employees available for interviews by the staff upon request, including facilitating certain employees to travel to the United States from abroad for interviews.

32.    GCC also undertook extensive remediation.  GCC has terminated or taken disciplinary actions against employees who were involved in the accounting issues.  All of GCC's executive management during the relevant time period has been replaced.  GCC has restructured its financial reporting to require its regional finance departments to report directly to GCC's CFO and Controller.

33.    Finally, GCC restructured its compliance policies and programs by appointing a Chief Compliance Officer who reports directly to GCC's CEO and Audit Committee.  Under this restructuring, GCC has enhanced its training of sales and accounting personnel on compliance policies and expectations, implemented regular reviews of accounting adjustments, improved the inventory reconciliation process and security procedures, developed a global information technology strategy for risk assessment and control for financial reporting, and instituted evaluations for compliance performance through performance indicators and audits.

### Undertakings

34.    Respondent has undertaken to cooperate fully with the Commission in any and all investigations, litigation, or other proceedings relating to or arising from the matters described in this Order.  In connection with such cooperation, Respondent shall:

1.    Produce, without service of a notice or subpoena, any and all non-privileged documents and other information requested by the Commission staff subject to any restrictions under the law of any foreign jurisdiction;

2.    Use its best efforts to cause its current or former officers, employees, and directors to be interviewed by Commission staff at such times and places as the staff reasonably may direct;

3.    Use its best efforts to cause its current or former officers, employees, and directors to appear and testify without service of a notice or subpoena in such investigations, depositions, hearings, or trials as may be requested by the Commission staff; and

4.    In connection with any testimony of Respondent's officers, employees, and directors to be conducted at deposition, hearing, or trial pursuant to a notice or subpoena, Respondent

a.    Agrees that any such notice or subpoena for the appearance and testimony of Respondent's officers, employees, and directors may be served by regular or electronic mail on: Christian J. Mixter, Esq., Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, N.W., Washington, DC 20004, christian.mixter@morganlewis.com, with a copy to Emerson C. Moser, Esq., Senior Vice President, General Counsel and Corporate Secretary, General Cable

8

Corporation, 4 Tesseneer Drive, Highland Heights, KY 41076-9753, emoser@generalcable.com;

        b.      Agrees that any such notice or subpoena for the appearance and testimony of Respondent's officers, employees, and directors in any action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 21C of the Exchange Act, GCC cease-and-desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

B.      GCC shall, within 30 days of the date of entry of this Order, pay a civil monetary penalty of $6,500,000 to the Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment of the civil monetary penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

C.      Payment must be made in one of the following ways:

      (1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

      (2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

      (3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

      Payments by check or money order must be accompanied by a cover letter identifying General Cable Corporation as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Gerald W. Hodgkins, Division of Enforcement, Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.

D.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, Respondent shall not argue that Respondent is entitled to, nor shall Respondent benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that Respondent shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.


Brent J. Fields
Secretary

10

KLEER-FAX
RECYCLED ♻

*90000 SERIES*
*30% P.C.W.*

EFiled:  May 10 2024 02:05PM
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT N**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 79703 / December 29, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17755

| | |
|---|---|
| In the Matter of<br><br>    **GENERAL CABLE<br>    CORPORATION,**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against General Cable Corporation ("GCC" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondent admits the jurisdiction over it and the subject matter of these proceedings, and consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that

### Summary

1.      This matter concerns violations of the anti-bribery, books-and-records, and internal accounting controls provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA") by GCC, a global manufacturer of copper, aluminum, and fiber optic wire and cable products based in Highland Heights, Kentucky.

2.      Between 2003 and 2015, GCC's subsidiaries made improper payments of approximately $19 million to foreign government officials in Angola, Thailand, China, Indonesia, Bangladesh, and Egypt, generating illicit profits over $51 million on sales to state-owned enterprises ("SOEs").  GCC made these payments directly to foreign government officials, or through third-party agents or distributors, in the form of sales commissions, rebates, discounts, and other fees, who passed on payments to foreign government officials in connection with SOE business.  Some of these payments were made even though employees of GCC's subsidiaries informed executives and employees at GCC that they suspected that payments to third parties were being used for improper purposes, including potential bribery.

3.      GCC failed to require or ensure, among other things, (a) anticorruption due diligence on the retention of third-party agents and distributors; (b) proof that services had been rendered by third parties before payment could be made to them; and (c) oversight of the payment process to ensure that payments were made pursuant to GCC's policies or contractual terms, or that payments were reasonable and legitimate.  GCC failed to address these risks, which allowed the conduct to continue.  And GCC's subsidiaries improperly recorded these payments as legitimate business expenses on their books and records and financial statements, which were consolidated into GCC's financial statements filed with the Commission.

### Respondent

4.      **GCC** is a publicly traded company headquartered in Highland Heights, Kentucky. GCC is a global manufacturer of copper, aluminum, and fiber optic wire and cable products. During the relevant period, GCC maintained operations in three segments, North America, Europe & Mediterranean ("E&M," now known as the Europe segment), and Rest of World ("ROW," split into the Latin America and Asia Pacific segments in 2014).  GCC's common stock is registered with the Commission under Section 12(b) of the Exchange Act, and GCC files annual and quarterly reports under Section 13(a) of the Exchange Act and related rules.  GCC's common stock trades on The New York Stock Exchange under the ticker symbol "BGC."

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in these or any other proceedings.

<u>Relevant Entities</u>

5.      **General Cable Celcat, Energia e Telecomunicações, S.A. ("Celcat")** is an indirect GCC subsidiary located in Portugal and acquired by GCC in June 1999. Celcat manufactures and sells GCC's wire and cable products primarily in the E&M segment.

6.      **General Cable Condel, Cabos de Energia e Telecomunicações, S.A. ("Condel")** is an indirect GCC subsidiary located in Angola and acquired by GCC in June 1999. Condel's direct parent company was Celcat. Condel manufactured and sold GCC products primarily to entities owned by the Angolan government. In October 2014, GCC announced a plan to exit its operations in the Africa and Asia Pacific regions, including Condel.

7.      **Phelps Dodge International (Thailand) Limited ("PDTL")** was an indirect GCC subsidiary acquired by GCC in October 2007. PDTL manufactured and sold GCC products in Southeast Asia and the Middle East. In August 2015, GCC sold PDTL as part of its plan to exit operations in the Africa and Asia Pacific regions.

8.      **General Cable (Tianjin) Alloy Products Company Limited ("GC China")** was an indirect GCC subsidiary acquired by GCC in December 2012, and manufactured and sold GCC products for its domestic market.

9.      **General Cable Egypt S.A.E. ("GC Egypt")** was an indirect subsidiary of GCC acquired by GCC in September 2010, and manufactured and sold GCC's products in the E&M segment. GCC sold GC Egypt in May 2016 as part of its plan to exit operations in the Africa and Asia Pacific regions.

<u>Facts</u>

10.      At all relevant times, GCC had a code of ethics ("Code of Ethics") that prohibited its employees from offering or giving any person any payment which may be illegal or unethical. The Code of Ethics specifically prohibited any consideration given to a public official, unless authorized by law, and made specific reference to the applicability of the FCPA to GCC and its employees. It also prohibited excessive payments to third parties when the value of the consideration offered or given exceeds the reasonable value of the services performed in return. Specifically, the Code of Ethics warned that an excessive payment to an individual arranging contracts with government officials could be illegal or unethical as it might suggest that some of the payment is being channeled to government officials, or is somehow being used for improper purposes. Finally, the Code of Ethics required all transactions to be executed only with management authority, general or specific, in compliance with federal securities laws that required GCC to maintain books, records, and accounts that accurately and fairly reflect transactions, and a system of internal accounting controls designed to provide reasonable assurances that GCC's financial statements will be accurate and complete.

11.      Although GCC's Code of Ethics applied globally to its subsidiaries and employees, GCC did not provide adequate guidance or training on policies and procedures to ensure compliance with the FCPA. As a result, a number of GCC's foreign subsidiaries lacked internal accounting controls for doing business with third-party entities on sales to government customers. Further, despite signing compliance questionnaires representing that they knew and understood the

3

Code of Ethics, some of GCC's employees generally were not aware that the FCPA, as a U.S. law, applied to their operations, and failed to perform anticorruption due diligence on third-party entities, obtain written contracts with third-party entities requiring their compliance with the FCPA, and report to management transactions that raised corruption issues.

**Improper Payments in Angola**

12.     GCC subsidiaries Celcat (in Portugal) and Condel (in Angola) in GCC's E&M (Europe & Mediterranean) segment sold wire and cable products to SOEs in Angola. A majority of Celcat's and Condel's sales in Angola were to these SOEs. Celcat was the direct parent company of Condel, which was managed by a Country Manager in Angola as its most senior employee.

13.     Since at least as early as 2008, GCC's E&M segment maintained a policy governing the payment of commissions or fees to third-party entities on sales contracts. This policy required the approval of E&M's management for commissions to third-party entities greater than 5% of the value of the sales contracts. The policy also prohibited commissions over 10% of the value of the sales contracts.

14.     From 2003 to 2013, Celcat and Condel made 81 improper payments through commissions totaling over $9 million either directly to employees of SOEs in Angola, or to a third-party agent, resulting in more than $34 million in profits on Celcat or Condel's sales to SOEs in Angola, as follows:

- From May 2003 to May 2009, 38 improper payments of $459,369 were directly made to at least five employees of Angolan SOEs on sales of approximately $6.1 million. The payments ranged from 1.7 to 2% of the related sales value.

- In 2008, three commission payments of $150,156 were made to an agent of a SOE in Angola with knowledge that the payments would be passed on, in part, to officials of the SOE. The commission was 15% of the related sales value of $967,644. The agent shared the commission with two officials of the SOE.

- From May 2009 to December 2013, 40 commission payments totaling $8.7 million were made to a third-party agent ("the Agent") in Angola on sales of $80 million with knowledge that the Agent would pass a portion of the payments to Angolan SOEs. These payments were directed by Condel's Country Manager and approved by Celcat's executives. Also, in August 2013 Condel directed the Agent to purchase a sport-utility vehicle valued at $135,239 and register it in the name of an employee of an Angolan SOE.

15.     In 2004 and 2005, though ultimately not paid due to a dispute with the SOE, Celcat initially agreed to make an improper payment of $52,784 (or 1%) to an employee of an SOE on sales of approximately $5.5 million to the SOE.

16.     The commissions identified above were approved by senior management at Celcat or Condel, but the true nature of the payments were concealed from GCC's executive management.

In particular, Condel's Country Manager conceived of and orchestrated the scheme to make improper payments to employees of the SOEs in Angola.

17.     GCC's employees and agents communicated about the scheme via e-mail, among other means of communication.  For example, on October 22, 2002, a Condel senior executive wrote an e-mail to a Celcat employee stating: "I agreed with [an Angolan SOE employee] on a commission of 2% on orders placed, which at this stage will be through General Cable Condel; I propose to work through objectives, on an identical basis with [the SOE]."

18.     Similarly, on September 12, 2005, a Condel employee wrote an e-mail to a Celcat employee stating: "Everyone knew that [an Angolan government official] was being paid (if not there would be no need for the bills that come from there); when the contract was signed, this was what was agreed had to be paid."

19.     Beginning in May 2009, Celcat and Condel concealed the payments to the Angolan officials through the Agent.  Condel's Country Manager facilitated Condel's engagement of the Agent to provide purported services under a written agreement, which was approved by Celcat's CEO and CFO.  The agreement did not specify any terms and conditions except that Condel would pay the Agent "a commission of 1% of the amount of each invoice . . . [that] may be revised on a case-by-case basis."  The agreement did not contain language prohibiting the Agent from paying bribes or other illicit payments.  And Celcat and Condel used the Agent as a conduit to direct corrupt payments to Angolan officials.

20.     Under Condel's relationship with the Agent, Celcat and Condel's annual sales to the SOEs in Angola increased substantially, from approximately $6.7 million in 2009 to $23.6 million in 2012.  During this period, Condel's Country Manager exclusively controlled the relationship with the Agent, including calculating the commissions that Condel would pay to the Agent on SOE sales, and took steps to conceal the improper payments from GCC's executive management.  From 2009 to 2013, in violation of GCC's policies, Condel paid commissions to the Agent from 5 to 24% of the sales value, with an average commission rate of 16%.  Records of these commissions did not describe any services performed by the Agent; the commissions were calculated separately from sales invoices to the SOEs; and Condel's Country Manager directed the commission payments to the Agent's personal bank account.  Celcat and Condel's management violated GCC's policies and did not seek approval of the commissions to the Agent from E&M's management.

### GCC's Investigation of the Agent

21.     In September 2012, GCC's Internal Audit department ("Internal Audit") performed an on-site audit of financial and operational processes and controls at Condel.  In December 2012, Internal Audit submitted a report to GCC's executive management that identified several red flags concerning Condel's relationship with the Agent: (a) the agreement with the Agent did not include an anti-bribery clause for compliance with the FCPA; (b) the agreement with the Agent established a 1% commission, but actual commissions paid to the Agent in 2012 ranged from 8.5 to 18.5%, although E&M's policy prohibited commissions over 10%; and (c) Condel's management was not aware that contracts with agents should include language requiring compliance with the FCPA.

22.     Despite red flags that GCC's relationship with the Agent may violate anti-bribery laws and its policies, GCC's executive management failed to implement any additional internal accounting controls in response to the report until August 2013. As a result, from December 2012 to August 2013, Condel continued to make commission payments to the Agent over $1.5 million in violation of GCC's policies.

23.     In August 2013, eight months after the Internal Audit report was issued, an E&M Compliance Manager conducted an onsite review of Condel to address internal controls matters and follow up on Internal Audit's December 2012 report. The Compliance Manager identified additional red flags about Condel's relationship with the Agent, including: (a) the average commissions paid in 2012 was 18% when the agreement with the Agent specified 1%; (b) Condel's Country Manager, who exclusively managed the relationship with the Agent, directed payments to the Agent's personal bank account; (c) no proof of services performed were provided by the Agent; and (d) the customers related to the Agent were Angolan SOEs.

24.     The Compliance Manager submitted a memorandum detailing the red flags to E&M's management, including a GCC executive officer. The Compliance Manager also informed E&M's management that Condel's management may be paying bribes to the Agent or government officials on sales to SOEs.

25.     Within days, GCC's executive management commenced an internal investigation of Condel's relationship with the Agent for potential bribery of SOE officials. In October 2013, GCC's executive management instructed Celcat and Condel's management to cease payment of past due commissions to the Agent pending further investigation and without authorization by GCC's executive management.

**GCC Approves Additional Commissions to the Agent During the Investigation**

26.     In November 2013, E&M's management consulted GCC's executive management on how to proceed with proposing new business to the Angolan SOEs in light of the investigation of the Agent. E&M's management anticipated that the prohibition of commission payments to the Agent would result in a potential loss of approximately $10 million in sales to the Angolan SOEs and in approximately $5 million in termination costs. To avoid further loss of sales, E&M's management asked GCC's executive management whether Condel could continue to use the Agent in dealing with the SOEs, or whether Condel should use another agent or deal directly with the SOEs.

27.     GCC's executive management instructed that (1) Condel should terminate the Agent and transition to a new agent, but (2) to allow time to transition to the new agent, Condel could work with the existing Agent on a case-by-case basis, until the new agent is in place, for new business with the SOEs, but with "appropriate" and "proper" commission payments to the Agent. At all relevant times, E&M's policy prohibited commissions above 10%. GCC's executive management requested E&M's management to follow up on these instructions and to lay out the process for dealing with the Agent while they transition to a new agent.

28.     Shortly thereafter, in November 2013 an E&M manager approved sales contracts with the Angolan SOEs that called for commissions to the Agent from 7.5% to 18.5%. Further, in

December 2013, the E&M manager approved the payment of past due commissions of $342,613 to the Agent from 6 to 18% of the related sales contracts. These commissions violated GCC's Code of Ethics, E&M's policy on excessive payments to third-parties, and GCC executive management's instructions.

### GCC's Improper Payments in Thailand, Indonesia, and Bangladesh

<u>Improper Payments on Domestic Sales to Thai SOEs</u>

29.     From January 2008 to January 2013, GCC's subsidiary, PDTL, paid more than $5.4 million in improper payments to a Thailand company ("Thai Company"), resulting in profits of $13 million on PDTL's sales to SOEs of the Thai government as follows:

- From January 2008 to December 2011, in connection with at least 26 sales contracts between PDTL and Thai SOEs, PDTL paid $3.9 million in "success fees" to the Thai Company that were improperly booked by PDTL as prepaid commissions or discounts. The payments were internally referred to as success fees to reflect PDTL's reward to the Thai Company for securing business with SOEs.

- From April 2012 to January 2013, in connection with 12 sales contracts between PDTL and a Thai SOE, PDTL made $1.5 million in payments to the Thai Company, with the understanding that the Thai Company would use the money, in part, to pass on to Thai SOE officials. These payments were internally referred to as "rebates" and improperly booked by PDTL as "Cash Discounts" and "Discount-Customer Rebates."

30.     PDTL's payments to the Thai Company were approved by PDTL's senior management and primarily managed by a Domestic Sales Director, who believed that the Thai Company was paying bribes to Thai SOE officials from the success fees paid by PDTL. The Domestic Sales Director told a PDTL executive ("PDTL Executive") in or around 2010 or 2011 about the potential bribery, but PDTL's management did not take any corrective action in response.

31.     In or about 2011, the PDTL Executive met with a GCC regional executive officer and expressed concerns that payments to the Thai Company by PDTL were being used for potential bribery. Despite this conversation, the payments did not stop and there was no investigation of PDTL's relationship with the Thai Company.

32.     On December 13, 2011, the PDTL Executive received an e-mail chain that included the following statement regarding the findings of a tax review in Thailand: "potential applicability of the US Foreign Corrupt Practices Act ("FCPA") for commissions paid to Thai governmental authorities." An e-mail later in the string, from a GCC employee with responsibility for corporate taxes, stated: "[s]ince this is a legal matter rather than tax, no need to do anything further for me. I will leave it up to you as to whether you want to look into any further." GCC took no further corrective action based on this information. The corrupt payments made through the Thai Company in Thailand and elsewhere continued and GCC failed to enhance its deficient internal accounting controls.

33.     In or about December 2011, the PDTL Executive instructed the Domestic Sales Director to change the payments, previously referred to as "success fees," to a "rebates" program for sales to SOEs.  The PDTL Executive directed this change because he suspected that the payments to the Thai Company were being passed on as bribes to Thai SOE officials.  These rebates, however, in effect continued the success fee arrangement with the Thai Company as the rebates were not related to PDTL's sales to the Thai Company, but rather to PDTL's sales to the Thai SOEs.  PDTL, believing that a portion of these rebates would be passed on to SOE officials, continued to improperly book these rebates as discounts.  PDTL ultimately ceased the rebates program in early 2013, when another PDTL employee complained to the PDTL Executive that PDTL's commissions and fees to third-party agents were not transparent.

Improper Payments on Export Sales to an Indonesian SOE

34.     From May 2011 to January 2014, PDTL made improper payments of $2.2 million to two purported freight forwarders on sales to an Indonesian SOE that resulted in $2 million in profits.  PDTL's records lacked evidence of services provided by the freight forwarders, which had ties to Indonesian government officials.  The fees to the freight forwarders ranged from 8.9 to 70.5% of the related sales to the Indonesian SOE.

35.     PDTL's employees and agents communicated via e-mail about payments to the freight forwarders that would be passed on to Indonesian government officials.  For example, on March 11, 2010, a PDTL employee wrote an e-mail describing the services of a principal of the two freight forwarders in Indonesia, stating "[l]ike I mention it before, my agent doesn't ask for any money upfront. He can afford to pay his way in and out of [the Indonesia SOE]."

36.     PDTL's relationship with these freight forwarders was exclusively controlled by a PDTL Manager, who ignored PDTL's policy in selecting freight forwarders, and failed to document the purpose of the fees or explain why they exceeded PDTL's customary rates for third-party payments.

37.     In February 2014, after an investigation into the PDTL Manager's relationship with the freight forwarders, PDTL terminated the PDTL Manager for refusing to cooperate with the investigation and for "fraudulent" and "dishonest and corrupt actions."

Improper Payment on Export Sale to a Bangladeshi SOE

38.     In September 2013, PDTL made an improper commission payment of $43,700 to a third-party agent on a sale of products to a Bangladeshi SOE that resulted in profits of $85,759.  The agent had requested PDTL, in an e-mail to senior PDTL executives, for a commission of 10% (or $147,761) of the sale to be "shared by decision makers [at the SOE and] concerned higher ups" in the Bangladeshi government.  Although PDTL rejected the agent's request for a 10% commission on the sale as excessive, the PDTL Executive nonetheless approved a 5% commission to the agent without addressing whether the agent would send any portion of the commission to a Bangladeshi government official.

### GCC's Improper Payments in China

39.     From December 2012 to September 2015, GC China made improper payments of more than $500,000 to third-party distributors or agents, typically in the form of special discounts, technical service fees, design institute fees, or rebates, in connection with sales to SOE customers on nineteen projects, resulting in profits of $1.8 million.  Portions of these payments, among other things of value such as merchandise, were given or intended to be given by the distributors or agents to SOE employees.

40.     These payments were authorized by GC China's senior sales leadership, and sometimes specifically authorized by senior GC China executives from December 2012 to September 2015.  For example, on or about August 14, 2013, a GC China employee sought approval from a GC China senior manager to provide additional money to a distributor in the form of a discount for a sale to a China SOE customer.  The GC China employee e-mailed the manager and justified the improper payment, stating that "a few key players at [the SOE customer] are our internal contacts and charge a certain amount of fees. If we are looking to have long term cooperation with them, charges for this is rather inevitable."

41.     On or about February 26, 2014, an internal GC China document outlined the reasons GC China provided special discounts to a distributor in association with sales to a SOE customer, and stated: "[o]n July 17, 2013, processed the consulting fee of 20,000 [yuan] for [a SOE customer employee] with 10,900 [yuan] remaining."

### GCC's Improper Payments in Egypt

42.     From September 2010 to May 2015, GC Egypt employees gave or offered to give more than $80,000 in improper payments, including cash, gifts, or tips to employees of certain customers or suppliers, some of which were Egyptian SOEs, resulting in approximately $114,000 in profits.  Some of these payments were improperly recorded as "consultant fees" for SOE customer employees to add GC Egypt to, or not to remove it from, supplier lists of the SOE customers.  Also, GC Egypt gave small amounts of cash or merchandise, such as laptop computers and televisions, to employees of SOE customers or suppliers as tips, "new year gifts," to buy goodwill, or to recognize them in winning or successfully completing contracts.

43.     In 2013 GC Egypt's General Manager offered to pay a third-party agent a commission of approximately 10% on a $1.53 million tender by GC Egypt to sell cables to an SOE of Iraq.  The commission was to be shared between the SOE staff and the agent.  When the SOE submitted an order under the tender, GCC's E&M managers rejected the order based on the high level of the contemplated commission, not because the order contemplated the sharing of the commission with the SOE staff.

### Legal Standards and Violations

44.     Under Section 21C(a) of the Exchange Act, 15 U.S.C. § 78u-3(a), if the Commission finds that any person is violating, has violated, or is about to violate any provision of the Exchange Act, or any rule or regulation thereunder, the Commission may publish its findings and enter an order requiring such person, and any other person that is, was, or would be a cause of the violation, due to an act or omission the person knew or should have known would contribute to

such violation, to cease and desist from committing or causing such violation and any future violation of the same provision, rule, or regulation.

45.     Section 30A of the Exchange Act, 15 U.S.C. § 78dd-1, which prohibits, in relevant part, any issuer with a class of securities registered pursuant to Section 12 of the Exchange Act, or any officer, director, employee, or agent acting on behalf of such issuer, in order to obtain or retain business, from corruptly giving or authorizing the giving of, anything of value to: i) any foreign official for the purposes of influencing the official or inducing the official to act in his or her official capacity in violation of his or her lawful duties, or to secure any improper advantage, or to induce a foreign official to use his influence with a foreign governmental instrumentality to influence any act or decision of such government or instrumentality; or ii) any person, while knowing that all or a portion of such thing of value will be offered, given, or promised, directly or indirectly, to any foreign official.

46.     Under Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), every issuer which has a class of securities registered pursuant to Section 12 of the Exchange Act is required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

47.     Under Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), every issuer which has a class of securities registered pursuant to Section 12 of the Exchange Act is required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

48.     GCC violated Section 30A by corruptly paying or offering to pay bribes or give other things of value to employees or officials of SOEs in Angola to obtain or retain business. GCC also violated Section 13(b)(2)(A) as the payments described above by Celcat, Condel, PDTL, GC China, and GC Egypt were recorded as legitimate business expenses on their respective books and records, when knowing or believing they were in fact used as bribes or improper payments to foreign government officials, or otherwise lacked reasonably detailed documentation to accurately and fairly reflect the payments on the subsidiaries' books and records, which were included in GCC's books and records and consolidated financial statements. Finally, GCC violated Section 13(b)(2)(B) as the payments or offers by GCC's subsidiaries identified above violated GCC's policies against bribery and excessive payments to third-parties on transactions with SOEs, or otherwise were not supported by proper documentation or authorization. Employees of GCC's subsidiaries were not adequately trained on anticorruption risks, did not require third-parties on SOE sales to comply with the FCPA, and did not perform any anticorruption due diligence on third parties.

### GCC's Self-Reporting, Cooperation, and Remedial Efforts

49.     In determining to accept GCC's Offer, the Commission considered GCC's self-reporting, substantial cooperation, and remedial efforts.  GCC promptly self-reported the potential FCPA violations to the Commission's staff in January 2014, after it retained outside counsel to conduct an internal investigation.  GCC also self-reported other potentially improper payments as its investigation progressed, and regularly updated the staff on the investigation.

50.     GCC further provided complete and timely cooperation with the staff by providing detailed presentations on the key findings of the investigations, and promptly producing all relevant documents and information (including thousands of documents translated into English), chronologies, key document binders, interview downloads, and forensic accounting analyses.  GCC also made its current or former employees available for interviews by the staff upon request, including facilitating certain employees to travel to the United States from abroad for interviews.

51.     GCC also undertook extensive remediation.  GCC has terminated or taken disciplinary actions against employees who were involved in the improper payments.  All of GCC's executive management during the relevant time period has been replaced.  In October 2014 GCC announced a strategic plan to focus on its core markets and divest its operations in the Africa and Asia Pacific regions.

52.     Finally, GCC restructured its compliance policies and programs by appointing a Chief Compliance Officer who reports directly to GCC's CEO and Audit Committee.  Under this restructuring, GCC has enhanced its training of sales and accounting personnel on compliance policies and expectations, implemented regular reviews of third-party relationships and accounting adjustments, developed a global information technology strategy for risk assessment and control for financial reporting, and instituted evaluations for compliance performance through performance indicators and audits.

### GCC's Non-Prosecution Agreement With the United States Department of Justice

53.     GCC has entered into a non-prosecution agreement with the United States Department of Justice that acknowledges responsibility for conduct relating to the findings in this Order.

54.     GCC acknowledges that the Commission is not imposing a civil penalty for the violations described in this Order based in part on GCC's payment of a criminal fine of $20,469,694.80 as part of GCC's settlement with the Department of Justice.

### Undertakings

55.     Respondent has undertaken to

A.     Cooperate fully with the Commission in any and all investigations, litigation, or other proceedings relating to or arising from the matters described in this Order.  In connection with such cooperation, Respondent shall:

11

       1.     Produce, without service of a notice or subpoena, any and all non-privileged documents and other information requested by the Commission staff subject to any restrictions under the law of any foreign jurisdiction;

       2.     Use its best efforts to cause its current or former officers, employees, and directors to be interviewed by Commission staff at such times and places as the staff reasonably may direct;

       3.     Use its best efforts to cause its current or former officers, employees, and directors to appear and testify without service of a notice or subpoena in such investigations, depositions, hearings, or trials as may be requested by the Commission staff; and

       4.     In connection with any testimony of Respondent's officers, employees, and directors to be conducted at deposition, hearing, or trial pursuant to a notice or subpoena, Respondent

       a.     Agrees that any such notice or subpoena for the appearance and testimony of Respondent's officers, employees, and directors may be served by regular or electronic mail on: Christian J. Mixter, Esq., Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, N.W., Washington, DC 20004, <u>christian.mixter@morganlewis.com</u>, with a copy to Emerson C. Moser, Esq., Senior Vice President, General Counsel and Corporate Secretary, General Cable Corporation, 4 Tesseneer Drive, Highland Heights, KY 41076-9753, emoser@generalcable.com;

       b.     Agrees that any such notice or subpoena for the appearance and testimony of Respondent's officers, employees, and directors in any action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

B.     Report to the Commission staff periodically, at no less than one-year intervals during a three-year period from the date of this Order:

       1.     The status of Respondent's remediation and implementation of compliance measures.  During this three-year period, should Respondent's Board of Directors, executive management, or legal and compliance personnel discover credible evidence, not already reported to the Commission staff, that questionable or corrupt payments, or questionable or corrupt transfers of property or interests may have been offered, promised, paid, or authorized by Respondent, or that related false books and records have been maintained, Respondent shall promptly report such conduct to the Commission staff.  During this three-year period, Respondent shall (1) submit an initial report, and (2) conduct and prepare one follow-up review and report, as described below:

a.     Respondent shall submit to the Commission staff a written report within 360 calendar days of the date of entry of this Order setting forth a complete description of its FCPA and anticorruption related remediation efforts to date, its plans or proposals reasonably designed to improve its policies and procedures for ensuring compliance with the FCPA and other applicable anticorruption laws, and the parameters of the subsequent reviews ("Initial Report").  The Initial Report shall be transmitted to Gerald W. Hodgkins, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.  Respondent may extend the time period for issuance of the Initial Report with prior written approval of the Commission staff.

b.     Respondent shall undertake at least two follow-up reviews, incorporating any comments provided by the Commission staff on the previous report, to further monitor and assess whether the policies and procedures of Respondent are reasonably designed to detect and prevent violations of the FCPA and other applicable anticorruption laws (the "Follow-Up Reports").

c.     The Follow-Up Report shall be completed no later than 365 days after the Initial Report.  The second Follow-Up Report shall be completed no later than 730 days after the completion of the preceding follow-up review.  Respondent may extend the time period for issuance of the Follow-Up Reports with prior written approval of the Commission staff.

d.     The periodic reviews and reports submitted by Respondent will likely include proprietary, financial, confidential, and competitive business information.  Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement.  For these reasons, among others, the reports and contents thereof are intended to remain and shall remain nonpublic, except (1) pursuant to court order, (2) as agreed by the parties in writing, (3) to the extent that the Commission staff determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

2.     Certify, in writing, that Respondent has made good faith efforts to comply with the undertakings set forth above.  The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence.  The certification and supporting materials shall be submitted to Gerald W. Hodgkins, Associate Director, with a copy to the Office of the Chief Counsel of the Division of Enforcement, Securities

13

and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, no later than sixty (60) days from the date of the completion of the undertakings.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 21C of the Exchange Act, GCC cease-and-desist from committing or causing any violations and any future violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 30A of the Exchange Act.

B.      GCC shall pay disgorgement of $51,174,237, and prejudgment interest of $4,107,660 to the Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  Payment shall be made in the following installments:  one installment of $5,856,380 due within 30 days of the date of entry of this Order, one installment of $18,534,568 due within 180 days of the date of entry of this Order, and a final installment of $30,890,949 due within 360 days of the date of entry of this Order.  If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of disgorgement and prejudgment interest, plus any additional interest accrued pursuant to the Commission's Rule of Practice 600 shall be due and payable immediately, without further application.

C.      Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying General Cable Corporation as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Gerald W. Hodgkins, Associate Director, Division of

14

Enforcement, Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.

D.      Respondent shall comply with the undertakings in paragraph 55.B, above.

By the Commission.


Brent J. Fields
Secretary


15



KLEER-FAX
RECYCLED ♻

*90000 SERIES*
*30% P.C.W.*

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT O**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 79704 / December 29, 2016

ADMINISTRATIVE PROCEEDING
File No. 3-17756

| | |
|---|---|
| In the Matter of<br><br>KARL J. ZIMMER,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Karl J. Zimmer ("Zimmer" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      In November and December 2013, Zimmer, who was a Senior Vice President of General Cable Corporation ("GCC"), approved improper commission payments to a third-party agent ("Agent") on sales by GCC's Angolan subsidiary to Angolan state-owned enterprises ("SOEs"). At the time, Zimmer knew that GCC's policies prohibited excessive commissions to third parties on sales to SOEs, GCC had commenced an investigation of potentially improper payments to the Agent, and GCC had prohibited the payment of past due commissions to the Agent while the investigation was pending and without further approval. Zimmer, however, approved multiple commissions to the Agent totaling $342,613, including commissions nearly double GCC's prescribed limits on third-party commissions, and which were not documented by any services performed by the Agent. By approving these commissions, Zimmer caused GCC's violations of the books and records and internal accounting controls provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), and knowingly circumvented a number of GCC's internal accounting controls.

### Respondent

2.      Zimmer, age 40, is a resident of Douglas, Georgia. Zimmer joined GCC in June 2001 and was promoted, effective January 2014, to Senior Vice President of GCC's Europe and Africa Supply Chain and Global Supply Chain, responsible for sales and marketing in those regions. Zimmer's employment with GCC ended in January 2015.

### Relevant Entities

3.      **General Cable Corporation ("GCC")** is a publicly traded company headquartered in Highland Heights, Kentucky. GCC is a global manufacturer of copper, aluminum, and fiber optic wire and cable products. During the relevant period, GCC maintained operations in Angola within its Europe & Mediterranean segment ("E&M," now known as the Europe segment). GCC's common stock is registered with the Commission under Section 12(b) of the Exchange Act, and GCC files annual and quarterly reports under Section 13(a) of the Exchange Act and related rules. GCC's common stock trades on The New York Stock Exchange under the ticker symbol "BGC."

4.      **General Cable Condel, Cabos de Energia e Telecomunicações, S.A. ("Condel")** is an indirect GCC subsidiary located in Angola and manufactured and sold wire and cable products primarily to entities owned by the Angolan government.

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

**GCC's Policies on Unlawful or Unethical Payments**

5.     At all relevant times, GCC had a Code of Ethics and Compliance Guidelines ("Code of Ethics") that prohibited its employees from offering or giving any person any payment which may be illegal or unethical. The Code of Ethics specifically prohibited any consideration given to a public official, unless authorized by law. It also prohibited excessive payments to third parties when the value of the consideration offered or given exceeds the reasonable value of the services performed in return. Specifically, the Code of Ethics warned that an excessive payment to an individual arranging contracts with government officials could be illegal or unethical as it might suggest that some of the payment is being channeled to government officials, or is somehow being used for improper purposes. Finally, the Code of Ethics required all transactions to be executed only with management authority, general or specific, in compliance with federal securities laws that required GCC to maintain books, records, and accounts that accurately and fairly reflect transactions, and a system of internal accounting controls designed to provide reasonable assurances that GCC's financial statements will be accurate and complete.

6.     In addition, at all relevant times, GCC's E&M segment maintained a policy governing the payment of commissions or fees to third-party entities relating to sales contracts. This policy required the approval of E&M's management for commissions to third-party entities greater than 5% of the value of the sales contracts. The policy also prohibited commissions over 10% of the value of the sales contracts.

**Condel's Relationship With the Agent on Government Sales**

7.     Beginning in May 2009, before Zimmer had any involvement with GCC's business in Angola, Condel entered into a contract with the Agent for assistance with sales to Angolan SOEs. The contract with the Agent did not specify any terms and conditions, except that Condel would pay the Agent a commission of 1% of the value of each sales contract with SOEs that may be revised on a case-by-case basis. The contract did not did not include an anti-bribery clause for compliance with the FCPA. The Agent was Condel's sole agent for sales in Angola.

**GCC's Investigation of the Agent**

8.     In September 2012, GCC's Internal Audit department ("Internal Audit") performed an on-site audit of financial and operational processes and controls at Condel. In December 2012, Internal Audit submitted a report to GCC's executive management that identified several issues with Condel's relationship with the Agent: (a) the agreement with the Agent did not include an anti-bribery clause for compliance with the FCPA; (b) the agreement with the Agent established a 1% commission, but actual commissions paid to the Agent in 2012 ranged from 8.5 to 18.5%, although E&M's policy prohibited commissions over 10%; (c) Condel's management was not aware that contracts with agents should include language requiring compliance with the FCPA. Zimmer received a copy of this report in early 2013.

9.     In August 2013, GCC's executive management commenced an internal investigation of Condel's relationship with the Agent. In October 2013, GCC's executive

management instructed E&M's management to cease payment of past due commissions to the Agent pending further investigation and without authorization by GCC's executive management.

## Zimmer Approves Improper Payments to the Agent

10.     In October 2013, GCC promoted Zimmer as a Senior Vice President of GCC, and head of E&M's supply chain. As one of his many responsibilities in this capacity, Zimmer would supervise Condel's operations, including its sales and marketing functions.

11.     By at least October 2013, Zimmer knew that GCC's Code of Ethics prohibited, among other things, excessive payments to an individual arranging contracts with government officials as it might suggest that some of the payment is being channeled to government officials, or is somehow being used for an improper purpose. Zimmer certified to GCC's Legal Department that he had read and understood the Code of Ethics and he was and has been in compliance with the Code of Ethics since January 1, 2012.

12.     Further, by at least October 2013, Zimmer also was aware that Condel had paid commissions to the Agent between 8.5 to 18.5% , although E&M's policy required approval of third-party commissions above 5%, and prohibited third-party commissions over 10%. And he was aware that GCC was investigating Condel's relationship with the Agent and had restricted the payment of past due commissions to the Agent without the approval of GCC's executive management. Zimmer instructed Condel's management not to pay any commissions to the Agent while the investigation was pending, and informed Condel's management that GCC's executive management was considering replacing the Agent and limiting commissions to 10%.

13.     In November 2013, E&M's management, including Zimmer, consulted GCC's executive management on how to proceed with proposing new business to the Angolan SOEs in light of the investigation of the Agent. The prohibition of commission payments to the Agent had resulted in a loss or potential loss of approximately $15 million in sales to the Angolan SOEs. To avoid further loss of sales, E&M's management asked GCC's executive management whether Condel could continue to use the Agent in dealing with the SOEs, or whether Condel should use another agent or deal directly with the SOEs.

14.     GCC's executive management instructed that (1) Condel should terminate the Agent and transition to a new agent, but (2) to allow time to transition to the new agent, Condel could work with the existing Agent on a case-by-case basis, until the new agent is in place, for new business with the SOEs, but with "appropriate" and "proper" commission payments to the Agent. E&M's policy required E&M' management's approval of third-party commissions above 5% and prohibited commissions above 10%. GCC's executive management requested E&M's management, including Zimmer, to follow up on these instructions and to lay out the process for dealing with the Agent while they transition to a new agent.

15.     Shortly thereafter, in November 2013, Zimmer approved sales contracts with the Angolan SOEs that called for commissions to the Agent from 7.5% to 18.5%  Further, in December 2013, Zimmer approved the payment of multiple past due commissions totaling $342,613 to the agent from 6 to 18% of the related sales contracts. Zimmer did not follow up with

4

or seek advance approval from GCC's executive management before knowingly approving these commissions. These commissions violated GCC's Code of Ethics, E&M's policy on excessive payments to third-parties, and GCC executive management's instructions.

16.     The new business with, and past due commissions to, the Agent were not supported by any documentation of the services performed by the Agent. Condel nonetheless improperly recorded these payments as legitimate commissions on its books and records and financial statements. Condel's financial statements were ultimately included in GCC's consolidated financial statements presented in GCC's filings with the Commission for the quarterly and annual periods ended December 31, 2013.

### Legal Standards and Violations

17.     Under Section 21C of the Exchange Act, the Commission may impose a cease-and-desist order upon any person who is violating, has violated, or is about to violate any provision of the Exchange Act or any rule or regulation thereunder, and upon any other person that is, was, or would be a cause of the violation, due to an act of omission the person knew or should have known would contribute to such violation.

18.     As a result of the conduct described above, Zimmer caused GCC's violation of Section 13(b)(2)(A) of the Exchange Act, which requires every issuer of a security registered pursuant to Section 12 of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

19.     As a result of the conduct described above, Zimmer caused GCC's violation of Section 13(b)(2)(B) of the Exchange Act, which requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

20.     Finally, as a result of the conduct described above, Zimmer violated Section 13(b)(5) of the Exchange Act, which states that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account.

### IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that:

5

A.     Pursuant to Section 21C of the Exchange Act, Respondent cease-and-desist from committing or causing any violations and any future violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act.

B.     Respondent shall, within 14 days of the entry of this Order, pay a civil penalty in the amount of $20,000 to the Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3).  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

C.     Payment must be made in one of the following ways:

1.     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

2.     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

3.     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Karl J. Zimmer as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Gerald W. Hodgkins, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549.

D.     Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, Respondent shall not argue that Respondent is entitled to, nor shall Respondent benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that Respondent shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Brent J. Fields
Secretary



90000 SERIES
30% P.C.W.

KLEEN-TAX
RECYCLED

Exhibit P

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT P**

3/5/2020                      Mathias Francisco Sandoval Herrera and Maria D. Cidre (Release No. LR-24407; Feb. 21, 2019)

 **U.S. SECURITIES AND EXCHANGE COMMISSION**

Search SEC Documents [Go]
Company Filings | More Search Options

ABOUT      DIVISIONS & OFFICES      ENFORCEMENT      REGULATION      EDUCATION      FILINGS      NEWS

**ENFORCEMENT**

Accounting and Auditing
Enforcement Releases

Administrative
Proceedings

ALJ Initial Decisions

ALJ Orders

Amicus / Friend of the
Court Briefs

Delinquent Filings

Fair Funds

Information for Harmed
Investors

Litigation Releases

Opinions and
Adjudicatory Orders

Receiverships

Stop Orders

Trading Suspensions

# SEC Obtains Final Judgments Against Former CEO and Former CFO of General Cable Corp. Operating Segment

## Litigation Release No. 24407 / February 21, 2019

### *Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera and Maria D. Cidre*, Civil Action No. 1:17-cv-20301-JAL (S.D. Fla., filed Jan. 24, 2017)

On February 20, 2019, the Honorable Joan A. Lenard of the U.S. District Court for the Southern District of Florida entered final judgments on consent against Mathias Francisco Sandoval Herrera and Maria D. Cidre, the former Chief Executive Officer and former Chief Financial Officer, respectively, of the Rest of World operating segment of General Cable Corp.

The SEC's complaint, filed on January 24, 2017, alleged that Sandoval and Cidre learned in January 2012 of an inventory overstatement and related accounting errors at General Cable's subsidiary in Brazil. The complaint alleged that, over the course of 2012, the estimated overstatement grew to tens of millions of dollars. Instead of disclosing the overstatement pursuant to General Cable's policies and system of internal controls, the complaint alleges that Sandoval and Cidre concealed the errors by omitting them from required reports and making false certifications to executive management.

The final judgments enjoin Sandoval and Cidre from violating the books-and-records provisions of Section 13(b)(5) of the Securities Exchange Act of 1934 and Rules 13b2-1 and 13b2-2 thereunder, and from aiding and abetting violations of the reporting provisions of Section 13(a) and 13(b)(2)(A)-(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder. The final judgment against Cidre also enjoins her from violating the antifraud provision of Section 17(a)(3) of the Securities Act of 1933. Sandoval and Cidre agreed to settle the charges without admitting or denying the allegations, and to pay a civil penalty of $150,000 and $40,000, respectively. The SEC also notified the court that it would not seek a civil penalty or an officer and director bar against cooperating defendant Jose Antonio Miranda Gonzalez, who previously settled with the Commission in this matter.

*Modified: February 21, 2019*

RECYCLED
MEAD
30% P.C.W.
90000 SERIES

EFiled:  May 10 2024 02:05PM
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT Q**



KAUFMAN BORGEEST & RYAN LLP

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

December 18, 2017

WAYNE E. BORGEEST
DIRECT: 914.449.1002
WBORGEEST@KBRLAW.COM

MATTHEW COLLIBEE
DIRECT: 914.449.1075
MCOLLIBEE@KBRLAW.COM

<u>BY EMAIL</u>

Lisa Campisi
Blank Rome LLP
405 Lexington Avenue
New York, New York 10174-0208
LCampisi@BlankRome.com

Re:   Insured          :   General Cable Corporation ("General Cable" or the "Company")
      Policy No.       :   105518156 (November 1, 2011 – November 30, 2012)
      Matters          :   (1) *In the Matter of General Cable*, SEC File No. 11998
                            (2) *McPherson v. Kenny et al.*, Case No. 14-CI-011 (Ky. Cir. Ct.
                            Div. I, Jan. 7, 2014)
                            (3) *Kelly v. Kenny et al.*, Case No. 14-CI-060 (Ky. Cir. Ct. Div. I,
                            Jan. 23, 2014)
                            (4) *Doshi v. General Cable Corp. et al.*, Case No. 13-7409
                            (S.D.N.Y. Oct. 21, 2013)
                            (5) *Doshi v. General Cable Corporation et al.*, Case No. 17-0092
                            (S.D.N.Y., Jan. 5, 2017)
                            (6) *Quackenbush v. General Cable Corporation*, Civil Action No.
                            2017-0219 (Del. Chan. Ct., Mar. 22, 2017)
      Travelers No. :   X1216977
      KBR No.       :   187.326

Dear Ms. Campisi:

As you know, this firm has been retained to advise and assist Travelers Casualty & Surety Company of America ("Travelers") in connection with the above-captioned matters. We write further to our prior communications, which are incorporated herein. Please continue to direct any future correspondence intended for Travelers in these matters to the undersigned.

Travelers issued Executive Choice+ Directors, Officers, and Organization Liability Policy No. 105518156 to General Cable for the Policy Period of November 1, 2011 to November 30, 2012 (the "Policy"). The Policy reflects a $15 million Limit of Liability for all Claims, per ITEM 5 of the Declarations, and Defense Expenses are part of, and not in addition to, the $15 million Limit of Liability.

NEW YORK          NEW JERSEY          CONNECTICUT          CALIFORNIA

4607129

General Cable Corporation
Travelers Ref. No. X1216977
KBR File No. 187.326
Page 2

As previously conveyed to you, the Policy's $15 million Limit of Liability is approaching exhaustion. Specifically, as of today, Travelers has paid $14,809,395.88 of its $15 million Limit of Liability, leaving $190,604.12 in remaining available Policy proceeds. Pursuant to Section V.A. of the Policy, as amended by Endorsement No. PCDO-10201:

> The Limits of Liability set forth in ITEM 5 of the Declarations are the maximum amounts the Company [Travelers] will pay under this Policy, regardless of the number of Claims, Interview Requests or Insureds, and regardless of when payment is made by the Company or when an Insured's legal obligation with regard to any Claim or Interview Request arises or is established.

> The Company's maximum liability for all Claims, and for all Interview Costs for all Interview Requests, first made during the same Policy Period, whether covered under one or more Insuring Agreements, is the Directors, Officers, and Organization Limit of Liability for the Policy Period set forth in ITEM 5 of the Declarations.

> [ . . . ]

> All Claims arising out of the same Wrongful Act and all Related Wrongful Acts are deemed one Claim, and such Claim is deemed to be first made on the date the earliest of such Claims is first made against any Insured, regardless of whether such date is before or during the Policy Period.

> [ . . . ]

> Defense Expenses and Interview Costs are part of, and not in addition to, the Limits of Liability set forth in ITEM 5 of the Declarations, and will reduce such Limits of Liability.

As you are aware, multiple Insureds have sought coverage under the Policy, including for the above-captioned matters. Travelers has paid $14,809,395.88 of its $15 million Limit of Liability in connection with these and other related matters. Once $15 million has been paid in Policy proceeds, Travelers will cease to have any coverage obligations under the Policy and will no longer be paying any amounts incurred by your client in connection with the submitted matters. As a result, we strongly encourage you to contact any other insurance carrier that may respond to the submitted matters, and advise them that the Travelers Policy will soon be exhausted.

We understand that you may have questions about the erosion of the Policy, and that you raised issues in your November 1 letter that may need to be addressed. We will reach out to you separately regarding same. The purpose of this letter is only to advise you in writing that Travelers will soon cease making payments under the Policy, and that the Company should take all steps necessary to protect its interests in light of the foregoing circumstances.

KAUFMAN BORGEEST & RYAN LLP

4607129

General Cable Corporation
Travelers Ref. No. X1216977
KBR File No. 187.326
Page 3

Travelers continues to reserve all of its rights under the Policy, at law, and in equity, and recognizes that your client likewise reserves all rights. Should you have any questions about this communication, please do not hesitate to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Matthew Collibee

KLEER-FAX
RECYCLED ♻
90000 SERIES
30% P.C.W.

Exhibit R

EFiled:  May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT R**



**KAUFMAN BORGEEST & RYAN LLP**

200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000   FAX: 914.449.1100   WWW.KBRLAW.COM

March 26, 2018

WAYNE E. BORGEEST
DIRECT: 914.449.1002
WBORGEEST@KBRLAW.COM

MATTHEW COLLIBEE
DIRECT: 914.449.1075
MCOLLIBEE@KBRLAW.COM

BY EMAIL

Lisa M. Campisi
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
lcampisi@blankrome.com

Re:  Insured        :   General Cable Corporation ("General Cable" or the "Company")
     Policy No.     :   105518156 (Nov. 1, 2011 – Nov. 30, 2012) (the "11/12 Policy")
     Matters        :   (1) *Doshi v. General Cable Corporation et al.*, Case No. 1:17-cv-
                         00092 (S.D.N.Y., Jan. 5, 2017) ("*Doshi II*")
                         (2) *Quackenbush v. General Cable Corporation*, Civil Action No.
                         2017-0219 (Del. Chan. Ct., Mar. 22, 2017) ("*Quackenbush*")
                         (3) SEC Subpoenas – Karl Zimmer; Glen Gustafson; John
                         Winstel; Brian Robinson; Gregory Kenny; Craig Omtvedt (the
                         "SEC Subpoenas")
     KBR No.        :   187.326

Dear Ms. Campisi:

As you know, this firm has been retained to advise and assist Travelers Casualty & Surety Company of America ("Travelers") in connection with the above-captioned matters.  We write further to Travelers' prior correspondence, which are incorporated herein, and in response to your November 1, 2017 letter.

In sum, your letter asserts that *Doshi II*, *Quackenbush*, and certain SEC Subpoenas do not relate back to the 11/12 Policy, and instead are "presumptively first made in the 2012-2016 Policy Period." While Travelers appreciates your letter and its long-standing relationship with General Cable, it respectfully disagrees with the Company's position for the reasons previously expressed and articulated herein.

As an initial matter, we note that it was quite surprising to receive your letter, which articulates a position by General Cable that is wholly inconsistent with its prior actions. In early 2016, more than two years ago, General Cable requested coverage for a Securities Exchange Commission

NEW YORK CITY     LOS ANGELES     NEW JERSEY     STAMFORD     WESTCHESTER     LONG ISLAND

4605421

General Cable Corp.
KBR File No. 187.326
Page 2

("SEC") subpoena issued to Karl Zimmer. As you know, the subpoena sought information from Mr. Zimmer related to potential Foreign Corrupt Practices Act ("FCPA") violations. The Zimmer subpoena is notably absent in the list of "FCPA Claims" in your November 1 letter, but undoubtedly is related to the other SEC Subpoenas you reference. As you are well aware, General Cable was insistent that Travelers reimburse the Company for its indemnification of Mr. Zimmer's Defense Expenses. In response, we conveyed to you that the then-submitted Zimmer defense invoices only would be reimbursable under the 11/12 Policy, and that if the subpoena was a Claim first made under the renewal policy for 2012-2016 (the "12/16 Policy"), General Cable would first have to satisfy a new Retention before any payments would be owed by Travelers. Nonetheless, General Cable continued to press for reimbursement—a clear sign they believed (and wanted) the 11/12 Policy to respond to the Zimmer subpoena.[1] Consistent with its coverage position, Travelers accepted the Zimmer subpoena as potentially covered under the 11/12 Policy, subject to a reservation of rights, and reimbursed General Cable over $400,000 for Mr. Zimmer's Defense Expenses. To date (because your November 1 letter is silent on the issue), General Cable has never disputed Travelers' coverage position on the Zimmer subpoena, and it has certainly never returned the more than $400,000 paid by Travelers that should have been borne by the Company if its newfound position is correct.

In September 2016—well over a year ago—General Cable requested coverage for five additional SEC Subpoenas (which are identified as part of the "FCPA Claims" in your November 1 letter). Once again, and consistent with its position, Travelers acknowledged that the SEC Subpoenas were potentially covered under the 11/12 Policy, subject to a reservation of rights. Until November 2017, this position was not disputed.

General Cable also sought coverage for *Doshi II* and *Quackenbush*. By email dated May 17, 2017, you wrote "to confirm my understanding that Travelers will provide coverage for both matters under the same 2011-2012 policy," and that "General Cable requests that this understanding by confirmed immediately." Again, the Company did not dispute Travelers' position that the 11/12 Policy responds to these matters. Instead, it accepted payment for nearly $30,000 in Defense Expenses related to *Doshi II* and *Quackenbush* and submitted additional invoices for payment. Indeed, as recently as September and October of 2017, you inquired as to when these additional invoices would be paid. Once again, the Company did not suggest that these amounts should be subject to the 12/16 Policy's Retention, even though it knew that satisfaction of the Retention would be a condition precedent to reimbursement under that policy.

In sum, General Cable's actions over the past two plus years clearly show that it expected and wanted reimbursement under the 11/12 Policy. Respectfully, nothing has changed about the submitted matters that would or does affect coverage Travelers' position.

It is not disputed that the SEC subpoenas and prior class/derivative actions that involved inventory and accounting issues in Brazil were rightly considered for coverage under the 11/12 Policy. All of these matters involved facts and circumstances at issue in *In the Matter of General Cable*, File HO-11998 (the "SEC Investigation"). Notably, each of the "FCPA Claims" identified in your November 1 letter, as well as the Zimmer subpoena, also are related to the SEC Investigation. Indeed, the SEC subpoenas for Messrs. Zimmer, Gustafson, Winstel, Robinson, Gregory Kenny, and Craig Omtvedt were all issued pursuant to the same formal order of

---

[1] By way of example, in an email from you to us on September 21, 2016, you sought confirmation "that Travelers will acknowledge its coverage and reimbursment [sic] obligations for the Zimmer subpoena . . . ."

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
KBR File No. 187.326
Page 3

investigation that granted the SEC power to issue subpoenas to individuals seeking information on inventory and accounting issues. As such, the common nexus, or causal connection of facts, circumstances, situations, events, and/or decisions, is obvious here, and the FCPA Claims relate back to all of the other Claims under the 11/12 Policy that are not in dispute.

Further, a Claim is defined to include "service of a subpoena on an Insured Person identified by name if served upon such person pursuant to an SEC formal investigative order." On or around July 27, 2015, Gregory Kenny received service of a subpoena pursuant to a SEC formal investigative order. Thus, it is a Claim. General Cable initially treated that subpoena as related to accounting issues in Brazil and sought reimbursement for Mr. Kenny's defense bills under the 11/12 Policy. As only one example, we received K&L Gates Invoice No. 3138675, dated July 31, 2015, labeled "SEC Enforcement Investigation re Brazil." Notably, this invoice included fees for K&L Gates attending Mr. Kenny's interview with the SEC on July 29 and 30, 2015, the only two dates (according to you) that he testified. Later, you submitted the subpoena as a Claim also related to potential FCPA violations. However, it remains the same exact Claim—a subpoena served on Mr. Kenny—which was already established as relating back to the 11/12 Policy. Therefore, any FCPA costs arising from the subpoena also relate back to the 11/12 Policy.[2]

It appears undisputed that *Doshi II*, *Quackenbush*, and each of the subpoenas related to potential FCPA violations relate to each other. This includes the subpoena issued to Mr. Kenny. Because Mr. Kenny's subpoena relates back to the 11/12 Policy, then *Doshi II*, *Quackenbush*, and the other subpoenas must also relate back to the 11/12 Policy.

Your November 1 letter alleges that the settlement agreement entered into by our clients "expressly stated that the Angola FCPA Investigation was not a Claim resulting from the Brazil Notice of Circumstances" because "the Parties agree that the FCPA Investigation is not presently a Claim made against General Cable under any insurance policy issued by Travelers to General Cable, and General Cable does not seek reimbursement under this Agreement for any defense costs and/or expenses it has incurred and/or paid in the FCPA Investigation." Respectfully, we disagree. The agreement does not address whether FCPA-related costs relate back to the notice of circumstances submitted under the 11/12 Policy. The agreement only states that the "FCPA Investigation" was not a Claim because—as your client has acknowledged—it was not a Claim at the time the agreement was executed. Indeed, the subpoenas you submitted as related to potential FCPA violations (that apparently were also issued in connection with Brazil and accounting) were served after execution of the settlement agreement. As such, General Cable was not seeking reimbursement for the "FCPA Investigation" when the settlement agreement was executed, and it was not the subject of our clients' compromise.

Travelers' position is supported by case law. For example, in *BioChemics, Inc. v. AXIS Reinsurance Company*, Civil Action No. 13-10691 (D. Mass., Jan. 6, 2015), an insured sought coverage for certain SEC subpoenas. The insurer denied coverage, arguing that the SEC investigation was a single Claim first made when the SEC issued its first subpoena on the insured, which occurred before the inception date of its policy. The Court agreed, holding that the "triggering events are all part of a single SEC Investigation under the Formal Order" and "[u]nder the clear language of the policy and on the record before the court, the subpoenas all

---

[2] This analysis also applies to Messrs. Gustafson, Winstel, Robinson, and Omtvedt to the extent they also testified about both accounting issues in Brazil and potential FCPA violations, as they also only received a single subpoena from the SEC.

KAUFMAN BORGEEST & RYAN LLP

General Cable Corp.
KBR File No. 187.326
Page 4

constituted a single '<u>Claim</u>' under the policy." Here, we have similar circumstances. Pursuant to a single formal order in a single SEC investigation, the SEC issued multiple subpoenas. As in *BioChemics*, the subpoenas at issue here (and by extension, *Doshi II* and *Quackenbush*) constitute a single Claim, and that single Claim falls under the 11/12 Policy.

\*        \*        \*

As you know, the 11/12 Policy has now been exhausted.  As a result, and consistent with its coverage position, Travelers no longer has any obligation to reimburse General Cable for any of the submitted matters.

This letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, exclusions, or Endorsements in the Policy.  Nothing in this letter is intended to, or does, waive any of Travelers' rights, privileges, or defenses under the Policy, at law, or in equity, all of which are expressly reserved.  Travelers continues to expressly reserve the right to alter, supplement, and modify its coverage determination as other or additional information may become available.

Should you have any questions or concerns, please do not hesitate to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Wayne E. Borgeest
Matthew Collibee

KAUFMAN BORGEEST & RYAN LLP

4605421



*90000 SERIES*
*30% P.C.W.*

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT S**

# HOFFMAN LEGAL

20 NORTH CLARK STREET, SUITE 2500
CHICAGO, ILLINOIS 60602

JAY R. HOFFMAN
PRINCIPAL

March 23, 2018

PHONE 312.899.0899
FAX 312.899.8201
www.hoffmanlegal.com
jay@hoffmanlegal.com

BY EMAIL

Lisa M. Campisi
Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
 (For General Cable Corporation)

Adam S. Ziffer
McKool Smith
One Bryant Park, 47th Floor
New York, NY 10036
*aziffer@mckoolsmith.com*
(For Insured Persons Mathias Francisco Sandoval
Herrera and Maria Cidre)

Wayne E. Borgeest
Matthew M. Collibee
Kaufman Borgeest & Ryan LLP
200 Summit Lake Drive
Valhalla, NY 10595
*wborgeest@kbrlaw.com*
*mcollibee@kbrlaw.com*
(For Travelers Casualty and Surety Co. of America)

Re:    Insurer:        Old Republic Insurance Company
       Insured;        General Cable Corporation and its Directors and Officers
       Policy Nos.:    CUG 34739 ("the 2011-12 Excess Policy")
                       CUG 35536 ("the 2012-16 Excess Policy")
       File Nos.:      11D8897 (2011-12) and 12D9502 (2012-16)
       Matters:        Brazilian Accounting Matters and FCPA Matters

Dear Counsel,

       I am coverage counsel for Old Republic Insurance Company and its underwriting manager
and claims administrator, Old Republic Professional Liability, Inc. ("Old Republic"). I am writing
to inform you of Old Republic's handling of these matters, its reservation of rights, and its coverage
positions. As a courtesy, I am providing this letter to representatives of the other excess carriers
participating in this insurance program.

All of the information in this letter is based on Old Republic's current understanding of the facts and circumstances involving these claims. If you believe that any of the information stated in this letter is incorrect, incomplete, or out of date, I thank you in advance for letting us know and providing us with relevant documentation at your earliest convenience.

*A.     Old Republic's Excess Policies*

Old Republic issued the 2011-12 Excess Policy to General Cable Corporation ("General Cable") effective for the period from November 1, 2011 to November 30, 2012. The 2011-12 Excess Policy provides up to $10 million of coverage excess of any applicable retention and $15 million in underlying coverage provided by the 2011-12 Primary Policy that Travelers Casualty & Surety Company of America ("Travelers") issued to General Cable.

Old Republic issued the 2012-16 Excess Policy to General Cable effective for the period from November 30, 2012 to November 1, 2016. The 2012-16 Excess Policy provides up to $10 million of coverage excess of any applicable retention and $15 million in underlying coverage provided by Travelers' 2012-16 Primary Policy. Except as otherwise provided in Old Republic's excess policies, Old Republic's coverage is in accordance with the same terms, conditions, warranties, exclusions, and limitations contained in, and added to, Travelers' primary policies.

Old Republic is not aware of any Side A-only DIC coverage in these insurance towers. If there is such coverage, please let us know the details as soon as possible.

*B.     Old Republic's File No. 11D8897 (Under the 2011-12 Excess Policy)*

Beginning in 2012, Old Republic received a series of notices and/or documentation from General Cable and/or Travelers that concern a series of matters involving alleged past inventory valuations and related accounting discrepancies at General Cable's Brazilian subsidiary known as Phelps Dodge International Brasil Ltda. Corp. ("the Brazilian Accounting Matters").

Some of these matters involve Mathias Francisco Sandoval Herrera ("Sandoval"), Maria Cidre ("Cidre"), and Jose Antonio Miranda Gonzalez ("Miranda"), who are reported to be directors and/or officers of General Cable's Rest of World segment and/or its subsidiaries, and therefore are individual insured persons under the Travelers and Old Republic policies ("the Insured Persons").

The Brazilian Accounting Matters include the following:

1.     Certain Securities Cases:

   a.     *Satish Doshi, et al. v. General Cable Corporation, et al.*, Docket No. 1:13-cv-7409 (S.D.N.Y. Oct 21, 2013), transferred to Consolidated Civil Action No. 2:14-cv-22-WOB-CJS (E.D. Ky. Feb. 14, 2014) ("*Doshi I*").

b.   *City of Livonia Employee' Retirement System v. General Cable Corp. et al.*, 13-cv-8634 (S.D.N.Y. Dec. 4, 2013).

c.   *In re General Cable Securities Litigation*, Master File No. 2:14-cv-00022-WOB-CJS (E.D. Ky. May 20, 2014).

2.   Certain Derivative Cases:

a.   *McPherson v. Kenny, et al.*, Case No. 14-CI-11, Circuit Court of Kentucky, Campbell County, Division No. I.

b.   *Kelly v. Kenny, et al.*, Case No. 14-CI-60, Circuit Court of Kentucky, Campbell County, Division No. I.

3.   Subpoenas that the SEC issued in *In the Matter of General Cable Corp.* (No. HO-11998), from October 17, 2013 through May 16, 2016, and variously directed to General Cable or one of its reported directors and/or officers Sandoval, Cidre, Miranda, David Zapata, and Douglas Guerra concerning the Brazilian accounting and inventory issues.

4.   The SEC Civil Case entitled *United States Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera, et al.*, Case No. 1:17-cv-20301-JAL (S.D. Fla.).

5.   Certain Document Requests, Wells Notices and Indemnification Demands relating to the Brazilian accounting and inventory issues.

6.   Certain Notices of Circumstances relating to the Brazilian accounting and inventory issues.

Of these matters stated above, only the SEC Civil Case is still pending. Old Republic has handled the Brazilian Accounting Matters as its File No. 11D8897 made under the 2011-12 Excess Policy.

C.   *Old Republic's File No. 12D9502 (Under the 2012-16 Excess Policy)*

Beginning in 2014, Old Republic received a series of notices and/or documentation from General Cable and/or Travelers that concern a series of matters involving alleged violations of the Foreign Corrupt Practices Act ("the FCPA"). The FCPA generally prohibits bribery of public officials, improper commission payments, and other illegal business conduct outside of the United States. The alleged violations of the FCPA concern the operations of General Cable and its subsidiaries in countries that include Angola, Thailand, Bangladesh, Indonesia, China, and Egypt ("the FCPA Matters").

The FCPA Matters include the following:

1.   A June 13, 2014 Notice of Circumstances disclosing General Cable's internal investigation into commission payments that its Angolan subsidiary made.

3

2.  Subpoenas that the SEC issued in *In the Matter of General Cable Corp.* (No. HO-11998), from August 8, 2014 through January 6, 2016, and variously directed to General Cable or one of its reported directors and/or officers Craig Omtvedt, Glen Gustafson, John Winstel, Brian Robinson, Gregory Kenny, and Karl Zimmer concerning the FCPA/bribery issues.

3.  Shareholder Demand Letters seeking the production of books and records pursuant to Section 220, Delaware General Corporation Law ("Section 220"), issued by or on behalf of:

    a.  Michael Hodkin (January 9, 2015).

    b.  Michael Quackenbush (October 27, 2015).

4.  The Section 220 Complaint captioned *Quackenbush v. General Cable Corp., et al.*, C.A. No. 2017-0219 (Del. Ch.).

5.  The Securities Class Action Case captioned *Doshi v. General Cable Corp., et al.*, Case No. 1:17-cv-00092 (S.D.N.Y.). ("*Doshi II*").

Old Republic has handled the FCPA Matters as its File No. 12D9502 made under the 2012-16 Excess Policy.

### D.    *Travelers' Reservations of Rights and Coverage Positions*

Travelers issued to General Cable a series of reservation of rights letters and coverage letters on the Brazilian Accounting Matters and the FCPA Matters.

With respect to the Brazilian Accounting Matters, Travelers agreed to pay defense costs under the terms of the 2011-12 Primary Policy subject to certain reservations of rights under the terms of that policy.  Furthermore, Travelers determined that the Brazilian Accounting Matters arose out of the same Wrongful Act or Related Wrongful Acts such that they should be treated as a single Claim for coverage purposes.

With respect to the FCPA Matters, on June 13, 2014, General Cable provided Travelers with notice of an internal investigation into potential FCPA violations.  On August 8, 2014, General Cable received a subpoena from the SEC relating to potential FCPA violations in Angola and elsewhere ("the Angola Subpoena").  General Cable provided the Angola Subpoena to Travelers on August 13, 2014.

On January 30, 2015, Travelers' coverage counsel wrote to General Cable's coverage counsel on coverage issues.  Travelers acknowledged that "[p]reliminarily, it does not appear that the Angola Subpoena is factually related to the inventory/accounting discrepancies at General Cable's Brazil operations."  Travelers also noted that "the SEC is reviewing the Angola matter as part of the SEC Investigation, and demanding documents and testimony on the Company's Angola operations[,] pursuant to the same Formal Order that also granted the SEC the authority to

subpoena documents concerning the Brazilian matter." Ultimately, Travelers stated its willingness "to consider accepting the June 13 Letter and the Angola Subpoena as a Notice of Circumstances under the [2012-16 Primary] Policy if General Cable provides, in writing, the names of actual or potential Insured Persons involved."

Travelers later refined its coverage position on the FCPA Matters. On September 29, 2016, Travelers' coverage counsel wrote General Cable's coverage counsel concerning the tender of the subpoena that the SEC, on January 7, 2016, issued to Karl Zimmer ("Zimmer") in the SEC Investigation. Zimmer is a former officer of General Cable. The SEC sought his testimony for the SEC's investigation into potential FCPA violations. In that letter, Travelers took the position that the subpoena related back to the Brazilian Accounting Matters under the 2011-12 policy period, and General Cable's October 9, 2012 Notice of a Potential Claim, because the Zimmer Subpoena was issued pursuant to the same formal investigative order, dated July 22, 2013, that commenced the SEC Investigation into the Brazilian accounting issues. Travelers stated that "the SEC Matter remains a single investigation." This was the first time that Travelers advised in writing that it would be handling one of the FCPA Matters under the 2011-12 Primary Policy rather than the 2012-16 Primary Policy.

On June 7, 2017, Travelers' coverage counsel wrote to General Cable's coverage counsel concerning the tender of the *Doshi II* Case, the *Quackenbush* case, and additional SEC Subpoenas. Travelers noted that all of the matters involved alleged FCPA violations. Travelers advised General Cable that Travelers would handle these additional FCPA Matters under the 2011-12 Primary Policy. Travelers explained its coverage position as follows:

> Although the formal order in the SEC Investigation originally was issued in response to these potential accounting discrepancies, at some point, the SEC expanded its investigation to include potential FCPA violations. Importantly, the SEC Investigation remained a single investigation, with all subpoenas issued pursuant to the same formal order, which authorized SEC personnel to "administer oaths and affirmations, subpoena witnesses, take evidence, and require the production of any books, papers, or other documents deemed relevant or material to the inquiry." Further, the Doshi II Complaint and Quackenbush Complaint include allegations related to and based upon the SEC Investigation and potential FCPA violations. As a result, Travelers will deem the SEC Subpoenas—as it treated other subpoenas issued pursuant to the formal order—as relating back to the October 9, 2012 Notice of a Potential Claim and the 2011-2012 Policy. Further, Travelers will also deem the Doshi II Complaint and Quackenbush Complaint as relating back to the 2011-2012 Policy.

Travelers also communicated with General Cable concerning General Cable's refusal to indemnify Sandoval and Cidre. In an April 16, 2014 letter from Travelers' coverage counsel to General Cable's coverage counsel, Travelers disagreed with General Cable's position that General Cable was not legally permitted to indemnify Sandoval or Cidre. Travelers noted that General Cable had indemnified other directors and officers who were named in the Derivative Cases.

*E.      General Cable's Coverage Position*

On November 1, 2017, General Cable's coverage counsel wrote to Travelers' coverage counsel. In that letter, General Cable disagreed with Travelers' coverage position on the policy year placement for the FCPA Matters, and stated that the FCPA Matters should be handled under Travelers 2012-16 Primary Policy.

To date, Travelers has not responded to that letter.

*F.      Exhaustion of Travelers Primary Policy Limits*

In a March 1, 2018 email, Travelers' coverage counsel advised Old Republic's counsel that "Travelers has now processed its final payments under the '11/'12 primary D&O policy issued to General Cable.... With these payments, the Travelers policy is now exhausted."

In a March 6, 2018 email, Travelers' coverage counsel responded to an inquiry from Old Republic's counsel concerning the amount of the payments under Travelers 2011-12 Primary Policy that were related to the FCPA Matters. The response confirmed that Travelers did make payments under Travelers 2011-12 Primary Policy for the FCPA Matters. Travelers stated, "In total, these 'FCPA' related payments equal $434,402.47."

Based on a preliminary review of the invoices that Travelers paid, Old Republic believes that the amount of payments made under the Travelers 2011-12 Primary Policy related to the FCPA Matters may be substantially higher than $434,402.47. Old Republic's analysis of this issue is continuing.

*G.      Old Republic's Reservation of Rights and Coverage Positions*

This letter will serve to advise that Old Republic will provide insurance coverage to General Cable and the Insured Persons for the Brazilian Accounting Matters pursuant to a full reservation of all rights under the 2011-12 Excess Policy and the law, and subject to the policy terms and applicable limit of insurance – as explained more fully below.

**1.     Fraud**

Section IV.B.1 of the Travelers 2011-12 Primary Policy, as amended by Endorsement PCDO-10201 ("the General Cable Endorsement") (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), contains the following Fraud exclusion:

1.      FRAUD

The Company will not be liable for any Loss for any Claim for any deliberately fraudulent act of omission, or any willful violation of any law or regulation, if a

final non-appealable adjudication adverse to the Insured in any proceeding other than a proceeding initiated by the Company establishes that:

a.     such Insured Person, with respect to Insuring Agreements A or E, and section *II. ADDITIONAL BENEFITS*; or

b.     any Executive Officer or the Insured Organization, with respect to Insuring Agreement C, committed such an act, omission, or willful violation.

Old Republic reserves its rights to the extent that a final non-appealable adjudication establishes a deliberately fraudulent act of omission, or a willful violation of any law or regulation, with respect to the Brazilian Accounting Matters.

## 2.     Personal Profit

Section IV.B.2 of the Travelers 2011-12 Primary Policy, as amended by the General Cable Endorsement (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), contains the following Personal Profit exclusion:

2.     PERSONAL PROFIT

The Company will not be liable for any Loss for any Claim based on or arising out of an Insured gaining any profit, remuneration, or financial advantage to which Insured was not legally entitled, if a final non-appealable adjudication adverse to the Insured in any proceeding other than a proceeding initiated by the Company establishes that such Insured was not legally entitled to such profit, remuneration, or financial advantage; provided, this exclusion will not apply to any Securities Claim for violation of section 11, section 12, or section 15 of the Securities Act of 1933, as amended.

Old Republic reserves its rights to the extent that a final non-appealable adjudication establishes a profit, remuneration, or financial advantage to which an Insured was not legally entitled with respect to the Brazilian Accounting Matters.

## 3.     The Application

Section V.N. of the Travelers 2011-12 Primary Policy (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), contains the following provision, in pertinent part, concerning Old Republic's reliance on statements and representations made in the Application:

[T]he Insureds agree that in the event any such statements or representations made in the Application are untrue or inaccurate and materially affect either the acceptance of the risk or the hazard assumed by the Company, then no coverage will be afforded under this Policy with respect to the following Insured for any Claim based upon or arising out of the information that was not truthfully or accurately disclosed in the Application (whether or

7

not the Insured or Executive Officer knew of such untruthful or inaccurate disclosure in the Application) with respect to any of the following Insured:

>   1.   any Insured Person, under Insuring Agreements A or E, who knew the information that was not truthfully or accurately disclosed in the Application;
>
>   2.   the Insured Organization, under Insuring Agreement B, to the extent that it indemnifies any Insured Person referenced in N.1 above; ....

Section III.A. of the Travelers 2011-12 Primary Policy, as amended by the General Cable Endorsement Policy (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), defines "Application" to mean:

>   1.   all signed applications for this Policy, or for any policy that this Policy renews or replaces, including any materials submitted with or requested in such applications; and
>
>   2.   all public documents filed by the Insured Organization with the Securities and Exchange Commission (SEC), or any similar federal, state, local, or foreign regulatory body, during the 12 months preceding the Policy Period.

Old Republic reserves its rights under Section V.N. and the definition of "Application" with respect to untrue or inaccurate statements or representations in the Application.

**4.     Indemnification**

General Cable refused to provide indemnification or advance costs to Sandoval and Cidre, who are defending SEC claims against them.  However, General Cable agreed to provide indemnification and advance costs for other directors and/or officers who were named in the Derivative Cases.  Old Republic reserves its rights under the terms of the 2011-12 Excess Policy and the applicable law with respect to General Cable's refusal to indemnify and advance costs for Sandoval and Cidre.

**5.     Policy Year Placement**

Section V.A. of the Travelers 2011-12 Primary Policy, as amended by the General Cable Endorsement (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), contains the following provision concerning Limits of Liability:

>   All Claims arising out of the same Wrongful Act and all Related Wrongful Acts are deemed one Claim ....

Section III.EE. of the Travelers 2011-12 Primary Policy (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), defines "Wrongful Act" as follows:

>   EE.     Wrongful Act means any actual or alleged:

8

1.      error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted:

       a.      by any Insured Person in their capacity as such, or in an Outside Position; or

       b.      with respect to Insuring Agreement C, by the Insured Organization; or

2.      matter claimed against the Insured Person solely because of their serving in such capacity or in an Outside Position.

Section III.Y. of the Travelers 2011-12 Primary Policy (which is incorporated into the 2011-12 Excess Policy pursuant to Section I), defines "Related Wrongful Acts" as follows:

Y.      Related Wrongful Acts means all Wrongful Acts that have as a common nexus, or are casually connected by reason of, any fact, circumstance, situation, event, or decision.

The Wrongful Acts involved in the Brazilian Accounting Matters concern the alleged past inventory valuations and related accounting discrepancies at General Cable's Brazilian subsidiary. The Wrongful Acts involved in the FCPA Matters concern alleged violations of the FCPA in other countries. Old Republic has not seen any allegations of a "common nexus" of "fact, circumstance, situation, event, or decision" between the inventory valuations and accounting discrepancies that allegedly took place in Brazil, on the one hand, and the bribes and/or improper commission payments allegedly made in Angola, Thailand, Bangladesh, Indonesia, China, and Egypt, on the other hand. Nor has Old Republic seen any allegations that the inventory and accounting issues in Brazil led to the bribes and commission payments in the other countries, or the other way around, sufficient to establish any casual connection between these two sets of events.

For this reason, under Section III.Y., the Brazilian Accounting Matters and the FCPA Matters do not involve Related Wrongful Acts. Accordingly, Section V.A. provides that the series of claims for the Brazilian Accounting Matters, and the series of claims for the FCPA Matters, cannot be deemed as one unified Claim.

Furthermore, Old Republic disagrees with Travelers' position that the FCPA Matters relate back to the General Cable's October 9, 2012 Notice of a Potential Claim. This notice expressly advised Travelers (and Old Republic) of potential claims that could arise out the Brazilian accounting issues. This notice was not, as Travelers suggested, a notice of potential claims that could arise out of the SEC Investigation, whatever its factual focus or duration. This notice does not even reference the SEC Investigation.

In addition, Old Republic notes the following:

- The first notice of the FCPA Matters was a June 13, 2014 Notice of Circumstances disclosing General Cable's internal investigation into commission payments that its Angolan subsidiary allegedly made.

- The SEC deemed the Brazilian accounting issues and the FCPA/bribery issues as sufficiently separate in law and fact to merit separate Cease-and-Desist Orders. Cease-and-Desist Order 3-17754, issued on December 29, 2016, concerned the alleged inventory accounting issues in Brazil. Cease-and-Desist Order 3-17755, also issued on December 29, 2016, concerned alleged FCPA violations in Angola, Thailand, China, Indonesia, Bangladesh, and Egypt.

- There is no reason to believe that the SEC chose to issue subpoenas concerning alleged FCPA violations under the July 22, 2013 formal order for any reason other than the SEC's administrative convenience and its own internal operating procedures. Nor is there any reason to believe that the SEC had any knowledge or suspicion of potential FCPA violations prior to 2014.

- In December 2014, Travelers and General Cable entered into a Settlement Agreement concerning certain coverage disputes arising out of the Brazilian Accounting Matters. In the Settlement Agreement, Travelers and General Cable acknowledged that the FCPA Investigation was not a Claim under the 2011-12 Travelers Primary Policy (which policy was at issue in the Settlement Agreement), or under any other insurance policy.

- The *Doshi II*, *Quackenbush*, and *Hodkin* matters do not involve any allegations relating to the Brazilian Accounting Matters.

All of these points provide further support for deeming the series of claims relating to the FCPA Matters as one Claim arising in the 2012-16 Policy Period.

### 6. Exhaustion of Primary Policy

Section II.A. of the 2011-12 Excess Policy, as amended by Endorsement No. 3, provides, in part, that Old Republic's "Liability for any covered Loss on account of Claims first made in the Policy Period shall attach to" Old Republic only after Travelers makes payments for "covered Loss equal to the full amount of the Underlying Limit" for Travelers 2011-12 Primary Policy.

Travelers confirmed that, because of its coverage position on policy year placement, it paid costs for both the Brazilian Accounting Matters and the FCPA Matters under the 2011-12 Primary Policy. Travelers stated that its payment of the $15 million primary layer applicable to the 2011-12 policy period included payments of $434,402.47 in costs related to the FCPA Matters. Old Republic believes that this figure may be significantly higher.

Regardless of the exact figure, Travelers' payments of costs associated with the FCPA Matters under the 2011-12 Primary Policy means that Travelers did not, under the terms of Section II.A., make payments for "covered Loss equal to the full amount of the Underlying Limit" for Travelers 2011-12 Primary Policy. Because of the lack of proper exhaustion of the Underlying

Limit of Traveler's primary coverage, Old Republic – at this time – has no "Liability for any covered Loss on account of Claims first made" in the 2011-12 Policy Period. Old Republic expressly rejects as improper Travelers' March 1, 2018 notice of exhaustion.

Nevertheless, Old Republic recognizes that Travelers' coverage position on policy year placement puts Sandoval and Cidre, two of the Insured Persons, in a difficult position. The currently outstanding costs of the Brazilian Accounting Matters are invoices of Sandoval and Cidre's respective counsel that contain approximately $2 million in charges. Old Republic also recognizes that General Cable refused to indemnify Sandoval and Cidre. In the event that Old Republic refused to pay some or all of these charges due to the lack of exhaustion of the primary coverage, Sandoval and Cidre might end up having to make payments to their counsel themselves.

Accordingly, Old Republic will pay the outstanding costs for the Brazilian Accounting Matters, and the future costs for the Brazilian Accounting Matters, subject to (a) its review of those costs for propriety and compliance with Old Republic's billing requirements, and (b) a full reservation of all of its rights as against Travelers, General Cable, and the Insured Persons with respect to the non-exhaustion of the primary layer of insurance. These reserved rights include, but are not limited to, Old Republic's right of Subrogation under Section V.Q. of the Travelers 2011-12 Primary Policy (which is incorporated into the 2011-12 Excess Policy pursuant to Section I).

### 7.    The FCPA Matters

In keeping with the coverage positions set forth above, and in accordance with Section II.A. of the 2011-12 Excess Policy, as amended by Endorsement No. 3, Old Republic will not respond to any requests for payment of costs associated with the FCPA Matters unless and until the limits of General Cable's retention and Travelers' primary coverage are properly exhausted for the 2012-16 policy period.

Furthermore, at this time, it would be premature for Old Republic to provide a more detailed reservation of its rights under the 2012-16 Excess Policy with respect to the FCPA Matters.

### 8.    Other Issues

Old Republic respectfully asks General Cable and the Insured Persons to keep us closely advised of all information and developments concerning the Brazilian Accounting Matters, as well as the FCPA Matters, in keeping with the reporting requirements of Old Republic's policies.

As noted above, this reservation of rights and coverage position is based upon information presently known and available to Old Republic. There may be other coverage defenses, not yet apparent, which may come to light as these matters proceed and as we receive additional information. Old Republic does not intend to waive any of its coverage defenses, nor shall it be estopped from asserting any applicable coverage defense in the future. This letter does not and is not intended to reference all potentially applicable policy provisions or all applicable law, and Old Republic reserves the right to identify additional policy provisions and law in the future. No action taken by Old Republic shall constitute either an admission of liability or coverage under any

11

applicable policy, or an acknowledgment to pay damages in any judgment or settlement or any defense costs. This letter, and the reservation of rights it contains, do not modify the terms of Old Republic's policies.

Accordingly, Old Republic reserves all of its rights under the terms, conditions, definitions, exclusions, limitations of liability and any other provision contained in the pertinent policies. Old Republic will consider any additional information that you submit, including statute or case law that might apply, respecting this coverage analysis and will respond to any questions you may have. Please let me know if you have, or receive in the future, any such additional information that you would like Old Republic to consider. In addition, please let me know if you believe that any of the facts or policy provisions recited in this letter are incorrect, so that we can discuss those statements and either clarify or correct them.

Thank you in advance for your careful review and consideration of the matters discussed in this letter.

Very truly yours,

Jay R. Hoffman

c:      Michael W. Early  (*mearly@oldrepublicpro.com*)
            (For Old Republic Professional Liability, Inc.)
        Edward C. Carleton  (*ecarleton@skarzynski.com*)
            (For Scottsdale Indemnity Co.)
        Kerri Duffell  (*kduffell@peabodyarnold.com*)
            (For Beazley Syndicates 2623 & 623 at Lloyd's)
        Tracy S. Tkac  (*ttkac@chubb.com*)
            (For Federal Insurance Co.)
        Claims Representative  (*inquiryusa@hiscox.com*)
            (For Hiscox Insurance Co.)
        Thomas Lookstein  (*thomas.lookstein@starrcompanies.com*)
            (For Starr Indemnity & Liability Co.)
        Jennifer Dowd  (*jennifer.a.dowd@marsh.com*)
        Mary Anne Mullin  (*mary-anne.mullin@marsh.com*)
            (For Marsh – FINPRO)

12



90000 SERIES
30% P.C.W.

Exhibit T

EFiled: May 10 2024 02:05PM EDT
Transaction ID 73022255
Case No. N24C-05-105 VLM

**EXHIBIT T**

**General Cable**

Campisi, Lisa M. <lisa.campisi@blankrome.com>
Tue 1/18/2022 10:01 AM
To:ecarleton@skarzynski.com <ecarleton@skarzynski.com>
Ted:

I hope that this finds you well and having had a great holiday season.  As you know from prior correspondence, General Cable has requested that your client participate in a mediation along with Travelers and Old Republic with respect to General Cable's losses on account of the FCPA matters.  As you also know form that correspondence, General Cable has incurred substantial  losses for the FCPA Matters in excess of the policy limits provided by the Travelers and Old Republic policies underlying the your client's policy, such that regardless of whether the proper period of liability attributable to the FCPA matters is November 1, 2011 through November 1, 2012, or if it is November 1, 2012 to November 1, 2016, your client's coverage is implicated.  Accordingly, General Cable reiterates its demand that Nationwide accept coverage for General Cable's losses, including the FCPA losses.  To the extent Nationwide does not do so, General Cable reserves all rights to pursue any and all remedies against Nationwide.  We therefore trust and hope that upon the rescheduling of the mediation, which we anticipate will occur in the first quarter of this year, Nationwide will see fit to participate.

Best regards,

Lisa

**Lisa M. Campisi | Partner | BLANKROME**
1271 Avenue of the Americas
New York, New York 10020-1300
Phone: +1212.885.5378 (o)| +1646.584.3732 (c)
Fax: +1212.658.9926
Email: lisa.campisi@blankrome.com

PLACE STICKER AT TOP OF ENVELOPE TO RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL** ®

9589 0710 5270 0597 8678 1



US POSTAGE PITNEY

ZIP 19901
02 4W
0000357202 JUN 10

$ 010.

Delaware Insurance Department
1351 W. North St., Suite 101
Dover, DE  19904

SCOTTSDALE INDEMNITY COMPANY
(SUPRLUS LINES CO)
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808